Edward Halealoha Ayau, Esq.
(HI 5013)
LAW OFFICE OF EDWARD
HALEALOHA AYAU
2 Nanea Street
Hilo, HI 96720
(808) 646-9015
halealohahapai64@gmail.com

Natali Segovia, Esq., (AZ 033589)*
WATER PROTECTOR LEGAL COLLECTIVE
P.O. Box 37065
Albuquerque, NM 87176
(602) 796-7034
nsegovia@waterprotectorlegal.org
* *Pro Hac Vice* Admission Pending

INTERNATIONAL ASSOCIATION OF
DEMOCRATIC LAWYERS
1 Whitehall Street, 16th floor
New York, New York 10031
(212) 231-2235

*Counsel for Non-Party Intervenor Council
of Regency of the Hawaiian Kingdom*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS; I.P., by and through her next friend and mother, B.P.; and B.P., *Plaintiffs,* <br><br> v. <br><br> TRUSTEES OF THE ESTATE OF BERNICE PAUAHI BISHOP d/b/a KAMEHAMEHA SCHOOLS, *Defendant.* | Case No. 1:25-cv-450-MWJS-RT <br><br> **MEMORANDUM OF LAW IN SUPPORT OF HAWAIIAN KINGDOM'S MOTION TO INTERVENE** |

**INTRODUCTION**

1.      The Council of Regency of the Hawaiian Kingdom (hereinafter, "Hawaiian Kingdom") respectfully submits this Memorandum of Law in support of its Motion to Intervene in the above-captioned matter. The Hawaiian Kingdom moves pursuant to Federal Rule of Civil Procedure 24 to intervene as a non-party intervenor as of right, or alternatively, by permission, for the limited purpose of preserving its interests and that of all Hawaiians, including future generations, which are not and cannot be adequately represented by any of the parties in this litigation.

2.      Beyond this Court, there is no adequate protection for the rights of Hawaiian subjects, as the Trustees of Kamehameha Schools can only represent the interests of the entity, and not for aboriginal Hawaiians nor the specific interests of the Hawaiian Kingdom to protect future generations of aboriginal Hawaiians, as originally intended by Aliʻi Bernice Pauahi Bishop in her will prior to the overthrow of the government of the Hawaiian Kingdom.

3.      The Motion to Intervene in this matter is timely. An amended complaint was filed on December 1, 2025. No answer has yet been filed.

4.      ʻŌlelo noʻeau (Hawaiian proverbs) say: "I ka wā ma mua, ka wā mahope" - the future is shaped by the past. This case deals with both the past and the future.

5.     Accordingly, the Hawaiian Kingdom moves to intervene to protect the Kamehameha Schools, an entity created under the nineteenth century laws of the Hawaiian Kingdom – laws that continue to apply today under the law of occupation, as well as future generations of aboriginal Hawaiians who were the intended beneficiaries of Aliʻi Pauahi's trust.

6.     This Court can only gain from granting limited purpose intervention as only the Hawaiian Kingdom as a non-party intervenor can provide accurate international legal context. The Hawaiian Kingdom does not ask this Court to adjudicate sovereignty, but rather to apply settled international law governing occupied territory for purposes of threshold jurisdiction and applicable law.

## FACTUAL BACKGROUND

7.     On October 20, 2025, plaintiffs Students for Fair Admissions ("SFFA") filed a complaint against defendant Trustees of the Estate of Bernice Pauahi Bishop d/b/a Kamehameha Schools for an allegedly race-based admissions policy giving preference for native Hawaiians.

8.     SFFA alleges that Kamehameha's admission policy is illegal under 42 U.S.C. §1981. SFFA claims that the United States District Court for the District of Hawaiʻi has subject-matter jurisdiction under 28 U.S.C. §1331, which provides the "district

courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." §1981 is a federal law.

9.      On December 1, 2025, SFFA filed an amended complaint.

10.     SFFA's amended complaint states an incorrect conclusion of law: "Once Hawaii became a territory over a century ago, Kamehameha became subject to §1981." SFFA assumes Hawaiʻi was legitimately a U.S. territory and reveals the lack of historical knowledge that informs its misguided lawsuit. *See* Am. Compl. ¶ 122.

11.     SFFA's claims are entirely premised on this incorrect conclusion of law. All claims that flow from this mistaken conclusion of law and historical misstatement are flawed.

12.      At the time Pauahi's trust was created until the overthrow in 1893, the Hawaiian Kingdom had over a hundred legations and consulates around the world.

13.     Despite the unlawful overthrow of the government of the Hawaiian Kingdom in 1893, Hawaiian State sovereignty and independence under international law was never ceded to the United States by a treaty of cession.

14.     The government of the Hawaiian Kingdom was restored by a Council of Regency by proclamation in 1997.  *See* Dr. David Keanu Sai, The Royal

Commission of Inquiry p. 19, 48 (attached as Exhibit C) (hereinafter "The Royal Commission of Inquiry").

15.    Since 1893, Hawai'i was and continues to be, an occupied State under international law. *See* Matthew Craven, *The Continuity of the Hawaiian Kingdom as a State Under International Law,* Ch. 3, at 125–149 (in David Keanu Sai ed., (2020)) (attached as Exhibit B) (hereinafter "Craven Opinion"); *see infra* Section IV(A).

## **ARGUMENT**

16.    The Hawaiian Kingdom may intervene as of right under Rule 24(a). In the alternative, the Hawaiian Kingdom satisfies the requirements for permissive intervention under Rule 24(b).

## **I.    The Hawaiian Kingdom May Intervene as Matter of Right**

17.    Rule 24(a)(2) grants a party the right to intervene if (1) its motion is "timely," (2) it "ha[s] a significantly protectable interest relating to the property or transaction that is the subject of the action;" (3) it is "situated such that the disposition of the action may impair or impede the party's ability to protect that interest;" (4) it is "not […] adequately represented by existing parties." *Arakaki v. Cayetano*, 324 F.3d 1078, 1083 (9th Cir. 2003) (citing Fed. R. Civ. P. 24(a)(2)).

### A. The Motion to Intervene is Timely and Does Not Cause Undue Delay or Prejudice

18.    By any standard, the Hawaiian Kingdom's motion is timely. *Cf. Day v. Apoliona*, 505 F.3d 963, 965 (9th Cir. 2007) (deeming motion to intervene was timely when made two years after the case was filed); *Smith v. Los Angeles Unified Sch. Dist.*, 830 F.3d 843, 854 (9th Cir. 2016) (deeming motion to intervene timely when made twenty years after the case was filed).

19.    The Hawaiian Kingdom's intervention does not prejudice or unduly create delay to any party and intervened "at th[e] particular stage of the lawsuit" in which its interests were implicated because neither party is a governmental entity nor can represent its interests. *United States v. Alisal Water Corp.*, 370 F.3d 915, 921 (9th Cir. 2004).

### B. The Hawaiian Kingdom Has a Significant Protectable Interest in the Subject Matter of this Case

20.    The Ninth Circuit, in *S. California Edison Co. v. Lynch*, 307 F.3d 794, 803 (9th Cir. 2002) (quoting *Donnely v. Glickman*, 159 F.3d 405, 410 (9th Cir. 1998)), explained that an applicant for intervention has adequate interests in a lawsuit where "the resolution of the plaintiff['s] claims actually will affect the applicant (emphasis added)." Courts must make a "practical, threshold inquiry," designed to "involve[e]

as many apparently concerned persons" in a lawsuit "as is compatible with efficiency and due process." *Id.*

21.    The Hawaiian Kingdom has a vital legal interest in the outcome of this case. As a State under international law, the Hawaiian Kingdom has a duty to protect its territorial integrity. *See e.g. The Royal Commission of Inquiry; see also* David J. Bederman and Kurt R. Hilbert, *"Arbitration—UNCITRAL Rules—Justiciability and Indispensable Third Parties—Legal Status of Hawaii,"* 95 Am. J. Int'l L. 927, 928 (2001) (discussing the *Larsen v. Hawaiian Kingdom* case at the Permanent Court of Arbitration wherein the PCA agreed that the Hawaiian Kingdom continues to exist "and that the Council of Regency (representing the Hawaiian Kingdom) is legally responsible under international law for the protection of Hawaiian subjects, including the claimant.").

22.    The continuity of the Hawaiian Kingdom despite overthrow, subsequent attempt at "annexation" and continuing occupation by the United States, has been chronicled extensively by experts in international law and diplomacy since the overthrow of the monarchy itself. *See* U.S. House of Representatives, 53rd Congress, Executive Documents on Affairs in Hawaiʻi: 1894–95 (1895); *The Royal Commission of Inquiry, supra*; *see* Craven Opinion; *see also* Professor Federico Lenzerini, on   the authority of the Council of Regency as temporal interim

government, attached hereto as Exhibit D (hereinafter "Lenzerini Opinion"); *see also* Dr. David Keanu Sai, "Hawaiʻi's Sovereignty and Survival in the Age of Empire," in H.E. Chehabi and David Motadel (eds.) Unconquered States: Non-European Powers in the Imperial Age (2024), attached hereto as Exhibit F.

23.    The Hawaiian Kingdom also has a duty to protect the public interest and ensure due process and fair trial rights are respected. If the lawsuit is allowed to proceed without adequate application and consideration of Hawaiian Kingdom laws and administrative measures allowed under international humanitarian law and the law of occupation, this could result in an unfair trial, which international legal experts agree could amount to usurpation of sovereignty under the law of occupation. *See* Professor William Schabas, "War Crimes Related to the United States Belligerent Occupation of the Hawaiian Kingdom," international law scholar on fair trial and usurpation of sovereignty, attached hereto as Exhibit E (hereinafter "Schabas Opinion").

24.    The U.S. Supreme Court has recognized that the writings of legal scholars are a source of customary international law: "the works of jurists and commentators, who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects they treat. Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to

be, but for trustworthy evidence of what the law really is." *Paquete Habana*, 175 U.S. 677, 700 (1900).

25.    Finally, the Hawaiian Kingdom has a duty to protect the Kamehameha Schools, being a private trust established under and by virtue of Hawaiian Kingdom laws, as well as future generations of aboriginal Hawaiians who were the intended beneficiaries of Aliʻi Pauahi's trust. The admission policy of Kamehameha Schools favoring aboriginal Hawaiians is consistent with controlling Hawaiian Kingdom laws regarding affirmative action in *Rex v. Booth*, 2 Haw. 616 (1863). *See* Exhibit A, Motion to Dismiss (addressing the particulars of nineteenth century Hawaiian Kingdom law regarding Kamehameha Schools admission policies in the context of applicable civil rights and national welfare laws).

### C. The Disposition of this Matter Would Impair the Hawaiian Kingdom's Ability to Protect its Interest

26.    The third requirement of intervention under Rule 24(a)(2) is satisfied  when the lawsuit "may as a practical matter impair or impede [an applicant's] ability to safeguard [its] protectable interest." *Smith v. Los Angeles Unified Sch. Dist.*, 830 F.3d 843, 862 (9th Cir. 2016).

27.    Here, the Hawaiian Kingdom meets the third requirement for intervention as it "can demonstrate that representation of its interests 'may be' inadequate." *Citizens*

*for Balanced Use v. Montana Wilderness Ass'n,* 647 F.3d 893, 898 (9th Cir. 2011);

*see Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n. 10 (1972).

28.    Three factors are relevant in conducting this inquiry: "(1) whether the interest

of a present party is such that it will undoubtedly make all of a proposed intervenor's

arguments; (2) whether the present party is capable and willing to make such

arguments; and (3) whether a proposed intervenor would offer any necessary

elements to the proceeding that other parties would neglect." *Citizens for Balanced*

*Use*, 647 F.3d at 898 (emphasis added).

29.    As a practical matter, neither the SFFA nor the Kamehameha Schools can

protect the interests of the Hawaiian Kingdom as a government, nor of its people at

large, which is a function inherent to the sovereignty of a governing body of a

country called a State under international law. *See* Lenzerini Opinion at ¶ 11; *see*

*also* The Royal Commission of Inquiry at ¶¶ 57, 90-97.

30.    Although Kamehameha Schools was established by Pauahi's will in trust for

the benefit of aboriginal Hawaiians, this case strikes at the core of its viability as an

entity, thus the arguments made by Kamehameha Schools pertain only to the school.

They do not and cannot articulate the duty to protect future generations of aboriginal

Hawaiians who will be harmed if this case proceeds and either is not aware of or

otherwise disregards applicable Hawaiian Kingdom law and customary international law.

## II.    Alternatively, the Hawaiian Kingdom Meets the Requirements for Permissive Intervention

31.    Alternatively, the Hawaiian Kingdom should be permitted to intervene pursuant to Rule 24(b).

32.    Rule 24(b)(1)(B) provides that "[o]n timely motion, the court may permit anyone to intervene who … has a claim or defense that shares with the main action a common question of law or fact." Permissive intervention is construed liberally, and doubts are resolved in favor of intervention. *Beckman Indus., Inc. v. Int'l Ins. Co.,* 966 F.2d 470, 473 (9th Cir. 1992).

33.    There is no standing requirement for permissive intervention under Rule 24(b). *Perry v. Proposition 8 Official Proponents,* 587 F.3d 947, 955 (9th Cir. 2009); *see also Diamond v. Charles*, 476 U.S. 54, 68–69 (1986). Where, as here, an intervenor seeks limited participation to protect sovereign, institutional, and public interests rather than to assert independent damages claim, no separate jurisdictional basis is required. *Beckman*, 966 F.2d at 473.

34.    The Hawaiian Kingdom seeks intervention for the limited purpose of ensuring that the Court is presented with accurate governing law, historical context, and applicable international legal obligations. Such limited-purpose intervention

strongly favors permissive intervention. *See Flynt v. Lombardi,* 782 F.3d 963, 967 (8th Cir. 2015).

35.    As set forth above, this motion is timely. No answer has been filed, no discovery has commenced, and no scheduling order has issued. Permissive intervention at this stage will not disrupt the proceedings and is routinely allowed. *See Smith v. L.A. Unified Sch. Dist.,* 830 F.3d 843, 854 (9th Cir. 2016).

36.    The Hawaiian Kingdom's interests share common questions of law and fact with the main action including but not limited to what the appropriate law governing the interpretation and administration of the Bernice Pauahi Bishop trust is, whether admissions preferences for aboriginal Hawaiians are lawful (and under what law they must be analyzed), and whether failure to apply the law of occupation results in the unlawful usurpation of sovereignty. These questions underlie the plaintiffs' claims. This satisfies Rule 24(b)'s "common question" requirement. *See Freedom from Religion Found, Inc. v. Geithner,* 644 F.3d 836, 843 (9th Cir. 2011).

37.    A court may deny a motion to intervene if it "will unduly delay the main action or will unfairly prejudice the existing parties." *Donnelly v. Glickman,* 159 F.3d 405, 412 (9th Cir. 1998).

38.    Allowing intervention here will streamline adjudication by ensuring that dispositive threshold issues including jurisdiction and applicable law, are properly addressed at the outset.

39.    Failure to allow intervention risks incomplete legal analysis and an erroneous application of the law. Courts favor permissive intervention where the intervenor contributes distinct legal perspectives not otherwise presented. *Citizens for Balanced Use*, 647 F.3d at 898.

### III.    The Hawaiian Kingdom Has a Duty to Protect

40.    There is a reciprocal relationship between every government and the public.

41.    This principle was expressly recognized in Hawaiian Kingdom constitutional and statutory law. Article 14 of the 1864 Constitution, as amended states: "Each member of society [both Hawaiian subjects and resident aliens have] a right to be protected by [the government], in the enjoyment of life, liberty, and property, according to law... [and] the laws are obligatory upon all persons, whether subjects of this kingdom, or citizens or subjects of any foreign State, while within the limits of this kingdom…" §6 of the Hawaiian Civil Code. *See also* Hawaiian Penal Code, section 2 (1869) (allegiance "is the obedience and fidelity due to the kingdom from those under its protection.)

42.    Customary international law affirms a State government's duty to protect. *See* G.A. Res. 60/1, ¶¶ 138–39, 2005 World Summit Outcome (Sept. 16, 2005) (Responsibility to Protect was unanimously adopted with three pillars 1) responsibility to protect from four mass atrocity crimes—genocide, war crimes, crimes against humanity and ethnic cleansing; 2) the wider international community

has the responsibility to encourage and assist individual States in meeting that responsibility; and 3) if a state is manifestly failing to protect its populations, the international community must be prepared to take appropriate collective action.).

43.    Consistent with the UN Charter, the nations have the right to determine their own political status and exercise permanent sovereignty within their territorial jurisdictions. *See* G.A. Res. 1803 (XVII), Permanent Sovereignty over Natural Resources (Dec. 14, 1962). *See also International Covenant on Civil and Political Rights,* Dec. 16, 1966, 999 U.N.T.S. 171.

44.    The Hawaiian Kingdom's intervention in this case is needed to protect its interests as an occupied State and the interests of its population against the usurpation of sovereignty through an unfair trial. *See* Schabas Opinion at 155-157; 164-165.

## IV.    The Laws of the Hawaiian Kingdom Control In this Matter

### A. *The Overthrow and Annexation of the Hawaiian Kingdom and Later Admission to the Union Was Not Lawful*

45.    "In the nineteenth century the Hawaiian Kingdom existed as an independent State recognized as such by the United States of America, the United Kingdom and various other States, including by exchanges of diplomatic or consular representatives and the conclusion of treaties." See *Larsen v. Hawaiian Kingdom*, 119 Int'l L. Reports, 566, 581 (2001). These treaties have never been terminated.

Undoubtedly, the Hawaiian Kingdom was a State at the time when the United States of America militarily occupied it on January 17, 1893.

46.    At the time of the American overthrow and occupation, the Hawaiian Kingdom fully satisfied the four elements of statehood prescribed by customary international law, later codified by the Montevideo Convention on the Rights and Duties of States in 1933: a) a permanent population; b) a defined territory; c) government; and d) capacity to enter into relations with the other states. *See Montevideo Convention on the Rights and Duties of States*, 1933, 165 LNTS 19, Article 1. This instrument codified the so-called declarative theory of statehood, already accepted by customary international law.

47.    The United States occupation began on January 17, 1893, when a small group of insurgents who favored annexation by the United States, supported by John Stevens, the U.S. Minister to Hawaiʻi, and a contingent of Marines from the warship U.S.S. Boston overthrew Queen Liliʻuokalani in a *coup de main* and proclaimed a provisional government. The Government of Hawaiʻi conditionally surrendered its authority under threat of war. *See* U.S. House of Representatives, 53rd Congress, Executive Documents on Affairs in Hawaiʻi: 1894-95, 62, 1295 (1895) ("Last January, a political crime was committed, not only against the legitimate Sovereign of the Hawaiian Kingdom, but also against the whole of the Hawaiian nation, a nation who, for the past sixty years, had enjoyed free and happy constitutional self-

government. This was done by a *coup de main* [a foreign invasion] of U.S. Minister Stevens, in collusion with a cabal of conspirators, mainly faithless sons of missionaries and local politicians angered by continuous political defeat, who, as revenge for being a hopeless minority in the country, resolved to 'rule or ruin' through foreign help. The facts of this 'revolution,' as it is improperly called, are now a matter of history.").

48.    Shortly into his presidency, Cleveland appointed Special Commissioner Blount to look into the events leading to Queen Lili'uokalani's yielding her authority temporarily "until such time as the Government of the United States shall, upon facts being presented to it, undo the actions of its representative… [and restore the Queen] as the constitutional sovereign of the Hawaiian Islands." *Id.* at 586.

49.    Special Commissioner Blount was a factfinder who provided periodic reports to Secretary of State Walter Gresham. Following his final report dated July 17, 1893, Secretary Gresham notified President Cleveland on October 18, 1893: "Should not the great wrong done to a feeble but independent State by an abuse of the authority of the United States be undone by restoring the legitimate government? Anything short of that will not, I respectfully submit, satisfy the demands of justice." *Id.* at 463.

50.    In October, President Cleveland initiated negotiations for an executive agreement with Queen Liliʻuokulani in order to establish mutually agreed upon conditions for her restoration. *Id.* at 464.

51.    The apology came from President Cleveland by a dispatch from Secretary Gresham to Minister Albert Willis dated October 18, 1893. He stated: "On your arrival at Honolulu you will take advantage of an early opportunity to inform the Queen of this determination, making known to her the President's sincere regret that the reprehensible conduct of the American minister and the unauthorized presence on land of a military force of the United States obliged her to surrender her sovereignty, for the time being, and rely on the justice of this Government to undo the flagrant wrong." *Id*. In the first meeting with the Queen, Willis conveyed this to her. *Id.* at 1242. On December 18, 1893, an executive agreement, by exchange of notes, had been made between the Queen and Minister Willis, on behalf of President Cleveland. *Id*. 1269.

52.    However, insurgent Sanford Dole, the self-appointed president of the Provisional Government of Hawaiʻi, refused to turn over power and unilaterally proclaimed Hawaiʻi a republic in 1894. *Id.* at 1276, 1350.

53.    President Cleveland concluded that the provisional government "was neither a government *de facto* nor *de jure,*" and "that the provisional government owes its existence to an armed invasion by the United States." *Id.* at 453-54. The provisional

government's change in name to the Republic of Hawai'i did not alter its status as

"'neither a government *de facto* nor *de jure*.'" *Id.*

54.    On June 16, 1897, with President William McKinley recently inaugurated,

McKinley and representatives of the self-proclaimed government of the Republic of

Hawai'i signed a treaty of annexation, later submitted for ratification to the U.S.

Senate. That treaty was defeated due to the organizing of fierce opposition from over

21,269 Hawaiian subjects and resident aliens opposed to annexation who gathered

signatures for anti-annexation in an effort broadly known today as the Kū'ē

Petitions. *See* Petition Against the Annexation of Hawai'i (1897), records of the U.S.

Senate, RG 46, National Archives.

55.    Nevertheless, when the Spanish-American war broke out, part of which was

fought in the Spanish colonies of Guam and the Philippines, the strategic value of

the Hawaiian Islands became palatable and pro-annexation forces in Congress

submitted a proposal to annex Hawai'i by joint resolution. *See generally* 31 Cong.

Rec. 5975–6635 (1898).

56.    On May 17, 1898, Congressman Robert Hitt reported the Newlands out of the

House Committee on Foreign Affairs and debate ensued until the resolution was

passed on June 15, 1898. *See* 31 Cong. Rec. 6019 (1898).

57.    Congressman Thomas Ball argued, "Advocates of the annexation of Texas

rested their case upon the express power conferred upon Congress in the Constitution

to admit new States. Opponents of the annexation of Texas contended that even that express power did not confer the right to admit State not carved from territory already belonging to the United States or some one of the States forming the Federal Union." *Id.* at 5975. He then characterized the effort to annex Hawai'i by a joint resolution after the defeat of the treaty as "a deliberate attempt to do unlawfully that which cannot be lawfully done." *Id.*

58.     From June 16 to July 6, 1898, the resolution of annexation was in the Senate Chambers. In the debate, Senator William Allen explained the limitation of American laws: the "Constitution and the statutes are territorial in their operation; that is, they can not have any binding force or operation beyond the territorial limits of the government in which they are promulgated... the Constitution and statutes can not reach across the territorial boundaries of the United States into the territorial domain of another government and affect that government or persons or property therein." *Id.* at 6635; *See also The Apollon,* 22 U.S. (9 Wheat.) 362, 370 (1824) (confirming that the "laws of no nation can justly extend beyond its own territories except so far as regards its own citizens. They can have no force to control the sovereignty or rights of any other nation within its own jurisdiction.").

59.     Notwithstanding, the Senate passed the resolution on July 6, 1898, and President William McKinley signed the joint resolution of annexation the following day. 30 Stat. 759 (1898).

60.    Annexation is the outcome of a process, normally a bilateral treaty between the ceding State and acquiring State; a joint resolution is not a treaty, merely an agreement between the House of Representatives and the Senate signed by the President, but it has no extraterritorial effect.

61.    In a 1988 legal opinion, the Office of Legal Counsel of the United States examined the purported annexation of Hawai'i by a joint resolution and concluded it is "unclear which constitutional power Congress exercised when it acquired Hawaii by joint resolution." *See* Douglas W. Kmiec, "Legal Issues Raised by Proposed Presidential Proclamation To Extend the Territorial Sea," 12 Op. O.L.C., 238, 252 (1988).

62.    According to constitutional scholar Westel Willoughby: "The constitutionality of annexation of Hawaii, by a simple legislative act, was strenuously contested at the time both in Congress and by the press. The right to annex by treaty was not denied, but it was denied that this might be done by a simple legislative act… Only by means of treaties, it was asserted, can the relations between States be governed, for a legislative act is necessarily without extraterritorial force— confined in its operation to the territory of the State by whose legislature it is enacted." *Id.*

63.    When the United States assumed control of its installed regime, the Republic of Hawai'i, under the new heading of the Territory of Hawai'i in 1900, 31 Stat. 141,

and later the State of Hawai'i in 1959, 73 Stat. 4, it surpassed "its limits under international law through extraterritorial prescription emanating from its national institutions: the legislature, government, and courts." *See* Eyal Benvenisti, *The International Law of Occupation* 19 (1993).

64.    The continuity of the Hawaiian Kingdom as a State under international law has not been affected despite the American occupation of its territory since January 17, 1893. *See* Craven Opinion at 126 ("The implications of continuity in case of Hawai'i are several: a) [the] authority exercised by US over Hawai'i is not one of sovereignty… the US has no legally protected 'right' to exercise that control and that it has no original claim to the territory of Hawai'i or right to obedience on the part of the Hawaiian population… b) the Hawaiian people retain a right to self-determination in a manner prescribed by general international law. Such a right would entail… the removal of all attributes of foreign occupation, and a restoration of the sovereign rights of the dispossessed government… c) [t]hat the treaties of the Hawaiian Kingdom remain in force...").

65.    On November 23, 1999, Public Law No. 103-150 of the 103rd Congress, approved by President Clinton, issued the Apology Resolution "to acknowledge the 100th anniversary of the January 17, 1893 overthrow of the Kingdom of Hawaii" and that "the indigenous Hawaiian people never directly relinquished their claims to their inherent sovereignty as people or over their national lands to the United States,

either through their monarchy or through a plebiscite or referendum." This was the
last public acknowledgment by the United States of the overthrow of the government
of the Hawaiian Kingdom.

B. Hawaiʻi Remains an Occupied Nation Recognized under
International Law

66.    Under international law, the overthrow of a government does not equate to an
obliteration of the State. *See* Quincy Wright, "The Status of Germany and the Peace
Proclamation," 46(2) *Am. J. Int'l L.* 299, 307 (Apr. 1952) ("international law
distinguishes between a government and the state it governs."); *see also* Sheldon M.
Cohen, *Arms and Judgment: Law, Morality, and the Conduct of War in the Twentieth
Century 17 (1989)* ("[t]he state must be distinguished from the government. The
state, not the government, is the major player, the legal person, in international
law."); *Texas v. White*, 74 U.S. (7 Wall.) 700 (1868) (the term State "is also used to
express the idea of a people or political community, as distinguished from the
government.").

67.    General Assembly Resolution 2625 on Friendly Relations provides: "The
territory of a State shall not be the object of acquisition by another State resulting
from the threat of use of force. No territorial acquisition resulting from the threat or
use of force shall be recognized as legal." G.A. Res. 2625 (XXV), Declaration on

Principles of International Law Concerning Friendly Relations (Oct. 24, 1970); *see* Craven Opinion at 126-149.

68.    The continuous occupation of Hawai'i by the United States from 1893 to the present, has not extinguished the Hawaiian Kingdom as an independent State, and consequently, as a subject of international law. *See* Lenzerini Opinion at 322.

69.    A territory is considered occupied "'when it is placed under the authority of the hostile army […] The law on occupation applies to all cases of partial or total occupation, even if such occupation does not encounter armed resistance. The essential ingredient for applicability of the law of occupation is therefore the actual control exercised by the occupying forces.'" Lenzerini Opinion at 322.

70.    "The Hawaiian Kingdom cannot be considered, by virtue of the prolonged US occupation, as extinguished as an independent State and a subject of international law, despite the long and effective exercise of the attributes of government by the United States over Hawaiian territory." Lenzerini Opinion at 322.

71.    The Permanent Court of Arbitration, in *Larsen v. Hawaiian Kingdom*, recognized the continued existence of the Hawaiian Kingdom as a non-Contracting State pursuant to Article 47 of the 1907 Hague Convention on the Pacific Settlement of International Disputes, 36 Stat. 2199, in its Annual Reports from 2001-2011. *Larsen v. Hawaiian Kingdom*, 119 *Int'l L. Reports* 566, 581 (Perm. Ct. Arb. 2001); *see also* Annual Report of 2011, annex 2, p. 51.

72.    On February 25, 2018, Dr. Alfred M. deZayas, a United Nations Independent Expert from the Office of the High Commissioner for Human Rights, communicated to two State of Hawai'i trial judges and members of the judiciary: "I have come to understand that the lawful political status of the Hawaiian Islands is that of a sovereign nation-state in continuity; but a nation-state that is under a strange form of occupation by the United States resulting from an illegal military occupation and a fraudulent annexation. As such, international laws require that governance and legal matters within the occupied territory of the Hawaiian Islands must be administered by the application of the laws of the occupied state (in this case, the Hawaiian Kingdom), not the domestic laws of the occupier (the United States)." Letter from Alfred-Maurice de Zayas, Independent Expert on the Promotion of a Democratic and Equitable International Order (Feb. 25, 2018).

C.  Under International Law, the Laws of the Occupied Nation Control

73.    Federal courts look to international law for interpretative guidance of constitutional and statutory provisions, as well as to ensure compliance with international legal obligations. *Graham v. Florida*, 560 U.S. 48, 80 (2010); *see also Roper v. Simmons*, 543 U.S. 551, 575 (2005) (noting international authority as "instructive for [the Court's] interpretation" of the Constitution); *Lawrence v. Texas*, 539 U.S. 558, 572–73 (2003);  *Hilton v. Guyot*, 159 U.S. 113, 163 (1895)

("International law . . . is part of our law, and must be ascertained and administered by the courts of justice . . . .").

74.    In *Sosa v. Alvarez-Machain,* 542 U.S. 692 (2004), the U.S. Supreme Court recognized: "For two centuries we have affirmed that the domestic law of the United States recognizes the law of nations." *See e.g. Sabbatino*, 376 U.S., at 423 ("[I]t is, of course, true that United States courts apply international law as a part of our own…"; *Paquete Habana*, 175 U.S., at 700 ("International law is part of our law"); *The Nereide*, 9 Cranch 388, 423 (1815) (Marshall, C.J.) ("[T]he Court is bound by the law of nations which is part of the law of the land").

75.    Under Article 43 of the Hague Regulations, the occupant must respect existing laws and customs of war of occupied land: "The authority of the legitimate power having in fact passed into the hands of the occupant, the latter shall take all the measures in his power to restore, and ensure, as far as possible, public order and safety, while respecting, unless absolutely prevented, the laws in force in the country." Hague Convention (IV) Respecting the Laws and Customs of War on Land art. 43, Oct. 18, 1907, 36 Stat. 2277; *see also* Marco Sassoli, "Article 43 of the Hague Resolution and Peace Operations in the Twenty-first Century," International Humanitarian Law Research Initiative (2004) (explaining that an occupying force may not extend its own legislation over the occupied territory – "it must, as a matter

of principle, respect the laws in force in the occupied territory at the beginning of the occupation.").

76.    The military occupation of a foreign State "necessarily implies that the sovereignty of the occupied territory is not vested in the occupying power. Occupation is essentially provisional. On the other hand, subjugation or conquest implies a transfer of sovereignty, which generally takes the form of annexation and is normally effected by a treaty of peace. When sovereignty passes, belligerent occupation, as such, of course ceases, although the territory may and usually does, for a period at least, continue to be governed through military agencies." *See U.S. Army Field Manual* 27-10 at 353 (1956). Without a treaty of peace between the Hawaiian Kingdom and the United States, the military occupation persists today.

77.    On November 10, 2020, the National Lawyers Guild (NLG) sent a letter to then-Governor Ige that cited Article 42 of the 1907 Hague Regulations and urged the immediate compliance with the law of occupation: "The United States has been in violation of international law for over a century, exercising, since 1893, the longest belligerent occupation of a foreign country in the history of international relations..." National Lawyers Guild, *NLG Calls upon US to Immediately Comply with International Humanitarian Law in its Illegal Occupation of the Hawaiian Islands* (January 13, 2020).

78.    "During the occupation, the ousted government would often attempt to influence life in the occupied area out of concern for its nationals, to undermine the occupant's authority or both… [the] occupant should give effect to the sovereign's new legislation as long as it addresses those issues in which the occupant has no power to amend the local laws, most notably in matters of personal status." *See* Eyal Benvenisti, *The International Law of Occupation* 104 (2nd ed., 2012).

79.    Thus, this court can apply international law because it is part of domestic law and under the international law of occupation, the laws of the occupied nation apply in addition to any laws of the occupying force (here, the United States) that are not inconsistent, are also applicable. *See supra* ¶¶ 75–80.

### D. The Laws of the Hawaiian Kingdom Should Control Here

80.    In *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936), the Supreme Court stated, "[n]either the Constitution nor the laws passed in pursuance of it have any force in foreign territory, and operations of the nation in such territory must be governed by treaties, international understandings and compacts, and the principles of international law."

81.    The Hawaiian Kingdom continues to exist under international law and its legal framework governs trust administration, property, admission policies as part of its civil laws. Trust administration, beneficiary designation, and matters of personal

27

status and civil law remain governed by the laws of the occupied state. *See* Hague Regulations, Art. 43.

82.    The Bernice Pauahi Bishop trust was created, accepted, and administered under the laws of the Hawaiian Kingdom. The Hawaiian Kingdom Supreme Court accepted Pauahi's will and trust on March 4, 1885 - eight years before the overthrow, and the trust vested rights and obligations under Hawaiian civil law.

83.    U.S. federal statutes are presumed not to apply extraterritorially absent clear congressional intent. *Morrison v. Nat'l Australia Bank Ltd.,* 561 U.S. 247, 255 (2010). Congress has never expressed an intent for 42 U.S.C. § 1981 to displace the domestic civil law of an occupied foreign State.

84.    As explained further in the attached Motion to Dismiss, this case raises threshold jurisdictional and choice-of-law issues and requires application of international law principles prior to reaching the merits of the plaintiffs' claims. Without such analysis, applying § 1981 to invalidate admissions policies lawful under Hawaiian Kingdom law would constitute an impermissible extension of U.S. municipal law into foreign territory, contrary to *Curtiss-Wright,* 299 U.S. at 318, and *The Apollon,* 22 U.S. at 370.

85.    In 2014, the Council of Regency of the Hawaiian Kingdom confirmed that the laws of the United States "shall be the provisional laws of the Realm… with the

express proviso that these provisional laws do not run contrary to the express reason and spirit of the laws of the Hawaiian Kingdom prior to July 6, 1887, the international laws of occupation and international humanitarian law, and if it be the case they shall be regarded as invalid and void." *See* Proclamation of the Council of Regency of the Hawaiian Kingdom, October 10, 2014, attached as Exhibit G.

86.    Hawaiian Kingdom jurisprudence expressly recognized lawful distinctions favoring aboriginal Hawaiians as part of the Kingdom's duty to promote national welfare and protect its population. *See Rex v. Booth*, 2 Haw. 616 (1863).

87.    Kamehameha Schools' admissions policy is consistent with that legal tradition and with Aliʻi Pauahi's expressed intent to educate aboriginal Hawaiians as a national remedial measure, not as racial discrimination within a U.S. constitutional framework that did not exist at the time.

88.    Failure to apply Hawaiian Kingdom law risks violating fundamental fair trial principles under international law. *See Professor Schabas,* Exhibit E (adjudicating rights under the wrong legal system in an occupied State, may constitute deprivation of fair trial and usurpation of sovereignty under the law of occupation).

89.    This Court has an obligation to avoid interpretations that place the United States in continuing violation of international law. *See Murray v. Schooner Charming Betsy,* 6 U.S. (2 Cranch) 64, 118 (1804).

## <u>CONCLUSION</u>

For the foregoing reasons, the Hawaiian Kingdom respectfully requests that this Court:

1.      Grant its Motion to Intervene as of right under Rule 24(a), or alternatively by permission under Rule24(b);

2.      Direct the Clerk of the Court to file the Hawaiian Kingdom's Proposed Motion to Dismiss, attached as Exhibit A, should intervention be granted; and

3.      Grant such other and further relief as the Court deems just and proper.

Respectfully submitted this 16th of January, 2026.

By:    __s/ Edward Halealoha Ayau_____
       Edward Halealoha Ayau, Esq. (HI 5013)
       LAW OFFICE OF EDWARD HALEALOHA AYAU
       2 Nanea Street
       Hilo, HI 96720
       (808) 646-9015
       halealohahapai64@gmail.com

       __s/ Natali Segovia_____
       Natali Segovia, Esq., (AZ Bar No. 033589)
       *Pro Hac Vice Admission Pending*
       WATER PROTECTOR LEGAL COLLECTIVE
       P.O. Box 37065
       Albuquerque, NM 87176
       (701) 566-9108
       nsegovia@waterprotectorlegal.org

INTERNATIONAL ASSOCIATION OF DEMOCRATIC
LAWYERS
1 Whitehall Street, 16th floor
New York, New York 10031
(212) 231-2235

*Counsel for Non-Party Intervenor*
*Council of Regency of the Hawaiian Kingdom*