Jesse D. Franklin-Murdock (10778)
DHILLON LAW GROUP INC.
500 Ala Moana Blvd., Ste. 7400
Honolulu, HI 96813
Tel: (415) 433-1700
Fax: (415) 520-6593
jfranklin-murdock@dhillonlaw.com

Adam K. Mortara*
LAWFAIR LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

Thomas R. McCarthy*
J. Michael Connolly*
Cameron T. Norris*
R. Gabriel Anderson*
Julius I. Kairey*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com
gabe@consovoymccarthy.com
julius@consovoymccarthy.com

* pro hac vice

Counsel for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS; I.P., by and through her next friend and mother, B.P.; and B.P., *Plaintiffs*, <br> v. <br><br> TRUSTEES OF THE ESTATE OF BERNICE PAUAHI BISHOP d/b/a KAMEHAMEHA SCHOOLS, *Defendant*. | Case No. 1:25-cv-450-MWJS-RT <br><br> **APPENDIX TO PLAINTIFFS' MOTION TO PROCEED USING INITIALS, VOLUME 2 (APP.302-419)** <br><br> Judge Micah W.J. Smith |

## TABLE OF CONTENTS

Exhibit A: *Doe I* Stipulated Protective Order (Aug. 13, 2003).....................App.302

Exhibit B: *Doe II* Motion to Proceed Anonymously (D. Haw. Aug. 29, 2008)..App.323

Exhibit C: Declaration of Eric Grant in *Doe II* (D. Haw. Aug. 29, 2008) ....App.328

Exhibit D: *Thompson v. Doe* Complaint (Haw. Cir. Ct. Aug. 6, 2008) ........App.342

Exhibit E: *Terms and Conditions*, Kamehameha Schools (archived Mar. 26, 2023) ..................................................................................App.354

Exhibit F: Debra Barayuga, *Dad Wants Non-Hawaiian Kamehameha Student Back*, Honolulu Star Bulletin (Sept. 12, 2003) ...................................App.381

Exhibit G: Beverly Creamer, *Alumni Plan Protest of Decision at School's Gate*, Honolulu Advertiser (Aug. 21, 2003) ...................................................App.381

Exhibit H: Editorial, *Attack the Act, But Not the Boy at School*, Honolulu Advertiser (Aug. 24, 2003) ...........................................................................App.389

Exhibit I: Vicki Viotti, *Officials Warn of School Violence*, Honolulu Advertiser (Aug. 22, 2003) ...................................................................................App.392

Exhibit J: Manu Kaʻiama, *The Movement Continues*, in *A Nation Rising* (2014) (excerpt) ...........................................................................................App.395

Exhibit K: "Kohole," Narkive Comment (2008)...........................................App.398

Exhibit L: "Dejahlani," Reddit Comment (Sept. 2025) ................................App.400

Exhibit M: U.S. Dep't of Justice, Press Release, *Two Maui Men Sentenced for Racially Motivated Attack on White Man* (Mar. 3, 2024) ......................App.402

Exhibit N: Paul Perrone, Haw. Dep't of the Atty. Gen., *Hate Crimes in Hawaii, 2024* (Mar. 2025) ...............................................................................App.405

Exhibit O: Larry Keller, *Prejudice in Paradise*, Southern Poverty Law Center, Intelligence Report (Fall 2009) ...............................................................App.410

Exhibit P: Declaration of Abigail Fisher in *SFFA v. Harvard* (D. Mass Apr. 27, 2016) ................................................................................................App.415

# EXHIBIT A

AUG-13-03 13:22 FROM:CADES SCHUTTE                    ID:         PAGE    2/20
Case 1:08-cv-00359-JMS-BMK    Document 13-5    Filed 08/29/2008    Page 1 of 20
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 5 of 122
PageID.896

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| JOHN DOE, a minor, by his mother and next friend, JANE DOE,<br><br>    Plaintiffs,<br><br>    v.<br><br>KAMEHAMEHA SCHOOLS/BERNICE PAUAHI BISHOP ESTATE; and CONSTANCE H. LAU, NAINOA THOMPSON, DIANE J. PLOTTS, ROBERT K.U. KIHUNE, and J. DOUGLAS ING, in their capacities as Trustees of the Kamehameha Schools/Bernice Pauahi Bishop Estate,<br><br>    Defendants. | CIVIL NO. 03-00316 ACK-LEK<br><br>**STIPULATED PROTECTIVE ORDER**<br><br><br><br>Trial Date: None assigned |

## STIPULATED PROTECTIVE ORDER

**I.   STIPULATION**

WHEREAS, in the course of this litigation disclosure may be sought of information that is of a private or confidential nature; and

WHEREAS, the parties hereto desire to establish a mechanism to protect the disclosure of such private or confidential information in this action;

IT IS HEREBY STIPULATED by and between the parties hereto, by their respective undersigned counsel of record herein, that the following protective order

IMANAGEDB:484896.5

**App.303**

AUG-13-03 13:22 FROM:CADES SCHUTTE                    ID:                    PAGE    3/20
Case 1:08-cv-00359-JMS-BMK    Document 13-5    Filed 08/29/2008    Page 2 of 20
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 6 of 122
PageID.897

shall govern the disclosure of private or confidential information provided pursuant to discovery in this action.

## II.   DEFINITIONS

The following definitions apply herein:

A.    "Action," as used herein, means the above-captioned action Civil No. 03-00316 ACK-LEK, which was initiated in the United States District Court for the District of Hawai'i.

B.    The designation "CONFIDENTIAL" may be applied by a party to any type of information which that party believes in good faith to constitute, contain, reveal, or reflect Education Records as defined below (which, for students other than the named minor plaintiff, Kamehameha Schools will produce with personally identifiable information redacted); the identity of the minor plaintiff in this Action; and confidential commercial information.

C.    "Confidential Information," as used herein, refers to all information that is subject to the designation "CONFIDENTIAL" as described above, and all information derived therefrom.

D.    "Counsel of Record," as used herein, means the following attorneys:

1.    Eric Grant;

2.    James F. Sweeney;

3.    David Schulmeister; and

App.304

AUG-13-03 13:22 FROM:CADES SCHUTTE          ID:                    PAGE   7/20
Case 1:08-cv-00359-JMS-BMK    Document 13-5    Filed 08/29/2008    Page 3 of 20
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 7 of 122
PageID.898

4.    Kelly LaPorte.

This paragraph may be amended, without the need for approval of the Court, to include other counsel retained by a party in this Action. The party seeking to amend this paragraph shall provide Counsel of Record for the remaining parties with a written notice containing the name of the attorney along with a signed statement from the attorney indicating that the attorney agrees to be bound by the terms of this Order. Should the other party object to the amendment to this paragraph, counsel for the party seeking the amendment will be provided with a written notice in not less than five (5) days. Unless such notice is provided, the amendment to this paragraph will be deemed approved; otherwise the amendment shall not be effective.

E.    "Education Records" means Records that are directly related to a Student; "Records" means any information recorded in any way, including, but not limited to, handwriting, print, computer media, video or audio tape, film, microfilm, and microfiche; and "Student" means a student enrolled, or previously enrolled, at Kamehameha Schools, or an applicant for admission to Kamehameha Schools. "Personally identifiable information" of Students other than the plaintiff in this Action that shall be redacted includes, but is not limited to, (1) the name of the Student, (2) the name of the Student's parent or other family member, (3) the address of the Student or Student's family, (4) a personal identifier, such as the

App.305

AUG-13-03 13:23 FROM CADES SCHUTTE ID: PAGE 5/20

Case 1:08-cv-00359-JMS-BMK Document 13-5 Filed 08/29/2008 Page 4 of 20
Case 1:25-cv-00450-MWJS-RT Document 54-9 Filed 01/21/26 Page 8 of 122
PageID.899

student's social security number or student number, (5) a list of personal characteristics that would make the Student's identity easily traceable, and (6) other information that would make the Student's identity easily traceable. The types of Records subject to this Order and the confidentiality of such Records under this Order shall be interpreted in light of the Family Educational Rights and Privacy Act , 20 U.S.C. § 1232g, its implementing regulations, 34 C.F.R. pt. 99, Hawai'i privacy law, and relevant policies of Kamehameha Schools.

      F.   "Order," as used herein, means this Stipulated Protective Order.

      G.   "Party," as used herein, means every named party to this Action and every director, officer, and employee of every named party to this Action.

## III.  TERMS OF THE PROTECTIVE ORDER

      A.   <u>Materials Subject to Designation.</u>  All originals or copies of transcripts, video or audio tapes of depositions, exhibits, answers to interrogatories and requests for admissions, and all documents, materials, tangible things and information obtained by inspection of files or by production of documents (hereafter collectively referred to as "Information") may be designated as "CONFIDENTIAL" by the Party or a nonparty that has agreed to the terms of this Order that is producing the Information in conformity with the definitions set forth above.

App.306

AUG-13-03 13:23 FROM:CADES SCHUTTE                    ID:                    PAGE    6/20

Case 1:08-cv-00359-JMS-BMK    Document 13-5    Filed 08/29/2008    Page 5 of 20
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 9 of 122
PageID.900

B.  <u>Treatment of "CONFIDENTIAL" Information.</u>    Information designated as "CONFIDENTIAL" and all information derived therefrom (excluding such information as is derived lawfully from an independent source) shall not be disclosed, given, shown, made available, or communicated in any way to any person or entity other than Counsel of Record and their current employees whose assistance is needed by Counsel of Record for the purposes of this litigation except as provided in Paragraphs C and D below.  Counsel of Record will use their best efforts minimize as much as possible the access provided to Confidential Information under this paragraph to employees whose assistance is needed for the purposes of this litigation.

C.  <u>Outside Experts and Consultants.</u>    Documents designated as "CONFIDENTIAL" may also be shown to outside experts or consultants (including, as necessary for the consultant's or expert's work and on a confidential basis consistent with paragraph F, all assistants, clerks, secretaries, and copy services employed or retained by said consultant or expert) retained by a Party in connection with preparation for trial or trial in this Action, provided that the following conditions are met:  Counsel of Record for the designating Party will be provided with written notice not less than seven (7) business days before disclosure to any such expert or consultant, together with a current resume for such expert or consultant.  Should counsel for the designating Party object to the proposed

App.307

AUG-13-03 13:23 FROM:CADES SCHUTTE          ID:          PAGE   7/20

Case 1:08-cv-00359-JMS-BMK     Document 13-5    Filed 08/29/2008     Page 6 of 20
Case 1:25-cv-00450-MWJS-RT     Document 54-9    Filed 01/21/26   Page 10 of 122
PageID.901

disclosure of its Confidential Information, it may give written notice of its objection. There shall be no disclosure of Confidential Information to such expert or consultant after receipt of such notice, absent a court order or written agreement by the designating Party. Before disclosure to any such expert or consultant, the person to whom such information is to be disclosed shall execute and deliver to the Counsel of Record making the disclosure a written agreement in the form attached hereto as Exhibit A.

D.    <u>Request for Additional Disclosure.</u>  If any Counsel of Record desires to give, show, make available or communicate to any person, other than those permitted under Paragraphs B and C above any information designated as "CONFIDENTIAL," said Counsel of Record shall first obtain the written consent of the designating Party through such Party's Counsel of Record. Each person to whom the Confidential Information is to be given, shown, made available, or communicated must execute a written confidentiality agreement in the form attached hereto as Exhibit A, agreeing not to use or to disclose to anyone any of the contents of the Confidential Information received and to be bound by the terms of this Order. Only after all of the foregoing conditions have been fully satisfied, or upon order of the Court after a noticed motion, may the Confidential Information be given, shown, made available, or communicated to any person other than those permitted under Paragraphs B and C above.

IMANAGEDB:484896.5

App.308

AUG-13-03 13:23 FROM CADES SCHUTTE          ID:          PAGE    8/20

Case 1:08-cv-00359-JMS-BMK    Document 13-5    Filed 08/29/2008    Page 7 of 20
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 11 of 122
PageID.902

E.  Record of Disclosure.  A file shall be maintained by the Counsel of Record making a disclosure to third parties of all written confidentiality agreements as described in Paragraphs B, C, and D above, that have been signed by persons to whom materials designated as "CONFIDENTIAL" have been given. A copy of each such agreement shall be sent to Counsel of Record for the designating Party within five (5) days of disclosure, and said file shall be made available for inspection and copying by opposing counsel upon written request.

F.  Maintenance of Confidential Information.  Persons receiving Confidential Information that is provided pursuant to this Order shall maintain such Confidential Information in a secure and safe area and shall exercise due and proper care with respect to the storage, custody, and use of all Confidential Information, so as to prevent the unauthorized or inadvertent disclosure of any Confidential Information.

G.  Manner of Designating Documents.  A party shall designate documents containing Confidential Information by placing a legend on each page of any document that such party wishes to protect against the disclosure or use, or in the case of computer disks or tape, on the cover and container of the disk or tape. This legend shall state:

**CONFIDENTIAL
SUBJECT TO A PROTECTIVE ORDER
OF THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF HAWAI'I, CIVIL NO. 03-00316 ACK-LEK**

IMANAGEDB:484896.5

-7-

App.309

A designation of Confidential Information as to any thing of which inspection or sampling has been requested shall be made by placing the "CONFIDENTIAL" legend defined above on the thing or container within which it is stored, or by some other means of designation agreed upon by the Parties. All documents and things shall be marked prior to the provision of a physical copy thereof to the other Party. Alternatively, documents may be made available for an initial inspection by Counsel of Record for the requesting (receiving) Party prior to the furnishing Party producing copies of selected items. In such cases, documents shall be inspected only by Counsel of Record for the receiving Party who is permitted access to Confidential Information pursuant to the terms of this Order, prior to furnishing copies to the receiving Party. Such initial inspection shall not constitute waiver of confidentiality with respect to any document or thing so inspected.

      H.   <u>Initial Failure to Designate Information.</u>  The initial failure to designate information "CONFIDENTIAL" in accordance with this Order shall not preclude any party, at a later date, from so designating the documents and to require such documents to be treated in accord with such designation from that time forward.

      I.   <u>Retrieval of Confidential Information from Unauthorized Persons.</u> If Confidential Information has previously been disclosed to persons no longer qualified after such designation, the disclosing Counsel of Record shall, within 14

App.310

AUG-13-03 13:24 FROM:CADES SCHUTTE                ID:                    PAGE  10/20
Case 1:08-cv-00359-JMS-BMK    Document 13-5    Filed 08/29/2008    Page 9 of 20
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 13 of 122
PageID.904

days from when that person or persons fails to qualify to receive such information, retrieve all such previously disclosed Confidential Information and shall remind and advise such formerly qualified persons of the claim of confidentiality.

J.    Depositions.

Should Counsel of Record for any Party introduce or use any Confidential Information in a deposition of any witness, or believe that any question to a witness at a deposition upon oral examination will disclose Confidential Information, or that answers to any question will require such disclosure, or if documents designated as containing Confidential Information will be used as exhibits during examination of a witness, Counsel of Record seeking to protect such Confidential Information shall either invoke the protections of this Order on the record during the taking of the deposition or provide written notice of such designation to all Counsel of Record within thirty (30) days after the delivery to Counsel of Record of the transcript of the deposition. In addition,

App.311

AUG-13-03 13:24 FROM:CADES SCHUTTE          ID:          PAGE 11/20

Case 1:08-cv-00359-JMS-BMK     Document 13-5     Filed 08/29/2008     Page 10 of 20
Case 1:25-cv-00450-MWJS-RT     Document 54-9     Filed 01/21/26     Page 14 of 122
PageID.905

1. Designating the transcript of a deposition as Confidential shall automatically constitute designation of all video tapes, audio tapes, and exhibits, if any, of the deposition that correspond to the designated transcripts; and

2. Deponents shall not retain or copy portions of the transcript of their deposition that have been designated as Confidential if such Confidential Information was not provided by them or the entities they represent.

Following notice of designation of a deposition of a witness as Confidential, all Counsel of Record receiving the transcript shall be responsible for marking the copies of the designated transcript in their possession or under their control as directed by the designating Party if not already marked by the court reporter. If, during the course of the deposition, Confidential Information will be given to a witness deponent who has not already signed the certificate of confidentiality, each such deponent shall first be required to sign the certificate of confidentiality attached hereto as Exhibit A. Unless otherwise ordered by this Court, the designating Party shall have the right to have all persons, except the deponent and his counsel, Counsel of Record for the Parties, the court reporter, and such other persons as are permitted under the terms of this Order that have access to the Confidential Information, excluded from a deposition during the taking therein of the testimony designated pursuant to this Order.

K.   Court Reporters. Any court reporter who reports the testimony in this Action at a deposition shall agree, before reporting any such testimony involving

IMANAGEDB:484896.5
-10-

App.312

AUG-13-03 13:25 FROM:CADES SCHUTTE          ID:          PAGE  12/20
Case 1:08-cv-00359-JMS-BMK    Document 13-5    Filed 08/29/2008    Page 11 of 20
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 15 of 122
PageID.906

Confidential Information, to be bound by the terms of this Order and shall execute a declaration in the form attached as Exhibit A hereto. All Confidential Information received by such a court reporter is, and shall remain, confidential and shall not be disclosed except to the attorneys of record and any other person who is present while such testimony is being given; and copies of any transcript, reporter's notes, or any other transcription records of any such testimony shall be retained in absolute confidentiality and safekeeping by such reporter or shall be delivered to the Counsel of Record for the designating Party or the Court subject to the provisions hereof.

L. <u>Filing Documents With The Court</u>. All information designated as Confidential Information which is filed or lodged with the Court, or any pleading or memorandum purporting to reproduce or paraphrase such information, shall be filed or lodged in sealed containers on which shall be recorded the title to this Action, the general nature of the contents, the words "CONFIDENTIAL" and a statement in substantially the following form:

> This sealed container filed in the case of **JOHN DOE**, et al. v. **KAMEHAMEHA SCHOOLS/BISHOP ESTATE**, et al., Civil No. 03-0031 ACK-LEK contains confidential materials. Pursuant to a Stipulated Protective Order entered herein, this container shall not be opened nor the contents thereof revealed except to the Court, including court personnel as necessary for handling of the matter. After any such opening or revelation, the container shall be resealed with the contents inside.

App.313

AUG-13-03 13:25 FROM:CADES SCHUTTE          ID:                    PAGE  13/20

Case 1:08-cv-00359-JMS-BMK    Document 13-5    Filed 08/29/2008    Page 12 of 20
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 16 of 122
PageID.907

Upon default of the filing or lodging Party to properly designate Confidential Information and file or lodge such information in accordance with this Order, any party who in good faith believes that designation and filing under seal is required may do so within ten (10) days of learning of the defective filing or lodging. Notice of such designation shall be given to all Parties. Nothing in this provision relieves a Party of liability for damages caused by failure to properly file such information under seal.

M.    No Effect On Party's Own Use. Nothing contained in this Order shall affect the right of a Party to disclose to its own officers, directors, employees, partners, or consultants or to use as it desires any information designated and produced by it as "CONFIDENTIAL."

N.    No Effect On Disclosure to Author or Addressees. Nothing contained in this Order shall affect the right of a Party to disclose any information designated as "CONFIDENTIAL" to the author or addressees of the document.

O.    Legal Effect of Designations. The designation by a Party of any document, material, or information as "CONFIDENTIAL" is intended solely to facilitate discovery in this Action, and neither such designation nor treatment in conformity with such designation shall be construed in any way as an admission or agreement by any Party that the designated disclosure constitutes or contains any protectible confidential information. Failure to so designate any document or thing

IMANAGEDB:484896.5

-12-

<span style="color:red">App.314</span>

AUG-13-03 13:25 FROM:CADES SCHUTTE          ID:          PAGE 14/20

Case 1:08-cv-00359-JMS-BMK    Document 13-5    Filed 08/29/2008    Page 13 of 20
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 17 of 122
PageID.908

shall not constitute a waiver of any claim by a Party that such documents or things do contain protectible confidential information.

P.    Final Disposition of Action.    The provisions of this Order shall, absent written permission of the producing Party or further order of the Court, continue to be binding throughout and after the conclusion of this Action, including without limitation any appeals therefrom.    Within thirty (30) days after receiving notice of the entry of a nonappealable order, judgment, or decree finally disposing of this Action, including any appeals therefrom, all persons having received Confidential Information shall destroy such material and all copies thereof including but not limited to summaries, excerpts, notes, analyses, memoranda, or reports.    Such destruction shall be certified to the producing Party in writing.    Alternately, at the option of the producing Party and at that Party's expense, a Party may request all Designated Information it produced be returned for its own disposition.    As an exception to the above, Counsel of Record may retain a single file copy of any document filed with the court and attorney work product.    The copy of these retained documents shall be treated as "CONFIDENTIAL" as designated and Counsel of Record shall immediately notify opposing Counsel of Record of any attempt by third parties to inspect and/or copy said documents.

Q.    Motion For Relief From Designation.    If, subsequent to a Counsel of Record's receipt of information designated "CONFIDENTIAL," such Counsel of

App.315

AUG-13-03 13:25 FROM:CADES SCHUTTE      ID:      PAGE  15/20

Case 1:08-cv-00359-JMS-BMK    Document 13-5    Filed 08/29/2008    Page 14 of 20
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 18 of 122
PageID.909

Record believes that any such information is not of a nature warranting the protection afforded hereunder, such Counsel of Record shall first notify Counsel of Record for the designating Party in writing, providing its reasons for challenging the designation. If, by 15 days after notice, the Parties have been unable to reach an agreement as to the designation, the Party may bring a noticed motion to be relieved of its obligations under this Order as to any such Confidential Information. The objecting Party bears the burden of proof that any Confidential Information fails to meet the requirements of good cause for such designation.

R.    Survival of Terms. Absent written modification hereof by the Parties hereto or further order of the Court, the provisions of this Order that restrict the disclosure and use of Confidential Information shall survive the final disposition of this Action and continue to be binding on all persons subject to the terms of this Order.

S.    Effect On Discovery. This Order shall not preclude or limit the right of any Party to oppose discovery on any ground which would otherwise be available.

T.    Submitting to Jurisdiction of The Court. Each person to whom disclosure of any Confidential Information is made shall be subject to and hereby submits to the jurisdiction of the United States District Court for the District of

App.316

AUG-13-03 13:26 FROM:CADES SCHUTTE          ID:          PAGE 16/20

Case 1:08-cv-00359-JMS-BMK    Document 13-5    Filed 08/29/2008    Page 15 of 20
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 19 of 122
PageID.910

Hawaiʻi that has jurisdiction over the person for the purpose of contempt proceedings in the event of any violation of this Order.

U.    Notice of Disclosure of Designated Materials at Pretrial Hearings or at Trial. If a Party anticipates that it may disclose at any hearing or trial any Confidential Information, it shall, at the time of filing or lodging such papers related to that hearing or portion of trial, provide notice to the Court and all other Parties of such anticipated disclosure, specifying that the information to be disclosed is "CONFIDENTIAL" as designated. This notice may identify the documents by the reference number assigned them at document production. When such notice has been given, only Counsel of Record or other persons authorized by this Order to receive such Confidential Information may be present at the hearing, or at that portion of the hearing or trial during which the disclosure of the Confidential Information occurs, except as otherwise ordered by the Court upon motion of a Party or the person seeking to be present. The requirement of advance notice shall not apply to a disclosure of Confidential Information in oral rebuttal or in oral response to another Party's argument where the need for such disclosure could not reasonably be anticipated in advance of the hearing or trial. However, prior to disclosing any information designated as "CONFIDENTIAL" in oral rebuttal or in oral argument, counsel, when possible, shall inform the Court and opposing Counsel of Record of his intention to do so. Counsel shall then request

IMANAGEDB:484896.5

-15-

App.317

AUG-13-03 13:26 FROM:CADES SCHUTTE          ID:                    PAGE  17/20
Case 1:08-cv-00359-JMS-BMK    Document 13-5    Filed 08/29/2008    Page 16 of 20
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 20 of 122
PageID.911

that persons not authorized by this Court to receive Confidential Information be excluded from the courtroom during the disclosure. This paragraph shall not be applied so as to conflict with the Court's own rules or any order or ruling by the Court.

V.   Violation of Order. In the event that anyone shall violate or threaten to violate any term of this Order, the Parties and non-parties subject to this Order agree that the aggrieved Party may immediately apply to obtain injunctive relief against any such person violating or threatening to violate any of the terms of this Order and, in the event the aggrieved Party shall do so, the respondent person subject to the provisions of this Order shall not employ as a defense thereto the claim that the aggrieved Party possesses an adequate remedy at law. The Parties and any other persons subject to the terms of this Order agree that this Court has the jurisdiction over such person or Party, for the purpose of enforcing this Order.

Violation of this Order shall constitute contempt and may be punishable as such.

App.318

AUG-13-03 13:26 FROM:CADES SCHUTTE      ID:           PAGE  18/20
Case 1:08-cv-00359-JMS-BMK    Document 13-5    Filed 08/29/2008    Page 17 of 20
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 21 of 122
PageID.912

SO STIPULATED AND AGREED:

SWEENEY and GRANT LLP

Dated: _____

By: Eric Grant, Esq.

Attorneys for Plaintiff
JOHN DOE, a minor, by his mother and
next friend, JANE DOE

JOHN W. GOEMANS, ESQ.

Dated: _____

John W. Goemans, Esq.

Attorneys for Plaintiff
JOHN DOE, a minor, by his mother and
next friend, JANE DOE

CADES SCHUTTE, LLP

Dated: _August 13, 2003_

By: David Schulmeister, Esq.

Attorneys for Defendants
CONSTANCE H. LAU, NAINOA
THOMPSON, DIANE J. PLOTTS,
ROBERT K.U. KIHUNE, and J.
DOUGLAS ING, in their capacities as
Trustees of the Estate of Bernice Pauahi
Bishop dba Kamehameha Schools

IMANAGEDB:484896.5

App.319

Case 1:08-cv-00359-JMS-BMK   Document 13-5   Filed 08/29/2008   Page 18 of 20
Case 1:25-cv-00450-MWJS-RT   Document 54-9   Filed 01/21/26   Page 22 of 122
PageID.913

SO STIPULATED AND AGREED:

SWEENEY and GRANT LLP

Dated: _12 Aug 03_____

_Eric Grant_____

By: Eric Grant, Esq.

Attorneys for Plaintiff
JOHN DOE, a minor, by his mother and
next friend, JANE DOE

JOHN W. GOEMANS, ESQ.

Dated: _____

_____

John W. Goemans, Esq.

Attorneys for Plaintiff
JOHN DOE, a minor, by his mother and
next friend, JANE DOE

CADES SCHUTTE, LLP

Dated: _____

_____

By: David Schulmeister, Esq.

Attorneys for Defendants
CONSTANCE H. LAU, NAINOA
THOMPSON, DIANE J. PLOTTS,
ROBERT K.U. KIHUNE, and J.
DOUGLAS ING, in their capacities as
Trustees of the Estate of Bernice Pauahi
Bishop dba Kamehameha Schools

AUG-13-03 13:26 FROM:CADES SCHUTTE                ID:                PAGE  19/20
Case 1:08-cv-00359-JMS-BMK    Document 13-5    Filed 08/29/2008   Page 19 of 20
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26   Page 23 of 122
PageID.914

MILLER & CHEVALIER CHARTERED


Dated: _____          _____
                                        By: Emmett B. Lewis, Esq.

                                        Attorneys for Defendants
                                        CONSTANCE H. LAU, NAINOA
                                        THOMPSON, DIANE J. PLOTTS,
                                        ROBERT K.U. KIHUNE, and J.
                                        DOUGLAS ING, in their capacities as
                                        Trustees of the Estate of Bernice Pauahi
                                        Bishop dba Kamehameha Schools




**SO ORDERED AS STIPULATED:**

Dated: _____          _____
                                        By: Hon. Alan C. Kay
                                        U.S. District Court Judge

App.321

AUG-13-03 13:26 FROM:CADES SCHUTTE          ID:          PAGE 20/20
Case 1:08-cv-00359-JMS-BMK   Document 13-5   Filed 08/29/2008   Page 20 of 20
Case 1:25-cv-00450-MWJS-RT   Document 54-9   Filed 01/21/26   Page 24 of 122
PageID.915

## EXHIBIT A

I, _____, declare under penalty of

perjury under the laws of the United States that:

1.   My address is:   _____

     _____

     _____

2.   My present employer is:_____

I HEREBY CERTIFY AND AGREE that I have read and understand the terms of the Stipulated Protective Order ("Order") entered in the matter of <u>John Doe, et al. v. Kamehameha Schools/Bernice Pauahi Bishop Estate, et al.</u>, Civil No. 03-0031 ACK-LEK in the United States District Court for the District of Hawai'i, and that I will not use or disclose to anyone any of the contents of any Confidential Information received under the protection of the Order except for purposes directly related to this litigation, as explicitly allowed by the Order, and agree to be bound by the terms and conditions of the Order.

I understand that I am to retain all copies of any of the materials that I receive which have been so designated as Confidential Information in a container, cabinet, drawer, room or other safe place in a manner consistent with this Order, and that all copies are to remain in my custody until I have completed my assigned or legal duties, whereupon the copies are to be returned or destroyed as specified in the Order. I acknowledge that such return or the subsequent destruction of such materials shall not relieve me from any of the continuing obligations imposed upon me by the Order.

Dated:_____   Signed: _____

IMANAGEDB:484896.5

**App.322**

# EXHIBIT B

App.323

Case 1:08-cv-00359-JMS-BMK    Document 13    Filed 08/29/2008    Page 1 of 4
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 26 of 122
PageID.917

Eric Grant (*pro hac vice*)
Attorney at Law
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone:  (916) 388-0833
Facsimile:  (916) 691-3261
E-Mail:     grant@eric-grant.com

David B. Rosen #7152
Law Office of David B. Rosen, ALC
810 Richards Street, Suite 880
Honolulu, Hawaii 96813
Telephone:  (808) 523-9393
Facsimile:  (808) 523-9595
E-Mail:     rosenlaw@hawaii.rr.com

Counsel for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

| | | |
|---|---|---|
| JACOB DOE and JANET DOE, minors, by their parents and next friends, JAMES and JOYCE DOE; KARL DOE, a minor, by his parents and next friends, KIRK and KATE DOE; and LISA DOE, a minor, by her mother and next friend, LAURA DOE, | ) ) ) ) ) ) ) | No. 1:08-cv-00359-JMS-BMK |
| Plaintiffs, | ) ) ) | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR LEAVE TO PROCEED ANONYMOUSLY AND FOR RELATED PROTECTIVE ORDER** |
| v. | ) ) | **[Fed. R. Civ. P. 16(b), 26(c)]** |
| KAMEHAMEHA SCHOOLS/BERNICE PAUAHI BISHOP ESTATE; and NAI-NOA THOMPSON, DIANE J. PLOTTS, CORBETT A. K. KALAMA, ROBERT K. U. KIHUNE, and J. DOUGLAS ING, in their capacities as Trustees thereof, | ) ) ) ) ) ) | Date:  _____ Time:  _____ Judge:  Hon. Barry M. Kurren |
| Defendants. | ) ) | |

**App.324**

Case 1:08-cv-00359-JMS-BMK   Document 13   Filed 08/29/2008   Page 2 of 4
Case 1:25-cv-00450-MWJS-RT   Document 54-9   Filed 01/21/26   Page 27 of 122
PageID.918

## NOTICE OF MOTION

TO DEFENDANTS AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on _____, at _____, or as soon thereafter as the matter may be heard in the above-entitled Court, located at 300 Ala Moana Boulevard, Honolulu, Hawaii 96850, Plaintiffs will move for leave to proceed with this action anonymously and for a related protective order that limits Defendants' disclosure of Plaintiffs' identities, as described below.

## MOTION FOR LEAVE PROCEED ANONYMOUSLY
## AND FOR RELATED PROTECTIVE ORDER

Pursuant to Federal Rule of Civil Procedure 16(b) and 26(c), and on the basis of the accompanying supporting memorandum of law, along with the other pleadings and papers filed herein, Plaintiffs hereby move for leave to proceed with this action anonymously and for a related protective order that limits Defendants' disclosure of Plaintiffs' identities.  By their motion, Plaintiffs seek

(1)     leave to prosecute this action employing (rather than their true names) the "Doe" pseudonyms used in the Complaint, including leave to submit any necessary declarations using such pseudonyms; and

(2)     a protective order prohibiting Defendants' counsel from disclosing to Defendants, their agents, or any third party Plaintiffs' names or other identifying information, without the agreement of Plaintiffs' counsel or further order of this Court.

- 1 -

**App.325**

Case 1:08-cv-00359-JMS-BMK   Document 13   Filed 08/29/2008   Page 3 of 4
Case 1:25-cv-00450-MWJS-RT   Document 54-9   Filed 01/21/26   Page 28 of 122
PageID.919

Dated:  August 29, 2008.

Respectfully submitted,

/s/ Eric Grant

Eric Grant
David B. Rosen

Counsel for Plaintiffs

**App.326**

Case 1:08-cv-00359-JMS-BMK    Document 13    Filed 08/29/2008    Page 4 of 4
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 29 of 122
PageID.920

## CERTIFICATE OF SERVICE

I hereby certify that, on the dates and by the methods of service noted below, a true and correct copy of the foregoing was served upon the following at their last known addresses:

### Served electronically through CM/ECF:

| | | |
|---|---|---|
| Paul Alston | palston@ahfi.com | August 29, 2008 |
| Louise K.Y. Ing | ling@ahfi.com | August 29, 2008 |
| Jason H. Kim | jkim@ahfi.com | August 29, 2008 |

### Served by first-class mail:

Kathleen M. Sullivan                                    August 29, 2008
Quinn Emanuel Urquart Oliver & Hedges LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

Colleen I. Wong                                         August 29, 2008
Livingston S. M. Wong, Jr.
Sabrina R. Toma
Kawaihao Plaza
567 South King Street, Suite 310
Honolulu, Hawaii 96813

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 29, 2008.

/s/ Eric Grant
Eric Grant

Counsel for Plaintiffs

**App.327**

# EXHIBIT C

Case 1:08-cv-00359-JMS-BMK    Document 13-3    Filed 08/29/2008    Page 1 of 13
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 31 of 122
PageID.922

Eric Grant (*pro hac vice*)
Attorney at Law
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone:  (916) 388-0833
Facsimile:  (916) 691-3261
E-Mail:       grant@eric-grant.com

David B. Rosen #7152
Law Office of David B. Rosen, ALC
810 Richards Street, Suite 880
Honolulu, Hawaii 96813
Telephone:  (808) 523-9393
Facsimile:  (808) 523-9595
E-Mail:       rosenlaw@hawaii.rr.com

Counsel for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

| | | |
|---|---|---|
| JACOB DOE and JANET DOE, minors, by their parents and next friends, JAMES and JOYCE DOE; KARL DOE, a minor, by his parents and next friends, KIRK and KATE DOE; and LISA DOE, a minor, by her mother and next friend, LAURA DOE, | ) ) ) ) ) ) | No. 1:08-cv-00359-JMS-BMK |
| | ) ) | **DECLARATION OF ERIC GRANT IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO PROCEED ANONYMOUSLY AND FOR RELATED PROTECTIVE ORDER** |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| KAMEHAMEHA SCHOOLS/BERNICE PAUAHI BISHOP ESTATE; and NAI-NOA THOMPSON, DIANE J. PLOTTS, CORBETT A. K. KALAMA, ROBERT K. U. KIHUNE, and J. DOUGLAS ING, in their capacities as Trustees thereof, | ) ) ) ) ) ) ) | Date:  _____ Time:  _____ Judge:  Hon. Barry M. Kurren |
| Defendants. | ) ) ) | |

**App.329**

Case 1:08-cv-00359-JMS-BMK    Document 13-3    Filed 08/29/2008    Page 2 of 13
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 32 of 122
PageID.923

I, Eric Grant, declare as follows:

1.        I am one of the counsel for Plaintiffs in this action.  I make this declaration in support of Plaintiffs' Motion for Leave to Proceed Anonymously and for Related Protective Order, filed concurrently herewith.  I make the statements of fact in this declaration of my own personal knowledge.  If called as a witness in this proceeding, I could and would competently testify to the facts set forth herein.

2.        I served as one of the counsel for the plaintiff in *John Doe v. Kamehameha Schools/Bernice Pauahi Bishop Estate*, No. 1:03-cv-00316-ACK-LEK, filed in this Court on June 25, 2003 ("*John Doe* litigation").  The defendants in the *John Doe* litigation—namely, Kamehameha Schools/Bernice Pauahi Bishop Estate ("KSBE") and its five incumbent Trustees—were the same as Defendants here.  A true and correct copy of the complaint in that litigation is attached hereto as Exhibit 1.

3.        In the *John Doe* litigation, I negotiated with KSBE's counsel—in particular, David Schulmeister and Kelly G. LaPorte of the Cades Schutte law firm—a stipulation designed to protect the parties' confidential information.  Pursuant to that stipulation, which was largely drafted by KSBE's counsel, John Doe's true name was provided to that counsel but not disclosed either to the defendants themselves or to the public.  A true and correct copy of the stipulation, as executed in August of 2003, is attached hereto as Exhibit 2.  (Although the stipulation is called a "Stipulated Protective Order," it was not in fact adopted as an order of this Court).

- 1 -

**App.330**

Case 1:08-cv-00359-JMS-BMK    Document 13-3    Filed 08/29/2008    Page 3 of 13
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 33 of 122
PageID.924

4.    On August 11, 2008, I visited a page on the *Honolulu Star-Bulletin*'s website, http://starbulletin.com/2003/08/22/news/story1.html.  That page was a posting of a news report from August 22, 2003 concerning the reaction to Judge David Alan Ezra's order that KSBE admit Brayden Mohica-Cummings.  The report quotes Ed Kubo, then United States Attorney for Hawaii:

> Prompted by heated rhetoric against a 12-year-old non-Hawaiian student admitted to Kamehameha Schools, U.S. Attorney Ed Kubo warned yesterday that any violence or threats of violence are federal offenses.
>
> Kubo said he was concerned by public comments by community members that could be seen as inciting violence against Brayden Mohica-Cummings, of Kauai, whose admission to Kamehameha Schools' Kapalama Heights campus was forced by federal court order.
>
> "I have been watching the news and the interviews and the talk shows, and we have references to 'kill haole day every day' or that people are not responsible for the safety of this child and comments like that," Kubo said yesterday.
>
> "Despite the heated debate, there's no need of the urging of violence or talk that lends itself to condoning the violence."
>
> . . . .
>
> Kubo said that inciting violence or threatening can be considered obstruction of justice, a civil rights violation or a federal hate crime.  The penalties are punishable by no less than a year in jail, he said.
>
> Kubo said he has been in contact with Honolulu police to monitor the situation.
>
> Kubo, whose children are part-Hawaiian, praised Headmaster Michael Chun for providing public assurances that Mohica-Cummings will be treated like any other student.  Chun promised to work with students, parents and faculty members to avoid a backlash.

App.331

Case 1:08-cv-00359-JMS-BMK    Document 13-3    Filed 08/29/2008    Page 4 of 13
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 34 of 122
PageID.925

> "We all agree about the importance of Kamehameha Schools to Haw-
> aii and to Hawaii's children, but violence, threatened violence, or the
> wrongful urging of violence has no place in this debate," Kubo said.  "It
> is our desire that cooler heads prevail in this emotional issue facing our
> community."

A true and correct copy of a printout of the cited webpage, with the quoted passages

highlighted, is attached hereto as Exhibit 3.

    5.    On August 11, 2008, I also visited a page on *The Honolulu Advertiser*'s

website, http://the.honoluluadvertiser.com/article/2003/Aug/22/ln/ln02a.html.  That

page was also a posting of a news report from August 22, 2003 concerning the reac-

tion to Judge David Alan Ezra's order that KSBE admit Brayden Mohica-Cummings.

This report corroborates the previous one vis-à-vis the U.S. Attorney's statements:

> Federal law enforcement officials, concerned about threats aired in the
> media toward a Kamehameha Schools student who is not Native Haw-
> aiian, put out a warning yesterday that violence or threats of violence
> based on race are federal offenses.
>
> The warning came from the offices of the U.S. attorney and the federal
> marshal, who said they are so far unaware of any credible threats against
> Brayden Mohica-Cummings, who is not Native Hawaiian and who began
> seventh-grade at the school yesterday under a federal judge's order.  The
> school had rescinded admission to the 12-year-old because he couldn't
> demonstrate he was of Native Hawaiian ancestry.
>
> U.S. Attorney Ed Kubo said he hopes "that cooler heads prevail in this
> emotional issue."
>
> . . . .
>
> Kubo said he was distressed by people quoted in news coverage and by
> callers to morning talk shows expressing "a growing sense of anger and
> rage."

**App.332**

Case 1:08-cv-00359-JMS-BMK    Document 13-3    Filed 08/29/2008    Page 5 of 13
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 35 of 122
PageID.926

"Some of these comments seem to imply that they would condone or turn a blind eye to violence," Kubo said.  He cited one who called KSSK radio yesterday to predict that "now there's going to be 'kill haole day' every day at Kamehameha Schools."

"That concerns me, when I hear the comment that this child is going to be sought out, or that 'we're not going to be responsible for what happens to him,' " he said.

A true and correct copy of a printout of the cited webpage, with the quoted passages highlighted, is attached hereto as Exhibit 4.

6.      In the *John Doe* litigation, a number of organizations collectively calling themselves the "Ohana Council" filed on November 10, 2003 an amicus curiae brief "in support of the Kamehameha Schools Admissions Policy."  On Pages 4 and 5, the brief stated:

> In late August 2003, members of the Ohana Council organized a petition campaign to gather signatures in support of Kamehameha Schools' Admissions Policy, to show the broad-based community support for Kamehameha Schools and its mission of educating Native Hawaiian children.
>
>         . . . .
>
> In less than eight weeks, the Ohana Council gathered 83,950 signatures on the petition.

On Page 7, the brief further stated:

> [B]y any measure, it is an extraordinary feat to gather more than 83,950 signatures in less than eight weeks in support of a private school admissions policy.  Respectfully, in no other state in the country could you find such an overwhelming response by its citizens.

A true and correct copy of the quoted amicus brief is attached hereto as Exhibit 5.

App.333

Case 1:08-cv-00359-JMS-BMK   Document 13-3   Filed 08/29/2008   Page 6 of 13
Case 1:25-cv-00450-MWJS-RT   Document 54-9   Filed 01/21/26   Page 36 of 122
PageID.927

7.      On August 28, 2008, I visited a page on the *West Hawaii Today* website,

http://www.westhawaiitoday.com/articles/2007/08/01/local/local02.prt.   That  page

was a posting of a news report from August 1, 2007, which included the following:

> Twenty-year Hawaii residents Tina and Sanford Mohr filed civil rights
> complaints in December 2004 with the U.S. DOE Office of Civil Rights
> alleging their children, who were both born and raised in Kona, were
> assaulted and repeatedly bullied because of their race and gender.
>
> The Mohr's then 11-year-old daughter suffered severe injuries, includ-
> ing a dislocated jaw, after being assaulted in May 2004 by a fellow, fe-
> male Kealakehe Elementary School student following weeks of taunting
> that included sexually related epithets and racial slurs, such as "f------
> haole."
>
> . . . .
>
> Trinette Feyereisen, whose daughter also was assaulted at a Kealakehe
> school, reported to the federal civil rights office but was unsure whether
> she formally filed a complaint. She said her daughter was targeted be-
> cause of race when she was assaulted by a fellow sixth-grade Kealakehe
> student.
>
> "The ongoing torment—'the f------ haole, haole whore, haole bitch'—
> that treatment after a while wears down your self-esteem," she said.  As
> a result of the assault, Feyereisen's daughter was marked by a black eye
> in her school pictures.

A true and correct copy of a printout of the cited webpage, with the quoted passages

highlighted, is attached hereto as Exhibit 6.

8.      On August 28, 2008, I visited another page on the *Star-Bulletin*'s web-

site, http://starbulletin.com/print/2005.php?fr=/2007/12/04/news/story02.html. That

page was a posting of a news report from December 4, 2007, which began:

**App.334**

Case 1:08-cv-00359-JMS-BMK    Document 13-3    Filed 08/29/2008    Page 7 of 13
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 37 of 122
PageID.928

> An assault case at the Waikele Center earlier this year that garnered na-
> tional news attention because of racial overtones is over, with the at-
> tacker getting a five-year prison term.
>
> Gerald D. Paakaula, 44, received the prison sentence in Circuit Court
> yesterday for beating Staff Sgt. Andrew Dussell into unconsciousness
> and breaking the nose of Dussell's wife, Dawn, 23, after a minor traffic
> incident Feb. 19.
>
> Paakaula's son screamed at Dussell, calling him a "f---- haole" several
> times, and later, Paakaula himself used the same expression.

A true and correct copy of a printout of the cited webpage, with the quoted passage

highlighted, is attached hereto as Exhibit 7.

9.    On August 28, 2008, I visited another page on the *Star-Bulletin*'s web-

site, http://starbulletin.com/print/2005.php?fr=/2007/12/05/news/story03.html. That

page was a posting of a news report from December 5, 2007, which began:

> When Waiakea Intermediate School student Evelyn Higgins had her
> head bashed against a wall by another girl two weeks ago, the incident
> followed a nasty exchange of words.  The attacker called Evelyn a "f--
> haole."  Evelyn called the attacker a "slut."
>
> Evelyn, 12, had a gash in her head closed with 10 surgical staples.

A true and correct copy of a printout of the cited webpage, with the quoted passage

highlighted, is attached hereto as Exhibit 8.

10.    I am the plaintiff in an action styled *Grant v. Kamehameha Schools/Ber-*

*nice Pauahi Bishop Estate*, No. 2:08-cv-00672-FCD-KJM, pending in the U.S. Dis-

trict Court for the Eastern District of California.  Both the plaintiff in the *John Doe*

litigation and his mother, Jane Doe, are parties to that action.  On April 3, 2008, Jane

**App.335**

Case 1:08-cv-00359-JMS-BMK    Document 13-3    Filed 08/29/2008    Page 8 of 13
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 38 of 122
PageID.929

Doe filed in the California action a declaration in support of her motion for a temporary restraining order and a preliminary injunction against KSBE. That declaration, executed under penalty of perjury on April 2, 2008, reads in part (emphasis and alterations in original declaration):

> 9.    On February 8, 2008, the Honolulu Advertiser printed an article setting forth the monetary terms of the settlement with the Estate. A true and correct copy of this article is attached as Exhibit 3. The Honolulu Advertiser article specifically states that the information regarding the terms of the settlement was provided to it by Goemans.

> 10.    According to the Advertiser's web site, there have been 1551 comments posted by readers to the Advertiser's February 8, 2008 article disclosing the terms of the settlement case. I have reviewed most of these posts. Many of them are extremely critical of us. Some include threats of violence against us. Examples of the negative comments and threats posted to the Honolulu Advertiser's February 8, 2008 article include:

>> "Seriously...Lawyers like Grant should be killed off...what a slime ball he his...and the "John Doe" hiding behind...grrr...makes my non Hawaiian blood boil....greedy SOB's they all are...**If I catch these people alone just for a few minutes ...I guarantee I would break every bone and make this bastards suffer....**" [Emphasis Added]

>> "I cannot believe that these people have the nerve to go there!!! Kamehameha Schools was formed well before we became a state! So I feel that has nothing to do with the constitution that the United states has forced upon us! **Im scared for the boy. His stupid parents were the greedy ones and now the boy will have to pay. Now he is probably going to get beat up. I know people who attend Kamehameha, who want to kick this boys \*\*\*\*** I pray he'll be spared that humiliation. Thanks for listening." [Emphasis Added]

**App.336**

Case 1:08-cv-00359-JMS-BMK    Document 13-3    Filed 08/29/2008    Page 9 of 13
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 39 of 122
PageID.930

> "I believe someone should go out there to review the California court records to find out who this John and Jane Doe is.  Why hide behind the scenes and be ashamed of what they did to the Hawaiian children that may be stripped of their benefits.  They need to stand up and face those that they are robbing."

11.    I have lived in Hawaii for many years. The negative comments and threats posted to the Honolulu Advertiser's February 8, 2008 article are entirely consistent with my experience with many local residents regarding the admissions policy of the Kamehameha Schools. Based upon the posts on the Advertiser's web site and my experience in living in Hawaii for many years, both John Doe and I fear for our safety if our identities are made public by the Estate.  We are prepared to move and go into hiding if the estate in fact makes our identities public.

A true and correct copy of Jane Doe's declaration is attached hereto as Exhibit 9.

11.    On August 27, 2008, I visited another page on the *Advertiser*'s website, http://www.honoluluadvertiser.com/apps/pbcs.dll/article?AID=/20080807/NEWS01/808070356/1001&template=printart.  That page was a posting of a news report from August 7, 2008 concerning the filing of the present action.  A true and correct copy of a printout of the cited webpage is attached hereto as Exhibit 10.

12.    The *Advertiser*'s August 7th report generated numerous comments on the *Advertiser*'s website.  On August 11, 2008, I viewed webpages containing these comments.  Following are two such comments, both posted on August 7, 2008.  True and correct copies of printouts of the cited webpages, with the quoted passages highlighted, are attached hereto as the indicated exhibits:

- 8 -

**App.337**

Case 1:08-cv-00359-JMS-BMK   Document 13-3   Filed 08/29/2008   Page 10 of 13
Case 1:25-cv-00450-MWJS-RT   Document 54-9   Filed 01/21/26   Page 40 of 122
PageID.931

• At 9:00:24 a.m., commenter "Dakar" wrote:  "Just think how much more fun it would be at [Kamehameha Schools] if they could celebrate Kill Haole Day like all the other schools!"  http://www.honoluluadvertiser.com/apps/pbcs.dll /section?Category=pluckcomments&key=20080807.honoluluadvertiser. M1808070356.article.NEWS01&s=a&page=14#pluckcomments (Exhibit 11).

• At 9:19:10 a.m., commenter "WestSydeJay" wrote:  "this is all for the money. why not go UH or HPU?  why go somewhere youre not wanted?  Youre jus gonna get lickins everyday and drop out anyway, so why bother?"  http://www. honoluluadvertiser.com/apps/pbcs.dll/section?Category=pluckcomments&key =20080807.honoluluadvertiser.M1808070356.article.NEWS01&s=a&page= 15#pluckcomments (Exhibit 12).

13.    On August 27, 2008, I visited another page on the *Star-Bulletin*'s web-site, http://starbulletin.com/print/2005.php?fr=/2008/08/07/news/story01.html.  That page was a posting of a news report from August 7, 2008 concerning the filing of the present action.  A true and correct copy of a printout of the cited webpage is attached hereto as Exhibit 13.

14.    The *Star-Bulletin*'s August 7th report generated numerous comments on the *Star-Bulletin*'s website.  On August 11, 2008, I viewed various pages containing these comments.  Following are a list of some of the comments, all of them posted on August 7, 2008.  True and correct copies of printouts of the cited webpages, with the quoted passages highlighted, are attached hereto as the indicated exhibits:

• In comment #8, commenter "mahealani" wrote:  "Leave the Hawaiians alone. You 'rOSEN' people have taken everything that the Hawaiians had and have. Go to another country and take what they have.  If you can't deal with this school then why the he— did you people come here.  no other groups of people have 'bitched' over this just you white folks." http://www.topix.net/forum/ source/honolulu-star-bulletin/TQEUFKT1CJF1EJ1HF (Exhibit 14).

App.338

Case 1:08-cv-00359-JMS-BMK    Document 13-3    Filed 08/29/2008    Page 11 of 13
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 41 of 122
PageID.932

- In comment #25, commenter "a final solution" wrote: "If I had $7B+ and somebody was bugging me, . . . I'd give a bag o' dough to the best people in any business who would help the honorables mr. grant, mr. goemans and mr. rosen to see the light. C'mon, Kamehameha. Being sued isn't news anymore. It's time to get off of your butts and be proactive, not reactive." http://www.topix.net/forum/source/honolulu-star-bulletin/TQEUFKT1CJF1EJ1HF/p2 (Exhibit 15).

- In comment #61, commenter "Proud Hawaiian" wrote: "If I may repeat myself, DO NOT support David Rosen or Eric Grant by not using their services and asking all your family, friends, and acquaintensces to not use their legal services."   http://www.topix.net/forum/source/honolulu-star-bulletin/TQEUFKT1CJF1EJ1HF/p3 (Exhibit 16).

- In comment #225, commenter "Imua Kamehameha" wrote: "If Rosen and the other haole attorneys continue doing this, one day they're gonna be targeted by some crazy Hawaiian or group of Hawaiians armed with baseball bats or guns—because they won't be able to take it any more. Every day is going to become 'Kill haole attorney day'. The situation is going to be so bad, I don't think you don't want to even go there." http://www.topix.net/forum/source/honolulu-star-bulletin/TQEUFKT1CJF1EJ1HF/p11 (Exhibit 17).

- In comment #225, commenter "Imua Kamehameha" wrote: "This is different. One day a crazy **** with a bat or a gun will kill the attorneys pushing this case."   http://www.topix.net/forum/source/honolulu-star-bulletin/TQEUFKT1CJF1EJ1HF/p12 (Exhibit 18).

- In comment #290, commenter "UNITED SUE OF AMERICA" wrote: "This is just a vision of how people try to screw others tradition and their 'will' for their greed. . . . Now lets imagine, what they're doing ...will come around one way or another back to them." http://www.topix.net/forum/source/honolulu-star-bulletin/TQEUFKT1CJF1EJ1HF/p14 (Exhibit 19).

- In comment #393, commenter "haven" wrote: "These 4 kids and their families should be named and be ashamed of themselves for trying to make a quick buck even their attorneys!  Auwe to the Haoles!  Kamehameha Schools be the Warriors for all us hawaiians now!"  http://www.topix.net/forum/source/honolulu-star-bulletin/TQEUFKT1CJF1EJ1HF/p18 (Exhibit 20).

App.339

Case 1:08-cv-00359-JMS-BMK   Document 13-3   Filed 08/29/2008   Page 12 of 13
Case 1:25-cv-00450-MWJS-RT   Document 54-9   Filed 01/21/26   Page 42 of 122
PageID.933

15.     On August 8 and 11, 2008, I corresponded in writing with KSBE counsel Paul Alston.  In that correspondence, I proposed that the parties enter into a stipulated protective order based on the parties' agreement in the *John Doe* case.  Such order would, by providing KSBE's counsel with Plaintiffs' identities under sufficient safeguards of confidentiality, allow KSBE to verify the standing-related allegations in the complaint and otherwise defend against Plaintiffs' claim, while protecting the four plaintiff children and their families from harassment and retaliation by members of the public.  I noted that Mr. Alston had previously rejected this proposal, but I reiterated it in hopes of resolving the issue without the need to involve the Court.

16.     On August 25, 2008, Mr. Alston responded in writing.  On Defendants' behalf, he again rejected my proposal for a stipulated protective order that would permit Plaintiffs to proceed anonymously.  Rather, he insisted that Plaintiff must file a motion seeking leave to proceed in that manner.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on August 29, 2008.

/s/ Eric Grant
Eric Grant

Counsel for Plaintiffs

- 11 -

**App.340**

Case 1:08-cv-00359-JMS-BMK   Document 13-3   Filed 08/29/2008   Page 13 of 13
Case 1:25-cv-00450-MWJS-RT   Document 54-9   Filed 01/21/26   Page 43 of 122
PageID.934

## CERTIFICATE OF SERVICE

I hereby certify that, on the dates and by the methods of service noted below, a true and correct copy of the foregoing was served upon the following at their last known addresses:

### Served electronically through CM/ECF:

| | | |
|---|---|---|
| Paul Alston | palston@ahfi.com | August 29, 2008 |
| Louise K.Y. Ing | ling@ahfi.com | August 29, 2008 |
| Jason H. Kim | jkim@ahfi.com | August 29, 2008 |

### Served by first-class mail:

Kathleen M. Sullivan                                                    August 29, 2008
Quinn Emanuel Urquart Oliver & Hedges LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

Colleen I. Wong                                                          August 29, 2008
Livingston S. M. Wong, Jr.
Sabrina R. Toma
Kawaihao Plaza
567 South King Street, Suite 310
Honolulu, Hawaii 96813

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 29, 2008.

/s/ Eric Grant
Eric Grant

Counsel for Plaintiffs

**App.341**

# EXHIBIT D

App.342

Of Counsel:
ALSTON HUNT FLOYD & ING
Attorneys At Law
A Law Corporation

PAUL ALSTON                        1126-0
LOUISE K. Y. ING                   2394-0
CLYDE J. WADSWORTH                 8495-0
American Savings Bank Tower
1001 Bishop Street, 18th Floor
Honolulu, Hawai`i  96813
Telephone:  (808) 524-1800
Facsimile:   (808) 524-4591
E-mail:  palston@ahfi.com
         ling@ahfi.com
         cwadsworth@ahfi.com

Attorneys for Plaintiffs
NAINOA THOMPSON, DIANNE J. POTTS,
CORBETT A.K. KALAMA, ROBERT K.U.
KIHUNE and J. DOUGLAS ING, in their
capacity as Trustees of the Estate of
Bernice Pauahi Bishop

## IN THE CIRCUIT COURT OF THE THIRD CIRCUIT

## STATE OF HAWAI`I

| | | |
|---|---|---|
| NAINOA THOMPSON, DIANNE J. POTTS, CORBETT A.K. KALAMA, ROBERT K.U. KIHUNE and J. DOUGLAS ING, in their capacity as Trustees of the Estate of Bernice Pauahi Bishop, | ) ) ) ) ) ) | Civil No. _____ (Hilo) (CONTRACT) **COMPLAINT; SUMMONS** |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| JOHN DOE and JANE DOE, | ) ) | |
| Defendants. | ) ) ) | |

**App.343**

## COMPLAINT

Plaintiffs NAINOA THOMPSON, DIANNE J. POTTS, CORBETT A.K.

KALAMA, ROBERT K.U. KIHUNE and J. DOUGLAS ING, in their capacity as

Trustees of the Estate of Bernice Pauahi Bishop (the "Estate") (collectively,

"Plaintiffs"), by and through their counsel, Alston Hunt Floyd & Ing, bring this

action against Defendants JOHN DOE and JANE DOE (the "Does" or

"Defendants"), and allege as follows:

### PARTIES

1.      Plaintiffs are the trustees of the Estate, which is a charitable

educational trust.  Plaintiffs are residents of the City & County of Honolulu,

State of Hawai`i.  The Estate's principal place of business is Kawaiahao Plaza,

567 South King Street, Suite 200, Honolulu, Hawai`i 96813.

2.      Defendants are residents of the County of Hawai`i, State of

Hawai`i.  Defendants are sued under fictitious names for the reasons explained

below.

### JURISDICTION

3.      This Court has jurisdiction based on Haw. Rev. Stat.

§ 603-21.5.

4.      Venue is proper in this Circuit under Haw. Rev. Stat.

§ 603-36 because Defendants reside in this Circuit, and some of the acts in

question took place in this Circuit.

App.344

**GENERAL ALLEGATIONS**

5.    The Does filed a lawsuit against the Estate on June 25, 2003 in the United States District Court for the District of Hawai`i, Civil No. CV03-00316 ACK LEK, seeking declaratory relief, a permanent injunction, and compensatory and punitive damages (the "Underlying Litigation").  The Does were designated by the fictitious names "John Doe" and "Jane Doe" because the Does asserted that they were concerned about the possible danger of invasion of their privacy, retaliation and physical or mental harm.  The Does' attorneys of record in the Underlying Litigation – in the District Court, the Ninth Circuit Court of Appeals, and the United States Supreme Court – included both John W. Goemans and Eric Grant.

6.    On May 11, 2007, after the Does lost in both the District Court and the Ninth Circuit Court (en banc), and while the Does' Petition for Certiorari was pending before the Supreme Court, the Does and the Plaintiffs reached a settlement that resolved the Underlying Litigation.  The settlement was embodied in a written agreement to which the signatures of the Does and the Estate's representatives were affixed (the "Settlement Agreement").  The parties' attorneys approved the Settlement Agreement as to form.

7.    The Settlement Agreement obligated the Estate to pay "to Doe" a confidential sum by wire transfer to Grant's client trust account, and obligated the Does to withdraw their petition for certiorari, which was then pending before the Supreme Court.  The Settlement Agreement released all

**App.345**

parties and their attorneys from all claims relating to the claims asserted in the Underlying Litigation.

8.    The Settlement Agreement further provided that no signatory or releasee – "including counsel" – would disclose the Does' names or any term of the Settlement Agreement, including, specifically, the amount of the settlement.  Under the terms of the Agreement, signatories were made liable for any actions of their attorneys which violate the confidentiality provision of the Settlement Agreement.  The confidentiality requirement was expressly made "a material term" of the Agreement.

9.    Pursuant to the Settlement Agreement, the Does dismissed the certiorari petition, and the Estate made the required payment.

10.    On or about February 7, 2008, Goemans spoke by telephone with representatives of newspapers and television stations in Hawai`i.  In those interviews, Goemans disclosed details of the Settlement Agreement, including what he claimed to be the amount of the settlement between the Does and Plaintiffs.

11.    On February 8, 2008, The Honolulu Advertiser published details of the Settlement Agreement based upon Goemans' disclosures.

12.    As a result of the acts and omissions of Defendants and their attorneys, both Plaintiffs and Defendants were sued by one of Defendants' lawyers, Eric Grant, on March 28, 2008, in the United States District Court for the Eastern District of California in *Grant v. Kamehameha Schools/Bernice Pauahi Bishop Estate, Case No. 2:08-cv-00672-FCD-KJM* (the "California Suit").

**App.346**

In the suit, Grant sought, among other things, a declaratory judgment against the Estate establishing that he did not breach any duties owed to the Estate under the Settlement Agreement and he is therefore not liable to the Estate. The California Suit was an effort by Grant to pre-empt any lawsuit that Plaintiffs might bring in the State of Hawai`i arising from the unauthorized disclosures of settlement terms and Defendants' and their lawyers' other wrongful acts and omissions.

13. The Does cross-claimed against the Estate in the California Suit, seeking similar declaratory relief, as well as an injunction against the Estate from disclosing the Does' true identities. The Does' claim for an injunction was based on their alleged fear that the Estate would reveal their true identities in the course of proceedings to obtain redress for breach of the Settlement Agreement. Plaintiffs have never intended to reveal the Does' identities in violation of any court order.

14. At all times relevant to this Complaint, Plaintiffs have fully complied with and performed their obligations under the Settlement Agreement.

**FIRST CLAIM FOR RELIEF**
**(BREACH OF CONTRACT)**

15. Plaintiffs reallege and incorporate the allegations contained in Paragraphs 1-14 above, as if fully set forth herein.

16. The acts and omissions of Defendants and their lawyers which led to disclosure of the terms of the Settlement Agreement constituted

App.347

material breaches of the Settlement Agreement and the duties and obligations Defendants owed to Plaintiffs thereunder.

17.     As a direct result of Defendants' material breaches of the Settlement Agreement, Plaintiffs have incurred substantial and continuing legal expenses and consequential damages arising from the need to defend and protect their rights and interests in the California Suit.

18.     As a direct result of Defendants' material breaches of the Settlement Agreement, Plaintiffs suffered and continue to suffer damages in amounts to be proven at trial, including but not limited to legal and other expenses incurred and to be incurred as a result of the California Suit, other compensatory, consequential and other special damages incurred by Plaintiffs as a result of Defendants' failure to honor their obligations under the Agreement, and  attorneys' fees and costs in defending and pursuing their rights under the Settlement Agreement.

## SECOND CLAIM FOR RELIEF
### (UNJUST ENRICHMENT)

19.     Plaintiffs reallege and incorporate the allegations contained in Paragraphs 1-14 above, as if fully set forth herein.

20.     Plaintiffs bestowed a benefit on Defendants by the payment of monies in part to ensure the confidentiality of the settlement terms by Defendants and their counsel.

21.     The subsequent disclosure of the settlement terms by Defendants' counsel in violation of the Settlement Agreement makes the retention of the monies received from Plaintiffs unjust.

App.348

22.     The conduct of Defendants and their counsel is contrary to the fundamental principles of equity and good conscience.  Defendants should be ordered to make restitution to Plaintiffs in an amount to be proven at trial, and be ordered to compensate Plaintiffs for the fair and reasonable value of their unjust retention and use of these benefits, in addition to monetary damages, including but not limited to legal and other expenses incurred and to be incurred as a result of the California Suit, other compensatory, consequential and other special damages incurred by Plaintiffs as a result of Defendants' failure to honor their obligations under the Agreement, and  attorneys' fees and costs in defending and pursuing their rights under the Settlement Agreement.

### THIRD CLAIM FOR RELIEF
### (INTENTIONAL/RECKLESS MISREPRESENTATION)

23.     Plaintiffs reallege and incorporate the allegations contained in Paragraphs 1-22 above, as if fully set forth herein.

24.     In order to induce Plaintiffs to enter into the Settlement Agreement, Defendants affirmatively represented that they had read the terms of the Agreement and that they and their attorneys would abide by such terms, including the confidentiality requirements.

25.     Defendants made the representation that they had read the terms of the Settlement Agreement with knowledge that it was false. Defendants made the representation that they and their attorneys would abide by the terms of the Settlement Agreement with knowledge that it was false or made this representation recklessly without knowledge whether it was true or false.  Upon information and belief, they did so by, among other things, signing

6

**App.349**

the Agreement without reading, knowing or seeking to determine and understand all of its terms.

26.    Defendants contemplated that Plaintiffs would rely on these representations in entering into the Settlement Agreement.

27.    Plaintiffs reasonably believed Defendants' misrepresentations were true and did in fact rely on these misrepresentations in their decision to enter into the Settlement Agreement.

28.    As a result of Defendants' misrepresentations, Plaintiffs have been damaged in an amount to be proven at trial, including but not limited to legal and other expenses incurred and to be incurred as a result of the California Suit, and other compensatory, consequential and special damages incurred by Plaintiffs as a result of Defendants' misrepresentations.

WHEREFORE, Plaintiffs pray for judgment against Defendants and each of them, jointly and severally, and for relief as follows:

A.    For an award of special, general, compensatory and consequential damages in an amount to be proven at trial;

B.    For an award of reasonable attorneys' fees and costs as provided by law;

C.    For pre-judgment and post-judgment interest in an amount to be proven at trial; and

D.    For such other and further relief as this Court may deem just and proper.

App.350

Dated:  Honolulu, Hawai`i, August 6, 2008.

_____

PAUL ALSTON
LOUISE K.Y. ING
CLYDE J. WADSWORTH
Attorneys for Plaintiffs
NAINOA THOMPSON, DIANNE J. POTTS,
CORBETT A.K. KALAMA, ROBERT K.U.
KIHUNE and J. DOUGLAS ING, in their
capacity as Trustees of the Estate of
Bernice Pauahi Bishop Estate

App.351

IN THE CIRCUIT COURT OF THE THIRD CIRCUIT

STATE OF HAWAI`I

| | | |
|---|---|---|
| NAINOA THOMPSON, DIANNE J. POTTS, CORBETT A.K. KALAMA, ROBERT K.U. KIHUNE and J. DOUGLAS ING, in their capacity as Trustees of the Estate of Bernice Pauahi Bishop, | ) ) ) ) ) ) ) | Civil No. _____ (Hilo) (CONTRACT) **SUMMONS** |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| JOHN DOE and JANE DOE, | ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

STATE OF HAWAII

To the above-named Defendant(s):

You are hereby summoned and required to serve upon ALSTON

HUNT FLOYD & ING, attorneys for Plaintiffs, whose address is 18th Floor,

American Savings Bank Tower, 1001 Bishop Street, Honolulu, Hawai`i 96813,

an answer to the Complaint which is herewith served upon you, within twenty

(20) days after service of this Summons upon you, exclusive of the day of

service.  If you fail to do so, judgment by default will be taken against you for

the relief demanded in the Complaint.

This Summons shall not be personally delivered between

10:00 p.m. and 6:00 a.m. on premises not open to the general public, unless a

judge of the above-entitled court permits, in writing on this Summons,

personal delivery during those hours.

679185_1 \ 8348-3

**App.352**

A failure to obey this Summons may result in an entry of default

and default judgment against the disobeying person or party.

DATED: _____, Hawai'i, _____.


_____
CLERK OF THE ABOVE-ENTITLED COURT

App.353

# EXHIBIT E

App.354



# Kamehameha Schools®

Education    Applications and aid    ʻĀina and community

News    Alumni    About us    Contact us

# Terms and conditions

## Menu

- **About us home**
- **Pauahi: The legacy of a princess**
- **Our faith**
- **Trustees and executives**
- **Publications and resources**
- **Join our mailing list**
- **News**
- **Contact us**
- **Find a job at KS**

# General Statement of Information Privacy

## Scope

Kamehameha Schools and its subsidiaries (collectively "KS") provide education and related services. In the normal course of these activities, KS collects, maintains and discloses information associated with individuals, some of which may be confidential while some may be non-confidential. This General Statement of Information Privacy (this "Statement") addresses a number of KS information handling practices that apply to individually identifiable confidential information and outlines other practices that apply to individual information that is not necessarily confidential. These practices include both traditional paper based information handling activities as well as information collected by KS through websites owned, controlled, or operated by KS under a number of

App.355

domains including ksbe.edu and pauahi.org. These sites are collectively known as the "KS Web." Some individually identifiable confidential information handling practices may be subject to additional information privacy provisions as identified in later segments of this statement. Information that is collected by KS in connection with its commercial transactions with individuals and legal entities may be subject to other contractual terms, agreements or regulations.

By using the KS Web, User agrees to be bound by the following terms and conditions and privacy policy stated herein.

# Purpose and Format

This Statement has been organized into the following sections that: (1) identify four general guidance rules for collecting and sharing individual information; (2) provide explanations of specific supplements to the four general guidance rules that provide extended privacy provisions for certain types of information handling; and (3) describe the typical practices employed by KS to address the four general guidance rules and their supplements. The content areas for this Statement are as follows:

# General Rules Regarding the Collection and Sharing of Individually Identifiable Information

1. Conformance with Legal and Professional Standards Regarding Confidential Information
2. Collection and Sharing of Individual Information that is Not Deemed Confidential
3. Contact "Opt-In" and "Opt-Out"
4. Third-Party Websites
5. Conformance with Legal and Professional Standards

App.356

Regarding Confidential Information

6. Collection and Sharing of Individual Information that is Not Deemed Confidential
7. Contact "Opt-In" and "Opt-Out"
8. Third-Party Websites
9. Conformance with Legal and Professional Standards Regarding Confidential Information
10. Collection and Sharing of Individual Information that is Not Deemed Confidential
11. Contact "Opt-In" and "Opt-Out"
12. Third-Party Websites

# Specific Privacy Supplements to the General Rules

- Student Records including Financial Information Collected for Financial Assistance Programs
- Collection and Use of Family Genealogy Data for Ancestry Verification
- Financial Information Provided for a Land Transaction Agreement and/or Potential Mortgage
- Credit Card Sales Over the KS Web or Other Direct Sales Programs

# Typical Practices Observed by KS in Meeting the General Rules and Specific Privacy Supplements

- Interactions with Individuals under Thirteen Years of Age
- Social Security Numbers and Other Government Issued Personal Identification Numbers
- Information Security and Destruction of Confidential Information

App.357

- Medical Information
- Credit Bureau Information
- Other Information Obtained from Third-Parties
- Web Server Login Information that KS may Gather
- Cookies and Login Security

## Changes to the General Statement of Information Privacy

Please be aware that this Statement may be amended periodically. KS will not diminish your rights under this Statement without your open consent. KS will also post any changes to the Statement on this page and, if the changes are significant, will provide a more prominent notice.

---

# General Rules Regarding the Collection and Sharing of Individually Identifiable Information

The following are four general rules observed by KS regarding the collection, maintenance and sharing of individual information collected by KS through the KS Web and other means. In this Statement, all of the individually identifiable information that is "confidential" is collectively called, "Confidential Information".

**App.358**

# 1. Conformance with Legal and Professional Standards Regarding Confidential Information

KS is committed to providing appropriate privacy and security of Confidential Information provided to KS in the conduct of its activities. KS obtains, uses, stores, shares and disposes of confidential information consistent with applicable federal and state laws.

In order to provide effective educational and other related services, KS collects, maintains and shares Confidential Information internally with its divisions and departments, and externally with its subsidiaries and third-parties. Examples of Confidential Information KS obtains about individuals includes:

- **Application Information:** Confidential Information KS receives voluntarily from students and their parents, such as: application information that may include family financial information used to determine eligibility for financial aid.
- **KS Web Information:** Confidential Information KS collects or issues via the KS Web such as passwords.
- **Credit Reports:** Confidential Information KS receives in reports from consumer reporting agencies KS uses for qualifying individuals for credit, employment and other permitted purposes.
- **Third-Party Educational Information:** Confidential Information KS obtains from third-parties regarding KS students and parents such as Confidential Information from the State Department of Education.
- **Internal KS Educational Records:** Confidential Information KS collects or generates internally regarding certain aspects of student academic performance and

**App.359**

disciplinary actions.

Subject to an individual's right to opt-out of the sharing of credit report information, KS may share all of the above information with its subsidiaries when KS determines that the sharing of the Confidential Information is necessary and appropriate. However, it is KS's usual practice not to share Confidential Information that it collects with third-parties, except as permitted by law or as disclosed in this Statement. When circumstances arise for the need to share Confidential Information, KS may share the Confidential Information described above, except for consumer credit reports, with third-parties as follows:

- As authorized by law;
- As permitted under this General Statement or other formally adopted KS privacy statements,
- As required in connection with educational and financial aid programs administered by third-parties and their agents such as FACTS and the Departments of Education, in order to assist those third-parties in the delivery of their programs.
- As clearly stated by KS program materials or other notifications, such as notices on the KS Web, that the Confidential Information will be shared and the user indicates the user's consent by providing the Confidential Information; or
- When consent is otherwise given.

# 2. Collection and Sharing of Individual Information that is Not Deemed Confidential

In order to provide effective educational and other related services, various operations within KS involve the collection of

**App.360**

web use information or other information that may be identifiable to individuals but is not formally private or confidential. Examples of individual information that is not necessarily confidential may include:

- **Participation in KS Programs:** Non-confidential information KS collects regarding individual constituent participation in educational activities or other programs offered by KS.
- **Directory Information:** Non-confidential information KS maintains such as KS generated IDs, name, address, telephone number, date of birth, participation in activities offered by KS, degrees and awards received, most recent and previous educational institutions attended.
- **Parent to Parent Information:** Non-confidential information KS may collect and make available from parent to parent in the form of student directories or the identity of parents who choose to cooperate together in education related activities such as booster clubs or mentoring services.
- **KS Web Information:** Non-confidential information such as the IP Address (computer identity) of those who access the KS Web or the sequencing of Web pages visited as used to improve KS services.
- **Cookie Enabled Information:** Non-confidential information that may be obtained via KS Web cookies (computer use files) which are transferred to a user's hard drive to enable the KS Web to deliver personal services.

It is KS's usual practice not to share individual information that it collects with those outside KS unless the sharing party is an aligned organization participating in the KS mission. However, when circumstances arise for the need to share information gathered from KS operations, KS may share individual non-confidential information:

**App.361**

- As permitted by law,
- As allowed under this General Statement or other formally adopted KS privacy statements,
- As authorized by an approved KS contract,
- As clearly stated by KS program materials or other notifications (e.g., a KS website) that such information will be shared and the user indicates consent by providing the information,
- When consent is otherwise given, or
- As authorized for good cause by KS management

# 3. Contact 'Opt-In' and 'Opt-Out'

In its effort to best provide services, KS may seek to better identify the groups that it serves and to contact persons in those groups regarding its services. As such, KS uses the KS Web or other information collection procedures that allow individuals to authorize KS to contact those users about its services. These authorizations may at times also involve the use of 'Opt-Out' elections that users may select in order to indicate their desire not to be contacted. In some cases, where KS is proactively seeking to establish contact, KS may use default 'Opt-In' provisions that do not require individuals to make an active option selection to receive further contact.

# 4. Third-Party Websites

In certain cases, the KS Web may link to third-party websites such as those providing retail sales of school related products. In such cases, KS cannot be responsible for the user terms and privacy policies adopted by the third-party sites, and KS Web users are advised to check the terms of use and privacy policies provided by those third-party webs prior to providing any personal information. Individuals who use the KS Web to access third-party websites do so at their own risk and KS is not responsible for the content of those websites or for any

**App.362**

problems an individual experiences when they visit and use the third-party websites, including but not limited to any unauthorized use of personal information provided to the third-party website or for any transactions individuals may perform through those websites.

# Specific Privacy Supplements to the General Rules

In addition to the general rules described above, KS has adopted more specific privacy provisions regarding the collection and sharing of Confidential Information associated with certain collection activities. Some of those special cases are noted below.

- Student Records including Financial Information Collected for Financial Assistance Programs: KS generally seeks to protect the individual privacy of educational records. KS reserves the right to release Confidential Information to its subsidiaries and qualified third-parties, such as school officials from other educational institutions that are involved or may be involved in the students' education. Parents and students are allowed to:

  1. inspect, review and obtain copies of their own education record,
  2. request that others review the student's education record (except where Kamehameha is required or authorized to allow others to review the record without parent/student permission). Requests should be made in writing to the Principal or his/her

**App.363**

designee.

3. obtain copies of Kamehameha's policies and procedures concerning parent/student access to education records. Requests should be made at the appropriate campus or educational administrator site office.

- Collection and Use of Family Genealogy Data for Ancestry Verification: The Ho'oulu Hawaiian Data Center (HHDC) at KS administers a Hawaiian Ancestry Registry ("HAR") program in order to allow potential KS trust beneficiaries to document their Hawaiian ancestry for purposes of KS' Admissions Policy which gives preference to applicants of Hawaiian ancestry. Information is collected primarily via a paper based HAR form and accompanied by certified public or government issued documents. Additional KS Web services for the collection and verification of such data are continually being considered and developed by KS. All genealogical information provided for the purposes of verifying one's ancestry with HHDC is held strictly confidential and is not shared with third parties or non-HHDC-authorized personnel. The ancestry database is accessible only by personnel authorized by HHDC and is not accessible through the KS Web.

- Financial Information Provided for a Land Transaction Agreement and/or Potential Mortgage: KS does not disclose Confidential Information about its former lessees or borrowers to any affiliated or non-affiliated third-parties, except as permitted by law and in accordance with its Financial Privacy Notice.

- Credit Card Sales Over the KS Web or Other Direct Sales Programs: KS may initiate and expand sales of school supplies or KS related products and services over the KS Web or through catalog and direct sales programs. KS does not share, trade or sell Confidential Information of

**App.364**

buyers for commercial or advertising purposes. For other commercial websites that may be linked to or from the KS Web, but are not operated by KS, web users are urged to check the applicable terms of use and privacy statements for those third-party websites.

In addition to these specific variations, other KS divisions and subsidiaries that maintain web pages or sites on the KS Web may have different Confidential Information gathering policies and procedures and may adopt appropriate privacy practices as their specific needs require. While an attempt has been made in this Statement to highlight notable variations, other variations may exist and may be disclosed in separate KS privacy statements and notices.

Some forms of Confidential Information may, at times, be received by KS but fall outside standard KS privacy protections if the Confidential Information is received by KS inadvertently or outside the regular KS Confidential Information collection processes. This may include Confidential Information that is provided to KS in the absence of a request by KS for the Confidential Information such as when the Confidential Information is included with typically non-confidential material. This form of inadvertent Confidential Information collection may occur in situations such as when an individual enrolls in a KS program and includes a Social Security Number on an application where no field exists to collect that information and where there was no intent on the part of KS to collect that information. In such cases, the application forms may not be handled with the presumption that confidential information exists on the forms.

# Typical Practices

App.365

# Observed by KS in Meeting the General Rules and Specific Privacy Supplements

## Interactions with Individuals under Thirteen Years of Age

KS is committed to protecting the privacy and safety of our children. Accordingly, if a user of the KS Web is under the age of thirteen, such user is requested not to provide KS with personally identifying information including Confidential Information, and KS will not knowingly use any such information in its database or as part of other data collection activities. KS cautions users under the age of thirteen and their parents or guardians that the collection of individual Information voluntarily provided by such a user without the knowledge of KS via the KS Web or other electronic or paper methods will be treated by KS the same way as information given by an adult. In addition, such information may be subject to public access until KS becomes aware that the information provider is under the age of thirteen. These provisions do not apply to the regular school interactions or homework assignments of under thirteen KS learners participating in on-going KS educational activities.

## Social Security Numbers and Other Government Issued Personal Identification Numbers

App.366

Terms and conditions | Kamehameha Schools
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 69 of 122    1/19/26, 2:50 PM
PageID.960

It is KS's general practice to avoid the collection of Social Security Numbers ("SSNs") and other government issued personal identification numbers unless those numbers are required for compliance with state and federal law and/or are needed for effective service delivery. For example, SSNs are required for various forms of financial aid assistance assessments as well as other assessments for credit. At present, no practical alternatives to SSN collection and use appear feasible for certain operations, but KS continues to look for methods to reduce SSN use. Persons interacting with KS should avoid providing SSNs and other government issued personal identifiers in general correspondence or email, but should instead provide such identification only via the specific forms for doing so in accordance with applications or KS Web forms specifically created by KS for collecting such information.

# Information Security and Destruction of Confidential Information

The security of Confidential Information is a priority at KS. KS employs information security practices consistent with the standards and practices adopted by other educational institutions, and by businesses which provide similar services. KS protects Confidential Information by maintaining physical, electronic and procedural safeguards that comply with applicable state and federal laws. KS trains its employees in the proper handling of Confidential Information. When KS uses third-parties for services, KS requires these third-parties to protect the confidentiality of any Confidential Information they receive. KS also disposes of Confidential Information in accordance with applicable state and federal laws.

**App.367**

Terms and conditions | Kamehameha Schools
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 70 of 122    1/19/26, 2:50 PM
PageID.961

# Medical Information

KS collects medical information regarding its students and may collect medical information at times for others such as KS employees. KS policies regarding the handling and safekeeping of medical information are intended to be consistent with legal requirements for K-12 academic environments and with respect to employees generally.

# Credit Bureau Information

KS may from time to time attempt to verify information provided to KS regarding personal or family financial status. As such, KS may order consumer reports and other credit bureau reports, and may also provide credit information to credit bureaus such as information on late payments or a person's failure to meet other payment obligations. KS may share those reports with its subsidiaries and affiliates. If you believe that information about you has been reported inaccurately by KS or that inaccurate information has been provided to KS by a credit bureau, please provide a full description of your concerns and appropriate contact information to the email address InformationPrivacy@ksbe.edu.

# Other Information Obtained from Third-Parties

In addition to credit reports and medical information, KS may obtain Confidential Information from third-parties. KS maintains and shares Confidential Information received from third-parties in the same way it maintains and shares Confidential Information received directly from individuals.

# Web Server Login Information that

App.368

# KS May Gather

KS websites may generate logs that may contain information about computers or devices used by users to access the KS Web or which contain information about general activity on the KS Web, such as the following:

- Internet address of computer or device
- Type of browser used
- The operating system of the computer or device
- Web pages requested
- Referring Web pages
- Time spent on the KS website

KS website administrators may produce summary reports from these logs and share that information with KS personnel and/or third-party vendors responsible for KS Web content management. KS Web content managers typically use this information, in aggregate, to understand what pages are popular, how users are navigating to and within sites, and when KS websites are used most frequently. KS generally avoids the inclusion in server logs of personally identifiable information that could identify particular users. The previously stated General Rules Regarding the Collecting and Sharing of Personally Identifiable Information and other segments of Specific Privacy Supplements to the General Rules provide further information on when individual information may be shared.

# Cookies and Login Security

Cookies are small pieces of data stored by a web browser on a user's computer. Cookies are often used to retain information about preferences and pages a user has visited. For example, when a user visits some sites on the Web, one might see a "Welcome Back" message. The first time one visits a KS

**App.369**

website, a cookie may be stored on the user's computer; and when the user returns, the cookie is read again. One can refuse to accept cookies, one can disable cookies, and one can remove cookies from one's hard drive.

Some sites require the use of cookies in order to access the site, such as KS websites requiring 'KS Secure Authentication'. KS websites sometimes use cookies with websites that require KS community members, such as students, staff and faculty, to log in with their KS provided NetID and password. KS Web users are normally required to enter their respective NetID and password when they request information about themselves or to ensure that they are an authorized KS Web user. These cookies are used so one will not have to repeatedly enter their user names and passwords when they go to different parts of the KS Web. When appropriate, KS administers the login process through a secure connection so that the user name and password are encrypted between the KS user Web browser and the KS website.

KS websites may use transactional cookies that facilitate the continuity of interactions during a particular visit. KS does not typically use permanent cookies and will not use other invasive tracking programs that monitor and track KS website viewing habits unless:

- the use of permanent cookies adds value to the user otherwise not available;
- there is a comprehensive online statement at the particular KS website where such permanent cookies or other invasive monitoring and tracking programs are utilized that discloses:
    - all types of information collected at that site;
    - KS's use of that information; and
    - how the collection and use of this information adds

**App.370**

value to the user; and

- there is a link to this Statement from that particular KS website where such permanent cookies or other monitoring and tracking programs are utilized.

---

# Questions

If an individual, including a KS Web user, has questions about this Statement or believes that the user's Confidential Information has been used or released in violation with the terms of this Statement or without his or her consent when such consent is required pursuant to this Statement, then please send and email to:

- [InformationPrivacy@ksbe.edu](mailto:InformationPrivacy@ksbe.edu)

In the email, the individual should include the individual's name, and why the user thinks his or her Confidential Information has been used or released in connection and/or without his or her consent.

---

# Statement of Terms and Conditions

## Scope

Kamehameha Schools (KS) provides Internet-based websites to display, collect and maintain information related to its mission. This statement of Terms and Conditions for Use of Kamehameha websites applies to all information exchange

**App.371**

Terms and conditions | Kamehameha Schools
Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 74 of 122
PageID.965
1/19/26, 2:50 PM

involving all sites owned, controlled, operated or maintained by KS under a number of domains including ksbe.edu and pauahi.org. These sites are collectively known as the "KS Web" and the Terms and Conditions set out in this Statement applies to all domains within the KS Web.

## Purpose and Format

As part of its commitment to maintain appropriate and reasonable Web based information services, KS has developed this Statement of Terms and Conditions to inform KS Web users of the expectations, levels of responsibility and the limitations involved in use of the KS Web. The content of this Statement is separated into the following topic areas:

- Legal Notices of Terms and Conditions Regarding Use of the KS Web
- Disclaimer of Liability
- Disclaimer of Warranties and Accuracy of Data
- Disclaimer of Endorsement
- Disclaimer for External Web Links
- Disclaimer of Duty to Continue Provision of Data
- Security
- Choice of Law
- Questions

# Legal Notices of Terms and Conditions Regarding Use of the KS

App.372

# Web

Access to the KS Web is provided subject to the following terms and conditions. Please read these terms carefully as use of the KS Web constitutes acceptance of all of the following terms and conditions:

## RULES OF CONDUCT

Users of the KS Web must comply with all applicable laws, and agree not to e-mail or post any of the following content anywhere on the KS Web, or on any other KS site:

1. Material that infringes on another's intellectual property
2. Material that defames or denigrates another
3. Material that is deemed harassing or threatening
4. Material that discusses the intent to commit illegal activities
5. Material that contains obscene images or language
6. Material that is otherwise unlawful

KS reserves the right to remove any material that it deems in violation of the above rules.

## Disclaimer of Liability

NEITHER KS, NOR ANY OF ITS UNITS, PROGRAMS, EMPLOYEES, AGENTS OR INDIVIDUAL TRUSTEES, SHALL BE HELD LIABLE FOR ANY IMPROPER OR INCORRECT USE OF THE INFORMATION DESCRIBED AND/OR CONTAINED IN THE KS WEB AND ASSUMES NO RESPONSIBILITY FOR ANYONE'S USE OF THE INFORMATION. IN NO EVENT SHALL THE KS WEB, KS OR ITS UNITS, PROGRAMS, EMPLOYEES, AGENTS OR INDIVIDUAL TRUSTEES BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, OR

**App.373**

CONSEQUENTIAL DAMAGES (INCLUDING, BUT NOT LIMITED
TO, PROCUREMENT OR SUBSTITUTE GOODS OR SERVICES;
LOSS OF USE, DATA, OR PROFITS; OR BUSINESS
INTERRUPTION) HOWEVER CAUSED AND ON ANY THEORY
OF LIABILITY, WHETHER IN CONTRACT, STRICT LIABILITY,
OR TORT (INCLUDING NEGLIGENCE OR OTHERWISE)
ARISING IN ANY WAY OUT OF THE USE OF THIS SYSTEM,
EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.
THIS DISCLAIMER OF LIABILITY APPLIES TO ANY DAMAGES
OR INJURY, INCLUDING BUT NOT LIMITED TO THOSE
CAUSED BY ANY FAILURE OF PERFORMANCE, ERROR,
OMISSION, INTERRUPTION, DELETION, DEFECT, DELAY IN
OPERATION OR TRANSMISSION, COMPUTER VIRUS,
COMMUNICATION LINE FAILURE, THEFT OR DESTRUCTION
OR UNAUTHORIZED ACCESS TO, ALTERATION OF, OR USE OF
RECORD, WHETHER FOR BREACH OF CONTRACT, TORTIOUS
BEHAVIOR, NEGLIGENCE OR UNDER ANY OTHER CAUSE OF
ACTION.

# Disclaimer of Warranties and Accuracy of Data

ALTHOUGH THE DATA PROVIDED ON THE KS CONTROLLED
PORTIONS OF ITS WEB HAVE BEEN PRODUCED AND
PROCESSED FROM SOURCES BELIEVED TO BE RELIABLE, NO
WARRANTY, EXPRESS OR IMPLIED, IS MADE REGARDING
ACCURACY, ADEQUACY, COMPLETENESS, LEGALITY,
RELIABILITY OR USEFULNESS OF ANY INFORMATION. THIS
DISCLAIMER APPLIES TO BOTH ISOLATED AND AGGREGATE
USES OF THE INFORMATION. KS PROVIDES THIS
INFORMATION ON AN "AS IS" BASIS. ALL WARRANTIES OF
ANY KIND, EXPRESS OR IMPLIED, INCLUDING BUT NOT
LIMITED TO THE IMPLIED WARRANTIES OF
MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE,
FREEDOM FROM CONTAMINATION BY COMPUTER VIRUSES

**App.374**

AND NON-INFRINGEMENT OF PROPRIETARY RIGHTS ARE DISCLAIMED. Changes may be periodically made to the information herein; these changes may or may not be incorporated in any new version of the publication. If a user has obtained information from any of the KS Web pages via a source other than the KS pages, be aware that electronic data can be altered subsequent to original distribution. Data can also quickly become out of date. It is recommended that careful attention be paid to the contents of any data associated with a file, and that the originator of the data or information be contacted with any questions regarding appropriate use. If a user finds any errors or omissions, please report them to:

- webmaster@ksbe.edu

# Disclaimer of Endorsement

KS is a distributor of content sometimes supplied by third parties and users. ANY OPINIONS, ADVICE, STATEMENTS, SERVICES, OFFERS, OR OTHER INFORMATION OR CONTENT EXPRESSED OR MADE AVAILABLE BY THIRD PARTIES, INCLUDING INFORMATION PROVIDERS, USERS, OR OTHERS, ARE THOSE OF THE RESPECTIVE AUTHOR(S) OR DISTRIBUTOR(S) AND DO NOT NECESSARILY STATE OR REFLECT THOSE OF KS AND SHALL NOT BE USED FOR ADVERTISING OR PRODUCT ENDORSEMENT PURPOSES. REFERENCE HEREIN TO ANY SPECIFIC COMMERCIAL PRODUCTS, PROCESS, OR SERVICE BY TRADE NAME, TRADEMARK, MANUFACTURER, OR OTHERWISE, DOES NOT CONSTITUTE OR IMPLY ITS ENDORSEMENT, RECOMMENDATION, OR FAVORING BY KS.

# Disclaimer for External Web Links

The KS Web has links to other websites. These include links to

App.375

websites operated by the State of Hawaiʻi Department of Education and other State agencies, nonprofit organizations and private businesses. When a user leaves the KS Web and visits another site, the user is subject to the privacy policy of that new site. KS IS NOT RESPONSIBLE FOR THE CONTENTS OF ANY OFF-SITE PAGES REFERENCED. THE USER SPECIFICALLY ACKNOWLEDGES THAT KS IS NOT LIABLE FOR THE DEFAMATORY, NEGLIGENT, INACCURATE, OFFENSIVE, OR ILLEGAL CONDUCT OF OTHER USERS, LINKS, OR THIRD PARTIES AND THAT THE RISK OF INJURY FROM THE FOREGOING RESTS ENTIRELY WITH THE USER. LINKS FROM KS WEB PAGES ON THE WORLD WIDE WEB TO OTHER SITES DO NOT CONSTITUTE AN ENDORSEMENT FROM KS. THESE LINKS ARE PROVIDED AS AN INFORMATION SERVICE ONLY. IT IS THE RESPONSIBILITY OF THE USER TO EVALUATE THE CONTENT AND USEFULNESS OF INFORMATION OBTAINED FROM OTHER SITES. AS THE KS WEB CONTAINS LINKS TO OTHER RELATED WORLD WIDE WEB SITES ONLY FOR THE CONVENIENCE OF ITS USERS, KS AND ITS WEBSITES ARE NOT RESPONSIBLE FOR THE AVAILABILITY OF THESE OUTSIDE RESOURCES OR THEIR CONTENTS, AND THE USER SHOULD DIRECT ANY CONCERNS REGARDING ANY EXTERNAL LINK TO ITS SITE ADMINISTRATOR OR WEBMASTER.

# Disclaimer of Duty to Continue Provision of Data

Due to the dynamic nature of the Internet, resources that are free and publicly available one day may require a fee or restricted access the next, and the location of items may change as menus, pages, and files are reorganized. THE USER EXPRESSLY AGREES THAT USE OF THE KS WEB IS AT THE USER'S SOLE RISK. KS DOES NOT WARRANT THAT THE SERVICE WILL BE UNINTERRUPTED OR ERROR FREE. THE

**App.376**

DOCUMENTS AND RELATED GRAPHICS PUBLISHED ON KS
WEBSITES COULD CONTAIN TECHNICAL INACCURACIES OR
TYPOGRAPHICAL ERRORS. CHANGES ARE PERIODICALLY
ADDED TO THE INFORMATION HEREIN. KS AND/OR ITS
RESPECTIVE UNITS AND PROGRAMS MAY MAKE
IMPROVEMENTS AND/OR CHANGES IN THE INFORMATION
AND/OR PROGRAMS DESCRIBED HEREIN AT ANY TIME.

# Security

The technology management teams used by KS and its
campuses have taken several steps to safeguard the integrity
of its communications and computing infrastructure,
including but not limited to authentication, monitoring,
auditing, and encryption. Security measures have been
integrated into the design, implementation and day-to-day
practices of the entire KS Electronic Information System (EIS)
operating environment as part of its continuing commitment
to risk management.  Such security measures are however
typically subject to constant threats from nefarious web users
and the measures taken by KS may be regarded as reasonable
but not necessarily perfect regarding efforts to provide
information security.

This statement should not be construed in any way as giving
business, legal, or other advice, or warranting as fail proof or
otherwise, the security of information provided via KS
supported websites.

# Choice of Law

Construction of the disclaimers above and resolution of
disputes thereof are governed by the laws of the State of
Hawaii. The laws of the State of Hawaiʻi, USA, shall apply to
all uses of this data and this system. By use of this system
and any data contained therein, the user agrees that use shall

**App.377**

conform to all applicable laws and regulations and user shall not violate the rights of any third parties.

---

# Questions

If a user has questions about this Statement of Terms and Conditions, send e-mail to:

- webmaster@ksbe.edu

---

# Copyrights and trademarks

## KS Proprietary Information

All intellectual property contained on KS websites are the exclusive property of Kamehameha Schools or its content contributors. This content cannot be copied, reproduced, or used without written permission from Kamehameha Schools.

## KS Trademarks and copyrights

KS websites contain logos, trademarks, service marks and design elements that are proprietary to Kamehameha Schools. These trademarks are protected under applicable trademark laws and cannot be copied, reproduced or used without written permission from Kamehameha Schools.

Reproduction, storage, or use of materials retrieved from KS Web sites are also subject to applicable copyright laws.

**App.378**





### Kawaiahaʻo Plaza

567 South King St.
Honolulu, HI 96813
(808) 523-6200

### KS Hawaiʻi

16-716 Volcano Rd.
Keaʻau, HI 96749
(808) 982-0000

MAP

### KS Kapālama

1887 Makuakāne St.
Honolulu, HI 96817
(808) 842-8211

MAP

### KS Maui

275 ʻAʻapueo Pkwy
Pukalani, HI 96768
(808) 572-3100

MAP

| | EDUCATION | APPLICATIONS AND AID | ʻĀINA AND COMMUNITY | KS WEBSITE ʻOHANA |
|---|---|---|---|---|
| **Give with Pauahi** | KS Hawaiʻi | Overview: Programs and scholarships | Our land kuleana | Kamehameha Publishing |
| **Join our mailing list** | KS Kapālama | Applications | KS Resource Centers | Pauahi Foundation |
| **Find jobs at KS** | KS Maui | Financial aid and scholarships | Commercial real estate | Charles Reed Bishop Trust |
| | KS Preschools | Hoʻoulu Verification Services | | |
| | KS health updates | KS | **ABOUT US** | **FOR STAFF** |
| | Mālama Ola | | About Pauahi | Ka Ipu o Lono |
| | Student safety and well-being | | | |

**App.379**

▸ Resource
Centers

▸ School
collaborators

▸ About
Kamehameha
Schools

▸ Trustees
and
executives

▸ Our faith

▸ Webmail

▸ HMSA
Transparency
in Coverage

▸ Kaiser
Transparency
in Coverage

© 1996-2023 Kamehameha Schools. All rights reserved.    Terms and conditions    Suggestions?

**App.380**

# EXHIBIT F

App.381

# Starbulletin.com

# Dad wants non-Hawaiian Kamehameha student back

## Kenneth Mohica seeks custody, alleging the boy is a scapegoat and should not be enrolled

————

By Debra Barayuga
dbarayuga@starbulletin.com

The father of the non-Hawaiian student who was admitted to Kamehameha Schools last month under court order is seeking custody of his son, alleging that the boy is a scapegoat in the fight against the schools' admission policy.

Kenneth Mohica, father of 12-year-old Brayden Mohica-Cummings, filed a motion in Family Court last Friday, alleging that his son's enrollment at Kamehameha is not in the child's best interest.

"He should not have to endure the negativity that is present and will continue to be present as a result of his being a scapegoat to challenge Kamehameha Schools' admissions policy," Mohica wrote.

The boy's mother, Kalena Santos, said yesterday that she was upset when she was served with the order on Wednesday and intends to fight it. She denied

--
Advertisements--
--
Advertisements--

**App.382**

using her son as a scapegoat."

"Brayden wants to be there. I'm not forcing him to be there. I'm doing it because this is what he wants," Santos said.

While Mohica does not explicitly say he intends to remove his son from Kamehameha, seeking full custody means he wants Brayden with him on Kauai, Santos said.

She said Mohica never wanted Brayden to attend Kamehameha.

Santos filed a lawsuit in federal court last month challenging Kamehameha Schools' admission policy giving preference to Hawaiians.

U.S. District Judge David Ezra granted a temporary restraining order and preliminary injunction ordering the school to admit the seventh-grader pending a ruling on the constitutionality of the admission policy.

Kamehameha Schools had rescinded Mohica-Cummings' admission just days before classes were to start saying Santos had not proved her son's Hawaiian ancestry. Brayden's parents do not have Hawaiian blood, but Santos' adopted father is native Hawaiian.

Her son was upset when told about his father's intentions, she said.

Warren Perry, attorney for Mohica, declined comment, saying his client has asked the court to order Santos to keep from talking about the case outside the courtroom.

According to the motion, Mohica is seeking temporary and eventually full custody of his son, with reasonable visitation awarded to Santos. The couple, who never married, broke up when Mohica-Cummings was a year old.

Santos has been ordered to appear at a hearing in Kauai Family Court on Monday.

The court had awarded Santos full custody of her son in 1994 and outlined visitation rights for Mohica, including on his days off from work, two weeks during the summer and alternate holidays, she said.

Mohica wrote that he has been deprived of visitation with his son since he left for Oahu on Aug. 18 and since then has had only a 15-minute phone call. Mohica said he got a sense during that call that the "tension and notoriety" his son seemed to be under was not in his best interest.

But Santos said her son told her he simply did not want to talk to his father, knowing he disapproved of his attending Kamehameha.

Santos said her son is adjusting well and has matured in the short period

**App.383**

since he began at the Kapalama campus.

"Every day I talk to him, he sounds excited and happy, not sad or discouraged," Santos said.

———

## Kamehameha Schools

E-MAIL THIS ARTICLE | | | PRINTER-FRIENDLY VERSION
E-mail to City Desk

BACK TO TOP

**Text Site Directory:**
[**News**] [**Business**] [**Features**] [**Sports**] [**Editorial**] [**Do It Electric!**]
[**Classified Ads**] [**Search**] [**Subscribe**] [**Info**] [**Letter to Editor**]
[**Feedback**]

© 2003 Honolulu Star-Bulletin -- https://archives.starbulletin.com

-Advertisement-

**App.384**

# EXHIBIT G

App.385



Sunday, January 18, 2026


**Comment, blog & share photos**
Log in | Become a member

Find what you are looking for ...    Search



Posted on: Thursday, August 21, 2003

ADVERTISEMENT

ADVERTISEMENT

Kamehameha Schools trustees and officials give fellow trustee Nainoa Thompson, center, a standing ovation after his impassioned speech about Kamehameha Schools' being the center of healing in the Hawaiian community. From left, Robert Kihune, Diane Plotz, Doug Ing, Thompson, Constance Lau, Colleen Wong and Michael Chun.

Richard Ambo • The Honolulu Advertiser

# Alumni plan protest of decision at school's gate

- **Kamehameha Schools told to make exception**
- **Ex-Kamehameha CEO sues Wisconsin lawyer**

By **Beverly Creamer**
Advertiser Education Writer

When 13-year-old Brayden Mohica-Cummings shows up for the first day of class this morning at Kamehameha Schools he has the assurance of headmaster Michael Chun that he'll be treated with respect, and receive the same warm welcome as all masters.

But his first day of school will also be greeted by a spontaneous protest demonstration by alumni at 6:30 a.m. at the gates of the mountaintop school and a growing sense of rage within the Hawaiian community.

"I don't know how much more the Hawaiian people need to endure," said Pohai Ryan, president of the Kamehameha Schools Alumni Association. "This is just one more thing. All the Hawaiian entities and trusts must come together and educate the public that this is really about social justice. It's not about exclusion."

The fierce reaction came after yesterday's court order by federal judge David Ezra to temporarily allow a non-Hawaiian child to attend the school established by Princess Bernice Pauahi Bishop to educate Hawaiian children. The boy's mother, Kalena Santos, had argued that her hanai, or adoptive father, was Native Hawaiian. But in court yesterday, it was revealed that both mother and son have the word "Hawaiian" under race on their birth certificates.

While trustees vowed to continue the court fight to uphold their policies of "preference" for children of Native Hawaiian ancestry, their supporters angrily wondered about the ramifications of the decision.

"The judge said the child suffered a greater harm than Kamehameha. We don't buy into that as a rational argument," said Leroy Akamine, a 1952 Kamehameha graduate and a past president of the

App.386

Alumni Association.

Trustees, alumni and Native Hawaiians filled Ezra's courtroom yesterday, including Lilikala Kame'eleihiwa, director of the Center for Hawaiian Studies at the University of Hawai'i, who said the decision was unfair to Native Hawaiian children who still want to be admitted.

"Why aren't you asking why there is so much discrimination against Hawaiian children in the public school system," she said. "Kamehameha offers a chance to go to a school where we don't have to be ashamed of who we are. There are 48,000 Hawaiian children in the public system who would love to have that spot. They should be taken care of first."

Kame'eleihiwa was not alone in her anger.

"It was a bad decision," said 20-year-old Mehana Ka'iama, a 2001 Kamehameha graduate who is organizing today's protest at the school gate "to show we're not happy."

Her mother, Manu Ka'iama, who directs the Native Hawaiian Leadership Project at UH, said the school should defy Ezra's order and refuse to allow the boy to attend class.

"It's one slot being used by someone who doesn't have a right to be there," she said. "They falsified records, and he got in illegally."

Yesterday trustees said only biological parentage matters, not adoption. For admittance, a student must submit birth certificates going back to a grandparent's generation to prove lineage.

While headmaster Chun said students, teachers and other staff are being apprised of the legal situation and the boy will be offered the same "supportive, nurturing, and caring learning environment" as other students, Kame'eleihiwa warned there will be children "with an attitude about this kid ... because their cousin or their brother or sister didn't get in and this child did and he's taking a spot. ..."

The anger began with a highly emotional Kamehameha Schools morning press conference in which trustee Nainoa Thompson received a standing ovation for an impassioned defense of the schools' preference policy as an attempt to address 200 years of injustice for Native Hawaiians.

"This society has not dealt with this poverty and where it's come from in 200 years," Thompson said. "It hasn't done it, but Kamehameha does. ... Look at the absentee rates, at the SAT scores, look at how our public schools are not meeting our need. Take away Kamehameha Schools and who is (meeting the need)?

"Make Kamehameha Schools like every other school, tear out its mission and I ask the question, 'Who's going to pay for the poverty? Who is going to pay for the increasing ignorance? Who is going to pay for the homelessness?' "

But Jill Nunokawa, a civil rights counselor for the University of Hawai'i, said Kamehameha trustees may have brought this court challenge upon themselves when they changed their admission criteria last year and permitted a non-Hawaiian eighth-grader to enroll at its Maui campus.

"Basically Kamehameha Schools made a determination that they were going to make it a preference for Native Hawaiians and that made it a race preference instead of sticking to the will of the princess and the status of Hawaiians as indigenous people," she said. "They opened up the door, and everyone's walking through."

Nunokawa said at the time the trustees said they were making the change to avoid lawsuits "and all they really did was instigate lawsuits." She predicted more suits are coming, and the final answer may lie with the U.S. Supreme Court.



Trustee Nainoa Thompson lashed out following yesterday's action allowing a non-Hawaiian into Kamehameha Schools: "This society has not dealt with this poverty and where it's come from in 200 years."



"Pau," Thompson said at the end of his speech, which drew a standing ovation from fellow trustees and Kamehameha administrators.

Photos by Richard Ambo • The Honolulu Advertiser

App.387

"Now they're right in the middle of it. At some stage the courts are going to make the determination."

*Reach Beverly Creamer at bcreamer@honoluluadvertiser.com or 525-8013.*

©COPYRIGHT 2010 The Honolulu Advertiser. All rights reserved.
Use of this site signifies your agreement to the Terms of Service and Privacy Policy/Your California Privacy Rights , updated March 2009.

**App.388**

# EXHIBIT H

App.389

Case 1:25-cv-00450-MWJS-RT      Document 54-9      Filed 01/21/26      Page 92 of 122
PageID.983



Sunday, January 18, 2026



**Comment, blog & share photos**
Log in | Become a member



Posted on: Sunday, August 24, 2003

**EDITORIAL**

A D V E R T I S E M E N T

A D V E R T I S E M E N T

# Attack the act, but not boy at school

The highly contested admission of 12-year-old Brayden Mohica-Cummings to Kamehameha Schools has touched off racially charged sentiments on both sides.

Supporters say the private school's Hawaiian-preference policy is racist, while opponents contend that ordering the admission of a non-Hawaiian to Kamehamaha Schools is as anti-Hawaiian as it gets.

If they really want to know how racism feels, they should ask Elizabeth Eckford of Arkansas. On a fall morning in 1957, the diminutive, black 15-year-old — wearing a cap-sleeved dress, bobby socks and penny loafers — grabbed a pair of sunglasses and a three-ring notebook and made her way to Little Rock Central High School.

Blocking her entrance was a wall of Arkansas National Guardsmen.

An angry segregationist mob spat and clawed at Eckford and eight other black students attending the previously all-white school as part of a desegregation order following the landmark Brown vs. the Board of Education ruling.

Arkansas Gov. Orval Faubus had ordered the state's National Guard to prevent any black students from entering to protect citizens and property from possible violence by protesters.

The troops withdrew a couple of weeks later after a federal judge granted an injunction to stop the governor from blocking the integration.

Classes resumed, but the "Little Rock nine" couldn't enter the building because of the protesters. Finally, they got inside under the protection of 1,000 members of the 101st Airborne Division of the U.S. Army. And so began their high school years, which were marked with taunting, physical and verbal assaults and even death threats.

In no way are we positing that Mohica-Cummings' admission to Kamehameha Schools is an act of desegregation. Regardless of ethnicity, it's understandable to feel frustrated if you've failed repeatedly to get your kid into an affordable private school, and someone who shouldn't qualify under the rules gets in.

But directing hostility toward a 12-year-old boy because of his race is an act of bigotry. And goading people to act out their resentment, even in the most subtle ways, is hate speech that is not protected.

And so we are troubled by remarks made at protests, such as "I don't know how the kids will treat him but they will have every right to resent him."

U.S. District Judge Alan Kay will determine the fate of Kamehameha School's Hawaiian-preference admission policy later this year in response to a separate challenge. Whatever he decides, it will probably be appealed, so it's entirely possible Mohica-Cummings will graduate before the issue is

**App.390**

resolved.

In the meantime, it's OK to get angry at the loopholes in the system that allowed Mohica-Cummings to gain a slot that could have gone to a Hawaiian. Or to be upset at his parents for perhaps not following the application procedure as closely as they should.

But if you attack the boy — or even if you intimate that others may be justified for doing so — you're just as bad as the segregationist mob in Little Rock back in 1957.

©COPYRIGHT 2010 The Honolulu Advertiser. All rights reserved.
Use of this site signifies your agreement to the Terms of Service and Privacy Policy/Your California Privacy Rights , updated March 2009.

App.391

# EXHIBIT I

App.392

Case 1:25-cv-00450-MWJS-RT     Document 54-9     Filed 01/21/26     Page 95 of 122
PageID.986

1/18/26, 2:04 PM




Comment, blog & share photos
Log in | Become a member



ADVERTISEMENT

ADVERTISEMENT

Posted on: Friday, August 22, 2003

# Officials warn of school violence

By **Vicki Viotti**
Advertiser Staff Writer

Federal law enforcement officials, concerned about threats aired in the media toward a Kamehameha Schools student who is not Native Hawaiian, put out a warning yesterday that violence or threats of violence based on race are federal offenses.

The warning came from the offices of the U.S. attorney and the federal marshal, who said they are so far unaware of any credible threats against Brayden Mohica-Cummings, who is not Native Hawaiian and who began seventh-grade at the school yesterday under a federal judge's order. The school had rescinded admission to the 12-year-old because he couldn't demonstrate he was of Native Hawaiian ancestry.

U.S. Attorney Ed Kubo said he hopes "that cooler heads prevail in this emotional issue."

After federal Judge David Ezra on Wednesday compelled the school to admit Mohica-Cummings, he was shown around the Kapalama campus by his "big brother," an older student assigned to shepherd each seventh-grader. "He's a kid from the Big Island and he gave him a big hug," attorney Eric Grant said. "They hit it off just great."

The boy's mother told Grant that their first campus visit went smoothly on Wednesday.

There was a protest outside the school gate yesterday, and organizer Mehana Ka'iama said school officials will be protecting Brayden against any backlash from classmates "like the Secret Service."

"I don't know how the kids will treat him, but they will have every right to resent him," she said. "Every one of them knows someone who got rejected from the school."

But there were no bodyguards, and family attorney John Goemans said he hasn't seen any reason yet to get one: Neither his client nor the boy's mother reported any direct threats yesterday.

"If they had got any phone calls, I'd have heard from them, I can tell you that," Goemans said.

Even so, U.S. Marshal Mark Hanohano said his office and other law enforcement agencies have contacts in the Native Hawaiian community, listening for rumblings about plans to harm the boy. So far, he said, the only thing they've picked up are indefinite plans for a protest demonstration at the Federal Building.

"I'm half-Hawaiian myself," he said. "Around every corner is a cousin or an auntie, and no one has heard anything."

Kubo said he was distressed by people quoted in news coverage and by callers to morning talk shows expressing "a growing sense of anger and rage."

"Some of these comments seem to imply that they would condone or turn a blind eye to violence," Kubo said. He cited one who called KSSK radio yesterday to predict that "now there's going to be 'kill haole day' every day at Kamehameha Schools."

App.393

"That concerns me, when I hear the comment that this child is going to be sought out, or that 'we're not going to be responsible for what happens to him,' " he said.

Some of this emotional response was evident yesterday morning, when Kamehameha sophomore Ka'ili Crabb, 15, said Brayden will never blend into the student body.

"Everyone is going to be searching him out," she said. "I don't know why his mother would put him through all this, knowing how people feel."

Kubo said expressing opinions and emotions is fine, but actual violence or threats of violence based on race are federal offenses.

Kubo acknowledged the passions aroused in the Hawaiian community this year, as Congress considers the latest proposal for federal recognition of Native Hawaiians and lawsuits challenging programs and entitlements move through the courts.

"We all have mixed feelings," said Hanohano. "I have mixed feelings, too. But I also have a job to do."

*Advertiser staff writer Mike Gordon contributed to this report. Reach Vicki Viotti at vviotti@honoluluadvertiser.com.*

©COPYRIGHT 2010 The Honolulu Advertiser. All rights reserved.
Use of this site signifies your agreement to the Terms of Service and Privacy Policy/Your California Privacy Rights , updated March 2009.

App.394

# EXHIBIT J

App.395

# A NATION RISING

Hawaiian Movements for Life, Land, and Sovereignty

*Noelani Goodyear-Kaʻōpua, Ikaika Hussey*
*& Erin Kahunawaikaʻala Wright,* EDITORS

PHOTOGRAPHS BY *Edward W. Greevy*

Duke University Press    Durham and London    2014

**App.396**

25. See "Sovereign in Hawaii," http://www.sovereignstories.org.

26. This announcement was included in an e-mail of November 28, 2003, that was sent to a number of Kamehameha alumni and supporters.

27. It is interesting to note that even after all of this, Mohica-Cummings was expelled from KS during his high school years for zero-tolerance behavior. Though a complete discussion of the complexity of the legal case is not warranted in this chapter, it was believed by those advising KS leaders that the initial settlement with Mohica-Cummings's family would improve their chances of winning the *Doe* case, which went up to the Ninth Circuit Court of Appeals. In May 2006 the full board of the Ninth Circuit Court of Appeals found in favor of Kamehameha in the *Doe* case in a vote of eight to seven. The community was elated, as a favorable ruling was unexpected. Kamehameha was immediately informed that an appeal to the U.S. Supreme Court would occur. Their team of legal experts began to strategize and once again decided to settle out of court. Once the plaintiff's attorneys realized that Kamehameha would never take their chances with the predominantly conservative highest court in the United States, they began to solicit for more clients, knowing this could be a profitable way to line their pockets. As Kamehameha continues to settle rather than fight, it is much harder to garner support and loyalty to their causes. It is unfortunate that they envision this as their only option.

28. See "Stryker Brigade in Hawaiʻi," http://www.dmzhawaii.org, for an in-depth look at the ramifications of Stryker vehicles residing in the Hawaiian Islands.

29. Sacred area near Wahiawā on Oʻahu, known for its large birthing stones used by aliʻi.

**App.397**

# EXHIBIT K

alt.culture.hawaii

Kamehameha expulsion                                                    (too old to reply)

**Kolohe**                                                              18 years ago

Permalink

KSBE admitted Brayden Mohica-Cummings to Kamehameha School by mistake.
Then closing the barn door after the horse had bolted did not work.
Apparently, most if not all students shunned him.

Now, the kid has been expelled allegedly for drinking.

# EXHIBIT L

App.400

 **dejahlani** · 4mo ago

yeah, i remember the guy that took on KS in the 2000s and got admitted. the white boy. he was in my titas graduating class (imua). she had some stories about him. after he got admitted, he thought he was untouchable and started doing drugs and drinking alcohol on campus. got kicked out immediately (he was not well liked by other students). that ego will get em. as it turns out, you arent protected if youre a little asshole that does that shit in full view of the kumu- or a student population THAT DOES NOT FUCKING LIKE YOU. aue.

 4

# EXHIBIT M

App.402

Office of Public Affairs | Two Maui Men Sentenced for Racially Motivated Attack on White Man | United States Department of Justice    1/18/26, 2:22 PM

Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 105 of 122
PageID.996



**PRESS RELEASE**

# Two Maui Men Sentenced for Racially Motivated Attack on White Man

Friday, March 3, 2023

**For Immediate Release**

Office of Public Affairs

Two men from the Hawaiian island of Maui were sentenced in federal court for their racially motivated attack on C.K., a white man who was attempting to move into their neighborhood of Kahakuloa.

Kaulana Alo-Kaonohi, 33, was sentenced to 78 months in prison. Levi Aki Jr., 33, was sentenced to 50 months in prison.

"The defendants in this case nearly killed a man because they believed he did not belong in their neighborhood because of the color of his skin," said Assistant Attorney General Kristen Clarke of the Justice Department's Civil Rights Division. "The law protects everyone in this country from racially motivated violence, and these sentences send a strong message that such violence will not be tolerated."

"No one should suffer the violence, cover up and injustice the defendants wrought in this case," said U.S. Attorney Clare E. Connors for the District of Hawaii. "All persons have a right to freedom from violence motivated by racial hatred, and the Department is committed to ensuring that right is protected in a court of law."

"This horrific violence was motived by nothing other than hate," said Special Agent in Charge Steven Merrill of the FBI Honolulu Field Office. "The FBI is committed to ensuring those who perpetrate such injustices are held accountable and that civil rights are respected and protected for all."

At trial, the evidence showed that the victim, C.K., purchased a house in Kahakuloa and decided to move there with his wife and three daughters after his wife was diagnosed with multiple sclerosis and forced to retire. When C.K. arrived in Kahakuloa, he was harassed and threatened by various Kahakuloa residents who told him things like, "This is a Hawaiian village. The only thing coming from the outside is the electricity," and "You don't even belong in Hawaii."

On Feb. 13, 2014, when C.K. was unpacking his belongings with his elderly uncle, the defendants, who had never met C.K. before, stormed onto his property and demanded that he pack his things and leave, threatening to "tie [him] up and drag [him]" and make him "go missing" if he did not comply. When C.K. replied that he owned the house, Alo-Kaonohi dragged his index finger along C.K.'s jaw and told him, "Your skin is the wrong f****** color." Aki then picked up a roofing shovel and handed it to Alo-Kaonohi, who struck C.K. in the head with it, opening up a bloody wound on the back of C.K.'s head. Later on, after C.K. had already begun packing up his possessions, the defendants attacked him a second time. During that attack, Aki head butted C.K. and struck him in the face with the shovel a second time, giving C.K. a concussion and causing him to lose consciousness. When he came to, the defendants were kicking him in the side and broke two of his ribs. During the second attack, one of the defendants said, "no white man is ever going to live here."

At the sentencing hearing, the government introduced evidence that just months after his unprovoked attack on C.K., Alo-Kaonohi committed a similar unprovoked attacked on a white-skinned man at the Steel Horse Saloon, a bar in Wailuku, Maui. In that attack, Alo-Kaonohi approached the victim from behind, tapped him on the shoulder and then punched him repeatedly in the head until he was unconscious. The victim sustained a large gash on his head that required seven staples to close and suffered permanent brain damage.

**App.403**

Case 1:25-cv-00450-MWJS-RT      Document 54-9      Filed 01/21/26      Page 106 of 122
PageID.997

Assistant Attorney General Clarke, U.S. Attorney Connors and Special Agent in Charge Merrill made the announcement.

The FBI Honolulu Field Office conducted the investigation.

Assistant U.S. Attorney Chris Thomas for the District of Hawaii and Special Litigation Counsel Christopher J. Perras and Trial Attorney Tara Allison of the Civil Rights Division's Criminal Section prosecuted the case.

*Updated February 6, 2025*

## Topics

**CIVIL RIGHTS**    |    **HATE CRIMES**

## Components

Civil Rights Division    |    Civil Rights - Criminal Section

Press Release Number: 23-245

# Related Content

## PRESS RELEASE

### Former Durham Police Department Officer Sentenced for Sexual Assault

Rayshawn Deon Taylor, 36, a former Durham Police Department officer, was sentenced to 37 months in prison and two years of supervised release for sexually assaulting a man during a...

January 15, 2026

## PRESS RELEASE

### United States Department of Justice Files Lawsuit Against Minnesota's 'Affirmative Action' Regime

The Justice Department's Civil Rights Division filed a lawsuit today against the State of Minnesota challenging Minnesota's requirement that all state agencies implement sex-and race-based affirmative action plans and...

January 14, 2026

## PRESS RELEASE

### Department of Justice and Consumer Financial Protection Bureau Withdraw Joint Statement on Fair Lending and Credit Opportunities for Noncitizen Borrowers

The Department of Justice and the Consumer Financial Protection Bureau (together, the "agencies") announced today that they have withdrawn a joint statement regarding the implications of a creditor's consideration of...

January 12, 2026

---

 **Office of Public Affairs**
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington DC 20530

📞 Office of Public Affairs Direct Line
202-514-2007

Department of Justice Main Switchboard
202-514-2000

**App.404**

# EXHIBIT N

App.405

# Criminal Justice Data Brief

**Department of the Attorney General** • **Crime Prevention & Justice Assistance Division** • **ag.hawaii.gov/cpja**

Anne E. Lopez, Attorney General

Julie Ebato, Administrator
March 2025

## *Hate Crimes in Hawaii, 2024*

### Prepared by
### *Paul Perrone, Chief of Research and Statistics*

Hawaii Revised Statutes §846-51 through §846-54 require the Department of the Attorney General to develop, direct, and report annually on a statewide hate crime statistics reporting program. With input and assistance from Hawaii's county prosecuting attorneys and police departments, the state program was launched in 2002.

This report covers hate crime cases that reached a final disposition during calendar year 2024. Five cases were reported to the program for this period; details appear on page 3. In addition, the Honolulu Department of the Prosecuting Attorney reported two cases that should have been submitted previously, for the 2022-2023 reporting periods; details appear on pages 3-4. Updated summary statistics are also included.

### Definition and Background

Similar to the federal definition, the term "hate crime" is legally defined in Hawaii as "any criminal act in which the perpetrator intentionally selected a victim, or in the case of a property crime, the property that was the object of a crime, because of hostility toward the actual or perceived race, religion, disability, ethnicity, national origin, gender identity or expression, or sexual orientation of any person" (HRS §846-51). "Gender identity or expression" was added in Hawaii in 2003 but was not included at the federal level until 2013.

It is important to note that hate crimes are not new types of offenses, but rather are traditional offenses (e.g., assault, vandalism) for which an offender's intent is at least partially based upon a bias against one or more of the protected groups. However, they differ from most traditional offenses in the frequently complicated process of determining if a hate crime has, in fact, occurred. While two heinous and highly publicized hate crimes that occurred nationally in 1998[1] offer clear-cut examples,

far more common are thousands of comparatively lesser offenses that exhibit at least one hate crime characteristic (see next section), but where it is difficult to determine the true motive and intent of the offenders. One of the challenges in these otherwise routine cases is in having sufficient investigative resources to definitively answer not only the standard question that the criminal justice system is designed to address, i.e., "Who did what to whom?" but also, "What were the offender's thoughts, biases, and motives – what was in his or her heart and mind at the time?"

The use of the term "intentionally" in Hawaii's hate crime definition adds further complication, as there are specific legal standards that must be met to establish criminal intent.

### Hate Crime Characteristics

The FBI's national program emphasizes a list of fourteen characteristics that should be considered when determining if an offense is a hate crime (CJIS, 1999). These same characteristics are also utilized in the Hawaii program. A critical concept concerning these characteristics is that they are not stringent criteria, *per se* – there is no requirement as to certain key characteristics or the minimum number of characteristics that must be present for an offense to be determined a hate crime.

1.  The offender and victim are of a different race, religion, disability, ethnicity/national origin, or sexual orientation (hereafter "group").

2.  Bias-related oral comments, written statements, or gestures were made by the offender.

3.  Bias-related drawings, markings, symbols, or graffiti were left at the crime scene.

4.  Certain objects, items, or things which indicate bias were used.

5.  The victim is a member of a group which is overwhelmingly outnumbered by other resi-

---

[1] The truck-dragging murder of James Byrd, Jr. in Texas in June, and the fatal beating of Matthew Shepard in Wyoming in October.

**App.406**

dents in the community where the crime took place.

6. The crime occurred in an area where other hate crimes against the victim's group have occurred, and where tensions remain high against this group.

7. Several incidents occurred in the same locality, at or about the same time, and the victims were all of the same group.

8. A substantial portion of the community where the crime occurred perceives that the incident was motivated by bias.

9. The victim was engaged in activities promoting his/her group.

10. The incident coincided with a holiday or a date of particular significance to the victim's group.

11. The offender was previously involved in a similar hate crime or is a member of a hate group.

12. There are indications that a hate group was involved.

13. A historically established animosity exists between the victim's and the offender's groups.

14. The victim, although not a member of the targeted group, was a member of an advocacy group supporting the precepts of the victim group.

## Hate Crime Statistics Reporting in Hawaii

Given the need for the most complete and accurate information, as well as the legal requirement to establish intent, Hawaii's hate crime statistics reporting program is set at the prosecution level. This avoids the pitfall that has occurred in many jurisdictions where the police report hate crime statistics. Specifically, the police are not able to investigate the interpersonal dynamics involved in many relatively less serious offenses that exhibit at least one hate crime characteristic (especially as the vast majority of these cases would *not* ultimately be determined to be hate crimes), particularly when an offender is not identified/arrested or when the "possible hate crime" aspects of an alleged incident are ambiguous.[2]

---

[2] Although most "possible hate crimes" (i.e., cases that exhibit at least one of the 14 characteristics) are not genuine hate crimes, they must be initially treated as such. Sometimes even seemingly obvious hate crimes may be invalidated upon thorough investigation.

By placing the point of data collection at the prosecution level, Hawaii's program avoids false positives, utilizes limited police resources much more efficiently, and is based on incidents that clearly meet the State's legal definition of hate crimes, i.e., criminal acts for which the intent of the perpetrator(s) is determined to be derived from hostility toward one or more of the protected groups. It also provides the ability to conduct statistical inquiries into case processing and outcomes, which yield important data that are generally not included in other jurisdictions' hate crime reporting.

The prosecutors' ability to make determinations of the intent behind possible hate crimes is dependent upon receiving good preliminary information from the police. In the Hawaii program, it is the police departments' responsibility to ensure that "suspected hate crime" information, when applicable, is clearly and consistently included in their incident reports.

At the request of this Department, the FBI provided hate crime recognition training to Hawaii's police departments on several occasions during the latter half of the 1990s and conducted specialized training sessions for prosecutors in 2002 and 2020. The police also include a hate crime module in their training programs for officer recruits.

The Hawaii program's data elements generally parallel those utilized in the FBI's program (CJIS, 1999). It was necessary to modify some of the data elements to more appropriately reflect the uniqueness of Hawaii (e.g., "beach or beach park" was added as a location type). In addition, the Hawaii program collects data on charge descriptions and dispositions. A completed hate crime report is due to the program no later than the last business day of the month following one in which a case reaches its final disposition, regardless of whether there was a conviction. Although Hawaii law does not provide for enhanced sanctions against perpetrators of misdemeanor-level hate crimes, or against juvenile perpetrators of hate crimes, these cases must still be reported for statistical purposes.

Similar to the FBI's quarterly summary report, an annual summary report form requiring the respective Prosecuting Attorney's (department head) signature is included in the Hawaii program. The annual summary provides the prosecutors' tally of hate crimes disposed and reported, and is useful for verifying data received by the program earlier in the year.

App.407

## Case Details for 2024

As presented below, a statewide total of five hate crime incidents, all from the City and County of Honolulu, were reported to Hawaii's hate crime statistics reporting program for calendar year 2024. Offender ages were calculated based on the date of the hate crime incidents, and criminal history tallies were made at the time of this report's preparation.

The first hate crime incident occurred on August 5, 2022, and the case reached its final disposition on January 18, 2024. In this incident, the offender, a 16-year-old White male, with a juvenile offense history including a single misdemeanor adjudication, punched the victim in the head twice, knocking him off the bench at a bus stop. During the assault, the offender repeatedly "misgendered" and otherwise insulted the victim, whose mother later described as "gender-fluid." The offender was arrested and charged with assault in the third degree, to which he admitted guilt and was sentenced to one year of probation plus substance abuse treatment.

The second incident occurred on May 25, 2023, and the case reached its final disposition on July 11, 2024. In this incident, the offender, a 30-year-old White male, with a criminal history record including convictions for one felony, one misdemeanor, and one petty misdemeanor or violation, threatened the victim with a knife while they were near a public roadway. The offender directed numerous anti-Black insults at the victim during the incident and stated that he would kill the victim and her family. The offender was arrested and charged with terroristic threatening in the first degree, to which he pleaded "no contest" and was sentenced to four years of probation plus substance abuse treatment and anger management counseling. Enhanced sanctions were not sought for this felony-level hate crime incident.

The third incident occurred on January 11, 2024, and the case reached its final disposition on November 13, 2024. In this incident, the offender, a 29-year-old Black female, with a criminal history record including convictions for one felony and three petty misdemeanors and/or violations, assaulted the victim by repeatedly hitting him with a liquor bottle with a broken rim, while uttering anti-Micronesian epithets. The offender was arrested and charged with assault in the first degree, to which she pleaded guilty and was sentenced to four years of probation. Enhanced sanctions were not sought for this felony-level hate crime incident.

The fourth incident occurred on October 21, 2023, and the case reached its final disposition on June 13, 2024. In this incident, the two offenders, 16-year-old and 14-year-old White males, respectively, with clean juvenile offense histories, stole a "gay pride" flag from the yard of a private residence. Multiple other flags of different types in the same neighborhood were not stolen. Doorbell video footage from the victim's residence led to the identification of the offenders. The offenders were arrested and charged with theft in the fourth degree and criminal property damage in the fourth degree. Prosecution was declined and the court dismissed the charges. This incident is related to the next one presented below.

The fifth incident occurred on September 30, 2023, and the case reached its final disposition on December 17, 2024. In this incident, the offender, who was the same 14-year-old White male involved in the incident presented above, stole a different "gay pride" flag from the same yard. (This incident preceded the other one in 2023, but the case reached its final disposition six months later in 2024.) The offender was arrested and charged with theft in the fourth degree and criminal property damage in the fourth degree, but the court dismissed both charges and ordered the offender to pay $84 in restitution to the victim.

## Additional Incidents for the City & County of Honolulu, 2022-2023

In their review of cases for inclusion in this annual report for 2024, personnel from the Honolulu Department of the Prosecuting Attorney also identified two additional hate crime incidents that should have been previously submitted for inclusion in the 2022 and 2023 report editions, respectively.

The first additional incident occurred on November 18, 2022, and the case reached its final disposition on November 20, 2022. In this incident, the offender, a 50-year-old White male, with a criminal history record including convictions for one felony and four petty misdemeanors and/or violations, harassed a police officer who was investigating the offender's after-hours presence in a storage facility that he rented. Among an array of insults and threats directed at the officer by the offender were numerous anti-Black epithets. The offender was arrested and charged with a single count of harassment, but the case was declined by the prosecutors.

The second additional incident occurred on September 14, 2023, and the case reached its final

**App.408**

disposition on December 15, 2023. In this incident, the offender, a 66-year-old White woman, with a criminal history record including two convictions for petty misdemeanors and/or violations, harassed and threatened a person conducting an external property check, repeatedly uttering an anti-Black epithet and stating that she would cause bodily harm to the victim. The offender was arrested and charged with a single count of harassment, which the court waived and instead imposed a fine.

## Summary Statistics, 2002-2024

A total of 95 hate crime incidents were reported to Hawaii's hate crime statistics reporting program since its inception in 2002, yielding a 23-year average of 4.1 incidents reported statewide per year. The following table presents annual tallies of hate crime incidents reported in Hawaii.

| Year | C&C of Honolulu | Hawaii County | Maui County | Kauai County | State Total |
|------|------|------|------|------|------|
| 2002 | 2 | 0 | 0 | 0 | 2 |
| 2003 | 1 | 0 | 0 | 0 | 1 |
| 2004 | 1 | 0 | 0 | 0 | 1 |
| 2005 | 0 | 1 | 0 | 0 | 1 |
| 2006 | 6 | 0 | 0 | 0 | 6 |
| 2007 | 1 | 0 | 0 | 0 | 1 |
| 2008 | 0 | 1 | 0 | 0 | 1 |
| 2009 | 0 | 0 | 1 | 0 | 1 |
| 2010 | 2 | 0 | 0 | 0 | 2 |
| 2011 | 1 | 0 | 0 | 0 | 1 |
| 2012 | 0 | 0 | 0 | 0 | 0 |
| 2013 | 0 | 1 | 0 | 3 | 4 |
| 2014 | 0 | 0 | 0 | 1 | 1 |
| 2015 | 0 | 0 | 0 | 2 | 2 |
| 2016 | 1 | 0 | 0 | 2 | 3 |
| 2017 | 3 | 0 | 0 | 2 | 5 |
| 2018 | 7 | 0 | 1 | 1 | 9 |
| 2019 | 8 | 0 | 0 | 1 | 9 |
| 2020 | 5 | 0 | 1 | 0 | 6 |
| 2021 | 13 | 0 | 0 | 1 | 14 |
| 2022 | 8* | 0 | 4 | 0 | 12* |
| 2023 | 7* | 0 | 1 | 0 | 8* |
| 2024 | 5 | 0 | 0 | 0 | 5 |
| Total | 71 | 3 | 8 | 13 | 95 |

*Revised April 2025.*

Due to multiple biases expressed in some cases, the 95 hate crime incidents identified above involved a total of 105 bias instances, as categorized in the following table.

| Bias Type | # of Bias Instances | % of Total Bias Instances | % within Bias Type |
|------|------|------|------|
| **Race/Ethnicity/Nat'l Origin** | **81** | **77.1** | |
| Anti-White | 40 | 38.1 | 49.4 |
| Anti-Black | 22 | 21.0 | 27.2 |
| Anti-Filipino | 4 | 3.8 | 4.9 |
| Anti-Arab/Middle Eastern | 3 | 2.9 | 3.7 |
| Anti-Asian *(non-specific)* | 3 | 2.9 | 3.7 |
| Anti-Hispanic | 3 | 2.9 | 3.7 |
| Anti-Japanese | 2 | 1.9 | 2.5 |
| Anti-Micronesian | 2 | 1.9 | 2.5 |
| Anti-Chinese | 1 | 1.0 | 1.2 |
| Anti-Russian | 1 | 1.0 | 1.2 |
| **Sexual Orientation** | **15** | **14.3** | |
| Anti-Homosexual *(non-specif.)* | 9 | 8.6 | 60.0 |
| Anti-Female Homosexual | 3 | 2.9 | 20.0 |
| Anti-Male Homosexual | 3 | 2.9 | 20.0 |
| **Religion** | **6** | **5.7** | |
| Anti-Islamic (Muslim) | 3 | 2.9 | 50.0 |
| Anti-Jewish | 3 | 2.9 | 50.0 |
| **Disability** | **1** | **1.0** | |
| Anti-Mental Disability | 1 | 1.0 | 100 |
| **Gender Identity** | **2** | **1.9** | |
| Anti-Transgender | 2 | 1.9 | 100 |

## Update on the National Incident-Based Reporting System (NIBRS) and the Future of Hate Crime Statistics Reporting in Hawaii

The State of Hawaii has transitioned to the current version of the FBI's Uniform Crime Reporting (UCR) Program, known as the National Incident-Based Reporting System (NIBRS). NIBRS requires FBI-style, police-level hate crime reporting, which includes incidents regardless of whether arrests are made, and the incidents are submitted to the state UCR program shortly after the initial police reports are created, rather than when the cases reach a conclusion. Moving forward, Hawaii's hate crime data will be presented in a special topic section of the state UCR program's online NIBRS dashboard, which will launch later this year. NIBRS hate crime reporting will supersede the proprietary, prosecutor-level program and related publication of this annual report. The state UCR program is staffed by the same personnel who administer the prosecutor-level program.

## Reference

Criminal Justice Information Services Division (October 1999). *Hate Crime Data Collection Guidelines.* U.S. Department of Justice: Federal Bureau of Investigation.

**App.409**

# EXHIBIT O

Case 1:25-cv-00450-MWJS-RT    Document 54-9    Filed 01/21/26    Page 113 of 122
                                        PageID.1004

Intelligence Report, Fall 2009, Issue Number:  135

# Prejudice in Paradise
**Hawaii Has a Racism Problem**

**By Larry Keller**

Celia Padron went on a Hawaiian vacation last year, lured by the prospect of beautiful beaches and friendly people. She, her husband and two teenage daughters enjoyed the black sand beach at Makena State Park on Maui. But a Hawaiian girl accosted her two teenage daughters, saying, "Go back to the mainland" and "Take your white ass off our beaches," says Padron, a pediatric gastroenterologist in New Jersey.

When her husband, 68 at the time, stepped between the girls, three young Hawaiian men slammed him against a vehicle, cutting his ear, and choked and punched him, Padron says. Police officers persuaded the Padrons not to press charges, saying it would be expensive for them to return for court appearances and a Hawaiian judge would side with the Hawaiian assailants, the doctor contends.

"There is no doubt in my mind [the attack] was racially motivated," she adds.

Roots of Resentment Go Way Back

- Browse All Issues
- Subscribe to the Intelligence Report
- Law Enforcement Resources
- Signup for newsletters
- Stand Strong against hate
- Donate

With no known hate groups and a much-trumpeted spirit of aloha or tolerance, few people outside Hawaii realize the state has a racism issue. One reason: The tourism-dependent state barely acknowledges hate crimes. That makes it hard to know how often racial violence is directed at Caucasians, who comprise about 25% of the ethnically diverse state's 1.3 million residents. Those who identify themselves as Native Hawaiian — most residents are of mixed race — account for nearly 20%.

Hawaii has collected hate crimes data since 2002 (most states began doing so a decade earlier). In the first six years, the state reported only 12 hate crimes, and half of those were in 2006. (All other things being equal, the state would be expected to have more than 800 such crimes annually, given the size of its population, according to a federal government study of hate crimes.) There was anti-white bias in eight of those incidents. But that doesn't begin to reflect the extent of racial rancor directed at non-Native Hawaiians in the Aloha State, especially in schools. For example:



Professor Haunani-Kay Trask believes Native Hawaiians have every right to feel hostile toward whites.

- The last day of school has long been unofficially designated "Kill Haole Day," with white students singled out for harassment and violence. (Haole — pronounced how-lee — is slang for a foreigner, usually white, and sometimes is used as a racial slur.)
- A non-Native Hawaiian student who challenged the Hawaiian-preference admission policy at a wealthy private school received a $7 million settlement this year.
- A 12-year-old white girl new to Hawaii from New York City needed 10 surgical staples to close a gash in her head incurred when she was beaten in 2007 by a Native Hawaiian girl who called her a "fucking haole."
- A vocal segment of Native Hawaiians is pushing for independence to end the "prolonged occupation" by the United States and governance by natives.
- Demonstrators shouting racial epithets at whites disrupted a statehood celebration in 2006.

Anti-white sentiments such as these have been more than 200 years in the making. The pivotal event occurred when American and European businessmen, backed by U.S. military forces, overthrew Hawaii's monarch in 1893 and placed her under house arrest two years later. The United States annexed the islands as a territory in 1898, and they became a state in 1959.

Little wonder then that as Hawaii prepares to observe the 50th anniversary of becoming the 50th state on Aug. 21, it will a muted celebration, devoid of parades or fireworks.

App.411

**Classroom Warfare**

Tina Mohr has lived in Hawaii for 25 years. She has Native Hawaiian friends. But in the 2003-04 school year, her twin blond-haired daughters, aged 11 at the time, began getting harassed by Native Hawaiian kids at their school on the Big Island. "Our daughters would come home with bruises and cuts," she tells the *Intelligence Report*.

One of her girls was assaulted twice in the same day. In one scuffle, she had her head slammed into a wall, and her attacker continued to threaten her. Her daughter suffered a dislocated jaw and had headaches for five weeks, Mohr says.

The torment continued in the summer between 5th and 6th grades. Native Hawaiian girls stalked and threatened her daughters and yelled "fucking haole" at them. Midway through the 6th grade, Mohr began to home-school her daughters.

She filed a complaint with the civil rights division of the U.S. Department of Education in 2004. It was only recently, on Dec. 31, 2008, that the division finally released its report. The report concluded there was "substantial evidence that students experienced racially and sexually derogatory name-calling on nearly a daily basis on school buses, at school bus stops, in school hallways and other areas of the school" that Mohr's children attended.

The epithets included names such as "f*****g haole," "haole c**t" and "haole whore," according to the report. Students were told "go home" and "you don't belong here." Most of the slurs were directed by "local" or non-white students at Caucasians, especially those who were younger, smaller, light-skinned and blond.

The report also concluded that school officials responded inadequately or not at all when students complained of racial harassment. Students who did complain were retaliated against by their antagonists. "They learned not to report this stuff," Mohr says of her own daughters.

The Hawaii Department of Education settled Mohr's complaint with a lengthy agreement in which educators promised to take various steps to improve the reporting, investigating and eliminating of student harassment in the future. Today, Mohr's daughters are again attending the school where they used to have trouble. They haven't been assaulted, but one was threatened on a school bus earlier this year.

**Racial Legacies**

The resentment some Native Hawaiians feels toward whites today can be chalked up in part to "ancestral memory," says Jon Matsuoka, dean of the School of Social Work at the University of Hawaii. "That trauma is qualitatively different than other ethnic groups in America. It's more akin to American Indians" because Hawaiians had their homeland invaded, were exposed to diseases for which they had no immunity, and had an alien culture forced upon them, he says. Stories about the theft of their lands and culture have been passed down from one generation to the next, Matsuoka adds. (One difference now, of course, is that Native Hawaiians in Hawaii are far more numerous than American Indians are in their own ancestral regions, where the Indians remain politically weak and largely marginalized by the far larger white population.)

Racial violence directed at whites in Hawaii, while deplorable, is minor compared to the larger issues underlying it, Matsuoka says. The Hawaiian spirit of aloha "is pervasive, but you have to earn aloha. You don't necessarily trust outsiders, because outsiders [historically] come and have taken what you have. It's an incredibly giving and warm and generous place, but you have to earn it," he says.

Further fueling the resentment that some Native Hawaiians feel for outsiders are attempts by the latter to usurp entitlement programs given the former to redress previous wrongs. In recent years, non-native residents have used the courts to try and rescind these entitlements on grounds that they are racially discriminatory and violate the U.S. Constitution.



Retired professor and "anti-sovereign" white activist Kenneth Conklin and others prevailed in a lawsuit in 2000 that challenged a requirement that trustees of the Office of Hawaiian Affairs — OHA — be of Native Hawaiian descent. OHA oversees huge tracts of lands that the United States took from Hawaii when it annexed the islands as a territory, and collects revenues from them for programs that benefit Native Hawaiians.

Kenneth Conklin

The state government was going to sell 1.2 million acres of these lands to developers for two state-sponsored affordable housing projects when OHA and four Native Hawaiian plaintiffs sued to stop the deal. A state court sided with the government, but the Hawaii Supreme Court

**App. 412**

Case 1:25-cv-00450-MWJS-RT   Document 54-9   Filed 01/21/26   Page 115 of 122
PageID.1006

reversed in favor of the plaintiffs. This March 31, the U.S. Supreme Court ruled unanimously that the Hawaii high court erred and sent the case back for further action.

There also was an unsuccessful legal challenge to the Hawaiian Homes Commission Act, passed by Congress in 1921. The act allows a Hawaiian agency to make 99-year leases at $1 per year to Native Hawaiians (but not other residents) for authorized uses on lands ceded to the United States when it annexed Hawaii. More than 200,000 acres of land were designated for uses such as homes and ranches.

One of the more protracted legal battles involved a lawsuit filed in 2003 by a non-Native Hawaiian student against the hugely wealthy and influential private Kamehameha Schools. Kamehameha operates three campuses for the benefit of children of Hawaiian ancestry. The student's attorneys contended that violates civil rights laws. As the U.S. Supreme Court was about to announce last year whether it would hear the case, Kamehameha paid $7 million to settle it out of court.

**'A Hateful Place'**
A violent incident with racial overtones in 2007 near Pearl Harbor prompted a good deal of soul searching about race in Hawaii. A Native Hawaiian man and his teenage son brutally pummeled and kicked a Caucasian soldier and his wife near Pearl Harbor after the soldier's SUV struck the other man's parked car. The son shouted "fucking haole" while attacking the soldier. The husband and wife suffered broken noses, facial fractures and concussions. A prosecutor said the assault was a road-rage incident, not a hate crime. But it generated much debate on newspaper websites and blogs about the use of the word haole and whether whites are the targets of racism in Hawaii.

"It is a hateful place to live if you are white," wrote a woman on one Hawaii website's comments section. A Hawaii native who is white wrote, "Racism exists in Hawaii. My whole life I've never really felt welcome here." A sailor stationed at Pearl Harbor added that "this island is the most racist place I have ever been in my life."

Other white residents, however, wrote that they had had no such experiences. And many people maintained that arrogant mainlanders are the most likely to incur natives' wrath. It's their "cultural inability to be humble [that] is a huge contributing factor in a lot of violence against them," one person wrote. "There is a high degree of arrogance and lack of respect that mainlanders exhibit," added another.

A Hawaiian Studies professor at the University of Hawaii, Haunani-Kay Trask, is one of the most caustic critics of whites in the islands. In her 1999 book, *From A Native Daughter*, Trask wrote: "Just as … all exploited peoples are justified in feeling hostile and resentful toward those who exploit them, so we Hawaiians are justified in such feelings toward the haole. This is the legacy of racism, of colonialism."

In a poem titled, "Racist White Woman," Trask wrote: "I could kick/Your face, puncture/Both eyes./You deserve this kind/Of violence./No more vicious/Tongues, obscene/Lies./Just a knife/Slitting your tight/Little heart."

Trask's opposite number is Conklin, the "anti-sovereignty" white activist who has lived on Oahu for 17 years and says he loves Hawaii's culture, spirituality and history, but is labeled a racist by some of his detractors. He wrote a book entitled *Hawaiian Apartheid: Racial Separatism and Ethnic Nationalism in the Aloha State*.

"Here in Hawaii, there is no compulsion to speak out on racist attacks. There are all these hate crimes and violent things happening to white people and you don't hear sovereignty activists speaking out against it," says Conklin, who manages a massive website on Hawaiian issues. "The violence has been going on for years and it's always been hush-hush."

**State and Race**
It's against this backdrop that Hawaii approaches its 50th anniversary of statehood. The non-celebration will consist largely of educational events at various venues. Iolani Palace won't be one of them. Once home to Hawaii's monarchy and where the last monarch was imprisoned after her government was overthrown, the palace is a potent symbol of anti-statehood — and anti-white — sentiment.

Republican state Sen. Sam Slom learned that the hard way. Although Statehood Day is a holiday in Hawaii, there were no celebrations for about 10 years, until he organized one in 2006 at the palace. He and others were confronted by demonstrators shouting racial epithets. Slom, who is Caucasian and has lived in Hawaii since 1960, said the 30 to 40 "hard-core" protesters intimidated a high school band, which left early, as well as some spectators.

App.413

Case 1:25-cv-00450-MWJS-RT   Document 54-9   Filed 01/21/26   Page 116 of 122
PageID.1007

The 50-year anniversary events figure to be "soft celebrations" aimed at defusing sovereignty passions, Slom says. "It is a divisive wedge that some people have exploited," he says. "There are people who have made it a racial thing. [But] the vast, overwhelming majority are proud to be United States citizens."

Still, a statehood commission planning commemorative events opted not to re-enact the phone call to the Territorial House of Representatives meeting at Iolani Palace in 1959 informing representatives that Congress had voted in favor of Hawaiian statehood. Commission member Donald Cataluna strongly opposed a reenactment, according to the *Honolulu Advertiser*, saying he "didn't want any blood to spill."

That won't completely mollify sovereignty activists, Slom predicts. "There will be protests, there's no question about it."

© 2011. Southern Poverty Law Center.

App. 414

# EXHIBIT P

App.415

Case 1:14-cv-14176-ADB   Document 150-4   Filed 04/29/16   Page 2 of 5
Case 1:25-cv-00450-MWJS-RT   Document 54-9   Filed 01/21/26   Page 118 of 122
PageID.1009

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STUDENTS FOR FAIR ADMISSIONS, INC.,

        Plaintiff,

    v.

PRESIDENT AND FELLOWS OF HARVARD
COLLEGE (HARVARD CORPORATION),

        Defendant.

Civil Action No.
1:14-cv-14176-
ADB

## DECLARATION OF ABIGAIL FISHER

Abigail Fisher, pursuant to 28 U.S.C. § 1746, declares the following:

1.    I am a member of Students for Fair Admissions, Inc. ("SFFA") and serve on its Board of Directors.

2.    I am also one of the original plaintiffs in the case *Fisher v. University of Texas at Austin*, No. 08-CV-263 (W.D. Tex.), which is currently pending before the Supreme Court of the United States.

3.    As a direct result of my involvement in that case, I have endured consistent harassment since 2008. Over the last eight years, writers and commentators have hounded me, my parents, and my friends about the case.

4.    I am the frequent subject of negative articles disseminated globally through the Internet. *See, e.g.*, Hillary Crosley Coker, "Noted Dummy Abigail Fisher's Rights Weren't Violated, Rules Court," Jezebel.com (July 16, 2014), http://goo.gl/M96073; Tom Scocca, "The White Student Suing to Overthrow Affirmative

1

**App.416**

Case 1:14-cv-14176-ADB   Document 150-4   Filed 04/29/16   Page 3 of 5
Case 1:25-cv-00450-MWJS-RT   Document 54-9   Filed 01/21/26   Page 119 of 122
PageID.1010

Action Was Too Dumb to Get Into Her Chosen School," Gawker.com (Mar. 20, 2013), http://goo.gl/YZfm9E.

5.      Strangers have frequently sent threats, insults, and other negative messages to me on social media platforms such as Twitter, Facebook, and LinkedIn due to my participation in the lawsuit.

6.      For example, there is an ongoing Twitter campaign attacking me using the "hashtag" #StayMadAbby. Thousands of people have sent tweets under this hashtag, many of which publicly question my character, accuse me of being racist and entitled, threaten me, and otherwise demean me in very vulgar terms. Some examples include:

   a.   "#StayMadAbby … bitch kill yourself";

   b.   "Abigail Fischer [sic] is a good example of someone who needs to fall over and die because of ignorance and entitlement. #StayMadAbby";

   c.   "someone will punch Abigail Fisher bc 1. her face is punchable, 2. she's stupid 3. She thinks too high of herself 4. She's racist."

   d.   "I hope this bitch Abby stays mad to her grave smh #StayMadAbby";

   e.   "#StayMadAbby somebody burn that bitch?";

   f.   "#StayMadAbby Dear Bitch, If you're stupid of course you aren't going to get into a school. Dumb ass racist.";

   g.   "Stay mad you pathetic bitch #StayMadAbby";

   h.   "LOOL Abigail Fisher and her white entitlement, BYE HOE. #StayMadAbby #Abigail Fisher";

   i.   "Fuck you Abigail Fisher. Your white privilege and mediocrity do not grant you college admissions, BYE. #StayMadAbby";

2

App.417

Case 1:14-cv-14176-ADB   Document 150-4   Filed 04/29/16   Page 4 of 5
Case 1:25-cv-00450-MWJS-RT   Document 54-9   Filed 01/21/26   Page 120 of 122
PageID.1011

    j.   "This hashtag is great. Abby dumb as hell for this whole case. Bitch go to another school tf. #StayMadAbby";

    k.   "this #staymadabby bitch is an embarrassment. i can't believe how far its been taken in court, fuck her.";

    l.   #StayMadAbby is this bitch for real? She doesn't get into a college & her instinct is to blame black people like sit the fuck down & shut up";

    m.   "And who is this bytch ABBY? You thought just because you white, you can get into ANY college you want? LMFAOOO U DUMB HOE #StayMadAbby";

7.    I am also frequently recognized at restaurants, bookstores, grocery stores, and other public places in Austin, Texas where I live. Strangers sometimes approach me to give their negative opinion of my case or to express hostility toward me generally. This makes me feel uneasy at times even to go out into public.

8.    Reporters have repeatedly hounded my friends and family for their opinions about me and my case. Even my teammates on my bowling team at Louisiana State University received inquiries from the press. This harassment made me feel like a burden on my friends and family.

9.    The negative publicity has also burdened me in my professional life. During the second week at my current job, a man I did not know came to my desk, pointed at my picture in a local newspaper, and asked in an aggressive tone, "Is this you?" This encounter made me feel uncomfortable at a new job.

10.    The sales team at my company, a group of about 30 people, held three separate meetings to discuss a Facebook-based discussion that was going around the

**App.418**

Case 1:14-cv-14176-ADB   Document 150-4   Filed 04/29/16   Page 5 of 5
Case 1:25-cv-00450-MWJS-RT   Document 54-9   Filed 01/21/26   Page 121 of 122
PageID.1012

office about me and the case. Ultimately, management forced the sales team to stop the discussion. This incident was a distraction at work.

11.     Overall, my experiences have often led me to second-guess my involvement in the case and as an advocate against unlawful affirmative action policies. I understand why members of SFFA would be afraid if their identities were disclosed, and I believe that many members of SFFA would limit their communications and participation within the group if they believed that their names, communications, and contributions were forced to be disclosed.

12.     As a board member of SFFA, I hope that I can help other members who wish to be involved in SFFA's mission and to fight against discrimination but who may have legitimate concerns about their names becoming disclosed. I understood that being a plaintiff came with risks, but it would not be fair for someone who expected confidentiality and did not volunteer for a public role to endure anything like what I have gone through because of my participation in the *Fisher* case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, April 27, 2016.

_____
Abigail Fisher

4

App.419

Dated: January 21, 2026

/s/ *Jesse D. Franklin-Murdock*
Jesse D. Franklin-Murdock (10778)
DHILLON LAW GROUP INC.
500 Ala Moana Blvd., Ste. 7400
Honolulu, HI 96813
Tel: (415) 433-1700
Fax: (415) 520-6593
jfranklin-murdock@dhillonlaw.com

Adam K. Mortara*
LAWFAIR LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

Respectfully submitted,

Thomas R. McCarthy*
J. Michael Connolly*
Cameron T. Norris*
R. Gabriel Anderson*
Julius I. Kairey*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com
gabe@consovoymccarthy.com
julius@consovoymccarthy.com

*pro hac vice*

*Counsel for Plaintiffs*