STUDENTS FOR FAIR ADMISSIONS;
I.P., by and through her next friend and
mother, B.P.; and B.P.,
                          *Plaintiffs,*

v.

TRUSTEES OF THE ESTATE OF
BERNICE PAUAHI BISHOP d/b/a
KAMEHAMEHA SCHOOLS,
                          *Defendant.*

Case No. 1:25-cv-450-MWJS-RT

**HAWAIIAN KINGDOM'S
MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR
RECONSIDERATION**

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES…………………………………………………….3

I.   BACKGROUND……………………………………………………….......9

II.  ARGUMENT………………………………………………………………9
   A.   United States Recognition of the Hawaiian Kingdom and the
        Council of Regency as its Government by Executive Agreement,
        through Exchange of Notes………………………………………..12
   B.   United States Recognition of the Hawaiian Kingdom and the
        Council of Regency as its Government by *Opinio Juris*………………..17
   C.   Defendant Kamehameha Schools will not represent the Hawaiian
        Kingdom's Interest……………………………………………...27

III. CONCLUSION………………………………………………………33

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

United States

*Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011)…………………9

*American Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003)………………………...15

*Baker v. Carr*, 369 U.S. 186 (1962)……………………………………………..10, 11

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221 (1986)……………..10

*Jones v. United States*, 137 U.S. 202 (1890)…………………………………11, 17

*Lin v. United States*, 561 F.3d 502, 506 (D.C. Cir. 2009)………………………...10

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)……………………………...10

*McDowell v. Calderon*, 197 F.3d 1253 (9th Cir. 1999) (*en banc*)…………………9

*United States v. Belmont*, 301 U.S. 324 (1937)…………………………………...16

*United States v. Goo*, 2002 U.S. Dist. LEXIS 2919………………………………30

*United States v. Lorenzo*, 995 F.2d 1448, *1455;
1993 U.S. App. LEXIS 10548………………………………………………………28

*United States v. Pink*, 315 U.S. 203 (1942)……………………………...14, 16

State of Hawai'i

*Bank of America, N.A. v. Santos*, 2015 Haw. App. LEXIS 250…………………..29

*Betsill Bros. Constr., Inc. v. Akahi*, 2004 Haw. App. LEXIS 205
(Haw. Ct. App. June 28, 2004)……………………………………………………30

*Burgo v. State of Hawaiʻi*, 2012 Haw. App. LEXIS 462…………………………29

*Chalon Int'l of Haw., Inc. v. Makuaole*, 2000 Haw. App. LEXIS 192
(Haw. Ct. App. Oct. 24, 2000)……………………………………………………30

*Makapono Partners, LLC v. Simeona*, 2003 Haw. App.
LEXIS 108, p. 17 (Haw. Ct. App. Apr. 14, 2003)………………………………...30

*Nishitani v. Baker*, 82 Haw. 281 (1996)………………………………………..30

*State Hawaiʻi v. Ampong*, 2009 Haw. App. LEXIS 72
(Haw. Ct. App. Feb. 27, 2009)……………………………………………………29

*State of Hawaiʻi v. Araujo*, 2004 Haw. App. LEXIS 3
(Haw. Ct. App. Jan. 14, 2004)……………………………………………………30

*State of Hawaiʻi v. Armitage*, 132 Haw. 36 (2014)………………………………29

*State of Hawaiʻi v. Ball*, 2007 Haw. App. LEXIS 267
(Haw. Ct. App. Apr. 19, 2007)……………………………………………………29

*State of Hawaiʻi v. Fergerstrom*, 106 Haw. 43, 101 P.3d 652,
2004 Haw. App. LEXIS 349 (Haw. Ct. App. 2004)………………………………30

*State of Hawaiʻi v. Keliikoa*, 2004 Haw. App. LEXIS 227
(Haw. Ct. App. July 21, 2004)……………………………………………………30

*State of Hawaiʻi v. Lee*, 90 Haw. 130; 976 P.2d 444 (App. 1999)………………..28

*State of Hawaiʻi v. Lindsey*, 2002 Haw. App. LEXIS 32
(Haw. Ct. App. Mar. 8, 2002)……………………………………………………..30

*State of Hawaiʻi v. Lorenzo*, 77 Haw. 219, 883 P.2d 641
(App. 1994)……………………………………………………27, 28, 29, 30

*State of Hawaiʻi v. Makekau*, 2009 Haw. App. LEXIS 633
(Haw. Ct. App. Sept. 29, 2009)………………………………………………...29

*State of Hawaiʻi v. Rodenhurst,* 2010 Haw. App. LEXIS 588
(Haw. Ct. App. Oct. 29, 2010)………………………………………………29

*State of Hawaiʻi v. Sherman*, 2000 Haw. App. LEXIS 218
(Haw. Ct. App. Dec. 11, 2000)……………………………………………30

*State of Hawaiʻi v. Spinney*, 2005 Haw. App. LEXIS 43
(Haw. Ct. App. Feb. 4, 2005)……………………………………………..30

International

*Larsen v. Hawaiian Kingdom*, 119 Int'l L. Reports 566 (2001)………………….18

**Treaties:**

Hague Convention on the Pacific Settlement of
International Disputes, 36 Stat. 2199 (1907)……………………………...17, 18, 23

Treaty of Friendship, Commerce and Navigation between the
Hawaiian Kingdom and the Austro-Hungarian Empire (1875)…………………...24

Treaty of Amity, Commerce and Navigation between the Hawaiian
Kingdom and Belgium (1862)………………………………………………24

Treaty of Friendship, Commerce and Navigation between the
Hawaiian Kingdom and France (1857)…………………………………...25

Treaty of Friendship, Commerce and Navigation between the
Hawaiian Kingdom and Great Britain (1851)……………………………………25

Treaty of Amity, Commerce and Navigation between the
Hawaiian Kingdom and Italy (1863)…………………………………………...25

Treaty of Peace and Friendship between the
Hawaiian Kingdom and Germany (1879)……………………………………...25

Treaty of Amity and Commerce between the
Hawaiian Kingdom and Japan (1871)…………………………………………25

Treaty of Friendship, Commerce and Navigation between the
Hawaiian Kingdom and the Netherlands (1862)…………………………………25

Treaty between the Hawaiian Kingdom and Portugal (1882)……………………25

Treaty of Commerce and Navigation between the
Hawaiian Kingdom and Russia (1869)…………………………………………26

Treaty of Peace and Friendship between the
Hawaiian Kingdom and Spain (1863)…………………………………………26

Treaty of Friendship, Commerce and Navigation between the
Hawaiian Kingdom and the Kingdoms of Sweden and Norway (1852)………….26

Treaty of Friendship, Commerce and Navigation between the
Hawaiian Kingdom and the United States, 9 Stat. 977 (1849)……………………26

Vienna Convention on Succession of States
in respect of Treaties (1978)……………………………………………………23

**Federal Rules of Civil Procedure:**

Rule 12()(1)……………………………………………………………………….31

Rule 24……………………………………………………………………9, 10

Rule 59………………………………………………………………………...9

Rule 60………………………………………………………………………...9

**Local Rules:**

Rule 60.1……………………………………………………………………9

Rule 60.1(c)…………………………………………………………………...9

**Other Authorities:**

Michael Akehurst, "Custom as a Source of International Law,"
47(1) *Brit. Y. B. Int'l L.* 1 (1975)………………………………………….21

Cendric van Assche, "1969 Vienna Convention," *The Vienna
Conventions on the Law of Treaties, A Commentary*, Vol. I,
Corten & Klein, eds., vol. 1 (2011)……………………………………….15

*Black's Law Dictionary*, 6th ed. (1990)…………………………………..31

Matthew Craven, "Continuity of the Hawaiian Kingdom,"
1 *Haw. J. L. & Pol* 508 (2004)……………………………………………31

*Report of Mr. Foster, Sec. of State, to the President*, Dec. 7, 1892,
S. Ex. Doc. 9, 52 Cong. 2 sess.; H. Doc. 471, 56 Cong. 1 sess…………...15

Henkin, *Foreign Affairs and the United States Constitution*
(2nd ed., 1996)……………………………………………………………….15

Federico Lenzerini, "Legal Opinion on the Authority of the
Council of Regency of the Hawaiian Kingdom,"
3 *Haw. J. L. & Pol* 317 (2021)……………………………………………31

F.E. Oppenheimer, "Governments and Authorities in Exile,"
36 *Am. J. Int'l L.* 568 (1942)…………………………………………………...21

M.J. Peterson, *Recognition of Governments: Legal Doctrines
and State Practice, 1815-1995* (1997)…………………………………………19

Georg Schwarzenberger, "Title to Territory: Response to a Challenge,"
51(2) *Am. J. Int'l L.* 308 (1957)…………………………………………...19

*Restatement (Third)*, §203……………………………………………...20

*Second report on succession in respect of treaties*, by
Sir Humphrey Waldock, Special Rapporteur, Document
A/CN.4/214 and ADD.1* AND 2 (1969)………………………………………23

J.L. Weinstein, "Exchange of Notes,"
20 *Brit. Y.B. Int'l L.* 205 (1952)…………………………………………...14

Johst Wilmanns, "Note Verbale," 9 *Encyclopedia of Public
International Law* 287 (1986)…………………………………………..14

# I. BACKGROUND

On January 23, 2026, this Court denied the Council of Regency of the Hawaiian Kingdom's (hereinafter, the "Hawaiian Kingdom") motion to intervene. *See* Order. Motions for reconsideration of interlocutory orders are governed by Federal Rule of Civil Procedure 59 and 60, as applied through Local Rule 60.1. Reconsideration is an appropriate remedy where (a) there is newly discovered evidence, or (b) where there has been an intervening change in controlling law, or (c) where the Court committed a manifest error of law or fact. It is not a vehicle for re-argument, but it is appropriate where the Court applied an incorrect legal standard.

Reconsideration is sought here to correct a manifest error of law. Local Rule 60.1(c). The Court concluded that permitting intervention under Rule 24 of the Federal Rules of Civil Procedure would require adjudication of issues constitutionally committed to the political branches. That conclusion reflects an erroneous application of the political question doctrine at the intervention stage, where the Court's inquiry is limited to whether the proposed intervenor has asserted a legally protectable interest relating to the subject of the action.

# II. ARGUMENT

Courts generally disfavor motions to reconsider. LR60.1. Such motions are, however, appropriate where a party shows a "manifest error of law." *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011) (citing *McDowell v. Calderon*,

197 F.3d 1253, 1255 n.1 (9th Cir. 1999) (*en banc*)).  The issue presented on reconsideration is narrow and procedural. Rule 24 does not require the Court to resolve sovereignty or recognition to permit intervention. It requires only a showing that the proposed intervenor asserts an interest relating to the subject of the action that may be impaired by its non-intervention. By collapsing this procedural inquiry into a merits determination foreclosed by the political question doctrine, the Court applied an incorrect standard. Moreover, the Court's application of this incorrect standard assumes the United States does not recognize the continued existence of the Hawaiian Kingdom as a State since the nineteenth century and the Council of Regency as its interim government.

The political question doctrine only arises if the United States' executive branch has not recognized the sovereignty and independence of a State. *See*, *e.g.*, *Lin v. United States*, 561 F.3d 502, 506 (D.C. Cir. 2009) (using a form of the political question doctrine concerning the status of Taiwan). The political question doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). The doctrine "is primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 210 (1962). The

"judiciary ordinarily follows the executive as to which nation has sovereignty." *Id.*, 212.

By invoking the political question doctrine, the Hawaiian Kingdom presumes the Court was unaware that the United States did recognize the continuity of the Hawaiian Kingdom as a State and the Council of Regency as its interim government in administrative proceedings in *Larsen v. Hawaiian Kingdom* at the Permanent Court of Arbitration (1999-2001). Therefore, reconsideration is appropriate here based on manifest error. Significantly, the United States' recognition of the Hawaiian Kingdom as a State in continuity since the nineteenth century and the Council of Regency as its interim government "conclusively binds the judges, as well as all other officers, citizens, and subjects of that government. This principle has always been upheld by this Court, and has been affirmed under a great variety of circumstances." *Jones v. United States*, 137 U.S. 202, 212 (1890); see also *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165–66 (1803) ("[b]y the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience. [...] He is the mere organ by whom that will is communicated. The acts of such an officer, as an officer, can never be examinable by the courts").

## A. United States Recognition of the Hawaiian Kingdom and the Council of Regency as its Government by Executive Agreement, through Exchange of Notes

To address the Court's manifest error and application of the incorrect standard, in its January 23, 2026, Order, the Hawaiian Kingdom respectfully submits that facts, information, context, acknowledgments and agreements, set forth hereinbelow, are necessary and essential to this Court's reconsideration.

Before the arbitral tribunal was formed by the Permanent Court of Arbitration on June 9, 2000, in *Larsen v. Hawaiian Kingdom*, Mr. Tjaco T. van den Hout, Secretary General of the Permanent Court, spoke with the Chairman of the Council of Regency, Minister Dr. David Keanu Sai, who served as agent for the Hawaiian Kingdom, over the telephone and recommended that the Hawaiian government provide an invitation to the United States to join in the arbitration. The Hawaiian government agreed with the recommendation, which resulted in a conference call meeting on March 3, 2000, in Washington, D.C., between Minister Dr. Sai, Larsen's counsel, Ms. Ninia Parks, and John Crook from the U.S. State Department. *See* Declaration of David Keanu Sai, Ph.D. The meeting was reduced to a formal note, dated March 3, 2000, and sent to Mr. Crook in his capacity as legal adviser to the State Department, and a copy of the note was sent to the Permanent Court's Registry for record that the United States was invited to join in the arbitral proceedings. *See* Declaration of Dr. David Keanu Sai, Exhibit 1.

Under international law, this note served as an offering instrument that contained the following language:

> [T]he reason for our visit was the offer by the…Hawaiian Kingdom, by consent of the Claimant [Larsen], by his attorney, Ms. Ninia Parks, for the United States Government to join in the arbitral proceedings presently instituted under the auspices of the Permanent Court of Arbitration at The Hague, Netherlands. … [T]he State Department should review the package in detail and can get back to the Acting Council of Regency by phone for continued dialogue. I gave you our office's phone number…, of which you acknowledged. I assured you that we did not need an immediate answer, but out of international courtesy the offer is still open, notwithstanding arbitral proceedings already in motion. I also advised you that Secretary-General van den Hout of the Permanent Court of Arbitration was aware of our travel to Washington, D.C. and the offer to join in the arbitration. As I stated in our conversation he requested that the dialogue be reduced to writing and filed with the International Bureau of the Permanent Court of Arbitration for the record, and you acknowledged. *Id*.

Thereafter, the Permanent Court's Deputy Secretary General, Phyllis Hamilton, informed Minister Dr. Sai over the phone that the United States, through its embassy in The Hague, notified the Permanent Court that the United States declined the invitation to join the arbitral proceedings. Instead, the United States requested permission from the Hawaiian government to have access to the pleadings and records of the case. The Hawaiian government consented to this request. The Permanent Court, represented by the Deputy Secretary General, served as an

intermediary to secure an agreement, by exchange of notes, between the Hawaiian Kingdom and the United States. *See* Declaration of David Keanu Sai, Ph.D.

"Legally there is no difference between a formal note, a note verbale and a memorandum. They are all communications which become legally operative upon the arrival at the addressee. The legal effects depend on the substance of the note, which may relate to any field of international relations." Johst Wilmanns, "Note Verbale," 9 *Encyclopedia of Public International Law* 287 (1986). And as "a rule, the recipient of a note answers in the same form. However, an acknowledgment of receipt or provisional answer can always be given in the shape of a note verbale, even if the initial note was of a formal nature." *Id.*

The offer by the Secretary General to have the Hawaiian government provide the United States an invitation to join in the arbitral proceedings, and the Hawaiian government's acceptance of this offer, also constitutes an international agreement between the Permanent Court and the Hawaiian Kingdom. "[T]he growth of international organizations and the recognition of their legal personality has resulted in agreements being concluded by an exchange of notes between such organizations and states." J.L. Weinstein, "Exchange of Notes," 20 *Brit. Y.B. Int'l L.* 205, 207 (1952). See *United States v. Pink*, 315 U.S. 203, 223 (1942) ("[t]his Court, speaking through Mr. Justice Sutherland, held that the conduct of foreign relations is committed by the Constitution to the political departments of the Federal

Government; that the propriety of the exercise of that power is not open to judicial inquiry"). "An exchange of diplomatic notes has often sufficed, without any further formality of ratification or exchange of ratifications, or even of proclamation, to effect purposes more usually accomplished by the more complex machinery of treaties…" See *Report of Mr. Foster, Sec. of State, to the President*, Dec. 7, 1892, S. Ex. Doc. 9, 52 Cong. 2 sess.; H. Doc. 471, 56 Cong. 1 sess. 16-17. "Presidents have made some 1600 treaties with the consent of the Senate [and] they have made many thousands of other international agreements without seeking Senate consent." Henkin, *Foreign Affairs and the United States Constitution* 215 (2nd ed., 1996).

"[T]he exchange of two notes […] constituting an agreement satisfies the definition of the term 'treaty' as provided by Article 2(1)(a) of the Vienna Convention." Cendric van Assche, "1969 Vienna Convention," *The Vienna Conventions on the Law of Treaties, A Commentary*, Vol. I, Corten & Klein, eds., vol. 1 261 (2011). Altogether, the exchange of notes on this subject matter, between the Hawaiian Kingdom, the Permanent Court, and the United States of America, constitutes a multilateral agreement of the recognition of the restored Hawaiian government as officers *de facto*. See *American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003) ("our cases have recognized that the President has authority to make 'executive agreements' with other countries, requiring no ratification by the Senate [...] this power having been exercised since the early years of the Republic"); *United*

*States v. Belmont*, 301 U.S. 324, 330 (1937) ("an international compact [...] is not always a treaty which requires the participation of the Senate").

*U.S. v. Pink*, 315 U.S. 203, 223 (1942) "'all international compacts and agreements' are to be treated with similar dignity, for the reason that 'complete power over international affairs is in the national government, and is not and cannot be subject to any curtailment or interference on the part of the several states.'" In *Garamendi,* at 416, "valid executive agreements are fit to preempt state law, just as treaties are." See also *Belmont*, at 327, 331; *Pink*, at 223, 230-231. This rule is a mandatory precedent by the U.S. Supreme Court that binds all the courts of states to follow. State courts, however, are not bound to follow persuasive precedents, but they may choose to unless there is a contradictory mandatory precedent. The preemption rule of valid executive agreements is a mandatory precedent, not a persuasive precedent.

The Court's finding that the Hawaiian Kingdom's motion to intervene raises "a political, question, the determination of which by the legislative and executive departments of any government" directly conflicts with the aforementioned Supreme Court holdings and constitutes further manifest error because the executive department of the United States, in its recognition of the Hawaiian Kingdom and the Council of Regency, by executive agreement, and by *opinio juris* "conclusively

binds the judges, as well as all other officers, citizens, and subjects of that government." *See Jones*.

### B. United States Recognition of the Hawaiian Kingdom and the Council of Regency as its Government by *Opinio Juris*

The *juridical fact* of the Hawaiian State produced a legal effect for the International Bureau of the Permanent Court to do the *juridical act* of accepting the dispute under the auspices of the Permanent Court by virtue of Article 47 of the 1907 Hague Convention for the Pacific Settlement of International Disputes (hereinafter "PCA Convention"), 36 Stat. 2199, a legal rule. The international dispute between Larsen and the Hawaiian Kingdom was not created by the *juridical fact*, but rather the *juridical fact* determined the legal conditions for the Permanent Court's acceptance of the dispute. This is the *juridical act* by which the dispute is established to gain access to the jurisdiction of the Permanent Court.

The significance of the *juridical act* is that the United States, as a member of the Permanent Court's Administrative Council, was fully aware of the *Larsen* case and did not object to it. Crucially, practice by the United States, should it object to an action taken by a State or an intergovernmental organization, *e.g.* the Permanent Court of Arbitration, was undisputedly evident when Palestine acceded to the PCA Convention on October 30, 2015, to become a Contracting State to the treaty that established the Permanent Court. The United States objected by filing a declaration

with the Dutch Foreign Ministry on December 28, 2015. In its declaration, which the Dutch Foreign Ministry translated into French, the United States explicitly stated, *inter alia*, "the government of the United States considers that 'the State of Palestine' does not answer to the definition of a sovereign State and does not recognize it as such (translation)." Declaration of Niklaus Schweizer, Ph.D., Exhibit 1, at 2.

The practice and course of conduct of the United States, in objecting to Palestine's accession to the PCA Convention, is the generally accepted and obligatory international customary practice of all countries. As such, the United States' failure to file an objection to the Permanent Court's institutional jurisdiction in determining that the Hawaiian Kingdom is a non-Contracting State to the PCA Convention pursuant to Article 47 of the PCA Convention, and the United States' further act to seek permission of the Hawaiian government to have access to the pleadings and records of the case conclusively binds the United States' recognition of the Hawaiian Kingdom and the Council of Regency as its interim government under customary international law.

It is important to note that the State of Palestine is a new State, whereas the Hawaiian Kingdom is a State in continuity since the nineteenth century. See *Larsen v. Hawaiian Kingdom*, 119 Int'l L. Reports 566, 581 (2001) ("in the nineteenth century the Hawaiian Kingdom existed as an independent State recognized as such

by the United States of America, the United Kingdom and various other States, including by exchanges of diplomatic or consular representatives and the conclusion of treaties"). Accordingly, since the United States explicitly recognized the validity of the Hawaiian Kingdom as an independent State in the nineteenth century it is precluded from "contesting its validity at any future time." Georg Schwarzenberger, "Title to Territory: Response to a Challenge," 51(2) *Am. J. Int'l L.* 308, 316 (1957).

There was no legal requirement for the Council of Regency, as the successor in office to Queen Liliʻuokalani under Hawaiian constitutional law, to obtain recognition from the United States as the government of the Hawaiian Kingdom. The United States' recognition of the Hawaiian Kingdom, as an independent State, on July 6, 1844,[1] was also the recognition of the Hawaiian Kingdom government— a Constitutional Monarchy. Successors in office to King Kamehameha III, who at the time of international recognition was King of the Hawaiian Kingdom, did not require diplomatic recognition. These successors included King Kamehameha IV in 1854, King Kamehameha V in 1863, King Lunalilo in 1873, King Kalākaua in 1874, Queen Liliʻuokalani in 1891, and the Council of Regency in 1997.

The legal doctrines of recognition of new governments only arise "with extra-legal changes in government" of an existing State. *See* M.J. Peterson, *Recognition*

---

[1] U.S. Secretary of State Calhoun to Hawaiian Commissioners (6 July 1844) (online at: https://hawaiiankingdom.org/pdf/US_Recognition.pdf).

*of Governments: Legal Doctrines and State Practice, 1815-1995* 26 (1997). Successors to King Kamehameha III were not established through "extra-legal changes," but rather through the constitution and laws of the Hawaiian Kingdom. According to United States foreign relations law, "[w]here a new administration succeeds to power in accordance with a state's constitutional processes, no issue of recognition or acceptance arises; continued recognition is assumed." *Restatement (Third)*, §203, comment c.

As a new administration, the Council of Regency was established in a similar fashion to the Belgian Council of Regency, which was formed after King Leopold was captured by the Germans, during the Second World War. Just as the Belgian Council of Regency was established, under Article 82 of its 1831 Constitution, as amended, *in exile*, so to was the Hawaiian Council of Regency formed under Article 33 of its 1864 Constitution, as amended, not *in exile* but *in situ*. As far as Belgium is concerned, the capture of the king did not create any serious constitutional problems. "According to Article 82 of the Constitution of February 7, 18[31], as amended, the cabinet of ministers have to assume supreme executive power if the King is unable to govern. True, the ministers are bound to convene the House of Representatives and the Senate and to leave it to their decision of the united legislative chambers to provide for a regency; but in view of the belligerent occupation it is impossible for the two houses to function. While this emergency

obtains, the powers of the King are vested in the Belgian Prime Minister and the other members of the cabinet." F.E. Oppenheimer, "Governments and Authorities in Exile," 36 *Am. J. Int'l L.* 568, 569 (1942).

State continuity of the Hawaiian Kingdom is determined by the rules of customary international law. While State members of the Administrative Council furnishes all Contracting States "with an annual Report," in accordance with Article 49 of the PCA Convention, this does represent "State practice [that] covers an act or statement by…State[s] from which views can be inferred about international law," and it "can also include omissions and silence on the part of States." Michael Akehurst, "Custom as a Source of International Law," 47(1) *Brit. Y. B. Int'l L.* 1-53, 10 (1975). Since the United States, to include all Contracting States of the PCA Convention, did not object to the International Bureau's juridical act of acknowledging the Hawaiian Kingdom's existence as a non-Contracting State, it reflects the practice of States—*opinio juris*. Furthermore, the Administrative Council is a treaty-based component of an intergovernmental organization comprised of representatives of States, and "their practice is best regarded as the practice of States." *Id.*, 11.

> "[I]t may be convincingly held that the PCA contracting parties actually agreed with the recognition of the juridical fact of the Hawaiian Kingdom as a State carried out by the International Bureau. In fact, in international law, acquiescence "concerns a consent tacitly conveyed by a State, unilaterally, through silence or inaction, in circumstances

such that a response expressing disagreement or objection in relation to the conduct of another State [or an international institution] would be called for". The case in discussion is evidently a situation in the context of which, in the event that any of the PCA contracting parties would have disagreed with the recognition of the continued existence of the Hawaiian Kingdom as a State by the International Bureau through its juridical act, an explicit reaction would have been necessary. Since they "did not do so […] thereby must be held to have acquiesced. Qui tacet consentire videtur si loqui debuisset ac potuisset." Declaration of Federico Lenzerini, Ph.D., Exhibit 1, at 4.

As a matter of *opinio juris*, all Contracting States to the Permanent Court, that includes the United States, recognizes the continuity of the Hawaiian Kingdom and the Council of Regency as its interim government under customary international law. These Contracting States are:

Albania, Argentina, Armenia, Australia, Austria, The Bahamas, Bahrain, Bangladesh, Belarus, Belgium, Belize, Benin, Brazil, Bulgaria, Burkina Faso, Cambodia, Cameroon, Canada, Chile, Colombia, the Democratic Republic of the Congo, Costa Rica, Croatia, Cuba, Cyprus, Czechia, the Democratic Republic of São Tomé and Príncipe, Denmark, Djibouti, Dominican Republic, Ecuador, Egypt, El Salvador, Eritrea, Estonia, Eswatini, Ethiopia, Fiji, Finland, France, Georgia, Germany, Greece, Guatemala, Guyana, Haiti, Honduras, Hungary, Iceland, India, Iran, Iraq, Ireland, Israel, Italy, Japan, Jordan, Kenya, Kuwait, Kyrgyzstan, Lao People's Democratic Republic, Latvia, Lebanon, Libya, Lithuania, Liechtenstein, Lithuania, Luxembourg, Madagascar, Malaysia, Malta, Mauritius, Mexico, Mongolia, Montenegro, Morocco, Netherlands, New Zealand, Nicaragua, Nigeria, North Macedonia, Norway, Pakistan, Palestine, Panama, Paraguay, the People's Republic of China, Peru, Philippines, the Plurinational State of Bolivia, Poland, Portugal, Qatar, Romania, Republic of Korea, Russian Federation, Rwanda, Saudi Arabia,

Senegal, Serbia, Singapore, Slovak Republic, Slovenia, South Africa, Spain, Sri Lanka, Sudan, Suriname, Sweden, Switzerland, Thailand, Timor-Leste, Togo, Türkiye, Uganda, Ukraine, United Arab Emirates, United Kingdom of Great Britain and Northern Ireland, United States of America, Uruguay, Vanuatu, Venezuela, Viet Nam, Zambia, and Zimbabwe.

All Hawaiian Kingdom treaty partners, to include the United States, are also Contracting States to the PCA Convention, and these treaties have not been terminated. These treaties are also binding on the successor States of the Hawaiian Kingdom treaty partners.

At the time of their independence, these successor States were not aware that the Hawaiian Kingdom continued to exist as a State since the nineteenth century. Therefore, neither the newly independent States nor the Hawaiian Kingdom could declare "within a reasonable time after the attaining of independence, that the treaty is regarded as no longer in force between them." *Second report on succession in respect of treaties*, by Sir Humphrey Waldock, Special Rapporteur, Document A/CN.4/214 and ADD.1* AND 2, p. 48 (1969). Until there is clarification of the successor States' intentions, as to a common understanding with the Hawaiian Kingdom regarding the continuance in force of the Hawaiian treaty with their predecessor State, the Hawaiian Kingdom will presume the continuance in force of its treaties with the successor States under customary international law. The

Hawaiian Kingdom's position is consistent with the 1978 Vienna Convention on Succession of States in respect of Treaties. Article 24 states:

1. A bilateral treaty which at the date of the succession of States was in force in respect of the territory to which the succession of States relates is considered as being in force between a newly independent State and the other State party when:
   a. they expressly so agree; or
   b. by reason of their conduct they are to be considered as having agreed.
2. A treaty considered as being in force under paragraph 1 applies in the relations between the newly independent State and the other State party from the date of the succession of States, unless a different intention appears from their agreement or is otherwise established.

Since successor States, at the time of their independence, were unaware of the existence of the Hawaiian Kingdom, Article 24(1)(a) and (b) could not arise. Therefore, in the absence of an express agreement or an agreement by conduct, under customary international law, it will be presumed that the treaties continue in force for two years with the successor States of the Hawaiian Kingdom treaty partners when they have been made aware of the Hawaiian Kingdom's existence. Here follows the list of successor States to Hawaiian Kingdom treaties:

- **1875 Treaty of Friendship, Commerce and Navigation between the Hawaiian Kingdom and the Austro-Hungarian Empire**—Austria, Czech Republic, Hungary, Poland and Slovakia;
- **1862 Treaty of Amity, Commerce and Navigation between the Hawaiian Kingdom and Belgium**—Burundi, Democratic Republic of the Congo, and Rwanda;

- **1857 Treaty of Friendship, Commerce and Navigation between the Hawaiian Kingdom and France**—Algeria, Benin, Burkina Faso, Cambodia, Cameroon, Central African Republic, Chad, Comoros, Congo, Côte d'Ivoire, Djibouti, Gabon, Guinea, Lao People's Democratic Republic, Lebanon, Madagascar, Mali, Mauritania, Morocco, Niger, Senegal, Syrian Arab Republic, Togo, Tunisia, Vanuatu, and Viet Nam;
- **1851 Treaty of Friendship, Commerce and Navigation between the Hawaiian Kingdom and Great Britain**—Afghanistan, Antigua and Barbuda, Australia, The Bahamas, Bahrain, Bangladesh, Barbados, Belize, Bhutan, Botswana, Brunei Darussalam, Cameroon, Canada, Cyprus, Egypt, Eswatini, Fiji, Gambia, Ghana, Grenada, Guyana, India, Iraq, Ireland, Israel, Jamaica, Jordan, Kenya, Kiribati, Kuwait, Lesotho, Malawi, Malaysia, Maldives, Malta, Mauritius, Myanmar, Namibia, Nauru, Nepal, New Zealand, Nigeria, Pakistan, Papua New Guinea, Qatar, Saint Kitts and Nevis, Saint Lucia, Saint Vincent and the Grenadines, Samoa, Seychelles, Sierra Leone, Singapore, Solomon Islands, Somalia, South Africa, South Sudan, Sri Lanka, Sudan, Tonga, Trinidad and Tobago, Tuvalu, Uganda, United Arab Emirates, United Republic of Tanzania, Vanuatu, Yemen, Zambia, and Zimbabwe;
- **1863 Treaty of Amity, Commerce and Navigation between the Hawaiian Kingdom and Italy**—Libya and Somalia;
- **1879 Treaty of Peace and Friendship between the Hawaiian Kingdom and Germany**—Poland;
- **1871 Treaty of Amity and Commerce between the Hawaiian Kingdom and Japan**—Democratic People's Republic of Korea and the Republic of Korea;
- **1862 Treaty of Friendship, Commerce and Navigation between the Hawaiian Kingdom and the Netherlands**—Indonesia, Luxemburg, and Suriname;
- **1882 Treaty between the Hawaiian Kingdom and Portugal**—Angola, Cabo Verde, Guinea-Bissau, Mozambique, Sao Tome and Principe, and Timor-Leste;

- **1869 Treaty of Commerce and Navigation between the Hawaiian Kingdom and Russia**—Armenia, Azerbaijan, Belarus, Estonia, Finland, Georgia, Kazakhstan, Kyrgyzstan, Latvia, Lithuania, Mongolia, Poland, Republic of Moldova, Tajikistan, Turkmenistan, Ukraine, and Uzbekistan;
- **1863 Treaty of Peace and Friendship between the Hawaiian Kingdom and Spain**—Cuba and Equatorial Guinea;
- **1852 Treaty of Friendship, Commerce and Navigation between the Hawaiian Kingdom and the Kingdoms of Sweden and Norway**—Norway and Sweden;
- **1849 Treaty of Friendship, Commerce and Navigation between the Hawaiian Kingdom and the United States,** 9 Stat. 977—Marshall Islands, Micronesia, Palau, Philippines.

The Hawaiian Kingdom has treaties with 153 Member States of the United Nations, of which 14 treaties are with original States and 139 treaties are with Successor States.

The Court's conclusion that the Hawaiian Kingdom's motion to intervene presents a political question directly conflicts with the aforementioned recognition by the United States and other States of the continued existence of the Hawaiian Kingdom as a State, the Council of Regency as its interim government, and its treaties with original States and their successor States, as *opinio juris* and is thus manifest error.

## C. Defendant Kamehameha Schools will not represent the Hawaiian Kingdom's Interest

Minister Dr. Sai was invited to a Teams meeting online with Chief Executive Officer of the Kamehameha Schools, Jack Wong, Vice-President of Uluhiwa Strategy and Experience, Dr. Kehau Abad, Ph.D., with a few of her staff, and Nalani Kaina, Head of the Legal Department, with a few of her staff attorneys. The Team's meeting took place on October 16, 2025, at 4:15pm. *See* Declaration of Dr. Sai.

In that meeting, Minister Dr. Sai did a powerpoint presentation on the precedence set by the Intermediate Court of Appeals in *State of Hawai'i v. Lorenzo*, 77 Haw. 219, 883 P.2d 641 (App. 1994) ("Lorenzo appeals, arguing that the lower court erred in denying his pretrial motion (Motion) to dismiss the indictment. The essence of the Motion is that the [Hawaiian Kingdom] (Kingdom) was recognized as an independent sovereign nation by the United States in numerous bilateral treaties; the Kingdom was illegally overthrown in 1893 with the assistance of the United States; the Kingdom still exists as a sovereign nation; he is a citizen of the Kingdom; therefore, the courts of the State of Hawai'i have no jurisdiction over him. Lorenzo makes the same argument on appeal. For the reasons set forth below, we conclude that the lower court correctly denied the Motion. *Id*., 220; 642. [...] Consequently, it was incumbent on Defendant to present evidence supporting his claim. *United States v. Lorenzo*. Lorenzo has presented no factual (or legal) basis for

concluding that the Kingdom exists as a state in accordance with recognized attributes of a state's sovereign nature. (citation omitted) Consequently, his argument that he is subject solely to the Kingdom's jurisdiction is without merit, and the lower court correctly exercised jurisdiction over him." *Id.*, 221; 643-644.).

In his presentation Minister Dr. Sai stated in 1993, the Ninth Circuit Court of Appeals was the first court to address defendants-appellants' claim that United States courts do not have jurisdiction over them because of the illegal overthrow of the government of the Hawaiian Kingdom on January 17, 1893. *United States v. Lorenzo*, 995 F.2d 1448, *1455; 1993 U.S. App. LEXIS 10548, 19-20 ("Appellants Brown and Lorenzo contend that they are Hawaiian nationals and therefore the federal district court had no jurisdiction to hear this case. [However], [t]he appellants have presented no evidence that the Sovereign Kingdom of Hawaii is currently recognized by the federal government or that they have received any immunity arising from the existence of the Kingdom.").

Minister Dr. Sai then explained, the following year in 1994, the Intermediate Court of Appeals, in *State of Hawaiʻi v. Lorenzo*, while citing *United States v. Lorenzo*, created an evidentiary standard for defendants to meet who argue the State of Hawaiʻi courts lack jurisdiction because of the overthrow of the government of the Hawaiian Kingdom in 1893. The Appellate Court also did not foreclose this evidentiary burden, in *State of Hawaiʻi v. Lee*, 90 Haw. 130, 142; 976 P.2d 444, 456

(App. 1999), when referencing *Lorenzo*, stated, "it is an open legal question whether the 'Kingdom of Hawai'i' still exists." In 2014, the Supreme Court, in *State of Hawai'i v. Armitage*, 132 Haw. 36 (2014), clarified the evidentiary burden that *Lorenzo* placed upon defendants ("Lorenzo held that, for jurisdictional purposes, should a defendant demonstrate a factual or legal basis that the Kingdom of Hawai'i "exists as a state in accordance with recognized attributes of a state's sovereign nature[,]" and that he or she is a citizen of that sovereign state, a defendant may be able to argue that the courts of the State of Hawai'i lack jurisdiction over him or her." *Id.*, 60).

Minister Dr. Sai also stated that since 1994, *State of Hawai'i v. Lorenzo* became a precedent case at the trial court level for denying defendants' motions to dismiss because they provided no evidence of "a factual or legal basis that the Kingdom of Hawai'i 'exists as a state in accordance with recognized attributes of a state's sovereign nature.'" If these decisions went to appeal, the Intermediate Court of Appeals have always affirmed the trial court's decision pursuant to *Lorenzo*. *See Burgo v. State of Hawai'i*, 2012 Haw. App. LEXIS 462; *Bank of America, N.A. v. Santos*, 2015 Haw. App. LEXIS 250; *State of Hawai'i v. Rodenhurst,* 2010 Haw. App. LEXIS 588, (Haw. Ct. App. Oct. 29, 2010); *State of Hawai'i v. Makekau*, 2009 Haw. App. LEXIS 633 (Haw. Ct. App. Sept. 29, 2009); *State v. Ampong*, 2009 Haw. App. LEXIS 72 (Haw. Ct. App. Feb. 27, 2009); *State of Hawai'i v. Ball*, 2007 Haw.

App. LEXIS 267 (Haw. Ct. App. Apr. 19, 2007); *State of Hawai'i v. Spinney*, 2005 Haw. App. LEXIS 43 (Haw. Ct. App. Feb. 4, 2005); *State of Hawai'i v. Fergerstrom*, 106 Haw. 43, 101 P.3d 652, 2004 Haw. App. LEXIS 349 (Haw. Ct. App. 2004); *State of Hawai'i v. Keliikoa*, 2004 Haw. App. LEXIS 227 (Haw. Ct. App. July 21, 2004); *Betsill Bros. Constr., Inc. v. Akahi*, 2004 Haw. App. LEXIS 205 (Haw. Ct. App. June 28, 2004); *State of Hawai'i v. Araujo*, 2004 Haw. App. LEXIS 3 (Haw. Ct. App. Jan. 14, 2004); *Makapono Partners, LLC v. Simeona*, 2003 Haw. App. LEXIS 108 (Haw. Ct. App. Apr. 14, 2003); *State of Hawai'i v. Lindsey*, 2002 Haw. App. LEXIS 32 (Haw. Ct. App. Mar. 8, 2002); *State of Hawai'i v. Sherman*, 2000 Haw. App. LEXIS 218 (Haw. Ct. App. Dec. 11, 2000); *Chalon Int'l of Haw., Inc. v. Makuaole*, 2000 Haw. App. LEXIS 192 (Haw. Ct. App. Oct. 24, 2000); and *Nishitani v. Baker*, 82 Haw. 281 (1996).

Minister Dr. Sai also stated that in 2002, Chief United States District Judge David Ezra, in his January 24, 2002, Order affirming Magistrate Judge Kobayashi's Order, *United States v. Goo*, 2002 U.S. Dist. LEXIS 2919, acknowledged the *State of Hawai'i v. Lorenzo* precedent as the *Lorenzo* principle ("[t]he court finds that Defendant has failed to provide any viable legal or factual support for his claim that as a citizen of the Kingdom he is not subject to the jurisdiction of the courts. Since the Intermediate Court of Appeals for the State of Hawaii's decision in *Hawaii v. Lorenzo*, the courts in Hawaii have consistently adhered to the *Lorenzo* court's

statements that the Kingdom of Hawaii is not recognized as a sovereign state by either the United States or the State of Hawaii. See *Lorenzo* [internal citation omitted]; see also *State of Hawaii v. French* [internal citation omitted] (stating that "presently there is no factual (or legal) basis for concluding that the [Hawaiian] Kingdom exists as a state in accordance with recognizing attributes of a state's sovereign nature") (quoting *Lorenzo* [internal citation omitted]). This court sees no reason why it should not adhere to the *Lorenzo* principle. *Id*. 3-4."). A *principle* is a "settled rule of action, procedure, or legal determination." *Black's Law* 1193 (1990).

Minister Dr. Sai explained that, pursuant to the *Lorenzo* principle, Kamehameha Schools should file a motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil procedure because it can provide a "factual (or legal) basis for concluding that the [Hawaiian] Kingdom exists as a state in accordance with recognizing attributes of a state's sovereign nature." The evidence of a factual basis would be the Permanent Court of Arbitration's Case Repository and its Annual Reports of 2000-2011 that identifies the Hawaiian Kingdom as a State. The evidence of a legal basis would be the legal opinion by Professor Matthew Craven, "Continuity of the Hawaiian Kingdom," 1 *Haw. J. L. & Pol* 508 (2004), and the legal opinion by Professor Federico Lenzerini, "Legal Opinion on the Authority of the Council of Regency of the Hawaiian Kingdom," 3 *Haw. J. L. & Pol* 317 (2021). After questions and answers, the Teams meeting ended.

On November 12, 2025, Minister Dr. Sai received a text from Dr. Abad that Kamehameha Schools will not be making this argument. This decision is an admission that Kamehameha Schools will not represent the interest of the Hawaiian Kingdom as a State under international law, which prompted the Hawaiian Kingdom to prepare to file a motion to intervene. The motion to intervene was filed on January 21, 2026.

The Court, stated, "[t]o be sure, the […] intervention motion also make arguments about the proper interpretation of federal law and […] refer to materials that might aid in interpreting both. But Plaintiffs and Defendant are ably represented by counsel fully capable of submitting and raising arguments based on any such pertinent materials." *See* Order. The Hawaiian Kingdom respectfully submits this specific ruling, in and of itself, constitutes manifest error, if only insofar as it is premature in assuming that counsel for Plaintiffs and Defendant are ably and capable to do so, or will, more importantly, raise "arguments based on any such pertinent materials." The Court's finding was manifest error because Defendant Kamehameha Schools took a position to not represent the Hawaiian Kingdom's interest and Plaintiff Student for Fair Admissions will not represent the Hawaiian Kingdom's interest because it relies on American law and not Hawaiian Kingdom law in its lawsuit.

### III. CONCLUSION

This Court should reconsider its Denial of the Hawaiian Kingdom's motion to intervene on January 23, 2026. *See* Order. The Court's conclusion that the Hawaiian Kingdom's motion to intervene presents a political question is manifestly erroneous. Moreover, the Court should reconsider the Hawaiian Kingdom's motion to intervene in light of the United States recognition of the continued existence of the Hawaiian Kingdom and the Council of Regency as its interim government, and the action by the Defendant Kamehameha Schools to not represent the interest of the Hawaiian Kingdom.

Respectfully submitted this 3rd of February, 2026.

By:

   s/ Edward Halealoha Ayau
Edward Halealoha Ayau, Esq. (HI 5013)
LAW OFFICE OF EDWARD HALEALOHA AYAU
2 Nanea Street
Hilo, HI 96720
(808) 646-9015
halealohahapai64@gmail.com

*Counsel for Non-Party Intervenor Council*
*Of Regency of the Hawaiian Kingdom*