IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS; I.P., B.P., E.S., by and through her next of friend and mother, K.S.; and K.S.<br><br>Plaintiffs,<br><br>vs.<br><br>TRUSTEES OF THE ESTATE OF BERNICE PAUAHI BISHOP d/b/a KAMEHAMEHA SCHOOLS,<br><br>Defendant. | CIVIL NO. 1:25-cv-00450-MWJS-RT<br><br>[*REDACTED*] MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION |

**[*REDACTED*] MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF MOTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

ARGUMENT ..................................................................................................... 10

I.    PLAINTIFFS FAIL TO SATISFY ARTICLE III REQUIREMENTS........ 10

II.   PLAINTIFFS' CLAIMS FOR PROSPECTIVE RELIEF ARE MOOT ...... 17

III.  CONGRESS HAS PERMISSIBLY EXEMPTED KAMEHAMEHA'S
      PREFERENCE POLICY FROM SECTION 1981 ................................... 20

      A.    Section 1981 Does Not Prohibit Kamehameha's Preference
            Policy........................................................................................ 20

            1.    Section 11705(c)(4) Forecloses Plaintiffs' Statutory
                  Argument ........................................................................ 20

            2.    Doe I Forecloses Plaintiffs' Statutory Argument.......................21

            3.    Section 1981 Does Not Bar Contracts Benefiting Native
                  Hawaiians..........................................................................25

      B.    Congress Can Constitutionally Exempt Kamehameha's
            Preference Policy From Section 1981 ....................................... 26

            1.    Doe I Forecloses Plaintiffs' Constitutional Argument ...............26

            2.    The Exemption Is Constitutional .......................................27

IV.   PLAINTIFFS DO NOT ADEQUATELY PLEAD SECTION 1981
      CAUSATION ......................................................................................... 34

CONCLUSION.................................................................................................. 36

CERTIFICATE OF COMPLIANCE.................................................................. 37

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alaska Chapter, Associated Gen. Contractors of Am., Inc. v. Pierce*,
  694 F.2d 1162 ................................................................................ 31

*Almeida v. Almeida*,
  4 Haw. App. 513, 669 P.2d 174 (1983) ............................................. 18

*Am. Fed'n of Gov't Emps., AFL-CIO v. United States*,
  330 F.3d 513 (D.C. Cir. 2003) .......................................................... 30

*Atonio v. Wards Cove Packing Co.*,
  10 F.3d 1485 (9th Cir. 1993) ............................................................ 33

*Bachman v. St. Monica's Congregation*,
  902 F.2d 1259 (7th Cir. 1990) .......................................................... 34

*Bank Markazi v. Peterson*,
  578 U.S. 212 (2016) ......................................................................... 33

*Bd. of Comm'rs of Creek Cnty. v. Seber*,
  318 U.S. 705 (1943) ......................................................................... 28

*Bolling v. Sharpe*,
  347 U.S. 497 (1954) ......................................................................... 27

*Bowen v. Energizer Holdings, Inc.*,
  118 F.4th 1134 (9th Cir. 2024) ......................................................... 10

*Bradley v. T-Mobile US, Inc.*,
  2020 WL 1233924 (N.D. Cal. Mar. 13, 2020) ................................... 11

*Bronze Shields, Inc. v. New Jersey Dep't of Civil Serv.*,
  667 F.2d 1074 (3d Cir. 1981) ........................................................... 13

*Brown v. J. Kaz, Inc.*,
  581 F.3d 175 (3d Cir. 2009) ............................................................. 34

*Bucklew v. Precythe*,
    587 U.S. 119 (2019) ................................................................ 26

*Californians for Equal Rights Foundation v. Her*,
    2025 WL 2324110 (E.D. Cal. Aug. 12, 2025).............................. 13, 16

*Carney v. Adams*,
    592 U.S. 53 (2020) ........................................................ 11, 12, 13, 14

*CBOCS W., Inc. v. Humphries*,
    553 U.S. 442 (2008) ................................................................ 34

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ................................................................ 18

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ................................................................ 18

*Comcast Corp. v. National Association of
    African American-Owned Media*,
    589 U.S. 327 (2020) ................................................................ 34

*Core Optical Techs., LLC v. Nokia Corp.*,
    2025 WL 3525943 (C.D. Cal. Sept. 12, 2025) ................................ 15

*Davis v. Guam*,
    932 F.3d 822 (9th Cir. 2019) ................................................... 32

*Delaware Tribal Bus. Comm. v. Weeks*,
    430 U.S. 73 (1977) ....................................................... 29, 30, 31, 32

*Doe v. Kamehameha Schools*,
    470 F.3d 827 (9th Cir. 2006) .................... 1, 2, 5-9, 21-24, 26, 28, 30, 31, 34

*EEOC v. Peabody W. Coal Co.*,
    773 F.3d 977 (9th Cir. 2014) ................................................... 30

*Ellison v. Am. Bd. of Orthopaedic Surgery*,
    11 F.4th 200 (3d Cir. 2021) ................................................... 12, 13

*Est. of Tahilan v. Friendly Care Home Health Servs., Inc.*,
    731 F. Supp. 2d 1000 (D. Haw. 2010)........................................ 17, 18

iii

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
 82 F.4th 664 (9th Cir. 2023) ...................................................................... 15

*Food & Drug Admin. v. All. for Hippocratic Med.*,
 602 U.S. 367 (2024) ............................................................................ 10, 11

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
 528 U.S. 167 (2000) ................................................................................. 11

*Garrett v. Tandy Corp.*,
 295 F.3d 94 (1st Cir. 2002) ....................................................................... 17

*Haaland v. Brackeen*,
 599 U.S. 255 (2023) ............................................................................ 28, 32

*Higginbottom v. Keithley*,
 103 F. Supp. 2d 1075 (S.D. Ind. 1999) ..................................................... 19

*Judie v. Hamilton*,
 872 F.2d 919 (9th Cir. 1989) .................................................................... 17

*Kahawaiolaa v. Norton*,
 386 F.3d 1271 (9th Cir. 2004) .................................................................. 31

*Korab v. Fink*,
 797 F.3d 572 (9th Cir. 2014) .................................................................... 27

*LA All. for Hum. Rts. v. Cnty. of Los Angeles*,
 14 F.4th 947 (9th Cir. 2021) ..................................................................... 15

*Lee v. City of Los Angeles*,
 250 F.3d 668 (9th Cir. 2001) .................................................................... 17

*Lierboe v. State Farm Mut. Auto. Ins. Co.*,
 350 F.3d 1018 (9th Cir. 2003) .................................................................. 15

*Loffman v. California Dep't of Educ.*,
 119 F.4th 1147 (9th Cir. 2024) ................................................................. 11

*T.L. ex rel. Lowry v. Sherwood Charter Sch.*,
 2014 WL 897123 (D. Or. Mar. 6, 2014) ................................................... 19

iv

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .................................................................................. 15

*Mathews v. Diaz*,
426 U.S. 67 (1976) .................................................................................... 27

*McClanahan v. Arizona State Tax Comm'n*,
411 U.S. 164 (1973) .................................................................................. 29

*McDonald v. Santa Fe Trail Transp. Co.*,
427 U.S. 273 (1976) .................................................................................. 25

*Miller v. Gammie*,
335 F.3d 889 (9th Cir. 2003) (en banc) ............................................. 23

*Moore v. Harper*,
600 U.S. 1 (2023) ...................................................................................... 31

*Morongo Band of Mission Indians v. California State Bd. of
Equalization*,
858 F.2d 1376 (9th Cir. 1988) .............................................................. 15

*Morton v. Mancari*,
417 U.S. 535 (1974) ............................................................................ 28, 29

*Mullin v. Doe*,
609 U.S. --, -- S. Ct. --, 2026 WL 1825840 (June 25, 2026) ........... 27

*N.L.R.B. v. Noel Canning*,
573 U.S. 513 (2014) .................................................................................. 31

*Ramos v. Louisiana*,
590 U.S. 83 (2020) .................................................................................... 23

*Rice v. Cayetano*,
528 U.S. 495 (2000) .................................................................................. 31

*Roberts v. Progressive Preferred Ins. Co.*,
167 F.4th 955 (6th Cir. 2026) ............................................................... 13

*U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*,
971 F.2d 244 (9th Cir. 1992) ................................................................ 20

v

*Rodriguez v. AT & T Mobility Servs. LLC*,
 728 F.3d 975 (9th Cir. 2013) ...................................................................... 23

*Rosebrock v. Mathis*,
 745 F.3d 963 (9th Cir. 2014) ...................................................................... 18

*Ross v. White*,
 2019 WL 2725338 (C.D. Cal. July 1, 2019) ...................................................... 13

*Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*,
 402 F.3d 1198 (Fed. Cir. 2005) .................................................................... 15

*SFFA & Do No Harm v. David Geffen Sch. of Med. at UCLA*,
 812 F. Supp. 3d 1035 (C.D. Cal. 2025) ............................................................ 12

*Spitalnick v. King & Spalding, LLP*,
 2025 WL 608013 (D. Md. Feb. 25, 2025) .......................................................... 13

*Students for Fair Admissions v. Harvard*,
 600 U.S. 181 (2023) ....................................................................... 9, 23, 24

*Sunderland v. United States*,
 266 U.S. 226 (1924) ................................................................................ 29

*TransUnion LLC v. Ramirez*,
 594 U.S. 413 (2021) ...................................................................... 10, 11, 13, 18

*United States v. Antelope*,
 430 U.S. 641 (1977) ................................................................................ 30

*United States v. Decker*,
 600 F.2d 733 (9th Cir. 1979) ...................................................................... 29

*United States v. Garrett*,
 122 F. App'x 628 (4th Cir. 2005) .................................................................. 30

*United States v. John*,
 437 U.S. 634 (1978) ................................................................................ 29

*United States v. Vaello Madero*,
 596 U.S. 159 (2022) ................................................................................ 27

*Warren Trading Post Co. v. Arizona Tax Comm'n*,
   380 U.S. 685 (1965) ................................................................ 29

*Warth v. Seldin*,
   422 U.S. 490 (1975) ................................................................ 15

*Washington v. Confederated Bands and Tribes of Yakima Indian
   Nation*,
   439 U.S. 463 (1979) ................................................................ 30

*Weaver v. Cary Acad.*,
   2021 WL 4428202 (E.D.N.C. Sept. 27, 2021) ................................ 19

*Welton v. Gallagher*,
   2 Haw. App. 242, 630 P.2d 1077 (1981) ........................................ 19

## Statutes, Rules, and Regulations

20 U.S.C. § 7512 ................................................................ 3, 4, 8, 23, 30

20 U.S.C. § 7514 ................................................................................ 6

20 U.S.C. § 7517 ................................................................................ 7

30 Stat. 750 ...................................................................................... 3

42 U.S.C. § 1981 ............... 1, 2, 7, 8, 9, 16, 17, 19, 20, 21, 22, 23, 24, 25, 26, 34, 35

42 U.S.C. § 11701 ............................................................................ 23

42 U.S.C. § 11705 ................................................................ 1, 8, 20, 31, 32, 33

43 C.F.R. § 50.1 ................................................................................ 6

118 Stat. 445 .................................................................................... 6

Apology Resolution, S. Joint Res. No. 19, Pub. L. No. 103-150, 107
   Stat. 1510 (Nov. 23, 1993) ...................................................... 3, 4

Educational Gift Act, Act 002, S.B. No. 3123, Thirty-Third
   Legislature of the State of Hawaiʻi (Mar. 27, 2026) ................. 18, 19

Fed. R. Civ. P. 12(b) ................................................... 2, 3, 15, 18, 20, 21

Fed. R. Evid. 201(b) ....................................................................................... 17

## Other Authorities

Assistant Secretary for Indian Affairs Bryan Newland,
Federal Indian Boarding School Initiative Investigative
Report Vol II, at 9, 14-15, 33 (July 2024) ............................................................ 31

Mo'olelo Ea O Nā Hawai'i at 828 (Office of Hawaiian Affairs Dec. 21, 2015).. 4, 5

## **INTRODUCTION**

The complaint in this case asks this Court to defy long-settled Ninth Circuit en banc precedent and to upend Kamehameha Schools' longstanding admissions preference for applicants who have at least one Native Hawaiian ancestor.  In *Doe v. Kamehameha Schools* (*Doe I*), the en banc Ninth Circuit held that this preference does not violate 42 U.S.C. § 1981, which prohibits racial discrimination in contracting.  470 F.3d 827, 849 (9th Cir. 2006).  That conclusion is as correct today as it was in 2006.  Indeed, it is even more clearly correct now:  Four years after *Doe I*, Congress enacted a statute that expressly exempts Kamehameha from 42 U.S.C. § 1981, making unmistakably clear that Section 1981 does not bar Kamehameha's preference policy.  *See* 42 U.S.C. § 11705(c)(4).

Congress plainly has the constitutional authority to provide for such an exception in light of the United States' special trust relationship with Native Hawaiians.  The historical record reflects an unbroken congressional practice, from long before Hawai'i's statehood to the present day, of legislating for the benefit of Native Hawaiians.  The *Doe I* majority expressly relied on that special trust relationship, *see* 470 F.3d at 847-49, and that leaves no doubt that the preference remains lawful, especially given that even the dissenting judges in *Doe I* agreed that Congress possesses the constitutional power to exempt the policy from Section 1981, *see id.* at 879 (Bybee, J., dissenting).  Exempting a private institution, originating

1

under Hawaiian kingdom law and dedicated to the education of Native Hawaiian children, from a private cause of action is well within Congress's plenary power to fulfill its special trust relationship with Native Hawaiians, as *Doe I* recognized.

In our system of vertical stare decisis, this Court is thus bound by *Doe I* to dismiss the complaint here, which is materially identical to the one filed in *Doe I*, under Rule 12(b)(6) for failure to state a claim.  And if this Court deems the issue one of first impression not controlled by *Doe I*, it should uphold the constitutionality of the 2010 statute as foreclosing Plaintiffs' claims.

The Court need not and should not even reach the merits of the case, however, for two reasons.  First, the Court should dismiss all of the claims at the threshold under Rule 12(b)(1) for lack of standing.  Plaintiffs are the activist group Students for Fair Admissions ("SFFA"), which fails to plead that its anonymous members have taken the most basic steps to apply to Kamehameha, and several other later-added plaintiffs who fail to plead even the most basic facts to support the claim of an injury-in-fact caused by the preference.  Second, the Court should dismiss the claims for prospective relief as moot because Kamehameha has now eliminated tuition.  In a decision expressly sanctioned by the Hawaiʻi state probate court, Kamehameha provides its private preschool, primary, and secondary education to future students solely as a conditional gift.  This eliminates any basis to assert the

existence of a contract on which a Section 1981 claim depends, as settled Hawai'i state common law and a recent Hawai'i statute confirm.

The Court should accordingly dismiss the complaint under either Rule 12(b)(1) or Rule 12(b)(6).

## BACKGROUND

1.  Native Hawaiians are the aboriginal, indigenous people who exercised sovereignty over the Hawaiian Islands for nearly a millennium before western contact and the formation of the United States. *See* 20 U.S.C. § 7512(2). For over 700 years before the arrival of Europeans, Native Hawaiians governed themselves independently through a system of ruling ali'i, which became internationally recognized as a sovereign government. *See id.* § 7512(3). The most prominent ali'i was King Kamehameha I, who in 1810 united the island chiefdoms into the Kingdom of Hawai'i. *See id.* In 1893, however, "the sovereign, independent, internationally recognized, and indigenous government of Hawaii . . . was overthrown by a small group of non-Hawaiians, including United States citizens, who were assisted in their efforts by the United States Minister, a United States naval representative, and armed naval forces of the United States." 20 U.S.C. § 7512(5). Five years later, Congress unilaterally annexed the independent Hawaiian nation without the consent of the Hawaiian people. Joint Res., 30 Stat. 750 (July 7, 1898); *see* S. Joint Res. No.

3

19, Pub. L. No. 103-150, 107 Stat. 1510, 1512 (Nov. 23, 1993) ("Apology Resolution"). Hawai'i became a state in 1959.

Alongside the political destruction of the independent Hawaiian nation were "economic and social changes" brought about by Westernization and Americanization that were "devastating to the population and to the health and well-being of the Hawaiian people." Apology Resolution, 107 Stat. 1510, 1512. By 1919, due to disease and other factors, the Native Hawaiian population had plummeted by more than 97%. 20 U.S.C. § 7512(7). Shifts in education policy under the new government, particularly in the highly centralized public school system serving most Native Hawaiian children, decimated Hawaiian culture, with students facing harsh punishment for speaking Hawaiian in school. Mo'olelo Ea O Nā Hawai'i at 543-44 (Office of Hawaiian Affairs Dec. 21, 2015). That produced "self-disparagement, feelings of inadequacy, fear of failure as well as fear of success, alienation, hopelessness and helplessness" among Native Hawaiians. Id. at 547.

To fight these devastating developments, Native Hawaiians have long turned to ali'i trusts and other traditional Hawaiian institutions, consistent with Native Hawaiian custom and tradition. Mo'olelo Ea O Nā Hawai'i at 828 (Office of Hawaiian Affairs Dec. 21, 2015). For over a millennium, ali'i were stewards of lands and resources held in trust for all, and several prominent ali'i ultimately dedicated their royal lands and estates to address specific needs of the Native

4

Hawaiian people.  *Id.*  One such aliʻi was Princess Bernice Pauahi Bishop ("Pauahi"), the great-granddaughter of King Kamehameha I and the last heir to the Kamehameha family lands.  Consistent with her Christian faith and the traditional responsibilities of aliʻi to support the well-being of their people, Pauahi created a charitable testamentary trust in 1883 under Hawaiian kingdom law that devoted more than 375,000 acres of her private landholdings to establish Kamehameha Schools, which opened in 1887.

Following Pauahi's directive, the trustees of Kamehameha have prioritized the education of Native Hawaiians through instruction in Native Hawaiian culture, language, leadership, and self-governance.  Moʻolelo Ea O Nā Hawaiʻi at 867 (Office of Hawaiian Affairs Dec. 21, 2015); *see Doe I*, 470 F.3d at 831.

2.  From annexation to the present, the United States has consistently engaged with Native Hawaiians as a distinct indigenous community within the framework of federal law, alongside American Indians and Alaska Natives.  Congress has enacted over 150 laws that establish the special legal and political trust relationship between the United States government and Native Hawaiians.  *See Doe I*, 470 F.3d at 850 (Fletcher, J., concurring).  Those laws include seminal legislation designating public lands for homesteading by Native Hawaiians, affirming the responsibility to administer public trust assets to improve the conditions of Native Hawaiians, establishing Native Hawaiian health care systems, and providing support for Native

5

Hawaiian educational programs. *See id.* at 847-49. In so doing, "Congress affirmed the special relationship between the United States and the Native Hawaiians," as trust-based, 20 U.S.C. § 7512(8), and confirmed that Native Hawaiians possess a status under federal law that is "comparable to that of American Indians and Alaska Natives," *id.* § 7512(12)(A)-(B), (D). The Executive Branch also recognizes this unique trust relationship through the Interior Department's Office of Native Hawaiian Relations and its administrative procedures to reestablish a formal government-to-government relationship with Native Hawaiians. 118 Stat. 445; 43 C.F.R. § 50.1.

Within the context of that longstanding trust relationship, the United States has steadfastly supported Pauahi's private philanthropic investment in the education of Native Hawaiian children, "affirm[ing] specifically the mission of Kamehameha" through legislation. *Doe I*, 470 F.3d at 848. For example, Congress has "approv[ed] by name the Schools' continued research and assessment activities," "directed the Secretary of Education to make grants to the Schools," *id*. (emphasis omitted), and designated a seat on the Native Hawaiian Education Council for Kamehameha's CEO, 20 U.S.C. § 7514.

Kamehameha has in turn continued to fulfill Pauahi's wishes to educate the descendants of indigenous Hawaiians, to instill Christian and Hawaiian values, and to prepare its graduates as ʻōiwi (native) leaders to pave the path for the lāhui

6

(nation).  As part of that mission, Kamehameha applies an admissions policy that gives preference to otherwise qualified applicants who can verify that they descended from the people who exercised sovereignty over the Hawaiian Islands before 1778, a criterion identical to the federal definition of "Native Hawaiian," 20 U.S.C. § 7517(2).

Kamehameha's current admissions process has two phases.  In the first phase, Kamehameha determines whether an "applicant could be offered admission based upon the order of each applicant's ranked composite score and number of available seats," without regard to Native Hawaiian ancestry.  ECF 103-2, ¶5.  In the second phase, the preference is applied only to the subset of applicants otherwise deemed qualified for admission.  *Id*.  In the most recent years, the number of qualified applicants with Native Hawaiian ancestry has exceeded the number of spots.

Although ancestry plays a significant role in the admissions process, race does not.  For example, an applicant who identifies as white but who has only one distant Native Hawaiian ancestor would be entitled to the same preference as an applicant who has 100% Native Hawaiian ancestry.  As a result, students from "[m]ore than 60 different racial and ethnic groups" have attended Kamehameha.  *Doe I*, 470 F.3d at 832.

3.    In the 2000s, an anonymous plaintiff challenged Kamehameha's admissions policy under 42 U.S.C. § 1981, a statute enacted in the wake of the Civil

7

War that guarantees "all persons within the jurisdiction of the United States . . . the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981.  The Ninth Circuit, sitting en banc, held that the policy (assuming *arguendo* it involves a racial classification) does not violate Section 1981.  *Doe I*, 470 F.3d at 836 n.9, 849.

Four years later, Congress expressly exempted Kamehameha's preference policy from Section 1981 in 42 U.S.C. § 11705(c)(4).  That statute provides:

> In order to enable privately funded organizations to continue to supplement public efforts to provide educational programs designed to improve the health, capability, and well-being of Native Hawaiians and to continue to provide health services to Native Hawaiians, notwithstanding any other provision of Federal or State law, it shall be lawful for the private educational organization identified in section 7512(16) of title 20 (as such section was in effect on the day before December 10, 2015) to continue to offer its educational programs and services to Native Hawaiians (as defined in section 7517 of title 20) first and to others only after the need for such programs and services by Native Hawaiians has been met.

42 U.S.C. § 11705(c)(4).  The identified "private educational organization" is "Kamehameha Schools."  20 U.S.C. § 7512(16) (effective through Dec. 9, 2015).

4.  Last October, SFFA filed a complaint raising the same claim that the Ninth Circuit rejected in *Doe I* and alleging associational standing on behalf of its members.  Compl., ECF 1.  The original complaint identified only anonymous "Families A and B" as affected SFFA members.  ¶62.  Neither family has ever sought

8

to have a child admitted to Kamehameha or taken any preparatory steps towards applying. ¶¶62-73.

SFFA has amended the complaint three times, adding two families as co-plaintiffs: (i) I.P., a student who just completed her senior year of high school and who was rejected when she applied to Kamehameha for her sophomore year, and her mother, B.P.; and (ii) E.S., a rising junior who was rejected when she applied to Kamehameha for her seventh and ninth grade years, and her mother, K.S. *See* Third Am. Compl. ("TAC"), ECF 124 ¶¶10-13, 81-105.

Although Plaintiffs plead three counts, they are essentially just different legal arguments in support of a single Section 1981 claim. TAC ¶¶106-130. Plaintiffs acknowledge that in *Doe I*, the Ninth Circuit upheld Kamehameha's admissions preference against a Section 1981 challenge on two independent grounds: (i) that the preference is a valid remedial program in light of persistent educational disparities, ¶¶47-54 (citing *Doe I*, 470 F.3d at 838-46); and (ii) that Congress intended to allow the preference when it amended Section 1981 in 1991, ¶¶55-56 (citing *Doe I*, 470 F.3d at 847-49). But they assert that the first holding in *Doe I* was "abrogated" by *Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023), and has been undermined by certain factual developments, ¶¶118-21. And they assert that the Ninth Circuit's second conclusion yielded an unconstitutional construction of Section 1981. ¶¶122-30.

Plaintiffs seek injunctive relief as well as nominal, compensatory, and punitive damages. TAC at 50-51.

## ARGUMENT

## I.  PLAINTIFFS FAIL TO SATISFY ARTICLE III REQUIREMENTS

To establish a constitutional case or controversy, a plaintiff must show "(i) that he suffered an injury in fact . . . ; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). A defendant may attack standing both facially and factually. A "facial attack . . . accepts the truth of the plaintiff's allegations but asserts that they are insufficient on their face to invoke federal jurisdiction," while "[a] factual attack on jurisdiction contests the truth of the plaintiff's factual allegations." *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1142 n.6 (9th Cir. 2024). Because the original complaint, filed only by SFFA, did not adequately plead an Article III case or controversy under these standards, this Court lacks subject matter jurisdiction and should dismiss this case under Rule 12(b)(1).

A. SFFA lacked standing to file the original complaint. As an initial matter, SFFA does not allege that it has suffered, or will suffer, any injury itself. Under the original understanding of Article III, that defeats its standing—an argument Kamehameha preserves for any future appellate proceedings. *See Food & Drug*

10

*Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 399-400 (2024) (Thomas, J., concurring).

At any rate, while existing precedent permits an organizational plaintiff to establish associational standing where the plaintiff's "members would otherwise have standing to sue in their own right," SFFA cannot meet that standard either. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). In its original complaint, SFFA grounded its standing on two anonymous member families, Families A and B. Compl. ¶¶66, 72; TAC ¶¶63-73. But Families A and B face no imminent injury-in-fact, and, even if they did, that injury would not be "likely caused" by Kamehameha's admissions policy. *TransUnion*, 594 U.S. at 423.

To plead an injury-in-fact in the school-admissions context, plaintiffs must plausibly allege that they are "able and ready" to be admitted. *Loffman v. California Dep't of Educ.*, 119 F.4th 1147, 1159 (9th Cir. 2024) (quoting *Carney v. Adams*, 592 U.S. 53, 60 (2020)). "[T]o be 'able' means qualified and to be 'ready' means seeking" and being "genuinely interested in" admission. *Bradley v. T-Mobile US, Inc.*, 2020 WL 1233924, at *10 (N.D. Cal. Mar. 13, 2020). The able-and-ready standard requires plaintiffs to allege specific facts such as "prior . . . applications," "efforts to determine likely openings," or "other preparations" for attending, not a mere naked allegation of intent. *Loffman*, 119 F.4th at 1160 (quoting *Carney*, 592

11

U.S. at 63); *see SFFA & Do No Harm v. David Geffen Sch. of Med. at UCLA*, 812 F. Supp. 3d 1035, 1041-42 (C.D. Cal. 2025); *see also Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 208-09 (3d Cir. 2021).

SFFA's allegations about Families A and B (Compl. ¶¶62-73; TAC ¶¶62-73) do not come close to establishing that they are able and ready to attend Kamehameha. SFFA acknowledges that admission to Kamehameha is "highly competitive," yet it failed to plead that the students in Families A and B have the grades or other accomplishments that would make them remotely competitive for admission. Compl. ¶17; TAC ¶21.

Moreover, as reflected in the complaint itself, there were several simple steps that Families A and B could have taken if they were truly interested in attending Kamehameha: (i) creating an account in an online portal, Compl. ¶21; TAC ¶25; (ii) completing an application questionnaire, Compl. ¶22; TAC ¶26; (iii) taking an admissions test, Compl. ¶22; TAC ¶26; and (iv) attending an interview, Compl. ¶22; TAC ¶26. Yet the families never completed any of those, or any other, practical steps toward admission. SFFA in fact admits that Families A and B did nothing more than "review[] Kamehameha's application and determine[] how they would answer each question"—and it does not allege that they took even that minimal step before SFFA discussed filing a lawsuit with them. Compl. ¶66; TAC ¶72.

12

SFFA seems to allege that Families A and B failed to take any real steps toward applying because they deemed such efforts futile.  Compl. ¶66; TAC ¶72. But "[a plaintiff] is not able and ready to apply . . . merely because it might be futile to actually do so."  *Ellison*, 11 F.4th at 208; *see Spitalnick v. King & Spalding, LLP*, 2025 WL 608013, at *4 n.3 (D. Md. Feb. 25, 2025); *see also Carney*, 592 U.S. at 63; *Roberts v. Progressive Preferred Ins. Co.*, 167 F.4th 955, 964 (6th Cir. 2026). Even if futility might excuse the failure to actually submit an application in some cases, it does not excuse the omission of specific allegations showing a realistic prospect of admission or a genuine interest in attending.

SFFA's failure to allege anything about the competitiveness of the students in Families A and B also means that it has not adequately alleged an imminent injury "likely caused" by the preference policy.  *TransUnion*, 594 U.S. at 423.  For example, in *Californians for Equal Rights Foundation v. Her*, a court in this circuit granted a motion to dismiss for lack of the causation element of standing in part because the plaintiff "made no nonconclusory factual allegations that its members' children are actually eligible" for the program challenged as racially discriminatory. 2025 WL 2324110, at *10 (E.D. Cal. Aug. 12, 2025); *accord Ross v. White*, 2019 WL 2725338, at *7 (C.D. Cal. July 1, 2019), *aff'd*, 2022 WL 543201 (9th Cir. Feb. 23, 2022); *see also Bronze Shields, Inc. v. New Jersey Dep't of Civil Serv.*, 667 F.2d 1074, 1080 n.12 (3d Cir. 1981) (finding that plaintiffs lacked standing to challenge

13

alleged racial discrimination at the screening stage because plaintiffs never reached that stage).

Here, although SFFA frames its members' injury as being subjected to a discriminatory admissions process, SFFA's own complaint makes clear that Kamehameha does not take into account Native Hawaiian ancestry when deciding whether an applicant is competitive for admission.  Despite alleging that the preference operates as a total bar on admission of applicants without Native Hawaiian ancestry, the complaint acknowledges that such applicants can be placed on the waitlist, demonstrating that the preference is not applied until a later stage. TAC ¶86.  And Kamehameha has now confirmed through a sworn declaration what the complaint indicates:  Kamehameha in fact "does not consider whether an applicant is Native Hawaiian until it has otherwise decided that the applicant could be offered admission based upon the order of each applicant's ranked composite score and number of available seats." ECF 103-2, ¶5.  For that reason, SFFA could establish likely causation only if its members were sufficiently competitive to reach the stage at which the preference would be considered.  But it has failed to do so.

Finally, SFFA's request for "nominal damages of $1 for each lost opportunity to apply" by an SFFA member suffers from a separate problem.  TAC at 51. Damages claims are incompatible with associational standing because they "require individualized proof"—including, here, whether each supposedly affected member

14

of SFFA was able and ready to apply—and thus the participation of individual members. *Warth v. Seldin*, 422 U.S. 490, 515-16 (1975).

B.  SFFA's standing defects at the time of the original complaint require dismissal of the complaint regardless of the later additions of individual plaintiffs or standing members.  It is well-settled that a court must base its standing analysis on the original complaint; subsequently added plaintiffs or associational members "do[] not factor into the standing calculus." *LA All. for Hum. Rts. v. Cnty. of Los Angeles*, 14 F.4th 947, 960 & n.9 (9th Cir. 2021) (citing *Morongo Band of Mission Indians v. California State Bd. of Equalization*, 858 F.2d 1376, 1381 (9th Cir. 1988)).  Courts in this circuit thus recognize that belatedly named individual plaintiffs or members of an associational plaintiff cannot salvage a standing defect.  *See Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1023 (9th Cir. 2003); *Core Optical Techs., LLC v. Nokia Corp.*, 2025 WL 3525943, at *16 (C.D. Cal. Sept. 12, 2025) (citing *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1203 (Fed. Cir. 2005)); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n.4 (1992) (retroactively named defendants insufficient for redressability); *see Carney*, 592 U.S. at 59 ("[Plaintiff] bears the burden of establishing standing *as of the time he brought this lawsuit* and maintaining it thereafter.") (emphasis added); *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 680 (9th Cir. 2023).  The Court should accordingly dismiss the case under Rule 12(b)(1).

15

C.  Even if the complaint's allegations about later-added plaintiffs I.P., B.P., K.S., and E.S. were relevant to the jurisdictional question, they also lack standing because they have not sufficiently pleaded an injury that was likely caused by the preference policy.  On its face, the complaint makes only conclusory allegations that I.P. was a "strong student with stellar academics" and that she "scored well on Kamehameha's test" and that E.S. "has a strong academic background and is an accomplished athlete."  TAC ¶¶83, 85, 92, 95.  These vague assertions do not set out the facts necessary to determine whether the admissions preference was ever applied to either student, nor do they demonstrate a likelihood that if E.S. applies again, she will imminently suffer an injury traceable to the preference.  *See Californians for Equal Rts. Found.*, 2025 WL 2324110, at *10.  Moreover, Kamehameha has confirmed through a sworn declaration that when I.P. and E.S. previously applied, neither reached the stage in the admissions process where the preference would have been considered—and so Kamehameha never considered their ancestry in denying them admission.  Decl. of Heather KK Park ¶¶7-9 (July 15, 2026).  Both times E.S. applied, she "scored lower on the ranked list than the number of seats available," so "her ancestry was not considered."  *Id.* ¶¶7-8.  The same was true of I.P.'s application.  *Id.* ¶9 (I.P. placed ███████ below" the 5 students admitted the year she applied).  They therefore lack standing to challenge the preference applied to others (and so cannot support SFFA's associational standing either).

16

## II.    PLAINTIFFS' CLAIMS FOR PROSPECTIVE RELIEF ARE MOOT

Plaintiffs' Section 1981 claim rests on the allegation that Kamehameha discriminates when it enters into contracts with admitted students.  TAC ¶110.  But on February 12, 2026, the Circuit Court of the First Circuit for the State of Hawai'i approved Kamehameha's decision to "permanently adopt a Complete Gift Approach, involving a non-contractual, free of tuition model for its preschools and K-12 campuses."  Decl. of John F. Bash, Ex. A.  This Court may take judicial notice of the state court's order.  *See* Fed. R. Evid. 201(b)-(d); *Lee v. City of Los Angeles,* 250 F.3d 668, 689 (9th Cir. 2001).  Following the order, Kamehameha is not charging its students any tuition.  Bash Decl., Ex. A.  All tuition, fees, meals, transportation, and boarding are part of the gift of education provided by Kamehameha through Pauahi's generous legacy.  *Id.*

That change eliminates any arguable vestige of a contractual relationship, and as a result, SFFA cannot credibly assert that Kamehameha enters into contractual relationships with its students.  Whether a contract exists between Kamehameha and its students is a question of Hawai'i law, absent a conflict with federal law.  *See Judie v. Hamilton*, 872 F.2d 919, 922 (9th Cir. 1989); *Garrett v. Tandy Corp.*, 295 F.3d 94, 100 (1st Cir. 2002).  Under Hawai'i law, provision of education free of tuition qualifies as a gift, not a contract, because it is "'a transfer of property gratuitously, without consideration.'"  *Est. of Tahilan v. Friendly Care Home Health*

17

*Servs., Inc.*, 731 F. Supp. 2d 1000, 1010 (D. Haw. 2010) (citing *Almeida v. Almeida*, 4 Haw. App. 513, 517, 669 P.2d 174, 178 (1983)).  The Hawaiʻi State Legislature recently reaffirmed that longstanding principle by providing that "any school-conditioned enrollment at any private school where no tuition or other monetary consideration is required or paid by the recipient shall be considered to be a conditional gift and not a contract."  Act 002, S.B. No. 3123, Thirty-Third Legislature of the State of Hawaiʻi (Mar. 27, 2026) ("Educational Gift Act").

Accordingly, any claim for prospective relief under Section 1981 is moot and should be dismissed under Rule 12(b)(1).  "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014).  Absent any reasonable prospect of a future contractual relationship between Kamehameha and Plaintiffs, Plaintiffs' alleged injury—impairment of a contractual relationship—is not "certainly impending."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013).  It is thus moot.  *See TransUnion*, 594 U.S. at 431 ("[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)."); *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (plaintiff must show he is "likely to suffer future injury" to seek prospective relief).

Moreover, Hawai'i law provides that an education without tuition "shall be considered to be a conditional gift and not a contract, *notwithstanding* that the . . . school . . . may require the student or the student's parents or guardians to . . . [p]ay for any optional extracurricular benefits . . . ; [a]llow the use of the student's name, image, likeness, [etc.] . . . ; or [s]ign waivers, consents, or similar agreements." Educational Gift Act (emphasis added); *accord Welton v. Gallagher*, 2 Haw. App. 242, 248, 630 P.2d 1077, 1083 (1981), *aff'd*, 65 Haw. 528, 654 P.2d 1349 (1982). That is consistent with the numerous cases that have held that there is no contractual relationship between a school and its students absent tuition, including where public schools are concerned. *See, e.g.*, *T.L. ex rel. Lowry v. Sherwood Charter Sch.*, 2014 WL 897123, at *13 (D. Or. Mar. 6, 2014), *aff'd sub nom. Lowry v. Sherwood Charter Sch.*, 691 F. App'x 310 (9th Cir. 2017); *Higginbottom v. Keithley*, 103 F. Supp. 2d 1075, 1080-81 (S.D. Ind. 1999).

The ancillary documents the complaint identifies also fail to support a claim under Plaintiffs' own allegations. Those documents—a "Kamehameha Schools Access Agreement," TAC ¶25, an "Acknowledge, Consent, and Authorization," ¶27, and an "Enrollment Contract/General Release," ¶28—are not alleged to apply an ancestry preference. They thus cannot support a Section 1981 claim. *See Weaver v. Cary Acad.*, 2021 WL 4428202, at *9 (E.D.N.C. Sept. 27, 2021). At any rate, Kamehameha has also discontinued the use of those agreements. Park Decl. ¶10.

19

Even if the claims for prospective relief are not jurisdictionally moot, the Court should dismiss them under Rule 12(b)(6) in light of the elimination of tuition. Although a Rule 12(b)(6) challenge is ordinarily limited to the pleadings, this Court may at this stage take judicial notice of the state-court order approving the elimination of tuition. *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992). Given that order, there is no plausible basis to believe that Family A, Family B, the E.S.-K.S. family or any other SFFA member will be denied a contractual relationship with Kamehameha in violation of Section 1981.

## III. CONGRESS HAS PERMISSIBLY EXEMPTED KAMEHAMEHA'S PREFERENCE POLICY FROM SECTION 1981

Should the Court conclude that it has jurisdiction, the Court should dismiss Plaintiffs' complaint for failure to state a claim under Rule 12(b)(6) because Congress has exercised its constitutional power and exempted Kamehameha's preference policy from Section 1981.

### A. Section 1981 Does Not Prohibit Kamehameha's Preference Policy

Plaintiffs assert that Kamehameha's preference policy violates Section 1981. TAC ¶¶106-30. That claim is barred by both Section 11705(c)(4) and *Doe I*.

#### 1. Section 11705(c)(4) Forecloses Plaintiffs' Statutory Argument

Plaintiffs have overlooked that in 2010 Congress expressly exempted Kamehameha's policy from Section 1981. Section 11705(c)(4) provides:

20

> [N]otwithstanding any other provision of Federal or State law, it shall
> be lawful for [Kamehameha] to continue to offer its educational
> programs and services to Native Hawaiians (as defined in section 7517
> of title 20) first and to others only after the need for such programs and
> services by Native Hawaiians has been met.

42 U.S.C. § 11705(c)(4).

That statute forecloses Plaintiffs' claim that Section 1981 bars the preference policy. By exempting Kamehameha's admissions policy from "any other provision of Federal or State law," Section 11705(c)(4) establishes that Section 1981 simply does not apply to the policy. Because they failed to cite Section 11705(c)(4) in any of the four iterations of their complaint, Plaintiffs have provided no explanation for why that statute would not control here.

### 2.    *Doe I* Forecloses Plaintiffs' Statutory Argument

Even if Section 11705(c)(4) did not exist, Plaintiffs' claim is foreclosed by the Ninth Circuit's en banc decision in *Doe I*, issued four years before Section 11705(c)(4) was enacted. *Doe I* squarely held that "a Hawaiian private, non-profit K–12 school that receives no federal funds," *i.e.*, Kamehameha, does not "violate[] § 1981 by preferring Native Hawaiians in its admissions policy." 470 F.3d at 829. *Doe I* provided two alternative justifications for its legal conclusion. First, it held that Kamehameha's "admissions policy, favoring students of Native Hawaiian descent," is "permissible in the educational context under § 1981" as a remedial measure given the longstanding, systemic disadvantages that Native Hawaiian

21

students face as indigenous youth, including those recognized in congressional findings. *Id.* at 837, 846.

Second, *Doe I* provided an "[a]lternative," stand-alone holding that Congress intended to allow the preference policy when it reenacted Section 1981 in 1991. 470 F.3d at 847-49. In reaching that holding, the court surveyed nearly a century of "steadfast congressional policies favoring remedial measures for Native Hawaiians—and specifically remedial educational measures, some of them even mentioning Kamehameha Schools and the Bishop Trust approvingly by name." *Id.* at 849. It noted that since 1920, "Congress has relied on the special relationship that the United States has with Native Hawaiians to provide specifically for their welfare in a number of different contexts," including with respect to "the educational disparities faced by Native Hawaiian students." *Id.* at 848. "It would be incongruous," the Ninth Circuit determined, "to conclude that while Congress was repeatedly enacting remedial measures aimed exclusively at Native Hawaiians, at the same time Congress would reject such Native Hawaiian preferences through § 1981." *Id.* at 849.

A five-judge concurrence written by Judge Fletcher reinforced *Doe I*'s alternative holding. *See id.* at 849-57. Judge Fletcher explained that "Native Hawaiians constitute a unique population that has a 'special trust relationship' with the United States" that "Congress has repeatedly 'affirmed,' 'acknowledged,'

22

'reaffirmed,' and 'recognized.'" *Id.* at 850 (quoting 20 U.S.C. § 7512(8)-(13); 42 U.S.C. § 11701(13)-(16), (19)-(21)).  "Based on this 'historical and unique legal relationship,'" he wrote, "Congress has enacted more than 150 laws that 'extend to the Hawaiian people the same rights and privileges accorded to American Indian, Alaska Native, Eskimo, and Aleut communities.'"  *Id.* (quoting 42 U.S.C. § 11701(19)).

*Doe I* bars this action.  In our legal system "vertical *stare decisis* is absolute," *Ramos v. Louisiana*, 590 U.S. 83, 124 n.5 (2020), and district courts are accordingly bound by precedential Ninth Circuit rulings.  *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

Plaintiffs claim that *Doe I* "cannot shield Kamehameha today" because "[i]ts legal reasoning was abrogated by the Supreme Court in *Harvard*."  TAC ¶5.  That is wrong.  To implicitly overrule a circuit precedent, a Supreme Court decision must "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable."  *Miller*, 335 F.3d at 900.  That requirement "is a high standard."  *Rodriguez v. AT & T Mobility Servs. LLC*, 728 F.3d 975, 979 (9th Cir. 2013) (citation omitted).  It is not met here.

Neither alternative holding of *Doe I* is clearly irreconcilable with *Harvard*. *Harvard* applied strict scrutiny under Title VI and the Equal Protection Clause to hold that campus diversity is not a sufficiently compelling interest to justify race-

23

conscious college-admissions policies at a university "that accepts federal funds." 600 U.S. at 195, 197-98, 198 n.2, 214. By contrast, *Doe I*'s first alternative holding concluded that under Section 1981, strict scrutiny does not apply to a remedial preference adopted by "a purely private entity that receives no federal funds," particularly given Congress's conclusion that, "in the unique context of Native Hawaiian history, affirmative measures are needed to address present, severe inequalities in educational achievement." *Id.* at 839, 845-46.

And at any rate, *Harvard* has no conceivable bearing on *Doe I*'s alternative, stand-alone holding validating Kamehameha's admissions policy on the ground that Congress did not intend the 1991 reenactment of Section 1981 to bar Kamehameha's policy. The complaint here tacitly admits that *Doe I*'s second holding is unaffected by *Harvard* by challenging the second holding only on other grounds. *See* TAC ¶¶123-30. Indeed, even judges who would have ruled against Kamehameha agreed that "U.S. Supreme Court decisions about affirmative action . . . have nothing to do with this case." *See Doe I*, 470 F.3d at 887 (Kleinfeld, J., dissenting).

*Harvard* also did not involve a federal statute specifically authorizing the challenged conduct, a sustained federal legislative relationship with an indigenous people, or an educational institution receiving no federal funds whose Native mission originated under the law of a sovereign indigenous government before the

24

United States assumed governance. Nothing in *Harvard* addressed that combination of circumstances.

Plaintiffs also assert that the factual predicates underlying *Doe I*'s approval of Kamehameha's admissions policy have changed so much that *Doe I* is no longer controlling. TAC ¶120. Here again, however, that contention has no bearing on *Doe I*'s alternative, stand-alone holding that the policy is exempt from Section 1981, because that holding was based on statutory context rather than facts on the ground. In any event, the developments that Plaintiffs cite are immaterial to *Doe I*'s first holding. On the contrary, their allegations confirm that significant educational disparities between Native Hawaiians and other students persist. *Id.* ¶¶51-52.

### 3. Section 1981 Does Not Bar Contracts Benefiting Native Hawaiians

Although the argument is not available under current precedent, Kamehameha preserves for potential future stages of review the argument that Section 1981 prohibits only contract-related discrimination in favor of "white citizens," 42 U.S.C. § 1981(a), not contracting practices that benefit other groups. The Supreme Court previously rejected that argument based on Section 1981's legislative history, despite acknowledging that a "mechanical reading" of the statute's text "would seem to lend support" to the argument. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286-96 (1976). But the mode of statutory interpretation leading to that conclusion has fallen into disfavor.

25

**B.    Congress Can Constitutionally Exempt Kamehameha's Preference Policy From Section 1981**

Plaintiffs assert that any exemption of Kamehameha's preference policy from Section 1981 liability would be unconstitutional.  TAC ¶¶122-30.  That argument is foreclosed by *Doe I* and, at any rate, lacks merit.

**1.    *Doe I* Forecloses Plaintiffs' Constitutional Argument**

The reasoning in *Doe I* necessarily establishes that its interpretation of Section 1981 is constitutional.  In reaching its first alternative holding, the Ninth Circuit considered whether Kamehameha's preference policy "unnecessarily trammels the rights of the non-preferred class, that is, students with no Hawaiian ancestry."  470 F.3d at 844.  The court concluded that it did not.  *Id.* at 845.  That conclusion is inconsistent with the view that an exemption for the policy violates the constitutional rights of non-Native Hawaiian students.  And it is axiomatic that "just as binding as [a] holding is the reasoning underlying it."  *Bucklew v. Precythe*, 587 U.S. 119, 136 (2019).

Further, both the five concurring judges *and* the seven dissenting judges in *Doe I* explicitly stated that "[i]f Congress wishes to exempt preferences for Native Hawaiians from § 1981, it may do so."  470 F.3d at 879 (Bybee, J., dissenting); *see id.* at 856-57 (Fletcher, J., concurring).  Those opinions accounted for twelve members of the fifteen-judge panel.

26

### 2.    The Exemption Is Constitutional

*Doe I* aside, Plaintiffs' constitutional argument lacks merit.  In light of the United States' longstanding trust obligations to Native Hawaiians in education, the Constitution permits Congress to exempt from Section 1981 a private educational institution that receives no federal funds and serves Native Hawaiian children.

a. The Equal Protection Clause does not by its terms apply to the federal government, but the Supreme Court has recognized an equal-protection component to the Fifth Amendment's Due Process Clause.  *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).  At the same time, the Court has long held that when the federal government exercises certain plenary powers, it has more flexibility than a state legislature to draw pertinent legislative classifications.  For example, federal classifications based on alienage and territorial residence are subject only to rational-basis review in light of Congress's plenary authority over immigration and federal territories.  *United States v. Vaello Madero*, 596 U.S. 159, 165-66 (2022); *Mathews v. Diaz*, 426 U.S. 67, 86 & n.26 (1976); *Korab v. Fink*, 797 F.3d 572, 574 (9th Cir. 2014); *see also Mullin v. Doe*, 609 U.S. --, -- S. Ct. --, 2026 WL 1825840, at *15-16 (June 25, 2026) (Thomas, J., concurring) ("Perhaps [because the Fifth Amendment's Due Process Clause is textually distinct from the Fourteenth Amendment's Equal Protection Clause,] this Court has never subjected even express racial classifications in immigration laws to scrutiny under the Due Process Clause.").

27

That flexibility includes Congress's authority—rooted in the Indian Commerce Clause as well as "principles inherent in the Constitution's structure"—to enact federal laws that benefit indigenous peoples. *Haaland v. Brackeen*, 599 U.S. 255, 274 (2023). The Supreme Court has repeatedly made clear that this power does not depend on formal tribal status. Rather, when "the United States overcame the Indians and took possession of their lands," the federal government "assumed the duty of furnishing . . . protection" to indigenous peoples "and with it the authority to do all that was required to perform that obligation and to prepare the Indians to take their place as independent, qualified members of the modern body politic." *Bd. of Comm'rs of Creek Cnty. v. Seber*, 318 U.S. 705, 715 (1943). The resulting "'trust relationship between the United States and the Indian people' informs the exercise of [federal] legislative power." *Haaland*, 599 U.S. at 274-75 (citation omitted). In administering that trust relationship, Congress has often "provid[ed] special treatment, including distribution of funds, based on broad definitions of the terms 'Indian,' 'native,' 'Native American,' and 'tribal organization' that encompass Indians who are not members of federally recognized tribes." *Doe I*, 470 F.3d at 850-52 (Fletcher, J., concurring) (compiling statutes).

When it enacts such provisions, Congress necessarily enjoys the same flexibility to draw classifications based on Native status as it does in the immigration and territorial contexts. *See Morton v. Mancari*, 417 U.S. 535, 539, 551, 554 (1974).

28

The Supreme Court has consistently upheld statutes and other exercises of federal power that single out indigenous peoples, including those with no tribal membership, for the receipt of benefits, without suggesting that such classifications are subject to heightened scrutiny.  *See United States v. John*, 437 U.S. 634, 650, 653 (1978); *Delaware Tribal Bus. Comm. v. Weeks*, 430 U.S. 73, 97 (1977); *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164 (1973); *Warren Trading Post Co. v. Arizona Tax Comm'n*, 380 U.S. 685, 691 n.18 (1965); *Sunderland v. United States*, 266 U.S. 226, 231-32, 234 (1924).  As the Ninth Circuit has held, "[t]raditional equal protection analysis . . . does not apply to legislation or governmental action favoring Indians."  *United States v. Decker*, 600 F.2d 733, 740 (9th Cir. 1979).

Thus, in *Morton*, *supra*, the Supreme Court held that a federal agency's hiring preference for Native Americans was not "invidious racial discrimination in violation of the Due Process Clause of the Fifth Amendment" but rather a permissible feature of the "special relationship" between the United States and Native Americans.  417 U.S. at 551-52, 554.  Invoking "the solemn commitment of the Government toward the Indians," the Court held that "[a]s long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed."  *Id.* at 552-55.

In the fifty years since *Morton*, the Supreme Court and courts of appeals have continued to uphold federal benefits for indigenous peoples based on the "special

29

treatment [that] can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians." *Delaware Tribal Bus. Comm.,* 430 U.S. at 85 (quoting *Morton,* 417 U.S. at 555); *see United States v. Antelope*, 430 U.S. 641, 646 (1977); *Washington v. Confederated Bands and Tribes of Yakima Indian Nation*, 439 U.S. 463, 500-01 (1979); *see also*, *e.g.*, *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 330 F.3d 513, 522-23 (D.C. Cir. 2003); *EEOC v. Peabody W. Coal Co.*, 773 F.3d 977, 987-88 (9th Cir. 2014); *United States v. Garrett*, 122 F. App'x 628 (4th Cir. 2005).

b.  As with other descendants of sovereign Native peoples, the United States has a longstanding trust relationship with Native Hawaiians that reflects a commitment to advance their education and well-being.  For over a century, Congress has furthered its commitment to Native Hawaiians through more than 150 statutes providing benefits or special treatment to them.  *Doe I*, 470 F.3d at 850. Congress has expressly confirmed that these statutes rest on "the trust relationship between the United States and the Hawaiian people."  20 U.S.C. § 7512(10) and (12)(B).  The Executive Branch likewise has repeatedly acknowledged that "the United States has unique treaty and trust responsibilities . . . [to] the Native Hawaiian Community" and specifically that "Kamehameha Schools are critical to providing quality education opportunities from early childhood through life, accounting for the mental, physical, religious, and cultural aspects of learners from the Native Hawaiian

30

Community."  Assistant Secretary for Indian Affairs Bryan Newland, Federal Indian Boarding School Initiative Investigative Report Vol II, at 9, 14-15, 33 (July 2024).

In light of that trust relationship, and consistent with *Morton* and the other precedents discussed above, the Ninth Circuit has applied rational-basis review to uphold federal classifications based on Native Hawaiian status.  *See Kahawaiolaa v. Norton*, 386 F.3d 1271, 1271, 1279 (9th Cir. 2004); *see also Alaska Chapter, Associated Gen. Contractors of Am., Inc. v. Pierce*, 694 F.2d 1162, 1168 n.8, n.10 (9th Cir. 1982) (same for Alaska Natives before tribal recognition).  As Judge Fletcher has noted, a contrary approach might require "striking down the enormous swaths of the United States Code enacted pursuant to the special relationship doctrine."  *Doe I*, 470 F.3d at 852 (Fletcher, J., concurring).

Particularly given that courts have "long looked to settled and established practice to interpret the Constitution," *Moore v. Harper*, 600 U.S. 1, 32 (2023), that unbroken congressional practice confirms the constitutionality of federal legislation designed to advance the education, health, and welfare of Native Hawaiians, *see, e.g.*, *N.L.R.B. v. Noel Canning*, 573 U.S. 513, 549 (2014).

Section 11705(c)(4) and the implicit exemption found in *Doe I*'s alternative holding also differ markedly from the state-law provision that the Supreme Court struck down in *Rice v. Cayetano*, 528 U.S. 495 (2000).  There, the Supreme Court held that a provision in Hawai'i's Constitution limiting the right to vote for the

31

trustees of the Office of Hawaiian Affairs to people with qualifying Hawaiian ancestry violated the Fifteenth Amendment. *Id.* at 522. The Court concluded that the Fifteenth Amendment does not "permit a State, by racial classification, to fence out whole classes of its citizens from decision making in critical state affairs." *Id.* at 522. That holding was limited to voting restrictions imposed by state law. *See* Brief for the Federal Parties at 55-59, 65, *Haaland*, 599 U.S. 255 (emphasizing *Morton*'s rational-basis review and distinguishing *Rice*); *Davis v. Guam*, 932 F.3d 822, 842 n.18 (9th Cir. 2019) ("*Rice*, which rejected the application of *Mancari* to Hawaiians for Fifteenth Amendment purposes, was careful to confine its analysis to voting rights under that amendment."). It has no bearing on whether in the exercise of its trust relationship, Congress may exempt a private school from federal liability for providing educational services to Native Hawaiians.

c. The settled understanding of congressional power in this area defeats Plaintiffs' constitutional argument. In enacting Section 11705(c)(4), Congress expressly invoked its trust obligation "to provide educational programs designed to improve the health, capability, and well-being of Native Hawaiians" and found that Kamehameha's preference policy helps the United States fulfill that obligation. 42 U.S.C. § 11705(c)(4). That finding demonstrates that Section 11705(c)(4) is rationally related "to the fulfillment of Congress' unique obligation toward" Native Hawaiians. *Delaware Tribal Bus. Comm.*, 430 U.S. at 85.

32

Indeed, in one important respect, the constitutional question here is easier than other cases in which courts have considered laws that aid or advantage Native peoples. In Section 11705(c)(4), Congress has not awarded any direct benefit to Native Hawaiians. Rather, it has allowed a single non-state actor to continue providing educational services to Native Hawaiians without interference from the federal government. *See Bank Markazi v. Peterson*, 578 U.S. 212, 234 (2016) (affirming the principle that "Congress may legislate a legitimate class of one" (internal quotation marks omitted)). That fulfills Congress's commitment to provide for the education of Native Hawaiians, and it does so by deferring to a longstanding institution established by Ke Aliʻi Bernice Pauahi Bishop under Hawaiian kingdom law, before the United States exercised governance over Hawaiʻi.

In fact, the Ninth Circuit has already approved a similar carve-out in *Atonio v. Wards Cove Packing Co.*, 10 F.3d 1485 (9th Cir. 1993). There, the court applied rational-basis review to uphold Section 402(b) of the Civil Rights Act of 1991, which exempted from that Act's amendments the plaintiffs—nonwhite cannery workers— in a single, long-running disparate-impact case. *Id.* at 1491, 1493-95. Even though the exempted plaintiffs were a racially defined group, the court held that the provision was "targeted at a particular case, and not at a racial class or other category subject to special constitutional protection," and that Congress had not "singled out" any class or "imposed special disabilities on" it. *Id.* at 1493. Section 11705(c)(4) is

33

targeted at Kamehameha in precisely that way—and more clearly still, because Kamehameha extends its preference to applicants *of any race* who have a single pre-1778 Hawaiian ancestor. *See Doe I*, 470 F.3d at 832 (noting that "the Schools' policy contains no requirement for a minimum blood quantum of Hawaiian ancestry," thus resulting in the attendance of "[m]ore than 60 different racial and ethnic groups").

## IV.    PLAINTIFFS DO NOT ADEQUATELY PLEAD SECTION 1981 CAUSATION

Section 1981 prohibits racial discrimination in the making and enforcement of contracts. In *Comcast Corp. v. National Association of African American-Owned Media*, the Supreme Court held that a Section 1981 "plaintiff bears the burden of showing that race was a but-for cause of its injury," *i.e.*, that the defendant would not "have responded the same way to the plaintiff even if he had been [of the allegedly favored race]." 589 U.S. 327, 333 (2020). Although the Court reserved the question whether that requires proof that the parties would have entered into the contract but for the plaintiff's race, *id.* at 339, at least two circuits have so held, *see Brown v. J. Kaz, Inc.,* 581 F.3d 175, 182 n.5 (3d Cir. 2009); *Bachman v. St. Monica's Congregation*, 902 F.2d 1259, 1263 (7th Cir. 1990). That follows from the text of Section 1981, which guarantees an equal right to "make" contracts, not a right to equal treatment in the contracting *process* regardless of whether any contract could have resulted. *See CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 451 (2008)

34

(explaining that Congress "define[d] the scope of § 1981 to include post-contract-formation conduct" but did not mention pre-formation conduct).   If the racial discrimination was not the but-for cause of the plaintiff's failure to "make" a contract, the plaintiff has no right to relief under Section 1981.

The complaint does not allege that I.P., E.S., or any SFFA member would have been admitted (or would be admitted in the future) to Kamehameha—*i.e.*, would have been able to enter into a contract for educational services—but for the challenged admissions policy.  That is fatal to the causation element of Section 1981, separate and apart from the Article III analysis.  Although the complaint alleges that I.P. was placed on the waitlist, TAC ¶10, it contains no allegations about how many applicants are placed on the waitlist or whether such a placement indicates that an applicant is sufficiently competitive that she would have been admitted but for the challenged policy.

The complaint therefore does not adequately allege that the challenged policy was the but-for cause of the students' failure to enter into a contract to attend Kamehameha.  And although the complaint alleges that parents and students also enter into contracts with Kamehameha during the application process, TAC ¶¶25-29, it does not allege that any preference applies to those contracts, so they could not support a Section 1981 claim.  *See* p. 19, *supra*.

35

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Third Amended Complaint in its entirety for lack of subject matter jurisdiction, or in the alternative, for failure to state a claim upon which relief can be granted.

DATED:  Honolulu, Hawaiʻi, July 17, 2026.

/s/ Joachim P. Cox
_____

JOACHIM P. COX
KAMALA S. HAAKE
JOHN F. BASH (Pro Hac Vice)
WILLIAM A. BURCK (Pro Hac Vice)
ELLYDE R. THOMPSON (Pro Hac Vice)

Attorneys for Defendant
TRUSTEES OF THE ESTATE OF
BERNICE PAUAHI BISHOP d/b/a
KAMEHAMEHA SCHOOLS

36

## CERTIFICATE OF COMPLIANCE

Pursuant to the Stipulation Re: Briefing Schedule & Page Limits for Defendant's Motion(s) to Dismiss, filed herein on June 8, 2026 at Dkt. No. 144 (the "Stipulation"), I hereby certify that the foregoing *Memorandum of Points and Authorities in Support of Defendant Kamehameha Schools' Motion to Dismiss Plaintiffs' Third Amended Complaint* is in Times New Roman, size 14 font and contains 8,341 words as reported by the word processing system used to produce the document.  Said word count is in compliance with the word limit set forth in the Stipulation.

DATED:  Honolulu, Hawai'i, July 17, 2026.

/s/ Joachim P. Cox
JOACHIM P. COX
KAMALA S. HAAKE
JOHN F. BASH *(Pro Hac Vice)*
WILLIAM A. BURCK *(Pro Hac Vice)*
ELLYDE R. THOMPSON *(Pro Hac Vice)*

Attorneys for Defendant
TRUSTEES OF THE ESTATE OF
BERNICE PAUAHI BISHOP d/b/a
KAMEHAMEHA SCHOOLS