Jesse D. Franklin-Murdock (10778)
SWEIGART MURDOCK, LLP
500 Ala Moana Blvd., Ste. 7400
Honolulu, HI 96813
Tel: (415) 873-0123
Fax: (877) 890-0791
jesse@sm-llp.com

Adam K. Mortara*
LAWFAIR LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

*pro hac vice

Thomas R. McCarthy*
Patrick Strawbridge*
J. Michael Connolly*
Cameron T. Norris*
R. Gabriel Anderson*
Ryan M. Proctor*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
patrick@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com
gabe@consovoymccarthy.com
ryan@consovoymccarthy.com

*Counsel for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS; I.P.; B.P.; E.S., by and through her next friend and mother, K.S.; and K.S., <br><br> *Plaintiffs*, <br><br> v. <br><br> TRUSTEES OF THE ESTATE OF BERNICE PAUAHI BISHOP d/b/a KAMEHAMEHA SCHOOLS, <br><br> *Defendant*. | Case No. 1:25-cv-450-MWJS-RT <br><br> **FOURTH\* AMENDED VERIFIED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** <br><br> Action Filed: October 20, 2025 <br><br> Trial Date: None |

---

\* Plaintiffs are amending their complaint as of right under Rule 15(a)(1)(B). Plaintiffs' prior amendments were with Kamehameha's consent, Docs.41 & 77, or the Court's leave, Doc.123; so those amendments did not extinguish Plaintiff's right to amend "once as a matter of course." Fed. R. Civ. P. 15(a)(1); *see Ramirez v. San Bernardino Cnty.*, 806 F.3d 1002, 1007 (9th Cir. 2015). After meeting and conferring, the parties agree that Plaintiffs' 21-day deadline to amend, Fed. R. Civ. P. 15(a)(1)(B), started after the filing of Kamehameha's motion to dismiss on July 17, 2026, Doc.149, not after the filing of Kamehameha's earlier cross-motion on anonymity, Doc.84; *see also* Doc.123 at 4 ("Defendant has not yet filed a responsive pleading").

1.      To many, *Brown v. Board of Education* is "the single most important and greatest decision" in the Supreme Court's history. *Ramos v. Louisiana*, 590 U.S. 83, 118 (2020) (Kavanaugh, J., concurring) (citing 347 U.S. 483, 494 (1954)); *accord Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 264 (2022) (calling *Brown* one of "our most important constitutional decisions"). *Brown* outlawed racial segregation in public schools, requiring them "to admit students 'on a racially non-discriminatory basis.'" *SFFA v. Harvard*, 600 U.S. 181 (2023). *Brown* was extended to private schools in *Runyon v. McCrary*, which held that private-school segregation violates 42 U.S.C. §1981's ban on racial discrimination in contracting. 427 U.S. 160, 173 (1976).

2.      After *Brown* and *Runyon*, no public or private school in America maintains a policy of racial segregation—except one: Kamehameha Schools, by express policy, conceded purpose, and totalizing effect, admits zero students who are not Native Hawaiian. Kamehameha claims its Hawaiians-only admissions policy is compelled by the will of its founder, Princess Bernice Pauahi Bishop, who died in 1884. Kamehameha has done everything possible to preserve its admissions policy, wielding its billion-dollar endowment and vast influence to extinguish any attempt to make the school desegregate.

3.      Kamehameha's violation of *Runyon* could not be clearer. A bar on non-Hawaiians is "race-based." *Rice v. Cayetano*, 528 U.S. 495, 517 (2000). Section

- 2 -

1981, as Justice Thurgood Marshall wrote for the Court fifty years ago, bans discrimination "against, or in favor of, any race." *McDonald v. Sante Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976). And Kamehameha's racial exclusion knows few bounds—discriminating even against African Americans, the "immediate impetus" for the Reconstruction laws. *Id.* at 289.

4.     Yet two decades ago, the full Ninth Circuit upheld Kamehameha's admissions policy under §1981. *Doe v. Kamehameha Schs.*, 470 F.3d 827 (9th Cir. 2006) (en banc) ("*Doe I*"). By an 8-7 vote, the *Doe I* court agreed that Kamehameha's policy is race-based and contractual, but upheld it under §1981's supposed "affirmative action" exception.

5.     *Doe I* was wrong at the time, and is bad law today. *Doe I* borrowed the affirmative-action exception from older caselaw interpreting Title VII; but as the EEOC just confirmed, that exception cannot be reconciled with the statutory text or more recent precedent. *Doe I* also changed Title VII's affirmative-action exception based on *Grutter v. Bollinger*, 539 U.S. 306 (2003), a decision that's no longer good law after *Harvard*. At the very least, *Doe I*'s findings are stale: It held that Kamehameha has an ongoing duty to justify its use of race with "current" data and to use race "only for so long as is necessary"—conditions that, now 20 years later, Kamehameha cannot satisfy. 470 F.3d at 846.

6.      Perhaps more than anyone, Kamehameha knows that *Doe I* is indefensible. It refused to defend the decision then: The school "settled" with that family "on what was very likely the day after the United States Supreme Court had acted on [the] petition for certiorari." Grant, *Doe v. Kamehameha Schools: The Undiscovered Opinion*, 30 U. Haw. L. Rev. 355, 355 (2008). When other families filed a follow-on suit, Kamehameha avoided a decision by fighting those children's right to proceed anonymously—coercing families into dropping their suit rather than face the wrath (including death threats) of resisting this powerful school. *Doe v. Kamehameha Schs.*, 596 F.3d 1036 (9th Cir. 2010) ("*Doe II*"). Shortly after *Doe II* ended, a provision was quietly slipped into the Affordable Care Act purporting to bless Kamehameha's racially discriminatory admissions. 42 U.S.C. §11705(c)(4). Kamehameha has never mentioned this provision on its website, in the press, or during the first nine months of this litigation. No wonder, as it's not remotely constitutional.

7.      Still fearing liability under §1981, and in direct response to this lawsuit, Kamehameha is now trying to shred its many "contract[s]." 42 U.S.C. §1981. Most notably, Kamehameha enlisted the Hawaii courts to amend the princess's will so that the school can no longer charge tuition. The Hawaii legislature and governor quickly followed up with legislation that tries to say a private school that charges no tuition—a brand-new class of one that includes only Kamehameha—is not engaged in contracting. Act 002, S.B. 3123, 33d Leg. of Hawaii (Mar. 27, 2026).

8.      Though these post-lawsuit maneuvers prove Kamehameha's fierce commitment to racial segregation, not one of them immunizes the school from §1981. State law cannot undermine federal antidiscrimination law by insisting that contracts are not contracts. And with or without tuition, private school inherently involves contracts. Kamehameha's strategic decision to end tuition is also classic voluntary cessation that changes nothing.

9.      If anything, Kamehameha's decision to enlist the state courts in its discrimination helps *make* the school liable for a new reason. Another segregated school tried a similar move in the civil-rights era. When the uber-wealthy businessman Stephen Girard died in 1848, his will created a school in Philadelphia dedicated to "poor white male orphans." *Pennsylvania v. Bd. of Dirs. of City Trusts of Phila.*, 353 U.S. 230, 231 (1957). The resulting school, Girard College, excluded non-white students for 127 years. Martin Luther King Jr. gave a famous speech there, calling Girard's whites-only policy "a kind of Berlin Wall" to "keep the colored children of God out." After the Supreme Court decided *Brown*, it was clear that Girard was a state actor that must desegregate, since the will said its leaders must be city officials. But instead of ending its discrimination, Girard tried to end the state action by convincing a state probate court to amend the will to make the school's leaders private individuals. Girard's gambit backfired: Enlisting the probate court "'significantly encouraged and involved the State in private discriminations,'" creating a new state-

action problem that made Girard College liable under the Fourteenth Amendment. *Pennsylvania v. Brown*, 392 F.2d 120, 125 (3d Cir. 1968) (quoting *Reitman v. Mulkey*, 387 U.S. 369, 381 (1967)), *cert. denied*, 391 U.S. 921 (1968). If Kamehameha's similar efforts today are not irrelevant and void, then Kamehameha is a state actor—implicating not only the state courts, but also the state legislature, governor, and even Congress in its racial discrimination.

10.    Kamehameha's race-based admissions policy remains fundamentally illegal. Segregation is bad. *Brown*, 347 U.S. at 494. "Separate cannot be equal." *Harvard*, 600 U.S. at 203. And "[t]he time for making distinctions based on race" in education has "passed." *Id.* at 204. This Court should order Kamehameha to desegregate with all deliberate speed.

**PARTIES**

11.    Plaintiff Students for Fair Admissions is a Texas-based voluntary membership organization. SFFA's "purpose is 'to defend human and civil rights secured by law,'" including the right to be free from illegal racial discrimination, through litigation and other lawful means. *Harvard*, 600 U.S. at 197. SFFA and its members believe that racial preferences in admissions are unfair, unnecessary, and illegal. *About*, SFFA, perma.cc/8ATF-6L9H. SFFA is recognized by the IRS as a 501(c)(3) tax-exempt nonprofit.

12.    SFFA is a traditional, genuine membership association. Founded in 2014, SFFA has grown to over 19,000 members. SFFA has vindicated many mem-

bers' rights in many federal cases. *Our Cases*, SFFA, studentsforfairadmissions.org/our-cases. No court has ever found any of SFFA's members insincere. *See Harvard*, 600 U.S. at 198-201 (agreeing unanimously with "every court" that SFFA "has identified members and represents them in good faith").

13.    SFFA is here in a representational capacity on behalf of its members who would have standing to sue on their own. All of SFFA's standing members voluntarily joined the organization, support its mission, authorized SFFA to represent their rights in this case, receive updates and can give input and direction on this case, and are represented by SFFA in good faith.

14.    Plaintiff I.P. was a minor at all relevant times. A non-Hawaiian, she applied to Kamehameha and was put on the waitlist but was ultimately denied admission. This Court granted her leave to proceed under her initials, at least through a decision on Kamehameha's motion to dismiss. Doc.118.

15.    Plaintiff B.P. is I.P.'s mother. She signed the contracts with Kamehameha that let her daughter apply there. B.P. sues to vindicate her own rights. Because I.P. was a minor at the time, B.P. also initially sued as I.P.'s representative. This Court granted her leave to proceed under her initials, at least through a decision on Kamehameha's motion to dismiss. Doc.118.

16.    Plaintiff E.S. is a minor. A non-Hawaiian, she applied to Kamehameha twice. Her application was denied both times. She has a right to proceed under her initials under Rule 5.2(a).

17.    Plaintiff K.S. is E.S.'s mother. She signed the contracts with Kamehameha that let her daughter apply there. K.S. sues to vindicate her own rights. She also sues as the representative of E.S., her minor child. Kamehameha stipulated that K.S. and E.S. can proceed using their initials, at least as long as B.P. and I.P. can. Doc.135.

18.    Defendant, Trustees of the Estate of Bernice Pauahi Bishop d/b/a Kamehameha Schools, is a system of schools in Hawaii. It is registered as a 501(c)(3) tax-exempt nonprofit under both federal and Hawaii law. It implements the race-based admissions policy at issue here.

## JURISDICTION & VENUE

19.    Subject-matter jurisdiction exists under 28 U.S.C. §1331 and §1343 because this case arises under 42 U.S.C. §1981, a federal civil-rights statute, as well as 42 U.S.C. §1983 and the U.S. Constitution.

20.    Venue is proper under 28 U.S.C. §1391(b) because the defendant resides here and because Kamehameha administers the challenged policy here.

## BACKGROUND
### I.    Kamehameha uses race in admissions to admit only Native Hawaiians.

21.    Kamehameha Schools is the largest private landowner in Hawaii, with holdings spanning 364,000 acres (less than 1% of which is used for schooling).

Kamehameha is also the largest educational trust in the country, with an endowment worth over $15 billion.

22.    Kamehameha educates students from kindergarten through twelfth grade, plus preschoolers. Kamehameha has three campuses: Hawaii, Kapalama, and Maui.

23.    The school chooses to cap admissions for each grade at each school. It has built new campuses and increased enrollment before, and it could do so again. In a recent interview, a recent principal said Kamehameha can and should serve "a lot more kids." *Inside Kamehameha Controversy: Retired KS Principal on Preference, Policy & Aloha 'Aina*, at 37:59-41:43, Brotherlee Time, YouTube (Oct. 13, 2025), youtube.com/watch?v=Ae9rMPyyzTU ("*Principal Interview*").

24.    Today, Kamehameha educates around 6% of the island's Native Hawaiians—5,400 K-12 students (100% of whom are Native Hawaiian) out of 86,000 school-aged Native Hawaiians. When its policy was last challenged, Kamehameha educated around 7% of the island's Native Hawaiians—4,800 K-12 students out of 70,000 school-aged Native Hawaiians. *Doe I*, 470 F.3d at 832.

25.    Also after *Doe I*, Hawaii has seen a large expansion of Hawaiian-focused charter schools. *OHA Trustees Approve $6 Million in Per Pupil Funding and Facilities Support for Hawaiian-Focused Public Charter Schools*, Office of Hawaiian Affairs (Nov. 16, 2023), archive.is/tWSob. Kamehameha, which substantially

funds these schools, "recognizes" that they "suppor[t] educational opportunities for Native Hawaiian learners" and "uplift Hawaiian identity." *Cultivating Native Hawaiian Learning: Hawaiian-Focused Charter Schools*, Kamehameha Schs. (Nov. 10, 2015), archive.is/wip/wlPqn. But unlike Kamehameha itself, these schools are open to students of all races. *See* Haw. Rev. Stat. Ann. §302D-34(a) ("A public charter school shall not discriminate against any student or limit admission based on race, color, ethnicity ….").

26.    "By policy, all applicants to Kamehameha Schools must be U.S. citizens. Even if an applicant has Hawaiian ancestry, Kamehameha" will not "accept or process their application" if the student is not a U.S. citizen. *Apply to Kamehameha Schools Kapālama*, Kamehameha Schs., archive.is/pVnM3 (archived July 21, 2026) ("*Apply to Kapālama*").

27.    Kamehameha has no special-education program. It will not admit students with serious mental disabilities. *See* Fujii, *Some Native Hawaiians Are Forgotten at Kamehameha Schools*, 6 Hohonu 80, 81-82 (2008), perma.cc/FQ9W-EEQP.

28.    Kamehameha chooses to limit whether and when children can apply based on their zip code and age. Generally, students in preschool can apply for kindergarten; and students in grades 3, 6, 8, 9, 10, and 11 can apply for the next grade up. Unsuccessful students often reapply multiple times.

29.    Kamehameha also allows "out-of-state applicants" to apply for grades 7-12. *Apply to Kapālama*.

30.    When deciding who to admit, Kamehameha confesses to awarding a "preference" to "applicants of Hawaiian ancestry"—*i.e.*, children who qualify as Native Hawaiian. *Apply to Kapālama*. The school defines Native Hawaiian to mean "descended from the aboriginal people who exercised sovereignty in the Hawaiian Islands prior to 1778." *Doe I*, 470 F.3d at 832; *accord* Doc.32 at 3-4.

31.    By plain meaning, purpose, history, and effect, this common definition of Native Hawaiian turns on race—not tribal status. Native Hawaiians have never been a federally recognized tribe. *Constitutionality of Race-Based Dep't of Educ. Programs*, 2025 WL 4055305, at *8 & n.7 (O.L.C. Dec. 2, 2025). When the Supreme Court granted *Rice* to decide whether a Hawaiians-only election statute was racially discriminatory, Kamehameha wrote an amicus brief based on its "strong interest in demonstrating that the statute" "does not unconstitutionally discriminate on the basis of race." KS-*Rice*-Amicus-Br.2, 1999 WL 557279. Kamehameha argued that classifications based on Hawaiian status are political, not racial. *Id.* at 22-30. The Supreme Court rejected all of Kamehameha's arguments. *Rice*, 528 U.S. at 514-22.

32.    Applicants to Kamehameha "must verify [their] Hawaiian ancestry" "by registering with the Kamehameha Schools Hoʻoulu Verification Services." *Hoʻoulu Verification Services*, Kamehameha Schs., archive.is/xxLdR (archived July

- 11 -

23, 2026). Applicants must let Kamehameha "trace" their "Hawaiian ancestry" by submitting birth certificates. *Step 2: Gathering Documents*, Kamehameha Schs., archive.is/T1X37 (archived July 24, 2026). Kamehameha treats applicants who lack Hawaiian ancestry, but who are adopted by Hawaiian parents, as non-Hawaiian.

33.    Far more than a "preference," Kamehameha admits *zero* students who lack Native Hawaiian ancestry. Its preference is a rigid quota. Kamehameha will "grant admission to any" Native Hawaiian "before admitting other applicants." *Doe II*, 596 F.3d at 1039. In other words, no non-Hawaiian can be admitted unless, after all Native Hawaiians get in, Kamehameha still has open seats—a condition that Kamehameha makes sure never holds. In effect and by design, Kamehameha's admissions policy is to never admit any non-Hawaiians.

34.    From at least 1966 to 2009, "only two" non-Hawaiians ever attended Kamehameha. *Doe II*, 596 F.3d at 1039. Both students prove the rule that Kamehameha does not admit non-Hawaiians.

a.    One of the two non-Hawaiians was admitted in 2003, after saying he was Native Hawaiian on his application because his mother was adopted by a Native Hawaiian. When Kamehameha found out the child was not (by its lights) truly Hawaiian, it revoked his admission. He attended only because he sued Kamehameha, won an injunction, and got a settlement. Yet the child was

not accepted by his peers and was ultimately expelled from Kamehameha. Doc.54-9 at 99, 101, 103.

b.       The other non-Hawaiian was admitted in 2002 when, due to what Kamehameha called an "unusually small applicant pool" for the Maui campus, a seat supposedly remained open after all Native Hawaiians were admitted. In reality, Kamehameha quietly *created* additional "open" seats so it could admit the non-Hawaiian and thus prove to the IRS and future courts that its policy did not categorically exclude non-Hawaiians. *See* Jones, *How Kamehameha Admitted a Haole*, Midweek, Vol. 19, No. 50, pp.8, 51 (July 16, 2003). As Kamehameha's chairman explained at the time, "We're attempting to protect the admissions policy. To do that it may be necessary for us to give up a pawn here and a pawn there." Liptak, *School Set Aside for Hawaiians Ends Exclusion to Cries of Protest*, N.Y. Times (July 27, 2002), archive.is/ 97gIL. When the non-Hawaiian's admission was discovered, however, angry protests erupted. Kamehameha said "[w]e screwed up major" and "stressed that this would not happen again." Daysog, *Angry Ohana Grills Trustees*, Star Bulletin (July 16, 2002), perma.cc/3FSK-Q3JM.

35.    After these events, Kamehameha "waived the application fee and the minimum-test-score requirement, effectively ensuring that there would never again be an insufficient number of qualified Native-Hawaiian applicants." *Doe II*, 596 F.3d

at 1039; *see also Doe I*, 470 F.3d at 870-71 (Bybee, J., dissenting). These changes were adopted to make even more certain that a non-Hawaiian could never be admitted to Kamehameha.

36.     Kamehameha's changes worked. After *Doe I* and still today, "the number of applications received exceeds the number of available spaces anywhere from a ratio of 2:1 to 15:1, depending on the campus and grade level." *Application Process*, Kamehameha Schs., archive.is/Jt0Gz (archived July 23, 2026). Admission to Kamehameha is more "competitive" than ever because the number of children seeking admission has been "increasing" every year. *Id.* The number of applications will only balloon further now that Kamehameha, in direct response to this lawsuit, has stopped charging tuition. *Kamehameha Schools Changes Its Tuition Policy to Protect Trust Against Lawsuit*, Island News (Jan. 29, 2026), perma.cc/U5JT-DMUU.

37.     At least since these changes to the admissions process, Kamehameha has not admitted a single non-Hawaiian. For Kamehameha's most competitive campus, Kapalama, the school has never admitted a non-Hawaiian.

38.     Applications to Kamehameha are virtually all from Native Hawaiians, as non-Hawaiians do not apply because they understand that their odds of admissions are zero. As the Associated Press reported in 2025, "There's an understanding among Hawaii residents that only students with Hawaiian blood will be admitted."

- 14 -

Kelleher, *Private School for Native Hawaiians Vows to Defend Admissions Policy from Conservative Strategist*, AP (Sept. 16, 2025), perma.cc/4Y7F-WN4E.

39.     Kamehameha states, publicly and repeatedly, that non-Hawaiians need not apply. For example, in its "media kit" for this case, Kamehameha says the princess's will "dedicate[ed] her estate to educate Native Hawaiians" and that Kamehameha honors her "chiefly charge." *Media Kit*, Kamehameha Schs., archive.is/2EGyc (archived July 22, 2026). In its "mission" statement, Kamehameha says its purpose is "empowering *Native Hawaiians* in perpetuity by improving the well-being of *our people* through education." *Ola Pauahi, Ola Hawaiʻi*, Kamehameha Schs., archive.is/xklUL (archived July 21, 2026) (emphases added). And on virtually every page of its website and materials, Kamehameha repeats that "Kamehameha Schools' admissions policy is to give preference to applicants of Hawaiian ancestry." *E.g.*, *Our Admissions Policy*, Kamehameha Schs., archive.is/NEJWO (archived July 23, 2026). Similar statements abound over the last several decades.

40.     Kamehameha considers Hawaiian ancestry, and preferences Native Hawaiians, in all parts of its admissions process.

41.     Throughout the admissions process, the fact of an applicant's Hawaiian or non-Hawaiian ancestry is visible to Kamehameha's decisionmakers.

     a.     When an applicant applies, they must immediately start the verification process for Hawaiian ancestry. Kamehameha's decisionmakers in

admissions thus know whether applicants have reported that they are non-Hawaiian, have started the verification process (and so are claiming to be Hawaiian), or have not started the verification process (and so are not claiming to be Hawaiian).

b.      The relevant form requires applicants to disclose their "family ancestry." Applicants must disclose their own "Hawaiian Ancestry," as well as the Hawaiian ancestry of their "Natural Father" and "Natural Mother." For "non-Hawaiian" applicants, Kamehameha says they can stop the disclosures there. For Hawaiian applicants, Kamehameha makes them also disclose the Hawaiian ancestry of both sets of grandparents and all four sets of great-grandparents. From these disclosures and the drawing of each applicant's family tree, it is directly and immediately obvious from the face of the application materials whether each applicant is Native Hawaiian or non-Hawaiian.

c.      Kamehameha requires applicants to attend a test session and perform a timed writing sample on campus and to attend an in-person interview with Kamehameha staff. These meetings give Kamehameha another opportunity to assess whether someone appears Native Hawaiian. *See Rice*, 528 U.S. at 514-15 (explaining that Native Hawaiians are an "'ethnic'" group with "common physical characteristics"). In the interview, Kamehameha asks questions designed to test how "Hawaiian" an applicant is. Common questions

- 16 -

include: "What does it mean to you to be Hawaiian?" "Why do you want to attend Kamehameha Schools? / Tell me what you know about Kamehameha Schools." "What are some Hawaiian traditions or values? / Describe a Hawaiian tradition in your family." *Kamehameha Schools Admissions Information*, Test Tutor Hawaii, perma.cc/JSP3-PZZA (archived July 23, 2026).

    d.    The application also asks the applicant's language and gives only two options: "English" and "Ōlelo Hawaiʻi." Students can choose to conduct the required interview and perform the required writing sample in one of those two languages. Ōlelo Hawaiʻi is the Native Hawaiian language and, according to Kamehameha, is directly connected to Native Hawaiian "identity." *Here's How to Celebrate Mahina ʻŌlelo Hawaiʻi with Your ʻOhana*, Kamehameha Schs. (Jan. 27, 2025), archive.is/IvxXX.

42.    Kamehameha also makes every applicant fill out an "Ohana questionnaire." Kamehameha's decisionmakers use this form to ensure applicants and their families are "like-minded," including that they share Kamehameha's "goal" of educating only Native Hawaiians. *Principal Interview* 43:45. And the decisionmakers screen families for whether they demonstrate support for "Hawaiian culture-based education." *Principal Interview* 43:38.

43.    Kamehameha claims to use a "holistic" admissions process, akin to selective universities like Harvard. The school has no objective minimum require-

ments for grades, test scores, or any other concrete academic or extracurricular criterion. Though the decisionmakers use a "rubric" and give out scores, the decisionmakers claim they "look at the whole child." *Principal Interview* 42:32-42:48; *accord id.* (Kamehameha is "looking" at each applicant's "total package"). "It's not just the highest scores get in." *Principal Interview* 42:32-43:58; *accord id.* (Kamehameha "is not looking for the most highest scoring kids"). Native Hawaiians with below-average scores on Kamehameha's in-person test, for example, are regularly admitted.

44.     Of the many admissions criteria that are considered, nearly all are subjective, including the strength of the applicant's recommendations (as assessed by Kamehameha); the applicant's performance in the in-person interview and on the writing sample (as assessed by Kamehameha); and the strength of the applicant's extracurriculars and academics (as assessed by Kamehameha). Kamehameha also weighs malleable criteria like applicants' "character," "leadership," and "how they [will] contribute to the classroom environment."

45.     When considering and scoring applications, Kamehameha's decisionmakers know whether a student is Native Hawaiian, and they consider that ancestry (or lack thereof) when scoring and weighing the many admissions factors. Kamehameha assesses an applicant's "leadership," for example, based on "the goals and targets that the school is working towards"; and "right now they're working

- 18 -

toward 'ōiwi leadership," which Kamehameha defines to mean leadership by Native Hawaiians.

46.     Kamehameha awards other preferences throughout its admissions process, which increase applicants' scores and their odds of admission at all stages. But these preferences cannot overcome Kamehameha's racial preference. No matter how much credit a non-Hawaiian gets under one of these other preferences, a non-Hawaiian cannot be admitted over a Native Hawaiian.

a.     Kamehameha gives a preference for "co-curricular excellence," meaning students "who currently excel" in "Arts," "Athletics," and other focuses (including, for example, "Farming/Agriculture," "Pageantry," "Lei-making," and "Weaving"). Strength in these areas can overcome weaknesses in other areas, including grades and test scores.

b.     Kamehameha also gives a preference for "orphans" and the "indigent." The school defines "orphan" as "a student who has lost one or both birth parents through death." And the school defines "indigent" to include any child whose family has an "income at or below 200% of the Federal Poverty Guidelines for the State of Hawaii." Orphaned and indigent applicants get "special consideration" in the admissions process. These students can be admitted with much lower test scores and grades than other students.

c.  Though not neutral with respect to Hawaiian ancestry, Kamehameha also gives an admissions preference to applicants who speak Ōlelo Hawaiʻi.

47.  Students who are competitive for admission to Kamehameha, but who are not initially admitted, are put on a waitlist. Not all students who are not initially admitted are put on the waitlist. Students are regularly admitted off the waitlist, and students on the waitlist are not denied admission to Kamehameha until the admissions process ends on December 31. Again considering ancestry, Kamehameha preferences Native Hawaiians on the waitlist over any non-Hawaiians on the waitlist.

48.  Kamehameha says its race-based admissions policy is required by Princess Bernice Pauahi Bishop's will. Her will, in relevant part, directs the trustees to "devote a portion of each year[']s income to the support and education of orphans, and others in indigent circumstances, giving the preference to Hawaiians of pure or part aboriginal blood." *Pauahi's Will* (Oct. 31, 1883), archive.is/g3Aqe. Though that provision says nothing about an admissions preference for Native Hawaiians, Pauahi's husband later wrote that the princess "'intended that … those of her race should have preference'" in admissions. *Doe I*, 470 F.3d at 832; *accord* 295 F. Supp. 2d 1141, 1155 (D. Haw. 2003) (quoting letters from Pauahi's husband saying "'it was intended and expected that Hawaiians having aboriginal blood would have a

- 20 -

preference'" and that "'it is understood by the Trustees that only those having Native blood are to be admitted at present'").

49.    Pauahi's will also directed that "the teachers of [Kamehameha] schools shall forever be persons of the Protestant religion." *EEOC v. Kamehameha Sch.*, 990 F.2d 458, 466 & n.18 (9th Cir. 1993). But that portion of the will was deemed illegal religious discrimination under Title VII because Kamehameha is a "secular" school. *Id.* at 459. Federal law trumps state law, so "[t]he fact that the Protestant-only requirement appears in Mrs. Bishop's will" did not make the discrimination legal. *Id.* at 466. The Ninth Circuit was confident that the "Hawaii courts" would "approve an involuntary departure" from the will "to comply" with federal law, like the trustees did in the 1940s when they "approved the merger of the separate boys and girls schools established by the will." *Id.* at 467 n.18.

50.    In fact, "it is clear that Pauahi left to her Trustees the discretion 'to regulate the admission of pupils.'" 295 F. Supp. 2d 1141, 1154 (D. Haw. 2003). Kamehameha itself says it will stop considering race in admissions "to the extent" the practice is not "permitted by law." *E.g.*, *Application Process*.

## II.    Plaintiffs are injured by Kamehameha's discrimination.

51.    SFFA has members who are ready and able to apply to Kamehameha Schools once a court orders adequate relief.

52.    Family A is a mother and her daughter. The daughter is white and not Native Hawaiian. She is a minor in ninth grade.

53.    Family A lives in Hawaii. After many bad experiences with the local public schools, Family A has searched for alternatives. For now, they chose a private school where they must pay tuition. Family A would prefer for the daughter to finish her education at Kamehameha, even more so now that the school charges no tuition.

54.    If Kamehameha were equally open to non-Hawaiians, Family A would apply for the daughter to attend. Family A believes the school's academic programs are outstanding. Family A thinks attending Kamehameha would create networking and career opportunities that would benefit the daughter for the rest of her life.

55.    Family A has created an online account with Kamehameha. Before the September 2025 deadline to apply, Family A reviewed Kamehameha's application and determined how they would answer each question. They would have submitted a timely application for tenth grade at the Kapalama campus. But the application process requires in-person testing and an interview with Kamehameha. Because Kamehameha accepts no non-Hawaiians, Family A refused to put the daughter through the time, effort, and humiliation of going through that futile process. Family A also wants the daughter to attend an integrated Kamehameha—not face the ostracization, bullying, and harassment that come from being the only non-Hawaiian in an otherwise segregated school.

56.    If she were Native Hawaiian, Family A's daughter would be a strong candidate. The daughter always makes the honor roll at her current school. Her GPA

is a high A. She has learned three languages besides English; and despite her young age, she is taking college courses in one of those languages. The daughter also has extensive volunteer experience working on environmental projects to restore Hawaii's native ecosystem. If she were Native Hawaiian, the daughter would satisfy Kamehameha's definition of "orphan," so she could take advantage of Kamehameha's admissions preference for orphans as well.

57.    Family A is ready and able to apply for the daughter to attend Kamehameha at the next opportunity, once a court orders the school to end its racial preference, to be equally open to non-Hawaiians, and to undo the effects of its past discrimination. If a court entered adequate relief, Family A would immediately apply for the daughter to finish her schooling there, whether she is in tenth, eleventh, or twelfth grade, including in the next admission cycle that begins in August 2026. Family A would submit a timely application; complete all other steps of the application process (including the orphan verification); and if the daughter were accepted, sign the necessary agreements and enroll.

58.    Family B is a father, stepmother, and daughter. The daughter is half-white, half-Asian, and not a Native Hawaiian. She is a minor in second grade.

59.    Family B lives in Hawaii. The daughter currently attends a public school. Family B is unsatisfied with the school's academics and facilities. They are looking for other options.

60.     Under Kamehameha's current age and zip-code requirements (absent judicial relief setting them aside), Family B could apply for the daughter to attend fourth grade at the Kapalama campus, since she has family on Oahu whom she could live with. Family B could also apply from their current address for the daughter to attend the Kapalama campus in seventh grade—and, if unsuccessful, ninth, tenth, eleventh, and twelfth grade. Once in seventh grade, Family B would have the daughter live on campus. *See Apply to Kapālama*.

61.     If Kamehameha were equally open to non-Hawaiians, Family B would immediately apply for the daughter to attend, even more so now that the school charges no tuition. Family B cares deeply about Native Hawaiian culture and is drawn to Kamehameha's unique number of high-quality programs, especially in the arts and music. The academics at Kamehameha are also excellent, which Family B thinks will best prepare their daughter for an economically viable future. And Family B appreciates that, compared to the public-school options, Kamehameha has a lower student-to-teacher ratio and could give the daughter more individualized attention.

62.     If a court orders Kamehameha to end its discrimination, Family B would apply for their daughter to finish her schooling there, no matter what grade she is in at the time. After creating an online account last year, Family B reviewed Kamehameha's application and filled out the answers to each question. But because Kamehameha accepts no non-Hawaiians, Family B refuses to put the daughter

- 24 -

through the time, effort, and humiliation of finishing this futile application process. Family B also wants the daughter to attend an integrated Kamehameha—not face the ostracization, bullying, and harassment that come from being the only non-Hawaiian in an otherwise segregated school.

63. If she were Native Hawaiian, Family B's daughter would be a strong candidate. As an elementary-schooler, the daughter does not have letter grades or a GPA, but she gets top marks on all the school's metrics—and exceptional marks in art and in Hawaiian dance and culture. Her teacher's reports last year describe Family B's daughter as "a pleasure" who "brings light to our class." If she were Native Hawaiian, the daughter would satisfy Kamehameha's definition of "indigent," so she could take advantage of Kamehameha's admissions preference for indigents as well.

64. Family B is ready and able to apply for the daughter to attend Kamehameha at the next opportunity, once a court orders the school to end its racial preference, to be equally open to non-Hawaiians, and to undo the effects of its past discrimination. If a court entered adequate relief, Family B would immediately apply, including in the application cycle that begins in August 2026. Family B would submit a timely application; complete all other steps of the application process (including the indigency process); and if the daughter were accepted, sign the necessary agreements and enroll.

65.    Families A and B are currently using pseudonyms because they want their children to attend Kamehameha and fear that the school would use their involvement in this lawsuit against them when making admission decisions. More immediately, Families A and B are aware of the backlash and threats made during the prior lawsuits against Kamehameha, as well as the backlash and threats regarding SFFA and this lawsuit. *See* Docs.54-5 to 54-9, 96-1, 96-2. Families A and B live and work in Hawaii and have young children there. If their participation in this lawsuit became public, they would face threats, retaliation, and an intolerable risk of physical harm to themselves, their property, and their livelihoods.

66.    I.P. dreamed of attending Kamehameha Schools. A lifelong resident of Hawaii, she has deep respect and knowledge of Hawaiian culture, language, and history. For several years before applying to Kamehameha, she attended another school that provides a specialized, Native Hawaiian curriculum. She decided to apply after Kamehameha held a recruiting event at her school.

67.    Though I.P.'s knowledge and interest in Native Hawaiian culture is stronger than many of her Native Hawaiian classmates, I.P. is not herself Native Hawaiian. She is Caucasian.

68.    When I.P. decided to apply to Kamehameha, many peers and authority figures discouraged her. Kamehameha admits only Native Hawaiians, they explained, so I.P. had no chance of admission solely because of her ancestry. One

teacher at her school, who is Native Hawaiian, heard she was applying and got angry with I.P., telling her that Kamehameha is only for Native Hawaiians and that she has no right to "take" a Hawaiian student's "spot." But when I.P. insisted on applying anyway, her school agreed to send the necessary materials.

69. I.P. applied for admission to Kamehameha's Kapalama campus as a freshman in high school, to enroll there her sophomore year. B.P. created the online account and signed the contracts that Kamehameha requires from parents before their children can apply. Her application materials immediately disclosed that she was non-Hawaiian.

70. I.P. timely completed her application to Kamehameha, attached all necessary materials, and completed the test and interview. I.P. scored well above average on Kamehameha's test. And her middle-school GPA was an A. During the interview, one of the first questions that Kamehameha asked I.P. was whether she is Native Hawaiian. They also asked whether she had completed the Hawaiian ancestry verification. Most of the interview was spent displaying I.P.'s knowledge and respect for Native Hawaiian history, culture, and language.

71. I.P. was denied admission to Kamehameha. After she learned that she had been placed on the waitlist, she contacted Kamehameha, and a representative from the school told her she had not been denied and could still be admitted off the waitlist. But on December 31, 2023, the waitlist ended and I.P. was not admitted.

- 27 -

72. I.P. was crushed. She realized the warnings were right and Kamehameha was lying—that she could not be admitted unless she was Native Hawaiian. I.P. was and remains deeply hurt by Kamehameha's discrimination against her based on her race, an accident of birth that she cannot control.

73. B.P. was also hurt to see her daughter become the victim of racial discrimination and to miss a vital educational opportunity. A first-generation immigrant who was raised in a communist country, B.P. came to America and became a U.S. citizen so that her family could pursue the American dream. Yet Kamehameha discriminated against them because of their ancestry—while failing to give B.P. and I.P. the full and equal benefits of the contracts that Kamehameha made B.P. sign.

74. Had I.P. been admitted as a rising sophomore, she would have attended Kamehameha and done so for three years. Had her status as a non-Hawaiian not made it futile to apply again, I.P. would have reapplied for admission to Kamehameha's Kapalama campus, including in 2024 and 2025. And I.P. would have finished her schooling and graduated from Kamehameha. Instead I.P. attended another private school in Hawaii, where B.P. paid much higher tuition than she would have paid at Kamehameha (even assuming Kamehameha charged I.P. full price).

75. Though I.P. was a strong applicant in ninth grade, she was an even stronger applicant in tenth and eleventh grade. After ninth grade, I.P. switched to a new school that was more academically rigorous. Her grades improved to an A av-

erage, even though her classes were more challenging. Despite her young age, she even took college-level math courses for dual credit. And she gained both maturity and experience at internships and part-time jobs within her expected career field.

76.    B.P. and I.P. are members of SFFA. They have authorized SFFA to represent their rights in this litigation. SFFA does so with the exception of their requests for compensatory and punitive damages, which B.P. and I.P. bring solely on their own. And if SFFA cannot recover nominal damages for B.P. and I.P., then they also seek nominal damages on their own.

77.    B.P. and I.P. are using initials because I.P. was a minor when she first brought her claim, *see* Fed. R. Civ. P. 5.2(a), and because using B.P.'s first and last name would necessarily reveal I.P.'s identity. The key events also occurred while I.P. was a minor. And B.P. and I.P. are aware of the intense and widespread backlash leveled at anyone who supports SFFA or this litigation, including the incidents already documented in the record. *See* Docs.54-5 to 54-9, 96-1, 96-2. If their real names are revealed, B.P. and I.P. fear physical threats and violence against themselves, doxing of their personal information and home address, retaliation against I.P. at school, and threats to B.P.'s small businesses in Hawaii and thus their family's economic livelihood.

78. A lifelong resident of Hawaii, E.S. believes she would be a great fit for Kamehameha Schools. She is particularly drawn to Kamehameha's culture of supporting student athletes.

79. E.S. is multiracial, including part Native Alaskan. She is not Native Hawaiian.

80. In 2021, E.S. applied for admission to Kamehameha's Kapalama campus as a sixth grader, to enroll there in seventh grade. Her mother, K.S., created the online account and signed the contracts that Kamehameha requires from parents before their child can apply. Her application materials immediately disclosed that she was non-Hawaiian.

81. E.S. was denied admission to Kamehameha in 2022.

82. In 2023, E.S. applied for admission to Kamehameha's Kapalama campus as an eighth grader, to enroll there her freshman year. K.S. created the online account and signed the contracts that Kamehameha requires from parents before their child can apply. Her application materials again immediately disclosed that she was non-Hawaiian.

83. E.S. was denied admission to Kamehameha a second time in 2024.

84. Both times she applied, E.S. timely completed her application to Kamehameha, attached all necessary materials, and completed the test and interview. Both times she applied, her grades and extracurriculars were unusually strong. Though

E.S. could have performed better on the tests, she struggled with anxiety during the tests because she feared she would be exposed and judged for not being Native Hawaiian. Even still, she knows at least two Native Hawaiian classmates who got into Kamehameha with much worse academic profiles than hers (but like E.S., both students were strong athletes).

85.    E.S. realized she could not be admitted unless she was Native Hawaiian. She was and remains deeply hurt by Kamehameha's discrimination against her based on her race, an accident of birth that she cannot control.

86.    K.S. was also hurt to see her daughter become the victim of racial discrimination and to miss a vital educational opportunity. K.S. encouraged her daughter to go through the time-consuming and involved process of applying to Kamehameha twice because of the opportunities she thought the school would provide. During the process, K.S. had colleagues who were hostile toward E.S.'s application, telling K.S. that Kamehameha was "only for Hawaiians." She now knows they were right. Kamehameha discriminated against E.S. because of her ancestry—while failing to give K.S. and E.S. the full and equal benefits of the contracts that Kamehameha made K.S. sign.

87.    Had E.S. been admitted as a rising seventh grader, she would have attended Kamehameha and done so for six years. Had she been admitted as a rising freshman, she would have attended Kamehameha and done so for four years. She

instead stayed at her existing private school, where her parents pay much more in tuition than they would have paid at Kamehameha (even assuming Kamehameha charged E.S. full price). At the time, Kamehameha offered scholarships for students who attend E.S.'s current school; but when K.S. and E.S. tried to apply for that scholarship, they were once again barred because Kamehameha's scholarships are available only for Native Hawaiians.

88.    E.S. is currently in tenth grade and is able and ready to apply again to Kamehameha at the next opportunity (including the next admissions cycle that begins in August 2026), once a court orders Kamehameha to end its racial preference, to be equally open to non-Hawaiians, and to undo the effects of its past discrimination. And if a court ordered adequate relief, E.S. would finish her schooling and graduate from Kamehameha, even more so now that the school charges no tuition.

89.    Though E.S. was a strong applicant in middle school, she is an even stronger applicant today. After two years of high school, her grades are superb—placing her at valedictorian level—even though her school and her classes are more rigorous and advanced than most other schools in Hawaii. She is also now a three-sport athlete that has racked up many school-level, district-level, and state-level awards. She was recently named Hawaii state champion in one of her sports. And she secured one of the few spots to represent Hawaii at nationals.

90.    K.S. and E.S. are members of SFFA. They have authorized SFFA to represent their rights in this litigation. SFFA does so with the exception of their requests for compensatory and punitive damages, which K.S. and E.S. bring solely on their own. And if SFFA cannot recover nominal damages for K.S. and E.S., then they also seek nominal damages on their own.

91.    K.S. and E.S. are using initials because E.S. is a minor, *see* Fed. R. Civ. P. 5.2(a), and using K.S.'s first and last name would necessarily reveal E.S.'s identity. Even after she turns 18 in 2028, the key events will have occurred while E.S. was a minor. And K.S. and E.S. are aware of the intense and widespread backlash leveled at anyone who supports SFFA or this litigation, including the incidents already in the record. *See* Docs.54-5 to 54-9, 96-1, 96-2. If their real names are revealed, K.S. and E.S. fear physical threats and violence against themselves, doxing of their personal information and home address, and retaliation against E.S. at school.

92.    Prior to this lawsuit, SFFA launched the website kamehamehanotfair.org. (SFFA launched similar websites before its successful lawsuits against Harvard, West Point, and others.) Before joining SFFA and this lawsuit, Family A, Family B, E.S., and K.S. never saw kamehamehanotfair.org. They did not visit that website, make submissions on that website, or come to participate in this lawsuit because

of that website. Though I.P. contacted SFFA through that website, she did so two years after her application was rejected by Kamehameha.

### III. To protect its racially discriminatory policy, Kamehameha enlists the government and tries to strategically moot this suit.

93.    In *Doe I*, Judge Kozinski wrote a solo dissent suggesting that Kamehameha "may" be able to escape §1981 if it stopped "charging tuition." 470 F.3d at 888-89. And the *Doe I* majority agreed that Kamehameha's admissions policy involved contracts "because the schools charge tuition." *Id.* at 837 n.9.

94.    Kamehameha could have acted on Judge Kozinski's suggestion at any time over the last two decades, but it refused. After *Doe I*, Kamehameha continued charging students tuition from 2006 to 2026, earning the school hundreds of millions of dollars in extra revenue. Kamehameha made applicants sign the "KS Tuition Contract." That contract makes parents agree, among other things, to "pay KS tuition" "in consideration for KS's enrollment of" their child. For the 2025-26 school year, the portion of tuition that parents must pay was $5,675, $6,983, or $12,934 per student—depending on campus and grade. Kamehameha has long claimed, however, that most families receive substantial financial aid. *Doe I*, 470 F.3d at 832.

95.    Judge Kozinski's suggestion was wrong. Regardless of tuition, private schools inherently involve an "implied contract": The school "must award" a diploma if the student "complies" with the school's rules and "completes the required courses." *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d

Cir. 2011); *accord Thompson v. Saint Louis Sch.*, 2011 WL 661818, at \*6 (Haw. Ct. App. 2011) (collecting cases and explaining that "[a] number of jurisdictions have recognized a contractual relationship between private schools and their students, even absent an express written contract"). Racial discrimination in these implied contracts is banned by §1981. *Minto v. Molloy Univ.*, 715 F. Supp. 3d 422, 431 (E.D.N.Y. 2024). Kamehameha has never eliminated this implied contract; it continues to offer the bargain of performance and compliance for diplomas. Kamehameha could not eliminate this contract without violating Hawaii law and the requirements of its accreditor. *See* Haw. Rev. Stat. Ann. §302A-1132(a), (d); *Standards and Procedures for the Licensing of Hawai'i Private Schools* 6, Haw. Council of Private Schs. (June 2020), perma.cc/67DB-ATD4.

96.    Judge Kozinski's suggestion about tuition also assumed that Kamehameha would have no other contracts, which is false. In all prior admissions cycles where Plaintiffs or their members applied or could have applied, Kamehameha had myriad contracts—for example:

　　　a.    Kamehameha required applicants to apply using an online portal, where they had to "read and agree to" the "Kamehameha Schools Access Agreement." This contract contains a choice-of-law provision and a forum-selection clause:

By accepting this agreement, I certify the following:

- 35 -

- o  I am 18 years of age or older, or possess legal parental or guardian consent, and am competent to enter into this Agreement.
- o  I further agree that any lawsuit or claim against KS arising from or related to this application must be brought exclusively in the U.S. District Court for the District of Hawaii or in the state courts of the State of Hawaii. I hereby waive any jurisdictional, venue, or inconvenient forum objections to such courts. I further agree that any federal claims arising from or related to this application shall be governed exclusively by the federal law applied by the U.S. District Court for the District of Hawaii, and any state law claims shall be governed exclusively by the laws of the State of Hawaii, without reference to its conflict of law rules.

b.      To submit the application, parents also had to sign the "Acknowledge, Consent, and Authorization." Among other obligations, this contract requires parents to "waive, release, and hold harmless" Kamehameha for mishandling the information disclosed in the application. It also requires parents to "waive any rights" to privacy or publicity, including "photographs" of the child, and to give Kamehameha the right to "use" this information for its own purposes. The Acknowledge warns that it is a binding contract: "**THE CONTENTS AND NATURE OF THIS AGREEMENT ARE CONTRACTUAL, NOT A MERE RECITAL**," and applying parents "**AGREE TO BE BOUND BY ALL TERMS AND CONDITIONS CONTAINED IN THIS AGREEMENT**."

c.      Once a child was accepted, that child could not enroll at Kamehameha unless the parents signed the "Enrollment Contract/General Release." Among other binding obligations, this contract requires parents—"[i]n con-

- 36 -

sideration for" Kamehameha supervising their child—to indemnify and waive their right to sue Kamehameha for certain injuries. It, too, stresses its contractual nature: "**THIS AGREEMENT IS A CONTRACT TO, AMONG OTHER THINGS, RELEASE THE KS PARTIES FROM LIABILITY AND TO INDEMNIFY THE KS PARTIES**."

d.    Aside from tuition, Kamehameha charged parents and students many "fees (for miscellaneous items such as textbooks, classroom supplies and instructional materials, class dues, yearbooks, student council dues, technology, and residential life fees for Kapālama campus)," and for "student meals." Dkt.5727 at 8 n.9, *In the Matter of the Estate of Bernice P. Bishop*, Equity No. 2048 (Haw. 1st Cir. Ct. Jan. 22, 2026) ("*Master's Report*"). Those exchanges of money for good and services were equally contracts.

97.    After the application window for the last admissions cycle closed in September 2025 and Plaintiffs filed this lawsuit in October 2025, Kamehameha quickly tried to eliminate these contracts—the same ones that Plaintiffs had identified in their initial complaints. Kamehameha's maneuvers carried out its declaration, issued the day this lawsuit was filed, that the school "will engage every legal and operational resource to protect" the will's preference for Native Hawaiians and "vigorously defend our admissions policy." *E Ulu Koa—Standing Strong for Ke Aliʻi Pauahi and Hawaiʻi*, Kamehameha Schs. (Oct. 20, 2025), perma.cc/P4MK-D7DH.

98.    In late December 2025, Kamehameha petitioned a Hawaii probate court to approve a plan to let the school eliminate tuition. Dkt.5670, *Bishop Estate*, Equity No. 2048 (Haw. 1st Cir. Ct. Dec. 23, 2025) ("*Tuition Petition*"). A court-appointed master wrote a report recommending that the court approve the change. *Master's Report*. And the Hawaii attorney general, participating as *parens patriae*, agreed with the change. The Hawaii probate court approved Kamehameha's petition in February 2026. Doc.149-4.

99.    The purpose of Kamehameha's petition, and its adoption by the Hawaii courts, was to strategically moot this lawsuit's requests for prospective relief so that Kamehameha could maintain its policy of racial segregation going forward.

a.    The timing of the change confirms this purpose. Kamehameha knew about the no-tuition strategy for a long time, since it was flagged in *Doe I*. But the school did nothing for twenty years. Then, just two months after SFFA filed this suit, Kamehameha quickly filed its petition with the probate court. Kamehameha also confessed that its petition was filed outside the normal process, as that kind of request would normally be made in a report that was not due for another year and a half. *Tuition Petition* ¶9, ¶27.

b.    Knowledgeable observers confirmed Kamehameha's purpose. Local media reported that the move was "seen as the best chance for Kamehameha Schools to get around" SFFA's "lawsuit." *Court Approves Tuition-*

- 38 -

*Free System for Kamehameha Schools*, Hawaii News Now (Jan. 30, 2026), perma.cc/3A98-NRUU; *accord* Consillio, *Kamehameha Schools Changes Its Tuition Policy to Protect Trust Against Lawsuit*, Island News (Jan. 29, 2026), perma.cc/U5JT-DMUU ("move to defend its … admissions policy"). A Kamehameha alum said the change "has to do with the pending lawsuit from Students for Fair Admissions." Ordonio, *Kamehameha Schools to Offer Tuition-Free Education*, Hawaii Public Radio (Dec. 25, 2025), perma.cc/TT5H-6VTH. A Hawaiian civic leader agreed that the move was meant to "help in the fight to protect the trust," and an attorney who works on Native Hawaiian issues said it was meant to "help in the lawsuit." Consillio, *Kamehameha Schools Changes Its Tuition Policy to Protect Trust Against Lawsuit*, Island News (Jan. 29, 2026), perma.cc/U5JT-DMUU. Many similar statements connect the move to this lawsuit, and no statements deny a connection to this lawsuit.

c.    On the day it filed the petition in state court, Kamehameha issued a public statement, confessing that the effort to eliminate tuition was "not an isolated decision" and linking it to the need for "our people" to "honor" the princess "by standing strong together when her intent, her relationships, and her legacy are challenged." *A Kamehameha Schools Education: A Kahua of*

- 39 -

*Kuleana*, Kamehameha Schs. (Dec. 23, 2025), archive.is/g1vwX ("*Kahua of Kuleana*").

  d. In the petition itself, Kamehameha said the move was "[c]ritical" to giving Kamehameha "the agency to define KS' own identity and relationships," meaning the agency to continue excluding non-Hawaiians based on race. *Tuition Petition* ¶20; *accord* ¶16. The petition admits that defeating "[l]egal challenges," of which this case alleging racial discrimination in contracting is the only one, is an "important" benefit of the change. ¶23. Eliminating tuition was economically responsible "now," according to Kamehameha, because the "recent legal challenges" (meaning this case) change how the school calculates "the cost." ¶20, ¶24. Kamehameha also stressed that its decision to eliminate tuition was "[b]ased on the privileged and confidential opinions and recommendations of [its] legal counsel." ¶38.

  e. After the court-appointed master "met with and had discussions" with Kamehameha's leaders about the petition, *Master's Report* 3-4, he issued a report endorsing Kamehameha's representations. He reiterated that the school's purpose is "education of Native Hawaiians" and said the change should be evaluated for its effect on the "Native Hawaiian Community." *Master's Report* 5, 16. He found that the change would "provide important benefits with respect to the legal challenges," meaning this lawsuit. *Master's Re-*

- 40 -

*port* 16-17. "[I]t is imperative during these unprecedented times," according to the master, "that the Trustees take all reasonable steps necessary to enforce and defend claims against the Trust." *Master's Report* 16.

f.    In approving the petition, the Hawaii probate court agreed with Kamehameha and the master. It approved the change because "KS will be continuing its commitment to provide support and educational benefits to the Native Hawaiian community." Doc.149-4 at 4 ¶3. And it stated that the change would further Kamehameha's "purpose of education of Native Hawaiians." Fujimori, *Kamehameha Schools Tuition to Be Free, Judge Rules*, Honolulu Star-Advertiser (Jan. 31, 2026), perma.cc/FH64-YNYF ("*Judge Rules*").

g.    Kamehameha's occasional suggestions that eliminating tuition better reflects the princess's "intent" and the school's "values" are pretextual. *Kahua of Kuleana*. As Kamehameha admits, the will gives the school's leaders complete "discretion" over tuition. *Pauahi's Will*. Kamehameha expressed no concern about violating any intent or values when it charged tuition for the many decades before this lawsuit. Eliminating it now will cost Kamehameha at least $10-15 million per year, which is not something trustees with a fiduciary duty can dismiss as trivial. *Tuition Petition* ¶35. Kamehameha agrees that the money from tuition is significant, which is why it will not refund the tuition that families have paid in the past. *JDC DEFER, JDC-EDU Public*

*Hearings 02-12-2026*, at 17:48-20:53, Hawaii State Senate, YouTube (Feb. 12, 2026), youtube.com/watch?v=17Z4pMsD75U ("*Senate Hearing*").

100.    Though the tuition change was approved by a Hawaii state court, it is not permanent. As Kamehameha's petition stressed and the master found, the will gives the school the "discretion '… to determine if tuition shall be charged in any case.'" *Tuition Petition* ¶25. The state court confirmed that the will "expressly gave the trustees the power to determine if tuition should be charged," "even without court approval." *Judge Rules*. In testimony before the Hawaii legislature, Kamehameha could not say the tuition change was "forever" because "we have a board of trustees and we cannot speak for" a future "board of trustees." *Senate Hearing* 32:40-32:52.

101.    Meanwhile, in Hawaii's other two branches of government, a complementary effort was afoot to insulate Kamehameha's race-based admissions policy from this lawsuit. In January 2026, the bill that would become Act 002 was introduced in the Hawaii Senate. Its goal was to declare that, once Kamehameha eliminates tuition, the school would no longer have a "contract" that could trigger §1981. *See* Act 002, §1(a) ("Unless the parties agree otherwise in writing, any donor-conditioned educational award for attendance at a private pre-school, elementary, middle, or high school or any school-conditioned enrollment at any private school where no tuition or other monetary consideration is required or paid by the recipient shall be considered to be a conditional gift and not a contract ….").

- 42 -

102.   Act 002 was introduced "(at the request of another party)," which means the bill was drafted by someone other than a legislator. *See generally Hawaii Lawmakers Should Identify the People Asking for Legislation*, Civil Beat (Mar. 6, 2022), perma.cc/4MUS-TUX9. During Kamehameha's live testimony supporting the bill, the school thanked "the governor for his leadership in introducing this bill" and "the attorney general for her collaboration." *JHA Public Hearing – Wed Mar 18, 2026 @ 2:00 PM HST*, at 14:02-16, Hawaii House of Reps., YouTube (Mar. 18, 2026), youtube.com/watch?v=CYhXIQtcRes ("*House Hearing*"); *accord Senate Hearing* 8:37-10:20. Both Hawaii's governor and its Office of Hawaiian Affairs officially supported the bill. *Senate Hearing* 6:07-6:26. And the Hawaii attorney general opined that the bill was constitutional. *Senate Hearing* 21:25-21:37.

103.   Act 002's sole purpose is to empower Kamehameha to keep discriminating in admissions in favor of Native Hawaiians and against non-Hawaiians.

a.   Act 002 repeatedly states that its purpose is to resolve legal "uncertainty," change "legal treatment," and avoid "legal penalties" with respect to private-school contracts. No legal questions on these topics were actually uncertain. And no one was in legal jeopardy, except Kamehameha Schools from this lawsuit alleging racial discrimination under §1981.

b.   The law's timing confirms its purpose. The draft bill contemplates a private school in Hawaii that charges no tuition even though, when

- 43 -

the bill was introduced, no such school existed. But Kamehameha was seeking that relief in probate court; and the bill was introduced just one month after Kamehameha's petition, just a few days after the master's report, and just a few days before the court's hearing in that proceeding. The relevant committees of the legislature approved the bill on the same day that the state probate court approved Kamehameha's petition to eliminate tuition.

c.      On its face, the law is gerrymandered to cover only Kamehameha—the one private school in Hawaii that has a policy of racial segregation and that is being sued for discrimination in contracting. The relevant portion of the law applies only to a "private school where no tuition or other monetary consideration is required or paid." Act 002, §1(a). Kamehameha is the only private school in Hawaii that does not charge tuition. As one of the bill's supporters testified, "While the bill is drafted in neutral terms, its practical effect is to shield Kamehameha Schools from a lawsuit funded by a well-known opponent of race-conscious programs," meaning SFFA. *Testimony of William Caron* (Mar. 16, 2026), perma.cc/PP62-PESZ. At the Senate hearing on the bill, a senator complained that this bill is "special interest legislation" for Kamehameha only. The senator observed that "the problem" the bill was trying to solve was SFFA's "lawsuit" against Kamehameha. When the senator asked how this bill would affect "other private schools" that do not consider

- 44 -

"race," neither Kamehameha nor the other witnesses could give a sensical answer. The witnesses said the bill would let private schools avoid negotiating contracts with donors. But the language about donors is separate from the language about schools. *See* Act 002, §1(a). And the witnesses admitted that the bill does not actually solve this supposed problem with donors because its "opt out" clause lets donors still demand that schools sign contracts. *Senate Hearing* 19:44-32:39; *see* Act 002, §1(a) (statute's no-contract rule does not apply when "the parties agree otherwise in writing").

d.      The legislative committees responsible for the bill reported that the bill was drafted and amended to address "the concern raised by Kamehameha Schools" about the need for "clarification" on the contours of a "contractual relationship." *Stand. Cmt. Rep. No. 2718*, at 2 (Feb 25, 2026), perma.cc/3EJC-EC3T. Kamehameha's CEO testified in support of the bill, stressing the need for "clarity" on how the "legal system" treats the "distinction between a charitable gift and a contractual relationship." House Committees on Judiciary and Hawaiian Affairs, *Testimony in Support of Senate Bill No. 3123, SD1, Relating to Private Support of Education* (Mar. 18, 2026), perma.cc/XBU4-GB5U ("*House Testimony*") (testimony of Jack Wong). At the House hearing, Kamehameha testified in support of the bill because it "empowers" Kamehameha to "define for ourselves our relationships and in-

teractions with our students" and to maintain "who we are and who we always have been." *House Hearing* 14:10-14:45; *accord Senate Hearing* 8:27-10:08 (similar).

e.    Other testimony in support of the bill referenced Kamehameha directly, and no witness denied that the bill's primary purpose was preserving Kamehameha's race-based admissions. Two private schools in Hawaii—both of which charge tuition—testified in support of the bill, stressing its implications for "Kamehameha Schools" specifically. *House Testimony* (testimony of St. Louis School and St. Andrew's Schools). The Hawaii Association of Independent Schools also supported the bill after "consultation with Kamehameha Schools." *Id.* (testimony of Deanna D'Olier). Other witnesses were even more direct about the bill's connection to Kamehameha. *See, e.g., id.* (testimony of William Caron) (the bill "clarifies Hawaiʻi contract law to protect the unique charitable and educational mission of institutions like Kamehameha Schools"); *id.* (testimony of Brandon Maka'awa'awa) ("this bill provides certainty for …. educational institutions … like Kamehameha Schools"); *id.* (testimony of Rebecca J.ʻI. Soon) (noting the bill concerned "the tuition-free model for Kamehameha Schools"). *See also generally* perma.cc/U6M7-C4GT (Senate versions of the same testimony).

f.    Local reporters familiar with the process and the key deci-sionmakers agreed that the bill was a "strategic" "move" to "defen[d] against a lawsuit by the 'Students for Fair Admissions'" and that "[i]ts intent is to defend Kamehameha Schools' admission policy." Consillio, *Hawaii Governor Supports Bill to Protect Kamehameha Schools Admissions Policy*, Island News (Jan. 29, 2026), perma.cc/JH4M-UBL6. In other words, "[w]ith Kamehameha Schools under attack," the whole "state is now taking a stand to defend the … admissions policy." *Id.*

104.    While Kamehameha and all three branches of Hawaii's government made all these moves to defeat this lawsuit, the school remains just as liable under §1981 as it was before. In the 21st century, no private school can operate without making contracts with its parents and students—and thus being liable under §1981 for a policy of racial segregation. Aside from the implied contract underlying private school itself, *supra* ¶95, Kamehameha continues to have many express and implied contracts that implicate §1981, including at least the following:

a.    Kamehameha maintains student handbooks for each campus and school. The handbooks state the rights and responsibilities of students and parents vis-à-vis Kamehameha. Though courts enforce them flexibly, these handbooks terms are contracts. *Gorman v. St. Raphael Acad.*, 853 A.2d 28, 34 (R.I. 2004). Kamehameha's 2026 handbook for the Kapalama campus, for

example, was published *after* the elimination of tuition. It is full of plainly binding requirements and discrete contracts, like a license for the school to use and publish recordings of students and a provision that makes students pay for damage to Kamehameha property.

b.    Kamehameha maintains terms and conditions that govern its online platforms, including the online portal it makes parents and students use to apply to the school. *Terms and Conditions*, Kamehameha Schs., archive.is/oWBgp (archived July 22, 2026). Kamehameha requires the parents of current applicants (as well as future admitted students) to "agre[e] to be bound by" Kamehameha's "terms and conditions" and "privacy policy." Both are binding contracts that include, among other things, liability disclaimers, privacy waivers, and a choice-of-law clause. *See Terms and Conditions*.

c.    On its website explaining Kamehameha's new tuition-free policy, the school tells families that it can still charge them money for certain activities, including "Bus transportation," "Kauluhala Summer Academy," "Clubs and extracurricular activities," "Advanced Placement courses," "Specialized programs (e.g., Association of Arts, dual-credit, career certifications)," "Materials, uniforms, and equipment necessary for extracurricular activities or athletics," and "Travel associated with extracurricular programs or optional." Charging money for goods or services is a contract.

d.      In another document published after the elimination of tuition, Kamehameha tells families that "KS engages community partners to assist in providing different types of learning activities" and that those community partners can demand that families sign "waiver forms." Those waivers are a contract; Kamehameha includes them "in [the] child's enrollment packet"; and Kamehameha "WILL NOT" allow students to participate unless the waivers are "signed" and "received." Though Kamehameha says these contracts are not between families and the school, Kamehameha bans non-Hawaiians from accessing these contracts with the providers, and students are the third-party beneficiaries of Kamehameha's contracts with the providers.

e.      Kamehameha's facilities are highly secure; students who do not attend cannot freely enter—or even pass the guard station at the entrance. Inside the school, Kamehameha has many contracting opportunities for students and their families, including several on-campus stores and vending machines that charge students money for clothes, food, and other goods. By barring non-Hawaiians from getting into the school, Kamehameha bars non-Hawaiians from accessing these contracts.

f.      Kamehameha has a Health Services Department, which provides healthcare and conducts a mandatory medical screening of all students. Parents of Kamehameha students must complete a "Medical Treatment Agree-

ment and Release" before the school year begins. A "release … is a contract." *Victoria C. v. Cincinnati Bengals*, 46 F.3d 1148 (9th Cir. 1994); *Stanley v. Geo. Wash. Univ.*, 394 F. Supp. 3d 97, 106 (D.D.C. 2019), *aff'd*, 801 F. App'x 792 (D.C. Cir. 2020). For students who need to take medications at school, Kamehameha generally bans students from administering the medications themselves and requires parents to sign a "Request for Administration of Medication Form." Though the form now insists it "is not a contract," the actual terms are contractual: Kamehameha makes parents consent to its administration of the medications and to hold it harmless for certain omissions.

g.     Kamehameha transports students to field trips and other school activities. Parents must either agree to that transportation or sign a form that makes them "waive and release any and all claims" against Kamehameha and "indemnify, defend, and forever hold harmless" Kamehameha.

h.     Students at Kamehameha use the school's computers, software, and mobile devices. So students must agree to Kamehameha's "Student Technology Acceptable Use Agreement" and "Student Mobile Device Agreement," both of which offer Kamehameha's technologies in exchange for students' agreement to follow specific requirements.

i.     Starting in seventh grade, students can live on campus at Kamehameha. Families whose children do so must sign an enrollment agreement

and agree to handbooks outlining their rights and responsibilities vis-à-vis Kamehameha in the dorms. Even without express agreements, on-campus housing itself involves implied contracts. *Nieswand v. Cornell Univ.*, 692 F. Supp. 1464 (N.D.N.Y. 1988); *see also* Haw. Rev. Stat. Ann. §§521-1 *et seq.*

j.    Kamehameha has sports teams. Once a student commits to a team, his commitment becomes (in Kamehameha's words) a "contract" to stay on the team until the season ends. If a student "break[s] this contract," then he is ineligible to play another sport for the next two seasons.

105.  On information and belief, Kamehameha has many other releases, waivers, binding requirements, and other contracts that it has not eliminated. Plaintiffs' information and belief is based on several contracts that remain active and online even after Kamehameha eliminated tuition and claimed to eliminate other contracts, the fact that it is impossible to run a school without contracts, and the trustees' fiduciary duty not to expose this multi-billion-dollar trust to lawsuits that could be easily avoided with contracts, and contracts from recent school years that have not yet been reissued for 2026-27. *E.g., Self-Declaration Form, SY 2022-23*, Kamehameha Schs., perma.cc/YWG3-XYVR (archived July 26, 2026) (liability waiver for volunteers); *Student Driver's Manual, SY 2025-2026*, Kamehameha Schs. Hawaii, (archived July 26, 2026) (contracts for student parking). But these other contracts are not available to Plaintiffs without discovery, since Kamehameha keeps

them behind password-protected websites, has pulled them down because of this lawsuit and blocks internet-archiving tools on its websites, or otherwise does not make the contracts available to families until after their Hawaiian children are admitted.

106. Act 002, if anything, confirms that Kamehameha continues to have contracts implicating §1981. Kamehameha continues to condition its provision of education on eligibility criteria, academic performance minimums, standards of conduct, enrollment status, and other requirements. Under Act 002, if Kamehameha acts against a student "for failure to satisfy [these] conditions" without itself following the conditions' "terms," its conduct shall "give rise to a contractual claim." §1(c).

## CLAIMS FOR RELIEF
### COUNT I
### Kamehameha's Admissions Policy Fails Strict Scrutiny
### (42 U.S.C. §1981, §1983)

107. Plaintiffs incorporate and restate all their prior allegations here.

108. Section 1981 guarantees "[a]ll persons … the same right … to make and enforce contracts … as is enjoyed by white citizens." 42 U.S.C. §1981(a). At least as of 1991, the statute's ban on racial discrimination in contracting "includes" discrimination that affects "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." §1981(b).

109. Section 1981 prohibits discrimination by "nongovernmental" actors like Kamehameha. §1981(c).

110. Section 1981 authorizes equitable and legal relief. *Johnson v. Ry. Express Agency*, 421 U.S. 454, 459-60 (1975).

111. Kamehameha's preference for Native Hawaiians is race-based. *Doe I*, 470 F.3d at 836 n.9. As the Supreme Court explained in *Rice*, relying on a case interpreting §1981, "'racial discrimination'" under "the Reconstruction era civil rights laws" is "that which singles out 'identifiable classes of persons ... solely because of their ancestry or ethnic characteristics.'" 528 U.S. at 515 (citing *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987)); *accord Davis v. Commonwealth Election Comm'n*, 844 F.3d 1087, 1093–94 (9th Cir. 2016). For Kamehameha, the princess's stated intent was to create a preference based on "race" and "blood." *Supra* ¶48. And by history, purpose, and effect, the Native Hawaiian definition it uses is "race-based" because it turns on ancestral links to a defined ethnic group. *Rice*, 528 U.S. at 514-17. Native Hawaiians are not a federally recognized tribe. *Supra* ¶31. And "even if Congress had treated Hawaiians or Native Hawaiians as a tribe," *Arakaki v. Lingle*, 477 F.3d 1048, 1068 (9th Cir. 2007), neither education nor admission to one private school "affect[s] uniquely Indian interests," *Williams v. Babbitt*, 115 F.3d 657, 665 (9th Cir. 1997); *see Harvard*, 600 U.S. at 216 (deeming a "Native Hawaiian" preference to be "racial" in educational context); *Constitution-*

*ality of Race-Based Dep't of Educ. Programs*, 2025 WL 4055305, at *16 (same); *Gratz v. Bollinger*, 539 U.S. 244, 253-54 (2003) (same for "Native American").

112.   Kamehameha's discrimination involves many contracts. *E.g.*, *supra* ¶¶93-96, ¶¶104-106. Kamehameha refuses to give applicants an equal chance to make these contracts based on race; makes these contracts but denies recipients equal benefits based on race; uses race to block access to contracts; and uses race to deny students and parents the intended third-party benefits of contracts. Each independently violates §1981. *See* 42 U.S.C. §1981(b); *Gratz*, 539 U.S. at 275-76 & n.3; *Watson v. Fraternal Ord. of Eagles*, 915 F.2d 235, 243 (6th Cir. 1990); *Diaz v. Tesla, Inc.*, 598 F. Supp. 3d 809, 831 (N.D. Cal. 2022); *see also Rajaram v. Meta Platforms*, 105 F.4th 1179, 1182 (9th Cir. 2024) ("section 1981 imposes liability when defendants have discriminated in a way that prevented individuals who sought to enter into contractual relationships from doing so" (cleaned up; quoting *Runyon*, 427 U.S. at 17)).

113.   Race is "a but-for cause of [Plaintiffs'] injury." *Comcast Corp. v. NAAOM*, 589 U.S. 327, 333 (2020). Kamehameha's race-based admissions policy is the sole cause of Plaintiffs' inability to compete on a racially "even field" and the associated "chill" on their applications. *AGC of Cal. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1407 (9th Cir. 1991). And Kamehameha's race-based admissions policy is a but-for cause of Plaintiffs' inability to get admitted. On information and belief,

- 54 -

Kamehameha would have admitted Plaintiffs if they were Native Hawaiian. That information and belief is based on Plaintiffs' strengths as applicants, *supra* ¶56, ¶63, ¶66, ¶70, ¶75, ¶84, ¶89; Plaintiffs' knowledge of weaker Hawaiian students who were admitted to Kamehameha in the same timeframe; acknowledgements by Kamehameha and admissions consultants that students with weaker academics have been admitted; the evidence that Kamehameha considers Hawaiian ancestry in all parts of the process and uses subjective criteria under a conceded policy of excluding all non-Hawaiians, *supra* ¶¶33-47; the visibility and discussion of non-Hawaiian status during E.S.'s and I.P.'s applications; and telling omissions about E.S. and I.P. from Kamehameha, *e.g.*, Doc.149-2. Without discovery, Plaintiffs cannot access Kamehameha's confidential admissions policies, practices, and records, including contemporaneous documents showing the qualifications of the weakest Hawaiians it admitted and how Kamehameha treats applications from non-Hawaiians like E.S. and I.P.

114.   Act 002 does not eliminate Kamehameha's liability under §1981. This new Hawaii statute cannot immunize Kamehameha's conduct in any past admissions cycle because it is not retroactive: It "appl[ies] only to … school-conditioned enrollments made on or after its effective date" in 2026. Act 002, §3, §5. And Act 002 does not immunize Kamehameha's conduct in any future admissions cycle either.

a.    The meaning of "contract" under §1981 is a question of "federal law rather than specific state statute." *Mitchell v. Keith*, 752 F.2d 385, 390

(9th Cir. 1985); *see Peterson v. Calif. Dep't of Corr. & Rehab.*, 451 F. Supp. 2d 1092, 1104 (E.D. Cal. 2006). Though the Ninth Circuit once consulted state contract law for a limited purpose under the pre-1991 version of §1981, the Ninth Circuit has never allowed state contract law to be "inconsistent with the Constitution and laws of the United States." *Flores v. City of Westminster*, 873 F.3d 739, 753 (9th Cir. 2017). Converting contracts into non-contracts, with the purpose and effect of letting a private school continue racial segregation, "hinders a preeminent federal interest" and is inconsistent with the Constitution and §1981. *Id.*; *see supra* ¶¶101-103; *infra* ¶¶136-142.

b.    Despite the state legislature's efforts, its rushed attempt to shield Kamehameha's discrimination is drafted so poorly that not even Kamehameha satisfies its terms. The statute purports to cover only "*enrollment* at any private school where no tuition *or other monetary consideration* is required *or paid* by the recipient." §1(a) (emphases added). The statute is limited to "enrollment." §1(a). It does not purport to affect the nature of contracts concerning *admission*, or even the nature of the contracts listed in the "notwithstanding" clause (payments for benefits, goods, or services; intellectual-property waivers; and other consents), §1(a)(1)-(3). Even if it did, those contracts are "in writing" and thus not covered. §1(a)(1); *see supra* ¶104. Separately, parents and students do "pa[y]" Kamehameha "other monetary consideration";

and this monetary consideration goes to goods and services that cannot be characterized as "optional" or "extracurricular," let alone both. §1(a)(1); *see supra* ¶104.

c.     By its terms, Act 002 does not say the conduct it covers is *not* a contract. It states a rule of construction for how certain conduct "shall be considered," §1(a), and it withdraws a remedy for certain kinds of breaches by saying they "shall not give rise to a contractual claim," §1(c). Indeed, the statute confirms that a "contractual claim" *does* arise when a school imposes "conditions" on enrollment and then does not "appl[y]" those conditions "in a manner consistent with the terms of the award and applicable law." §1(c). Plus one "applicable law" is §1981's ban on racial discrimination.

115.   Race-based contracting violates §1981—either without exception, or at least if the defendant cannot satisfy strict scrutiny. In *Grutter* and *Gratz,* the Supreme Court held that Title VI and §1981 are "coextensive" with the Fourteenth Amendment, so a race-based admissions policy that fails strict scrutiny necessarily violates Title VI and §1981. *Grutter*, 539 U.S. at 343; *Gratz*, 539 U.S. at 276 n.23. And in *Harvard*, the Supreme Court held that this principle means strict scrutiny applies even if the defendant is a private school, *see* 600 U.S. at 198 n.2, thus abrogating the Ninth Circuit's contrary reasoning in *Doe I.*

116.   Kamehameha cannot satisfy strict scrutiny for many reasons, including:

a.    Kamehameha treats race as a "negative" for some applicants. *Harvard*, 600 U.S. at 219. Admission to Kamehameha is zero sum; applicants compete for a limited number of seats. *Supra* ¶23. So by giving Native Hawaiians a preference, Kamehameha treats race as a positive for Hawaiian applicants and a "negative" for all others. *Harvard*, 600 U.S. at 219.

b.    Kamehameha uses racial "'quotas.'" *Id.* at 211. It does not use race "only as a 'plus.'" *Id.* at 209. It "forthrightly admit[s] that as long as there are qualified students who possess at least some Native Hawaiian ancestry, they will be admitted before even the most qualified of those who lack aboriginal blood." 416 F.3d 1025, 1029 (9th Cir. 2005). Kamehameha thus puts applicants on "'separate admissions tracks'" based on race—something that never satisfied strict scrutiny. *Harvard*, 600 U.S. at 211. And in practice, its policy is a "complete race-based ban" of non-Hawaiians, which is "almost by definition not narrowly tailored." *Williams v. Babbitt*, 115 F.3d 657, 665-66 (9th Cir. 1997).

c.    Kamehameha's use of race has no "end point." *Harvard*, 600 U.S. at 225. Kamehameha has employed a 100% racial quota in admissions for nearly 150 years. It did not lessen its use of race after the Supreme Court decided *Harvard*. Its only meaningful change with respect to race came around 2002 when, after one non-Hawaiian was admitted, Kamehameha *in-*

*creased* its use of race by ensuring the number of qualified Hawaiian applicants would always exceed the number of seats. *Supra* ¶¶35-37. Kamehameha also says its racial preference will end only after Native Hawaiians no longer face disparities in education. *E.g.*, *Doe I*, 470 F.3d at 846. That supposed end point, as the Supreme Court held in *Harvard*, is no end point at all. *See* 600 U.S. at 225, 213, 230. Kamehameha's recent move to end tuition in the hopes of escaping §1981 altogether further confirms that it will not stop using race any time soon. *Supra* ¶36.

d.      Kamehameha engages in racial "stereotyping." *Harvard*, 600 U.S. at 220. It does not give a preference based on educational disadvantage; it at best uses Native Hawaiian ancestry as a proxy for educational disadvantage. *Id.* at 220-21. Kamehameha would admit a wealthy Hawaiian whose parents both have PhDs, for example, over a poor non-Hawaiian Hispanic whose parents never graduated from high school. And Kamehameha falsely assumes that Native Hawaiians—who the school stresses are "exemplars of … diversity"—share values, experiences, and needs based on the arbitrary fact that they can identify one Hawaiian ancestor. KS-*Rice*-Amicus-Br.4.

e.      Kamehameha's overarching goal of "redress[ing] the under-representation of Native Hawaiians" by "increas[ing] the diversity of civic, business, and philanthropic leadership," 295 F. Supp. 2d at 1169, cannot be sub-

jected to meaningful judicial review, *Harvard*, 600 U.S. at 214. While Kamehameha measures its own students' academic success, it educates only "a fraction of the Native Hawaiian school-age population." 295 F. Supp. 2d at 1169-71. "How many fewer leaders [Kamehameha] would create without racial preferences … are inquiries no court could resolve." *Harvard*, 600 U.S. at 215. Any other supposed educational benefits from segregation would be too "'amorphous'" and unmeasurable to satisfy strict scrutiny. *Id.* at 214-17, 224. Kamehameha claims to value, after all, "the interaction of diverse people and ideas" in its learning environments. *Cultural Principles and Education Framework Cultivate Strong Hawaiian Identity in KS Learners*, Kamehameha Schs., archive.is/7NmV7 (archived July 23, 2026). It also claims to admit non-Hawaiians to its preschool, enrichment programs, and summer school, *Doe I*, 470 F.3d at 832-33; and from 1946 to 1962, it allowed the children of its non-Hawaiian faculty to attend.

      f.    Kamehameha cannot "articulate a meaningful connection between the means [it] employ[s] and the goals [it] pursue[s]." *Harvard*, 600 U.S. at 215. Its definition of Native Hawaiian is "arbitrary." *Id.* at 216. Because Kamehameha defines Native Hawaiian to require only one Hawaiian ancestor, it gives the same preference to a student whose mom is Native Hawaiian (50% Native Hawaiian) as a student whose great-great-great-great-

- 60 -

great-great-great grandmother is Native Hawaiian (0.2% Native Hawaiian). No court could "scrutinize" whether Kamehameha's admissions preference accomplishes anything for Native Hawaiians, defined at this meaningless level of generality. *Id.*

g.    Kamehameha's use of race does not serve a compelling interest. Outside the context of prisons, the only compelling interest for using race is "remediating specific, identified instances of past discrimination that violated the Constitution or a statute." *Id.* at 207. Kamehameha is not trying to remedy "specific, identified" instances of past illegal discrimination. *Id.* The beneficiaries of its racial preference were not alive when the Hawaiian monarchy ended, let alone suffered discrimination in educational opportunities that violated the Constitution or a statute; so Kamehameha's use of race is not tailored to "mak[ing] members of the discriminated class whole for the injuries they suffered." *Id.* at 215 (cleaned up). The non-Hawaiian children who suffer from Kamehameha's discrimination today "'bear no responsibility for whatever harm'" Native Hawaiians "'have suffered.'" *Id.* at 226.

h.    Kamehameha has not reasonably "considered" or "tried" race-neutral alternatives. *Fisher v. UT Austin*, 570 U.S. 297, 312 (2013); *Williams*, 115 F.3d at 666. Kamehameha educates 5,400 Native Hawaiians at a time. Given its astronomical wealth and land, *supra* ¶21, the school could educate

- 61 -

the exact same number of Native Hawaiians—while ending its totalizing racial preference—by admitting more students, adding more classrooms, or opening new campuses. Kamehameha can afford it; it just agreed to pay $10-15 million per year in lost tuition to keep discriminating. *Supra* ¶99. As its former principal recently confirmed, Kamehameha can expand to serve more students, including non-Hawaiians, without compromising its educational mission. *Principal Interview* 38:38-42:41. And after *Rice* was decided in 2000, Kamehameha's lawyers likewise advised the school that, instead of "Hawaiian blood," the school may achieve its goals "just as well" by considering an applicant's "'demonstrated interest in Hawaiian culture, language, music, dance, art and history ... and family history of involvement in Hawaiian cultural and community affairs.'" King & Roth, *Broken Trust* 289 (2006), perma.cc/U8KJ-KAT2. Kamehameha has issued no study or report explaining why it could not adopt these or other race-neutral alternatives.

117. Section 1981 contains no "affirmative action" exception that lets schools use race in contracting, at least without satisfying strict scrutiny. The Ninth Circuit's contrary holding in *Doe I* is bad law.

    a.    Section 1981 contains no exceptions at all to its ban on racial discrimination in contracting. Its "broad terms" bar discrimination "against, or in favor of, any race." *McDonald*, 427 U.S. at 295.

b.      The Supreme Court has never recognized an affirmative-action exception to §1981. To the contrary, it holds that §1981 "guarantee[s] continuous equality between white and nonwhite citizens," *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 208 (2019), and protects the "equal right of all persons … to make and enforce contracts without respect to race," *Domino's Pizza v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up). The Supreme Court also recently held that §1981 uses but-for causation. *Comcast*, 589 U.S. at 332. But-for causation is satisfied when race is a reason why the plaintiff could not equally compete for a contractual benefit, which is true even when the defendant was acting under an affirmative-action plan. *See Harvard*, 600 U.S. at 289-90 (Gorsuch, J., concurring); *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020).

c.      Courts have reasoned that, in cases involving employment contracts, §1981 must contain an affirmative-action exception or else employers could not meaningfully take advantage of the exception in Title VII. *E.g.*, *Setser v. Novack Inv. Co.*, 657 F.2d 962, 966 (8th Cir. 1981) (en banc). But that anticircumvention reasoning does not apply in cases, like this one, that do not involve employment contracts. And the Supreme Court has since rejected the notion that, because §1981 and Title VII overlap, courts can use that overlap to narrow either statute. *CBOCS W. v. Humphries*, 553 U.S. 442, 455 (2008);

*accord Comcast*, 589 U.S. at 338 (stressing that Title VII and §1981 are "two statutes with two distinct histories"). Employees need not exhaust their §1981 claims with the EEOC, for example, even though they must do so when bringing identical theories of discrimination under Title VII. *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008). *See generally Metoyer v. Chassman*, 504 F.3d 919, 947 n.11 (9th Cir. 2007) (Bea, J., concurring in part and dissenting in part) (highlighting the many reasons why "§1981 provides a much more attractive avenue of relief to plaintiffs than does Title VII").

      d.     Even for Title VII, the affirmative-action exception is either bad law or should be overruled. The Supreme Court's prior decisions rely on the supposed "purpose" of Title VII, devoid of any reliance on text. *See United Steelworkers of Am. v. Weber*, 443 U.S. 193, 202 (1979) ("purpose of the statute"); *Johnson v. Transp. Agency*, 480 U.S. 616, 630 (1987) (*Weber* "was grounded in … Title VII's purpose"). The Court used Title VII's supposed "'spirit'" to "rewr[i]te the statute." *Johnson*, 480 U.S. at 670 (Scalia, J., dissenting). The Supreme Court abandoned this approach to Title VII in *Bostock*, 590 U.S. at 654-55. Even more recently, the Supreme Court confirmed that Title VII "draws no distinctions between majority-group plaintiffs and minority-group plaintiffs." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 309 (2025). After *Ames*, the EEOC rescinded its guidance on affirmative-action

plans, explaining that the so-called affirmative-action exception is "incon-sistent with the plain text of Title VII" and has been "rendered … obsolete" by recent "caselaw." *Rescission of Guidelines on Affirmative Action Appropriate Under Title VII of the Civil Rights Act of 1964, as Amended*, 91 Fed. Reg. 40,879, 40,880-81 (July 6, 2026).

118. Kamehameha's race-based admissions policy cannot satisfy strict scru-tiny. It violates §1981.

**COUNT II**
**Kamehameha's Admissions Policy Is Not a Valid Affirmative-Action Plan**
**(42 U.S.C. §1981, §1983)**

119. Plaintiffs incorporate and restate all their prior allegations here.

120. Even if §1981 contained an affirmative-action exception, that exception should be no broader than Title VII's. If the goal is avoiding circumvention of Title VII, then the exception for §1981 should be *the same as* the *Johnson/Weber* excep-tion under Title VII. If the Title VII exception remains good law, that standard makes defendants redress their own racial imbalances, rather than imbalances in society writ large. This requirement "provides assurance" that "race will be taken into ac-count in a manner consistent with … eliminating the effects of employment *discrim-ination*" and that "the interests of those employees not benefiting from the plan will not be unduly infringed." *Johnson*, 480 U.S. at 632 (emphasis added).

121. The Ninth Circuit's contrary reasoning in *Doe I* was abrogated by the Supreme Court in *Harvard*. Citing *Grutter*, the Ninth Circuit justified a laxer test

based on "'educational autonomy'" and "deference to private educational deci-sionmakers." 470 F.3d at 841. But in *Harvard*, the Supreme Court held that *Grutter*'s discussion of "deference" does not justify weakening the legal standard that governs the use of race in education. 600 U.S. at 217. Also citing *Grutter*, the Ninth Circuit justified a laxer test based on schools' legitimate interest in producing diverse citizens, workers, and leaders. 470 F.3d at 841. But in *Harvard*, the Supreme Court rejected those interests as amorphous, standardless, unmeasurable, and illegitimate racial balancing. 600 U.S. at 214-15, 223-25.

122.   Kamehameha cannot satisfy the affirmative-action exception from *Johnson* and *Weber* for several reasons, including:

a.    Kamehameha's assertion that its admissions policy is an affirmative-action plan is not sincere. As Kamehameha admitted during the prior litigation, "Kamehameha's preference policy is not an affirmative action program, designed to mirror societal diversity within an institution." And in response to this litigation, Kamehameha defended its policy based solely on the princess's will, with no mention of affirmative action:

**Is your admissions policy discriminatory?**

No. Kamehameha Schools is a private trust established in the Kingdom of Hawaiʻi to implement the will of a Native Hawaiian chiefess. The trust is entirely privately funded, receiving no state or federal financial assistance. The United States government should not be interfering with the business of a private trust's

- 66 -

ability to implement the kauoha of a high-ranking Hawaiian Kingdom chiefess.

*Ola Pauahi, Ola Hawaiʻi*, Kamehameha Schs., archive.is/xklUL#selection-1499.0-1508.0 (archived July 21, 2026).

b.      Kamehameha cannot prove a manifest imbalance in the proportion of Native Hawaiians in its student body compared to the proportion of school-aged Native Hawaiians in the State. Native Hawaiians are 100% of the student body at Kamehameha, but only 21% of the population of Hawaii.

c.      Kamehameha's policy totally excludes non-Hawaiian students in effect and by design, *supra* ¶¶33-47, so it creates an absolute bar to their advancement. That bar has become more clearly absolute since 2002, when *Doe I* was filed. *Supra* ¶¶35-37. That non-Hawaiians can attend "other" schools is "no response" to Kamehameha's complete exclusion. *AAER v. Fearless Fund*, 103 F.4th 765, 777 (11th Cir. 2024). "Not only is that position anathema to the principles that underlie all antidiscrimination provisions," but it would "render *Johnson*'s 'absolute bar' caveat a nullity." *Id.*; *cf. Weber*, 443 U.S. at 208 (asking whether whites could participate "in the program" being challenged); *Johnson*, 480 U.S. at 638 (asking whether men could be promoted under "the Plan" being challenged).

d.      Even if it were not an absolute bar, Kamehameha's "rigid," sequencing-based quota unnecessarily trammels non-Hawaiians' rights. *In re*

- 67 -

*Birmingham*, 20 F.3d 1525, 1541-43 (11th Cir. 1994). This "hard-core, cold-on-the-docks quota" is precisely what *Weber* and *Johnson* said was illegal. *Hammon v. Barry*, 826 F.2d 73, 79 (D.C. Cir. 1987); *cf. Johnson*, 480 U.S. at 638 (stressing that "the Plan sets aside no positions for women" and "requires women to compete with all other qualified applicants"); *Weber*, 443 U.S. at 208 (stressing that "half" the recipients would be "white").

e.      Kamehameha's use of race has no meaningful end date. Its exclusion of non-Hawaiians is nearing its 140th year, with no sign of stopping. In a statement released in response to this lawsuit, Kamehameha said it is "prepared and committed to vigorously defen[d]" its "nearly 140-year-old admissions policy," "[j]ust as we did decades ago." *Ola Pauahi, Ola Hawaiʻi*. Kamehameha also offered a defense solely based on Pauahi's will—making points that not even the Ninth Circuit accepted in *Doe I* and adopting a rationale that justifies the use of race indefinitely. *Id.* Its recent attempts to escape scrutiny under §1981 by eliminating tuition further confirm that it has no intention to stop discriminating ever, let alone soon. *Supra* ¶36.

123.   At the very least, Kamehameha can no longer satisfy the version of the affirmative-action exception articulated by the Ninth Circuit. *Doe I*'s holding was limited to Kamehameha's admissions policy as it existed in 2002-2005. *See* 470 F.3d at 834 n.5 (by the time of en banc, plaintiff was seeking "only damages" based on

his past rejected applications); 295 F. Supp. 2d at 1157 (plaintiff applied for admission for the school years 2002-03, 2003-04, and 2004-05). That policy is no longer justified two decades later, for many reasons.

a.      The Ninth Circuit held that Kamehameha must justify its race-based admissions policy based on "current" data showing a manifest imbalance in educational outcomes for Native Hawaiians. 470 F.3d at 843; *accord, e.g., id.* ("presently"); *id.* at 842 ("present" and "presently"); *id.* at 844 ("currently"). Kamehameha has not done so. It has not published a report on that question since 2021, relying on data no more recent than 2018. *See Ka Huakai, Native Hawaiian Educational Assessment 2021* (*2021 Ka Huakai*). Even those numbers are outdated to the point of uselessness, since they do not account for the massive effects of school closures and remote learning in the wake of COVID-19.

b.      The Ninth Circuit assumed that Kamehameha's racial preference is "limited" because non-Hawaiians can be admitted "if qualified students with Native Hawaiian ancestry do not apply in sufficient numbers." 470 F.3d at 845-46. But after *Doe I*, Kamehameha made changes to its admissions process to ensure that never happens, including the most recent change to eliminate tuition. *Supra* ¶¶35-37.

- 69 -

c.      The Ninth Circuit assumed that Kamehameha would adjust its racial preference based on "changes" in "the capacity of the School's programs" and "the well-being of the Native Hawaiian community" in education. 470 F.3d at 846. Since *Doe I*, Kamehameha reports that educational imbalances for Native Hawaiians have improved in several areas, *infra* ¶123, and Kamehameha has increased its enrollment by 600 students, *supra* ¶24; yet Kamehameha has not decreased its racial preference one iota.

d.      The Ninth Circuit held that Kamehameha's use of race needed no "explicit or immediately foreseeable end date," stressing that *Grutter* allowed universities to use race for another 25 years. 470 F.3d at 846. But in *Harvard*, the Supreme Court held that "*Grutter* did no such thing." 600 U.S. at 228; *accord id.* at 224. The holding of *Grutter*, it explained, is that "race-based admissions programs eventually had to end" and that the lack of a logical and durational end point is fatal. *Id.* at 225; *accord id.* at 369 (Sotomayor, J., dissenting) (explaining that, per the *Harvard* majority, "everyone … has been misreading *Grutter*"). *Harvard* also explained that any 25-year clock from *Grutter* has expired. *Id.* at 225 (majority). And yet Kamehameha's use of race in admissions remains operating in perpetuity.

e.      The passage of another 20 years also shows that Kamehameha's racial preference is not "necessary to correct the manifest imbalance suffered

by students of Native Hawaiian ancestry." *Doe I*, 470 F.3d at 845. While Kamehameha's report suggests that educational outcomes for Native Hawaiians have improved in several areas, so did outcomes for all students in Hawaii. *See 2021 Ka Huakai* 436, 481, 212, 469, 454. Meanwhile, the population of school-aged Native Hawaiian children in Hawaii increased from 70,000 to over 86,000—meaning Kamehameha serves a smaller percentage of Native Hawaiians today than during *Doe I*. *Compare* 470 F.3d at 832*, with 2021 Ka Huakai* 339. The data shows no meaningful relationship between Kamehameha's race-based admissions policy and the educational achievement of Native Hawaiians as a whole because there is not one.

f.      In *Doe I*, "nothing in the record" suggested that "educational opportunities in Hawaii are deficient for students … who lack any Native Hawaiian ancestry." 470 F.3d at 844. That record exists today. A comprehensive report published in 2025 ranked Hawaii's public schools 42nd in the country. Another report from late 2024 found that "Hawaii's public schools are chronically underfunded," ranking 39th in expenditures despite having one of the nation's highest costs of living. In a September 2025 study of educational innovation in private and public schools, Hawaii ranked 44th out of 50 States. A 2023 study by the CDC reports that students experience much higher levels of racism in Hawaii schools compared to the national average—with black

and white students experiencing the highest levels of racism (55% and 47%) and Native Hawaiians experiencing the lowest levels of racism (34%).

124.  Kamehameha's race-based admission policy is not a valid affirmative-action plan. It violates §1981.

## COUNT III
### Any Statutory Authorizations Are Unconstitutional
### (42 U.S.C. §1981, §1983; U.S. Const. amends. V & XIV)

125.  Plaintiffs incorporate and restate all their prior allegations here.

126.  After holding that Kamehameha's admissions policy was a valid affirmative-action plan, the Ninth Circuit's 2006 opinion had another section titled: "Alternatively, and in Addition, Congress Specifically Intended to Allow the Kamehameha Schools to Operate When, in 1991, It Re-enacted 1981." *Doe I*, 470 F.3d at 847.

127.  On the one hand, this discussion might have been an alternative reason why §1981 contains an affirmative-action exception (and why that exception is laxer than the one for employers under Title VII). After discussing various statutes involving Native Hawaiians and education, the Ninth Circuit said those statutes simply "inform our analysis"—*i.e.*, the affirmative-action analysis that the court undertook in the prior section. 470 F.3d at 849. Under this reading of the opinion, Kamehameha's race-based admissions policy is carved out of §1981, but only insofar as it satisfies *Doe I*'s requirements for a valid affirmative-action plan. For the same reasons Kamehameha's policy is not a valid affirmative-action plan, it would fail

this part of the Ninth Circuit's opinion too. *See supra* ¶123. Those reasons also make it fail the "need" standard of 42 U.S.C. §11705(c)(4).

128.   On the other hand, the Ninth Circuit might have held that race-based admissions policy like Kamehameha's are carved out of §1981 entirely. Under this reading of the opinion, §1981 cannot apply to a race-based admissions policy like Kamehameha's, regardless of whether the school's preference for Native Hawaiians satisfies *Doe I*'s test for a valid affirmative-action plan.

129.   If this part of the opinion is an alternative holding that Congress approved discrimination in favor of Native Hawaiians, then the opinion does not address the constitutionality of that approval. The Ninth Circuit stressed that the plaintiff "brought no constitutional claims" and so its analysis was "only" about "Congress's intent." 470 F.3d at 847. Throughout the litigation in *Doe I*, the parties did not "contes[t] the constitutionality of §1981" or "any" other congressional enactment, however interpreted, and the courts never considered or decided any constitutional question. 416 F.3d at 1034 n.3; 295 F. Supp. 2d at 1174 n.30. "If the [*Doe I*] Court had read section 1981 to prohibit discrimination against persons of some races but not others, it would have raised serious constitutional questions." *Rajaram*, 105 F.4th at 1184.

130.   If §1981 has an implied approval for certain preferences "for Native Hawaiians," *Doe I*, 470 F.3d at 849, then that approval is unconstitutional. The ap-

proval is a racial classification: It treats a discriminator that prefers to contract with Native Hawaiians differently from a discriminator that favors other races; and it treats the victims of discrimination differently depending on whether they are Native Hawaiian. *See McLaughlin v. Florida*, 379 U.S. 184, 194 (1964); *Ames*, 605 U.S. at 318, 314 n.1 (Thomas, J., concurring). So, too, if Congress specifically intended to give certain private schools the "right to discriminate" in favor of Native Hawaiians. *Reitman*, 387 U.S. at 381. Racial classifications must satisfy strict scrutiny—a test that's no less strict for Congress than the States. *Adarand Constructors v. Peña*, 515 U.S. 200, 224, 235 (1995); *see also Mullin v. Doe*, 146 S.Ct. 2121, 2143 n.2 (2026) (Thomas, J., concurring). Strict scrutiny cannot be satisfied here. *Supra* ¶116; *infra* ¶134.

131.   Under principles of equal protection and severability, courts would deem this exception for Native Hawaiians unconstitutional and severable. The proper approach is to refuse to enforce the exception while leaving the broader §1981 in place. *See Barr v. AAPC*, 591 U.S. 610, 630-34 (2020); *Sessions v. Morales-Santana*, 582 U.S. 47, 72-76 (2017).

132.   Whatever its scope, the Ninth Circuit's statutory analysis in *Doe I* is wrong and unpersuasive.

a.    Once Hawaii became a territory over a century ago, Kamehameha became subject to §1981. Congress amended §1981 in 1991, but those

amendments added no exception to the statute—or even mentioned schools or preferences for Native Hawaiians. With respect to Kamehameha, the 1991 amendments wholly strengthened §1981's ban on racial discrimination: The amendments clarified that §1981 covers "nongovernmental" discriminators, as well as discrimination that occurs before and after contract formation. §1981(b), (c); *see Rivers v. Roadway Exp.*, 511 U.S. 298, 302 n.2, 303 (1994) (discussing how the 1991 amendments "enlarged" the scope of §1981).

b.      The Ninth Circuit pointed to nothing in the text of §1981, before or after the 1991 amendments, to support a carveout for Native Hawaiians. It relied on two unrelated statutes: the Hawkins-Stafford Amendments (passed in 1988 and repealed in 1994) and the Native Hawaiian Education Act (passed in 1994 and reenacted in 2002). 470 F.3d at 848-49. Neither statute amends §1981, regulates private-school admissions, or does anything at all to the legal status of race-based contracting by Kamehameha.

133.   If *Doe I* alternatively holds that Congress carved out Kamehameha from §1981, then that alternative holding is bad law.

a.      The Ninth Circuit relied on an approach to statutory interpretation that has since been rejected. Instead of looking at what Congress wrote, the Ninth Circuit looked to the general policy goals of other statutes to divine what Congress must have "had in mind," "intended," and "understood" when

it amended §1981. 470 F.3d at 847-49. Yet "Congress expresses its intentions through statutory text," so courts cannot entertain arguments about what Congress "*implicitly intended.*" *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022); *accord Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta*, 33 F.4th 1107, 1117 n.3 (9th Cir. 2022). Congressional "assumptions are not laws" and cannot add "language" to a statute that isn't there. *Castro-Huerta*, 597 U.S. at 648. "When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit." *Bostock*, 590 U.S. at 653. That principle applies equally when the extratextual considerations are "alleged congressional intent divined from other statutes with very different language." *Corner Post v. Fed. Rsrv.*, 603 U.S. 799, 815 (2024).

b.      Separately, Congress has abrogated and overruled any alternative holding in *Doe I*. In 2010, four years after *Doe I*, Congress passed an explicit authorization of Kamehameha's admissions policy: "[N]otwithstanding any other provision of Federal or State law, it shall be lawful for [Kamehameha Schools] to continue to offer its educational programs and services to Native Hawaiians … first and to others only after the need for such programs and services by Native Hawaiians has been met." 42 U.S.C. §11705(c)(4). By passing this express authorization, Congress rejected the Ninth Circuit's rea-

- 76 -

soning that Congress had already authorized Kamehameha's race-based admissions policy when it amended §1981 in 1991. *See United States v. Lande*, 968 F.2d 907, 911 (9th Cir. 1992). Congress's explicit authorization also would override any implicit authorization from *Doe I*, especially because §11705(c)(4) creates a "need" standard that imposes different and tougher requirements on Kamehameha. *See TRW Inc. v. Andrews*, 534 U.S. 19, 28-29 (2001); *Jama v. ICE*, 543 U.S. 335, 349-52 (2005).

134.   Just like any implicit authorization in the Ninth Circuit's opinion, *supra* ¶130, any explicit authorization in §11705(c)(4) would be unconstitutional. At a minimum, constitutional avoidance requires reading §11705(c)(4) to codify strict scrutiny or the affirmative-action exception.

   a.   Under the Constitution's equal-protection requirements, the government cannot "authorize private racial discriminations." *Reitman*, 387 U.S. at 376-81. "Few principles of law are more firmly stitched into our constitutional fabric than the proposition that a State must not … in any way act to … encourage racial segregation." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150-52 (1970).

   b.   Section 11705(a)(4) authorizes and encourages private racial discrimination on its face. It states that Kamehameha can preference "Native Hawaiians," using the same "defin[ition]" that the Supreme Court deemed racial

in *Rice*. 42 U.S.C. §11705(c)(4). *Compare* 20 U.S.C. §7517(2)*, with Rice*, 528 U.S. at 509-10. "Race is the factor upon which the statute operates, and its involvement promotes the ultimate discrimination." *Anderson v. Martin*, 375 U.S. 399, 404 (1964).

c.    Even if the text did not draw a racial classification on its face, authorizing Kamehameha's racial discrimination is the statute's obvious purpose and effect. *Reitman*, 387 U.S. at 373-77. The statute cross-references Kamehameha by name. It was passed shortly after Kamehameha narrowly escaped two lawsuits challenging its admissions policy as racially discriminatory. And its only possible effect is to insulate Kamehameha from liability under the laws banning racial discrimination. Kamehameha itself calls §11705(a)(4) "a federal statute specifically authorizing" its "challenged conduct." Doc.149-1 at 33.

d.    Because §11705(a)(4) authorizes racial discrimination, the statute is either unconstitutional outright, *Anderson*, 375 U.S. at 404, or must survive strict scrutiny. It fails strict scrutiny for the same reasons that Kamehameha's policy does, *supra* ¶116, plus some more. When Congress passed the statute in 2010, it "made no findings." *Constitutionality of Race-Based Dep't of Educ. Programs*, 2025 WL 4055305, at *16; *see* 42 U.S.C. §11701 (findings from 1992 and not about education). Congress did not consider nar-

- 78 -

rower alternatives either, like increasing funding or requiring Kamehameha to satisfy strict scrutiny. The statute also contains no "'durational'" end point. *Harvard*, 600 U.S. at 228. And its non-durational "need" standard, 42 U.S.C. §11705(c)(4), at best "cannot be subjected to meaningful judicial review," *Harvard*, 600 U.S. at 214, and at worst is unconstitutionally vague.

## COUNT IV
### Kamehameha's Discrimination Is State Action
### (42 U.S.C. §1983; U.S. Const. amends. V & XIV)

135. Plaintiffs incorporate and restate all their prior allegations here.

136. Plaintiffs contend that any statutes purporting to authorize Kamehameha's racial discrimination are inapplicable or unconstitutional, and that Kamehameha's attempts to eliminate tuition is voluntary cessation that does not affect this case. But if the Court disagrees and credits any of these actions, then Plaintiffs alternatively claim that Kamehameha is a state actor. The Constitution's equal-protection principles would apply directly to Kamehameha, requiring it to satisfy strict scrutiny. Kamehameha fails that standard. *Supra* ¶116.

137. Discrimination by state actors "on the basis of ancestry" violates equal protection, just as it violates §1981. *Saint Francis*, 481 U.S. at 613 n.5; *accord Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 390 (1982) ("it would be incongruous to construe the principal object of their successor, §1981, in a manner markedly different from that of the Amendment itself").

138.    "As Judge Friendly has suggested, 'Racial discrimination is so peculiarly offensive and was so much the prime target of the Fourteenth Amendment that a lesser degree of involvement may constitute "state action" with respect to it than would be required in other contexts.'" *Fletcher v. R.I. Hosp. Tr. Nat. Bank*, 496 F.2d 927, 931 (1st Cir. 1974).

139.    If the Hawaii courts authorized Kamehameha's discrimination, *supra* ¶¶98-99, then state action is satisfied. *Pennsylvania*, 392 F.2d at 125. The state probate court acted with full awareness of Kamehameha's racially discriminatory admissions policy and used the State's authority with the intent to further that discrimination. *Supra* ¶99. This "authorization to discriminate" is "sufficient" to make Kamehameha's conduct "state action" in "violat[ion]" of "the Fourteenth Amendment." *Reitman*, 387 U.S. at 379 (citing *McCabe v. Atchison, T.&S.F.R. Co*, 235 U.S. 151 (1914), a suit against private railroads authorized by state law to discriminate); *accord Griffin v. Maryland*, 378 U.S. 130, 136-37 (1964).

140.    If Congress or the Hawaii legislature and governor authorized Kamehameha's discrimination, *supra* ¶103, ¶130, ¶134, then state action is satisfied. After Girard College successfully petitioned a court to change its will, the Pennsylvania legislature passed a law ratifying the court's actions. *Pennsylvania*, 392 F.2d at 128 (Van Dusen, J., concurring) (citing a 1959 state statute). Though the Third Circuit

found state action based on the state court's involvement, one judge explained that the state legislature's involvement was "[e]ven clearer state action." *Id.*

141.   Kamehameha is also a state actor by virtue of being "associated with the State in a manner which tends to suggest to the community that the institution's policy of racial discrimination is either practiced by or approved by public authority." *Pennsylvania v. Brown*, 270 F. Supp. 782, 788 (E.D. Pa. 1967). The "not insubstantial …connections" between Kamehameha and the "agencies" of Hawaii "afford further grounds for inferring a proscribed involvement in the discriminatory design" and "len[d] sustenance, actual or apparent, to a policy of racial discrimination." *Id.* at 790.

a.   Hawaii is "significantly" entangled with Kamehameha through the state courts' "assumed power of appointment and reappointment of the Trustees." *Pennsylvania*, 392 F.2d at 123. Under the princess's will, Kamehameha's trustees must be appointed by the Hawaii Supreme Court. *Pauahi's Will*. That court did so for more than a century; but after a widely publicized scandal in 1997, the justices now refuse to exercise this power. The state probate court stepped in and is now responsible for recruiting, vetting, and selecting the trustees. To help select them, the probate court appoints a screening committee who "must" be "familiar with and sensitive to (1) the history and role of the Trust Estate relative to the Hawaiian community and the commu-

nity at large, and (2) Pauahi's legacy and her vision for the future of Hawaiian children." Dkt.5549, *Bishop Estate*, Equity No. 2048 (Feb. 6, 2025), perma.cc/UM8S-M5L2. The court picks only trustees who are committed to Kamehameha's race-based admissions. *E.g.*, Gutierrez, *Three Kamehameha Schools Trustee Finalists Outline Challenges Ahead*, Hawaii News Now (Dec. 19, 2025), perma.cc/832P-DYK5.

b.      "[T]oday as from the inception of the school's operation," Kamehameha makes "regular reports" to the State. *Pennsylvania*, 270 F. Supp. at 790. The princess's will says the "trustees shall annually make a full and complete report of all receipts and expenditures, and of the condition of said schools to the … highest judicial officer" in Hawaii. *Pauahi's Will*. Kamehameha now sends regular reports to the state probate court. All these reports "continue to associate the State with the institution's discriminatory conduct." *Pennsylvania*, 270 F. Supp. at 790. In fact, Kamehameha's petition to eliminate tuition cited some of these "reports" as a reason why it was involving the court. *Master's Report* 12, 8 (quoting *Tuition Petition* ¶29).

c.      There is also "substantial evidence of collaboration between" Kamehameha and "various [Hawaii] public schools." *Pennsylvania*, 270 F. Supp. at 791. Teachers and principals at Hawaii's public schools "refe[r] potential applicants" to Kamehameha, thus giving "an institution which they

- 82 -

must have known engaged in racial discrimination" a "mutual respect and esteem." *Pennsylvania*, 270 F. Supp. at 791-92. In a resolution that "strongly supports and reaffirms the Kamehameha Schools' mission" and "its contributions to the Native Hawaiian community," Honolulu stressed the school's "extensive scholarship programs" and "community educational initiatives." *Resolution 25-280*, Honolulu City Council (adopted Oct. 1, 2025), perma.cc/ 92AJ-8PG2. A Hawaii state agency agreed that Kamehameha has "vast community partnerships and programs" and "invests heavily in public charter schools, early childhood education, teacher training, and community-based programs." *State Civil Rights Commission Voices Support for Kamehameha Schools Admissions Policy*, Hawaii Civil Rights Comm'n (Dec. 21, 2025), perma.cc/XUM3-AZS2. Among many other examples, *see Media Kit*, Kamehameha spends millions on scholarships for students at other schools, including public colleges in Hawaii, while restricting the scholarships to Native Hawaiians. And Kamehameha maintains "formalized … statewide partnerships" with the University of Hawaii, the State Board of Education, and other public institutions across the State to assist Native Hawaiians.

d.      Especially now that Kamehameha charges no "tuition," it is "unlike other 'private' schools." *Pennsylvania*, 270 F. Supp. at 791. It uniquely "performs a service to its students which would otherwise have to be per-

formed by the public school system." *Id.*; *accord* 42 U.S.C. §11705(c)(4) (Kamehameha "supplement[s] public efforts to provide educational programs" for "Native Hawaiians"); *Statement from Hawaiʻi House of Representatives Leadership in Support of Kamehameha Schools and the Education of Native Hawaiian Children*, Hawaii House Democrats (Oct. 21, 2025), perma.cc/AV3Z-CJDW ("Kamehameha Schools' enduring work … aligns closely with the State's efforts"). As Kamehameha puts it, the school "frees up millions in [state] funding for other keiki statewide." *Media Kit*.

e.      Kamehameha also "enjoys the substantial benefits of tax exemptions and other special concessions from public agencies." *Pennsylvania*, 270 F. Supp. at 790. Among other benefits, the federal government exempts Kamehameha from federal income tax. And Hawaii exempts Kamehameha from income taxes, property taxes, and excise taxes. Though not enough to create state action on their own, these benefits "are undeniably relevant in ascertaining whether the total State involvement is such as to afford to the practice of racial discrimination by a State-subsidized or supervised institution an aura of public approval and sanction." *Id.*

142.   "Although this is a lawsuit against a private party, not the State or one of its officials," Kamehameha is responsible for this state action and the resulting constitutional violation. *Adickes*, 398 U.S. at 152. Just as Girard College was "af-

- 84 -

flicted with State action," Kamehameha "may no longer deny admission to applicants simply because they are not [Native Hawaiian]." *Pennsylvania*, 270 F. Supp. at 792.

**WHEREFORE**, Plaintiffs ask this Court to enter judgment in their favor and to provide the following relief:

a. A declaratory judgment that Kamehameha's race-based admissions policy violates §1981.

b. A declaratory judgment that Kamehameha's race-based admissions policy is state action that violates the Constitution's equal-protection guarantees.

c. A permanent injunction prohibiting Kamehameha from knowing or considering applicants' race, including their Native Hawaiian ancestry, when making admissions decisions.

d. A declaratory judgment that Kamehameha must take all steps "necessary and proper" to desegregate "with all deliberate speed," *Brown v. Bd. of Educ.*, 349 U.S. 294, 301 (1955), including by increasing the number of students it can admit and serve.

e. A permanent injunction prohibiting Kamehameha from continuing any admissions policies or practices that were adopted with the purpose and effect of advantaging Native Hawaiians or disadvantaging non-Hawaiians.

f.  Any equitable relief needed to undo Kamehameha's past discrimination, including an order barring Kamehameha from applying its rules governing the timing of applications or the location of applicants and an order requiring Kamehameha to admit E.S. and other SFFA members.

g.  Compensatory and punitive damages to B.P., I.P., K.S., and E.S.

h.  Reasonable costs and expenses of this action, including attorneys' fees.

i.  All other relief that Plaintiffs are entitled to, including nominal damages of $1 for each lost opportunity to equally compete.

## DEMAND FOR JURY TRIAL

Per Rule 38(b), Plaintiffs demand a trial by jury on all issues so triable.

Dated: October 20, 2025
Amended: July 27, 2026

Thomas R. McCarthy*
Patrick Strawbridge*
J. Michael Connolly*
Cameron T. Norris*
R. Gabriel Anderson*
Ryan M. Proctor*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
patrick@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com
gabe@consovoymccarthy.com
ryan@consovoymccarthy.com

*pro hac vice

Respectfully submitted,

/s/ *Jesse D. Franklin-Murdock*
Jesse D. Franklin-Murdock (10778)
SWEIGART MURDOCK, LLP
500 Ala Moana Blvd., Ste. 7400
Honolulu, HI 96813
Tel: (415) 873-0123
Fax: (877) 890-0791
jesse@sm-llp.com

Adam K. Mortara*
LAWFAIR LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

*Counsel for Plaintiffs*

## VERIFICATION

I, Edward Blum, declare as follows:

1. I am the president of Students for Fair Admissions.

2. I have reviewed this complaint.

3. For the allegations within my personal knowledge, I believe them all to be true.

4. For the allegations not within my personal knowledge, I believe them all to be true based on my review of the cited policies and documents and based on SFFA's conversations with its members, including Family A and B, K.S. and E.S., and B.P. and I.P.

5. I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 26, 2026

_____
Edward Blum
President of SFFA