IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS; I.P., B.P., E.S., by and through her next of friend and mother, K.S.; and K.S.<br><br>Plaintiffs,<br><br>vs.<br><br>TRUSTEES OF THE ESTATE OF BERNICE PAUAHI BISHOP d/b/a KAMEHAMEHA SCHOOLS,<br><br>Defendant. | CIVIL NO. 1:25-cv-00450-MWJS-RT<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS; CERTIFICATE OF COMPLIANCE |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

INTRODUCTION ........ 1

BACKGROUND ........ 4

ARGUMENT ........ 11

I. PLAINTIFFS FAIL TO SATISFY ARTICLE III REQUIREMENTS ........ 11

A. The Court Should Dismiss The Case Under Rule 12(b)(1) Because SFFA Lacks Article III Standing ........ 11

B. The Individual Plaintiffs Also Lack Standing ........ 17

II. PLAINTIFFS' REQUEST FOR PROSPECTIVE RELIEF UNDER SECTION 1981 IS MOOT ........ 19

A. Plaintiffs' Acknowledgement That Kamehameha Has Eliminated Tuition Moots Their Request For Prospective Relief ........ 19

B. Plaintiffs' New Reliance On Other Alleged "Contracts" Does Not Save The Case From Mootness ........ 24

C. The Voluntary-Cessation Exception Does Not Apply To Judicially Adopted Permanent Change ........ 28

III. CONGRESS HAS PERMISSIBLY EXEMPTED KAMEHAMEHA'S PREFERENCE POLICY FROM SECTIONS 1981 AND 1983. ........ 30

A. Sections 1981 And 1983 Do Not Prohibit Kamehameha's Preference Policy. ........ 30

1. Section 11705(c)(4) Forecloses Plaintiffs' Statutory Claims. ........ 30

2. *Doe I* Forecloses Plaintiffs' Statutory Claims. ........ 32

3. Section 1981 Does Not Bar Contracts Benefiting Native Hawaiians. ........ 36

B. Congress Can Constitutionally Exempt Kamehameha's Preference Policy From Sections 1981 And 1983. ........ 37

1. *Doe I* Forecloses Plaintiffs' Constitutional Argument. ........ 37

2. The Exemption Is Constitutional. ........ 38

IV. PLAINTIFFS DO NOT ADEQUATELY PLEAD SECTION 1981 OR SECTION 1983 CAUSATION ........ 47

V. PLAINTIFFS DO NOT ADEQUATELY ALLEGE THAT KAMEHAMEHA IS A STATE ACTOR. .................................................. 48

A. Plaintiffs Do Not Adequately Allege That Kamehameha Meets The State-Policy Requirement ........................................................ 50

B. Plaintiffs Do Not Adequately Allege That Kamehameha Meets The State-Actor Requirement .......................................................... 51

VI. THE COURT SHOULD DISMISS PLAINTIFFS' FIFTH AND FOURTEENTH AMENDMENT CLAIMS.................................................. 54

CONCLUSION........................................................................................... 55

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akina v. Hawaii*,
141 F. Supp. 3d 1106 (D. Haw. 2015) ... 44

*Alaska Chapter, Associated Gen. Contractors of Am., Inc. v. Pierce*,
694 F.2d 1162 (9th Cir. 1982) ... 42

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013) ... 29

*Am. Fed'n of Gov't Emps., AFL-CIO v. United States*,
330 F.3d 513 (D.C. Cir. 2003) ... 41

*American Alliance for Equal Rights v. Fearless Fund Management, LLC*,
103 F.4th 765 (11th Cir. 2024) ... 22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ... 55

*Atonio v. Wards Cove Packing Co.*,
10 F.3d 1485 (9th Cir. 1993) ... 45

*Bachman v. St. Monica's Congregation*,
902 F.2d 1259 (7th Cir. 1990) ... 47

*Bank Markazi v. Peterson*,
578 U.S. 212 (2016) ... 45

*Bd. of Comm'rs of Creek Cnty. v. Seber*,
318 U.S. 705 (1943) ... 39

*Bolling v. Sharpe*,
347 U.S. 497 (1954) ... 38

*Bowen v. Energizer Holdings, Inc.*,
118 F.4th 1134 (9th Cir. 2024) ... 16

*Bradley v. T-Mobile US, Inc.*,
2020 WL 1233924 (N.D. Cal. Mar. 13, 2020) ... 13

*Bronze Shields, Inc. v. New Jersey Dep't of Civil Serv.*,
667 F.2d 1074 (3d Cir. 1981) .......... 15

*Brown v. J. Kaz, Inc.*,
581 F.3d 175 (3d Cir. 2009) .......... 47

*Bucklew v. Precythe*,
587 U.S. 119 (2019) .......... 37

*Californians for Equal Rights Foundation v. Her*,
2025 WL 2324110 (E.D. Cal. Aug. 12, 2025) .......... 15

*Carney v. Adams*,
592 U.S. 53 (2020) .......... 11, 14

*Carroll v. Nakatani*,
342 F.3d 934 (9th Cir. 2003) .......... 13, 14

*Caviness v. Horizon Cmty. Learning Ctr., Inc.*,
590 F.3d 806 (9th Cir. 2010) .......... 51

*CBOCS W., Inc. v. Humphries*,
553 U.S. 442 (2008) .......... 47

*Chaudhry v. Aragon*,
68 F.4th 1161 (9th Cir. 2023) .......... 48

*Children's Health Def. v. Meta Platforms, Inc.*,
112 F.4th 742 (9th Cir. 2024) .......... 48, 49, 50, 51

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 19

*Collins v. Womancare*,
878 F.2d 1145 (9th Cir. 1989) .......... 49

*Comcast Corp. v. National Association of African American-Owned Media*,
589 U.S. 327 (2020) .......... 47

*Core Optical Techs., LLC v. Nokia Corp.*,
2025 WL 3525943 (C.D. Cal. Sept. 12, 2025) .......... 11

*Dante Valve Co. v. Republic Brass Sales, Inc.*,
2019 WL 1406583 (S.D. Cal. Mar. 28, 2019) .................................................. 28

*Davis v. Guam*,
932 F.3d 822 (9th Cir. 2019) ........................................................................ 43

*Del. Tribal Bus. Comm. v. Weeks*,
430 U.S. 73 (1977) ........................................................................... 40, 41, 44

*Dennis v. Sparks*,
449 U.S. 24 (1980) ......................................................................................... 53

*Doe v. Kamehameha Schools* (*Doe I*),
470 F.3d 827 (9th Cir. 2006) (en banc) ...........1, 2, 6-9, 20, 31-38, 40, 42, 43, 46

*Doe v. Wake Forest Univ.*,
671 F. Supp. 3d 624 (M.D.N.C. 2023) ........................................................... 21

*Domino's Pizza, Inc. v. McDonald*,
546 U.S. 470 (2006) ....................................................................................... 17

*EEOC v. Peabody W. Coal Co.*,
773 F.3d 977 (9th Cir. 2014) .......................................................................... 41

*Ellison v. Am. Bd. of Orthopaedic Surgery*,
11 F.4th 200 (3d Cir. 2021) ..................................................................... 13, 14

*Est. of Tahilan v. Friendly Care Home Health Servs., Inc.*,
731 F. Supp. 2d 1000 (D. Haw. 2010).............................................................. 20

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ....................................................................................... 12

*Food Mktg. Inst. v. Argus Leader Media*,
588 U.S. 427 (2019) ....................................................................................... 37

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ....................................................................................... 12

*Garrett v. Tandy Corp.*,
295 F.3d 94 (1st Cir. 2002)............................................................................ 20

*Gilley v. Stabin*,
2024 WL 1007480 (9th Cir. Mar. 8, 2024) ............................................ 28, 29

*Grupo Dataflux v. Atlas Global Grp., L.P.*,
541 U.S. 567 (2004) ............................................................................ 12

*Haaland v. Brackeen*,
599 U.S. 255 (2023) ....................................................................... 39, 43

*Higginbottom ex rel. Davis v. Keithley*,
103 F. Supp. 2d 1075 (S.D. Ind. 1999)................................................ 21

*Jackson v. Metropolitan Edison Co.*,
419 U.S. 345 (1974) ............................................................................ 54

*Judie v. Hamilton*,
872 F.2d 919 (9th Cir. 1989) ............................................................... 20

*Kahawaiolaa v. Norton*,
386 F.3d 1271 (9th Cir. 2004) ............................................................. 42

*Korab v. Fink*,
797 F.3d 572 (9th Cir. 2014) ............................................................... 39

*LA All. for Hum. Rts. v. Cnty. of Los Angeles*,
14 F.4th 947 (9th Cir. 2021) ........................................................... 11, 12

*Lair v. Bullock*,
697 F.3d 1200 (9th Cir. 2012) ............................................................. 34

*Lee v. City of Los Angeles*,
250 F.3d 668 (9th Cir. 2001) ............................................................... 20

*Lierboe v. State Farm Mut. Auto. Ins. Co.*,
350 F.3d 1018 (9th Cir. 2003) ............................................................. 11

*Loffman v. California Dep't of Educ.*,
119 F.4th 1147 (9th Cir. 2024) ............................................................ 13

*Lonneker Farms, Inc. v. Klobucher*,
804 F.2d 1096 (9th Cir. 1986) ............................................................. 53

*T.L. ex rel. Lowry v. Sherwood Charter Sch.*,
2014 WL 897123 (D. Or. Mar. 6, 2014) .......... 21

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 11, 12

*Manhattan Cmty. Access Corp. v. Halleck*,
587 U.S. 802 (2019) .......... 51

*Mathews v. Diaz*,
426 U.S. 67 (1976) .......... 38-39

*McClanahan v. Arizona State Tax Comm'n*,
411 U.S. 164 (1973) .......... 40

*McDonald v. Santa Fe Trail Transp. Co.*,
427 U.S. 273 (1976) .......... 36, 46

*Miller v. Gammie*,
335 F.3d 889 (9th Cir. 2003) .......... 34

*Moore v. Harper*,
600 U.S. 1 (2023) .......... 43

*Mortimer v. Grodsky*,
2020 WL 6729118 (S.D.N.Y. Nov. 13, 2020) .......... 53

*Morton v. Mancari*,
417 U.S. 535 (1974) .......... 40, 41

*Mullin v. Doe*,
146 S. Ct. 2121 (2026) .......... 39

*N.L.R.B. v. Noel Canning*,
573 U.S. 513 (2014) .......... 43

*Natke v. N. Branch Area Sch. Dist.*,
2010 WL 522798 (E.D. Mich. Feb. 8, 2010) .......... 21

*Nelson v. Arizona Dep't of Econ. Sec.*,
2022 WL 4354369 (9th Cir. Sept. 20, 2022) .......... 27

*Northstar Fin. Advisors Inc. v. Schwab Invs.*,
779 F.3d 1036 (9th Cir. 2015) .......... 12

*O'Handley v. Weber*,
62 F.4th 1145 (9th Cir. 2023) .......... 51

*Ohno v. Yuko Yasuma*,
723 F.3d 984 (9th Cir. 2013) .......... 54

*Pasadena Republican Club v. W. Just. Ctr.*,
985 F.3d 1161 (9th Cir. 2021) .......... 52

*Pennsylvania v. Board of Directors of City Trusts of City of Philadelphia*,
353 U.S. 230 (1957) .......... 50

*Pennsylvania v. Brown*,
270 F. Supp. 782 (E.D. Pa. 1967) .......... 49, 50, 52

*Ramah Navajo School Board, Inc. v. Bureau of Revenue of New Mexico*,
458 U.S. 832 (1982) .......... 44

*Ramos v. Louisiana*,
590 U.S. 83 (2020) .......... 34

*Reitman v. Mulkey*,
387 U.S. 369 (1967) .......... 46

*Rendell-Baker v. Kohn*,
457 U.S. 830 (1982) .......... 51

*Rice v. Cayetano*,
528 U.S. 495 (2000) .......... 43

*Roberts v. Progressive Preferred Insurance Co.*,
167 F.4th 955 (6th Cir. 2026) .......... 13

*U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*,
971 F.2d 244 (9th Cir. 1992) .......... 30

*Rockwell Int'l Corp. v. United States*,
549 U.S. 457 (2007) .......... 12

*Rosebrock v. Mathis*,
745 F.3d 963 (9th Cir. 2014) .......... 19

*Runyon v. McCrary*,
427 U.S. 160 (1976) .......... 1

*SFFA & Do No Harm v. David Geffen Sch. of Med. at UCLA*,
812 F. Supp. 3d 1035 (C.D. Cal. 2025) .......... 13

*Students for Fair Admissions v. Harvard*,
600 U.S. 181 (2023) .......... 10, 35

*Sunderland v. United States*,
266 U.S. 226 (1924) .......... 40

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 11, 12

*United States v. Antelope*,
430 U.S. 641 (1977) .......... 40, 41

*United States v. Decker*,
600 F.2d 733 (9th Cir. 1979) .......... 40

*United States v. John*,
437 U.S. 634 (1978) .......... 40

*United States v. Lara*,
541 U.S. 193 (2004) .......... 39

*United States v. Vaello Madero*,
596 U.S. 159 (2022) .......... 38

*Vinion v. Amgen Inc.*,
272 F. App'x 582 (9th Cir. 2008) .......... 19

*Warren Trading Post Co. v. Arizona Tax Comm'n*,
380 U.S. 685 (1965) .......... 40

*Warth v. Seldin*,
422 U.S. 490 (1975) .......... 17

*Wartluft v. Milton Hershey Sch. and Sch. Trust*,
2020 WL 1285332 (M.D. Pa. Mar. 18, 2020) ........................................... 21, 22

*Washington v. Confederated Bands and Tribes of Yakima Indian Nation*,
439 U.S. 463 (1979) ........................................................................................ 41

*Weaver v. Cary Acad.*,
2021 WL 4428202 (E.D.N.C. Sept. 27, 2021) ................................................ 25

*Welton v. Gallagher*,
2 Haw. App. 242, 630 P.2d 1077 (1981)......................................................... 27

*Williams v. Babbitt*,
115 F.3d 657 (9th Cir. 1997) .......................................................................... 44

**<u>Statutes, Rules, and Regulations</u>**

Act 002, S.B. No. 3123, Thirty-Third Legislature of the State of
Hawaiʻi (Mar. 27, 2026)......................................................... 20, 21, 22, 23, 27

Civil Rights Act of 1991 Section 402(b) ........................................................... 45

Fed. R. Civ. P. 12(b)(1) .................................................................... 3, 11, 13, 19

Fed. R. Civ. P. 12(b)(6) ................................................................................ 3, 30

Fed. R. Civ. P. 15(d)......................................................................................... 12

Fed. R. Evid. 201(b)-(d) ............................................................................. 19, 20

Pub. L. No. 104-317, tit. III, § 309(c),
110 Stat. 3847 (Oct. 19, 1996)........................................................................ 34

S. Joint. Res. No. 19, Pub. L. No. 103-150,
107 Stat. 1510 (Nov. 23, 1993) ................................................................... 4, 5

14 Stat. 27 ......................................................................................................... 46

16 Stat. 140 ....................................................................................................... 46

20 U.S.C. § 7512...................................................................... 4, 5, 6, 7, 9, 33, 42

20 U.S.C. § 7517(2)(B)....................................................................................... 7

30 Stat. 750, 751 (July 7, 1898) .......... 4

42 U.S.C. § 1981 .......... 1, 2, 3, 8, 9, 10, 19, 20, 23, 26, 28, 30-38, 47, 48

42 U.S.C. § 1983 .......... 2, 11, 30, 31, 34, 37, 38, 47, 48, 51

42 U.S.C. § 2000e-1 .......... 46

42 U.S.C. § 2000e-2 .......... 46

42 U.S.C. § 3603 .......... 46

42 U.S.C. § 3607 .......... 46

42 U.S.C. § 11701 .......... 33, 34

42 U.S.C. § 11705(c)(4) .......... 1, 2, 9, 10, 30, 31, 32, 36, 43, 44, 45, 46

43 C.F.R. § 50.1 (2025) .......... 7, 42

81 Fed. Reg. 71,278 (Oct. 14, 2016) .......... 42

118 Stat. 445 (Jan. 23, 2004) .......... 7

**<u>Other Authorities</u>**

Moʻolelo Ea O Nā Hawaiʻi: History of Native Hawaiian Governance in Hawaiʻi (Office of Hawaiian Affairs Dec. 21, 2015) .......... 5, 6

Assistant Secretary of the Interior for Indian Affairs Bryan Newland, Federal Indian Boarding School Initiative Investigative Report Vol II (July 2024). .......... 42

38 Am. Jur. 2d Gifts § 68 .......... 21

38A C.J.S. Gifts § 40 .......... 21

## INTRODUCTION

The complaint asks this Court to defy controlling precedent and to upend Kamehameha Schools' longstanding admissions preference for applicants who have at least one Native Hawaiian ancestor. In *Doe v. Kamehameha Schools* (*Doe I*), the en banc Ninth Circuit held that this preference does not violate 42 U.S.C. § 1981, which prohibits racial discrimination in contracting. 470 F.3d 827, 849 (9th Cir. 2006); *see Runyon v. McCrary*, 427 U.S. 160, 173 (1976). The Ninth Circuit's conclusion, including its interpretation of 42 U.S.C. § 1981 in the context of a century of federal laws protecting the interests of Native Hawaiians, is as correct today as it was in 2006. Indeed, it is even more clearly correct now: Four years after *Doe I*, Congress enacted a statute that expressly exempts Kamehameha from Section 1981, making unmistakably clear that Section 1981 does not bar Kamehameha's preference policy. *See* 42 U.S.C. § 11705(c)(4).

After having failed to cite that statute in any of the first four iterations of the complaint, Plaintiffs have now lodged a *Fourth* Amended Complaint ("4AC") that barely disputes that the unambiguous language of Section 11705(c)(4) bars their claims and instead attempts to attack the Section's constitutionality. Those arguments lack merit. The plain text of Section 11705(c)(4) preserves Kamehameha's preference policy. And under decades of precedent, Congress possesses the constitutional authority to exempt a private educational institution

serving Native Hawaiian children from federal civil liability in light of the United States' special trust relationship with Native Hawaiians. The historical record reflects an unbroken congressional practice, from long before Hawai‘i joined the Union to the present day, of legislating for the benefit of Native Hawaiians, including in the field of education. The *Doe I* majority expressly relied on that special trust relationship, *see* 470 F.3d at 847-49, and that reliance leaves no doubt that the preference remains lawful, especially given that even the *dissenting* judges in *Doe I* agreed that Congress possesses the constitutional power to exempt the policy from Section 1981, *see id.* at 879 (Bybee, J., dissenting).

Having premised their entire lawsuit on a statutory oversight, Plaintiffs now pivot to an extreme "alternative" argument that Kamehameha—a private school that receives no government funding—is somehow a *state actor* liable under 42 U.S.C. § 1983. That is so, Plaintiffs say, because Kamehameha's trust is overseen by a probate court, public-school teachers sometimes recommend applicants to Kamehameha, and Kamehameha engages in charitable work in the community. That argument has no basis, and it wouldn't matter if it did: Section 11705(c)(4) equally bars Plaintiffs' new claims under Section 1983.

At any rate, the Court should not even reach the merits because the claims all fail at the threshold for lack of Article III standing. Supreme Court and Ninth Circuit precedent demands that the parties to the original complaint satisfy Article III. Here,

the original complaint was filed only by the activist group Students for Fair Admissions ("SFFA"), relying on allegations about two anonymous member-families. However, the Complaint failed to adequately plead that those families' students were ready and able to apply to Kamehameha or that they were sufficiently competitive applicants that their purported injury was traceable to the preference policy they challenge.

Finally, even if the Court has subject-matter jurisdiction, the Court should dismiss the Section 1981 claims for prospective relief as moot because Kamehameha has eliminated tuition. Through a decision approved by the Hawai‘i state probate court, Kamehameha now provides its private preschool, primary, and secondary education to current or future students solely as a conditional gift. That extinguishes any basis to assert the existence of a contract on which a Section 1981 claim depends, as settled Hawai‘i common law and a recent Hawai‘i statute confirm. Plaintiffs' attempt to keep the case alive by alleging other racially discriminatory contracts is legally insufficient for multiple reasons and relies largely on threadbare allegations about contracts that do not in fact exist.

The Court should accordingly dismiss the complaint in its entirety under either Rule 12(b)(1) or Rule 12(b)(6).

## BACKGROUND

1. Native Hawaiians are the aboriginal, indigenous people who exercised sovereignty over the Hawaiian Islands for nearly a millennium before western contact and the formation of the United States. *See* 20 U.S.C. § 7512(1)-(2). For over 700 years before the arrival of Europeans, Native Hawaiians governed themselves independently through a system of ruling ali‘i, which became internationally recognized as a sovereign government. *See id.* § 7512(3)-(4). The most prominent ali‘i was King Kamehameha I, who in 1810 united the island chiefdoms into the Kingdom of Hawai‘i. *See id.* In 1893, however, "the sovereign, independent, internationally recognized, and indigenous government of Hawaii, the Kingdom of Hawaii, was overthrown by a small group of non-Hawaiians, including United States citizens, who were assisted in their efforts by the United States Minister, a United States naval representative, and armed naval forces of the United States." *Id.* § 7512(5). Five years later, Congress unilaterally annexed the independent Hawaiian nation without the consent of the Hawaiian people. Joint Res., 30 Stat. 750, 751 (July 7, 1898); *see* S. Joint Res. No. 19, Pub. L. No. 103-150, 107 Stat. 1510, 1512 (Nov. 23, 1993) ("Apology Resolution"). Hawai‘i became a state in 1959.

Alongside the overthrow of the independent Hawaiian nation were "economic and social changes" brought about by Westernization and Americanization that were

"devastating to the population and to the health and well-being of the Hawaiian people." Apology Resolution, 107 Stat. at 1512. By 1919, due to disease and other factors, the Native Hawaiian population had plummeted by more than 97%. 20 U.S.C. § 7512(7). Shifts in education policy under the new government, particularly in the highly centralized public-school system serving most Native Hawaiian children, decimated Hawaiian culture, with students facing harsh punishment for speaking Hawaiian in school. Moʻolelo Ea O Nā Hawaiʻi: History of Native Hawaiian Governance in Hawaiʻi at 543-44 (Office of Hawaiian Affairs Dec. 21, 2015).[1]

To fight these developments, Native Hawaiians have long turned to aliʻi trusts and other traditional Hawaiian institutions, consistent with Native Hawaiian custom and tradition. Moʻolelo Ea O Nā Hawaiʻi at 828. Historically, aliʻi were stewards of lands and resources held in trust for all, and several prominent aliʻi ultimately dedicated their royal lands and estates to address specific needs of the Native Hawaiian people. *Id.* at 853-54. One such aliʻi was Princess Bernice Pauahi Bishop ("Pauahi"), the great-granddaughter of King Kamehameha I and the last heir to the Kamehameha family lands. Consistent with her Christian faith and the traditional responsibilities of aliʻi to support the well-being of their people, Pauahi created a charitable testamentary trust in 1883 under Hawaiian kingdom law that devoted

---

[1] http://www.regulations.gov/document?D=DOI-2015-0005-4290.

more than 375,000 acres of her private landholdings to establish Kamehameha Schools, which opened in 1887, almost six years before the Kingdom's overthrow. *Id*. at 853-55, 860.

Following Pauahi's directive, the trustees of Kamehameha have prioritized the education of Native Hawaiians through instruction in Native Hawaiian culture, language, leadership, and self-governance. Moʻolelo Ea O Nā Hawaiʻi at 867; *see Doe I*, 470 F.3d at 831-32.

2. From annexation to the present, the United States has consistently engaged with Native Hawaiians as a distinct indigenous community within the framework of federal law, alongside American Indians and Alaska Natives. Congress has enacted over 150 laws that establish the special legal and political trust relationship between the United States and Native Hawaiians. *See Doe I*, 470 F.3d at 850 (Fletcher, J., concurring). Those laws include seminal legislation designating public lands for homesteading by Native Hawaiians, affirming the responsibility to administer public trust assets to improve the conditions of Native Hawaiians, establishing Native Hawaiian healthcare systems, and providing support for Native Hawaiian educational programs. *See id.* at 847-49. In so doing, "Congress affirmed the special relationship between the United States and the Native Hawaiians" as trust-based, 20 U.S.C. § 7512(8), and confirmed that Native Hawaiians possess a status under federal law that is "comparable to that of American Indians and Alaska Natives," *id.*

§ 7512(12)(A)-(B), (D)-(E). The Executive Branch also recognizes this unique trust relationship through the Interior Department's Office of Native Hawaiian Relations and administrative procedures to reestablish a formal government-to-government relationship with Native Hawaiians. 118 Stat. 445 (Jan. 23, 2004); 43 C.F.R. § 50.1 (2025).

Within the context of that longstanding trust relationship, the United States has steadfastly supported Pauahi's private philanthropic investment in the education of Native Hawaiian children, "affirm[ing] specifically the mission of Kamehameha" through legislation. *Doe I*, 470 F.3d at 848. For example, Congress has "approv[ed] by name the Schools' continued research and assessment activities." *Id*. (emphasis omitted).

Kamehameha has, in turn, continued to fulfill Pauahi's wishes to educate the descendants of indigenous Hawaiians, instill Christian and Hawaiian values, and prepare its graduates as ʻōiwi (native) leaders to pave the path for the lāhui (nation). As part of that mission, Kamehameha applies an admissions policy that gives preference to otherwise qualified applicants who can verify that they descend from the sovereign Hawaiian nation before 1778, a criterion identical to the federal definition of "Native Hawaiian," 20 U.S.C. § 7517(2)(B).

Kamehameha's current admissions process has two phases. In the first phase, after evaluating each applicant's qualifications such as grades and test scores,

Kamehameha determines whether the "applicant could be offered admission based upon the order of each applicant's ranked composite score and [the] number of available seats," without regard to Native Hawaiian ancestry. ECF 103-2 ¶5. In the second phase, the preference is applied only to the subset of applicants otherwise deemed qualified for admission. *Id.* In the most recent years, the number of qualified applicants with Native Hawaiian ancestry has exceeded the number of seats available in each class.

Although ancestry plays a significant role in the second phase of the admissions process, race does not. For example, an applicant who identifies as white but has a distant Native Hawaiian ancestor would be entitled to the same preference as an applicant who has 100% Native Hawaiian ancestry. As a result, students from "[m]ore than 60 different racial and ethnic groups" have attended Kamehameha. *Doe I*, 470 F.3d at 832.

3. In the 2000s, an anonymous plaintiff challenged Kamehameha's admissions policy under 42 U.S.C. § 1981, a statute enacted in the wake of the Civil War that guarantees "all persons within the jurisdiction of the United States . . . the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. The Ninth Circuit, sitting en banc, held that the policy does not violate Section 1981 (assuming *arguendo* it involves a racial classification). *Doe I*, 470 F.3d at 836 n.9, 849. The en banc court rested that

holding on the alternative grounds that the preference is a valid affirmative-action program, *id.* at 836-48, and that Congress, in light of other federal statutes relating to Native Hawaiian education and Kamehameha specifically, had not intended to bar the preference when it reenacted Section 1981 in 1991, *id.* at 847-49.

Four years later, Congress expressly exempted Kamehameha's preference policy from Section 1981 in 42 U.S.C. § 11705(c)(4). That statute provides:

> In order to enable privately funded organizations to continue to supplement public efforts to provide educational programs designed to improve the health, capability, and well-being of Native Hawaiians and to continue to provide health services to Native Hawaiians, notwithstanding any other provision of Federal or State law, it shall be lawful for the private educational organization identified in section 7512(16) of title 20 (as such section was in effect on the day before December 10, 2015) to continue to offer its educational programs and services to Native Hawaiians (as defined in section 7517 of title 20) first and to others only after the need for such programs and services by Native Hawaiians has been met.

42 U.S.C. § 11705(c)(4). The identified "private educational organization" is "Kamehameha Schools." 20 U.S.C. § 7512(16) (effective through Dec. 9, 2015).

4. Last October, SFFA filed a complaint raising the same claim that the Ninth Circuit rejected in *Doe I* and alleging associational standing on behalf of its members. Compl., ECF 1 ¶9. The original complaint identified only anonymous "Families A and B" as affected SFFA members. ¶62. Neither family has ever sought to have a child admitted to Kamehameha or taken any preparatory steps towards applying. ¶¶62-73.

That complaint sought relief only under Section 1981. Although SFFA pleaded three counts, they were each just extended legal arguments in support of a single Section 1981 claim. ¶¶86-107. SFFA acknowledged *Doe I*, but it asserted that the first holding in *Doe I* was "abrogated" by *Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023), and undermined by certain factual developments, ¶90, and that the second holding yielded an unconstitutional construction of Section 1981, ¶¶100-107.

SFFA has since amended the complaint four times. Earlier amendments added co-plaintiffs from two families: (i) I.P., a student who completed her senior year of high school and who was rejected when she applied to Kamehameha for her sophomore year, and her mother, B.P.; and (ii) E.S., a current junior who was rejected when she applied to Kamehameha for her seventh and ninth grade years, and her mother, K.S. *See* 4AC ¶¶14-17, 68-89.

Kamehameha moved to dismiss the Third Amended Complaint. It explained that Plaintiffs had overlooked Section 11705(c)(4) and that Kamehameha had eliminated tuition, mooting the claims for prospective relief. Plaintiffs then filed yet another amended complaint adding entirely new claims and legal theories. Plaintiffs now assert that Section 11705(c)(4) is unconstitutional, 4AC ¶134; that Kamehameha enters into other contracts with students through things like school rules, sports, and vending machines, ¶104; and that Kamehameha is a "state actor"

under the Fifth and Fourteenth Amendments and 42 U.S.C. § 1983, which provides a cause of action against a "person who, under color … of any State" deprives others "of any rights, privileges, or immunities secured by the [federal] Constitution and laws," ¶136. As relief, Plaintiffs seek declaratory and injunctive relief as well as damages. 4AC at 85-86.

## ARGUMENT

## I. PLAINTIFFS FAIL TO SATISFY ARTICLE III REQUIREMENTS

### A. The Court Should Dismiss The Case Under Rule 12(b)(1) Because SFFA Lacks Article III Standing

To establish a constitutional case or controversy, a plaintiff must show "(i) that he suffered an injury in fact . . . caused by the defendant" that "would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Whether plaintiffs meet those standing requirements depends on the plaintiff in the original complaint, not later-added individual plaintiffs, because plaintiffs "bear[] the burden of establishing standing ***as of the time [they] brought [a] lawsuit*** and maintaining it thereafter." *Carney v. Adams*, 592 U.S. 53, 59 (2020) (emphasis added). Subsequently added plaintiffs or associational members thus "do[] not factor into the standing calculus." *LA All. for Hum. Rts. v. Cnty. of Los Angeles*, 14 F.4th 947, 960 & n.9 (9th Cir. 2021); *see Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1023 (9th Cir. 2003); *Core Optical Techs., LLC v. Nokia Corp.*, 2025 WL 3525943, at *16 (C.D. Cal. Sept. 12, 2025); *see also Lujan v. Defenders of*

*Wildlife*, 504 U.S. 555, 569 n.4 (1992) (retroactively named defendants insufficient for redressability).[2]

SFFA cannot meet Article III's injury-in-fact, traceability, or redressability requirements. As an initial matter, SFFA does not allege that it has suffered, or will suffer, any injury itself. Under the original understanding of Article III, that defeats its standing. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 399-400 (2024) (Thomas, J., concurring).

That said, existing precedent permits an organizational plaintiff to establish associational standing when the plaintiff's "members would otherwise have standing to sue in their own right." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). But SFFA cannot meet that standard either because Families A and B face no imminent injury-in-fact, and, even if they did, that injury would not be "likely caused" by Kamehameha's admissions policy or redressable by the Court. *TransUnion*, 594 U.S. at 423. And because the original plaintiff, SFFA,

[2] Plaintiffs have resisted this rule before, citing *Rockwell Int'l Corp. v. United States*, 549 U.S. 457 (2007), and *Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036 (9th Cir. 2015). *See* ECF 112 at 4 & n.1. Neither helps them. *Rockwell* looked to amended allegations to defeat jurisdiction, reasoning that a plaintiff should not be able to "plead a trivial theory" at the outset and then "later amend the complaint" free of jurisdictional scrutiny—much like what Plaintiffs attempt with their five complaints. 549 U.S. at 473. And *Northstar* permitted a Rule 15(d) supplemental pleading resting on a claim an injured party held at filing, not the post-filing recruitment of new members. The Ninth Circuit reaffirmed the original-complaint rule after both decisions. *LA All. for Hum. Rts.*, 14 F.4th at 960 & n.9; *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 570-71 (2004).

does not have standing, this Court lacks subject-matter jurisdiction and should dismiss this case under Rule 12(b)(1).

*First*, SFFA's members face no imminent injury-in-fact. To plead an injury-in-fact and causation in the school-admissions context, plaintiffs must plausibly allege that they are "able and ready" to be admitted. *Loffman v. California Dep't of Educ.*, 119 F.4th 1147, 1159-60 (9th Cir. 2024) (citation omitted). "[T]o be 'able' means qualified and to be 'ready' means seeking … [and being] genuinely interested in" admission. *Bradley v. T-Mobile US, Inc.*, 2020 WL 1233924, at *10 (N.D. Cal. Mar. 13, 2020). The able-and-ready standard requires plaintiffs to allege specific facts such as "prior . . . applications," "efforts to determine likely openings," or "other preparations" for attending. *Loffman*, 119 F.4th at 1160 (citation omitted); *see SFFA & Do No Harm v. David Geffen Sch. of Med. at UCLA*, 812 F. Supp. 3d 1035, 1041-42 (C.D. Cal. 2025); *see also Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 208-09 (3d Cir. 2021). The mere "[s]ubmission of a symbolic, incomplete application demonstrates neither readiness nor ability to compete." *Carroll v. Nakatani*, 342 F.3d 934, 942 (9th Cir. 2003); *see Roberts v. Progressive Preferred Insurance Co.*, 167 F.4th 955, 964 (6th Cir. 2026) (plaintiff who "closed the grant application without submitting it" lacked standing).

In its original complaint, SFFA grounded its standing on two anonymous member families, Families A and B. Compl. ¶¶66, 72; 4AC ¶65. While Plaintiffs'

latest complaint has attempted to bolster the allegations about Families A and B (Compl. ¶¶62-73; 4AC ¶¶52-64), it still does not establish that the students in those families are able and ready to attend Kamehameha. Families A and B could have taken simple steps if they were interested in attending, including: (i) completing and submitting an application questionnaire, Compl. ¶22; 4AC ¶42; (ii) taking an admissions test, Compl. ¶22; 4AC ¶41; and (iii) attending an interview, Compl. ¶22; 4AC ¶41. Yet SFFA admits that Family A did nothing more than "review[] Kamehameha's application and determine[] how they would answer each question," Compl. ¶66; 4AC ¶55, and that Family B simply "filled out the answers to each question" of the admissions questionnaire without actually submitting anything, 4AC ¶62. That is not enough, especially given that even "***[s]ubmission***"—let alone mere contemplation—"of a symbolic, incomplete application demonstrates neither readiness nor ability to compete." *Carroll*, 342 F.3d at 942 (emphasis added).

SFFA seems to allege that Families A and B failed to take any real steps toward applying because they deemed submitting an application to be futile. Compl. ¶66; 4AC ¶¶55, 62. But "[a plaintiff] is not able and ready to apply . . . merely because it might be futile to actually do so." *Ellison*, 11 F.4th at 208; *see also Carney*, 592 U.S. at 63. Even if futility might excuse the failure to submit an application in some cases, it does not excuse the omission of specific allegations showing a genuine interest in attending.

*Second*, it is not likely that the families' alleged injuries were caused by the preference policy because the complaint does not contain plausible allegations that the students in Families A and B were sufficiently competitive to be admitted to Kamehameha.[3] Plaintiffs challenging a program as racially discriminatory cannot satisfy the redressability component of standing if they were not otherwise "actually eligible." *Californians for Equal Rights Foundation v. Her*, 2025 WL 2324110, at *10 (E.D. Cal. Aug. 12, 2025). It follows that plaintiffs cannot challenge an allegedly discriminatory criterion applied only at a final stage in the application process when they have not plausibly alleged that they would likely make it beyond the screening stage. *Bronze Shields, Inc. v. New Jersey Dep't of Civil Serv.*, 667 F.2d 1074, 1077, 1080 n.12 (3d Cir. 1981).

Kamehameha has submitted a sworn declaration from its admissions director explaining that Kamehameha "evaluates each applicant based on their grades, teacher recommendations, testing, interview, and application questionnaire, and assigns them a composite score" that "does not consider whether the applicant is Native Hawaiian." ECF 149-2, ¶5. Rather, "[a]ncestry status is only handed over to Admissions and the preference policy potentially applied as the ***final*** step of the

---

[3] That defect also further demonstrates the insufficiency of the allegations that they were genuinely interested in attending Kamehameha—few would go through the "time" and "effort" (4AC ¶¶55, 62) to submit an application with no realistic prospect of admission.

process—after Kamehameha Schools decides an applicant could be invited based on their composite score and the number of available seats." Decl. of Heather KK Park ¶6 (August 31, 2026) ("Park Decl.").

That is fatal to SFFA's standing because the complaint contains no concrete allegations that the students in Families A and B were actually competitive for admission, so they cannot show that they likely would have been subjected to any preference. *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1142 n.6 (9th Cir. 2024) (permitting "[a] factual attack on jurisdiction" that "'contests the truth of the plaintiff's factual allegations'" through declarations and other evidence) (citation omitted).

The complaint acknowledges that Kamehameha's admissions process is "more competitive than ever." 4AC ¶36. And while Plaintiffs have added allegations about the grades and achievements of the students in Families A and B, 4AC ¶¶56, 63, the complaint contains no allegations whatsoever that those accomplishments rendered the students competitive for admission. That contrasts with the allegations that SFFA has marshaled in other litigation. *See, e.g.*, Compl. ¶23, *SFFA v. Harvard*, No. 1:14-cv-14176 (Dkt. 1).

*Finally*, SFFA's request for "nominal damages of $1 for each lost opportunity to equally compete" by an SFFA member (4AC at 86) does not solve SFFA's lack of injury because damages claims are incompatible with associational standing.

*Warth v. Seldin*, 422 U.S. 490, 515-16 (1975); *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470 (2006) (denying § 1981 relief to shareholder of corporation that was allegedly discriminated against because he was not seeking to enter any personal agreement).

**B. The Individual Plaintiffs Also Lack Standing**

Even if the complaint's allegations about later-added plaintiffs I.P., B.P., K.S., and E.S. were relevant to the jurisdictional question, the individual plaintiffs also lack standing. With respect to damages, Kamehameha has introduced a sworn declaration attesting that when I.P. and E.S. previously applied, neither reached the stage in the admissions process where the preference would have been considered—meaning the policy did not cause any alleged injury. ECF 149-2 ¶¶7-9. As explained, that means that the individual plaintiffs cannot establish Article III traceability. *See* pp. 15-16, *supra*.

The complaint's attempts to overcome Kamehameha's evidence all fail. To start, Plaintiffs' allegations about I.P.'s and E.S.'s grades and extracurriculars (4AC ¶¶70, 84) cannot override Kamehameha's declaration demonstrating that neither student even reached the stage in Kamehameha's process at which ancestry might be considered. Similarly, Plaintiffs' allegations insinuating that consideration of ancestry might permeate earlier stages of the admissions process are contradicted by the sworn declaration. For instance, Plaintiffs allege that during admissions testing,

E.S. "feared she would be exposed and judged for not being Native Hawaiian" (4AC ¶84), but this alleged concern does not make it so. Because applicants to Kamehameha Schools come from a range of backgrounds, there is no way to visually identify Hawaiians and non-Native Hawaiians based on their appearance. Park Decl. ¶7. And even if both applicants *voluntarily* disclosed their non-Native Hawaiian ancestry (4AC ¶¶69, 82), Kamehameha did not induce the disclosure and did not actually consider the unsolicited disclosure. Plaintiffs also allege that "[d]uring the interview, one of the first questions that Kamehameha asked I.P. was whether she is Native Hawaiian" (4AC ¶70), but as the declaration states, that is not correct. Park Decl. ¶8.

As to the request of E.S. and her mother for prospective relief, that has the same standing problem as SFFA's claims. The complaint does not allege sufficient facts showing that E.S. is any more competitive for admission now than she was previously when, as just explained, the preference was not applied to her. *See* pp. 15-17, *supra*.

Accordingly, I.P., B.P., E.S., and K.S. lack standing to challenge a preference that was not applied to I.P. or E.S. (and so cannot support SFFA's associational standing either).

## II. PLAINTIFFS' REQUEST FOR PROSPECTIVE RELIEF UNDER SECTION 1981 IS MOOT

### A. Plaintiffs' Acknowledgement That Kamehameha Has Eliminated Tuition Moots Their Request For Prospective Relief

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) (citation omitted). When seeking injunctive relief based on the prospect of a future injury, that future injury must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013).

Plaintiffs' claim for prospective relief under Section 1981 is moot and should be dismissed under Rule 12(b)(1) because Plaintiffs face no future injury—much less a "certainly impending" one. *Clapper*, 568 U.S. at 414. Their claim rests on the allegation that Kamehameha discriminates when it enters into contracts with admitted students. 4AC ¶¶108, 112. But as the complaint acknowledges (4AC ¶98), on February 12, 2026, the Circuit Court of the First Circuit for the State of Hawai'i approved Kamehameha's decision to "permanently adopt a Complete Gift Approach, involving a free of tuition model for its preschools and K-12 campuses." ECF 149-4. This Court may consider that decision because it is referred to in the complaint, *see Vinion v. Amgen Inc.*, 272 F. App'x 582, 584 (9th Cir. 2008), and a federal court may take judicial notice of a state court's order, *see* Fed. R. Evid.

201(b)-(d); *Lee v. City of Los Angeles,* 250 F.3d 668, 689 (9th Cir. 2001). Following the order, Kamehameha is not charging its students tuition. All fees, meals, transportation, and boarding are part of the gift provided by Kamehameha. Park Decl. ¶10; *accord* ECF 149-4.

That change eliminates any arguable vestige of a contractual relationship between Kamehameha and its students or their families. Whether a contract exists is a question of Hawai‘i law, absent a conflict with federal law. *See Judie v. Hamilton*, 872 F.2d 919, 922 (9th Cir. 1989); *Garrett v. Tandy Corp.*, 295 F.3d 94, 100 (1st Cir. 2002). Under longstanding Hawai‘i law, the provision of education free of tuition qualifies as a gift, not a contract, because it is "a transfer of property gratuitously, without consideration." *Est. of Tahilan v. Friendly Care Home Health Servs., Inc.*, 731 F. Supp. 2d 1000, 1010 (D. Haw. 2010) (citation omitted); *Doe I*, 470 F.3d at 888 (Kozinski, J., dissenting) ("I don't believe section 1981 would apply at all if the schools … allowed students to attend for free.").

The Hawai‘i State Legislature recently "clarif[ied]" that longstanding principle by providing that "any school-conditioned enrollment at any private school where no tuition or other monetary consideration is required or paid by the recipient shall be considered to be a conditional gift and not a contract." Act 002, S.B. No. 3123, Thirty-Third Legislature of the State of Hawai‘i (Mar. 27, 2026) ("Gift Act"). And that conclusion is consistent with numerous cases establishing that there is no

contractual relationship between a school and its students absent tuition, including where public schools are concerned. *See, e.g.*, *T.L. ex rel. Lowry v. Sherwood Charter Sch.*, 2014 WL 897123, at *13 (D. Or. Mar. 6, 2014), *aff'd sub nom. Lowry v. Sherwood Charter Sch.*, 691 F. App'x 310 (9th Cir. 2017); *Wartluft v. Milton Hershey Sch. and Sch. Trust*, 2020 WL 1285332 (M.D. Pa. Mar. 18, 2020), *aff'd,* 844 F. App'x 499 (3d Cir. 2021); *Doe v. Wake Forest Univ.*, 671 F. Supp. 3d 624, 631 & n.3 (M.D.N.C. 2023); *Natke v. N. Branch Area Sch. Dist.*, 2010 WL 522798, at *6 (E.D. Mich. Feb. 8, 2010); *Higginbottom ex rel. Davis v. Keithley*, 103 F. Supp. 2d 1075, 1080-81 (S.D. Ind. 1999).

The Fourth Amended Complaint attempts to evade the mootness problem by arguing that private schools "inherently" enter into a contractual relationship in which students agree to complete courses in exchange for diplomas. 4AC ¶95. But under both Hawai'i common law and the Gift Act, the students' actions at Kamehameha are merely the "condition[s]" and manner of receiving the "gift" of free education. Gift Act § 2 (§ 1(a)); 38 Am. Jur. 2d Gifts § 68 ("a donor may limit a gift … conditioned and dependent upon an expected state of facts"); 38A C.J.S. Gifts § 40 (similar). As in the public-school context—and many other contexts, such as a soup kitchen that requires its diners to be peaceful to maintain order—those conditions are not consideration that students give up to their detriment or for Kamehameha's benefit in a bargained-for exchange. *See* pp. 20-21, *supra.*

The complaint's reliance elsewhere on *American Alliance for Equal Rights v. Fearless Fund Management, LLC*, 103 F.4th 765 (11th Cir. 2024), 4AC ¶122(c), also does not help Plaintiffs. The grant "contest" in *Fearless Fund* was contractual because the sponsor extracted a bargained-for exchange through, among other things, indemnification and arbitration agreements in return for the chance at a cash prize. *Id.* at 775-76. Kamehameha's conditions run in the opposite direction and, like the conditions of a public-school education, facilitate the gift. *Cf. Wartluft*, 844 F. App'x at 502-03. And unlike in *Fearless Fund*, the governing law here expressly defines tuition-free, school-conditioned enrollment as "a conditional gift and not a contract." Gift Act § 2 (§ 1(a)).

Consistent with their other attacks on the integrity of Hawai'i institutions, Plaintiffs further claim that the Gift Act is "drafted so poorly that not even Kamehameha satisfies its terms" (an apparent concession that the Legislature intended to confirm that Kamehameha's model is non-contractual). 4AC ¶114b. Of course, the Gift Act merely reaffirmed preexisting Hawai'i common law, so it is not needed to establish mootness here. At any rate, it is Plaintiffs, not the Legislature, who have erred.

Plaintiffs first assert that the Act applies only to "enrollment" contracts and not "contracts for admission," by which they presumably mean a contract authorizing an applicant to complete the admissions process. That is irrelevant

because Kamehameha does not currently enter into such contracts, Park Decl. ¶10, and the complaint does not allege that Kamehameha has ever limited "contracts for admission" to Native Hawaiians.

Plaintiffs next incorrectly claim that the statute does not cover any contract "in writing." 4AC ¶114b. The statute allows parties to *opt out* of the Act—*i.e.*, create a contract—only when doing so "in writing." Gift Act § 2 (§ 1(a)). The complaint does not allege that Kamehameha has entered into any such writing.

Plaintiffs claim that the statute "does not say the conduct it covers is *not* a contract" but rather merely "states a rule of construction." 4AC ¶114c. But the obvious meaning of the statement that tuition-free education "shall be considered to be a conditional gift and not a contract," Gift Act § 2 (§ 1(a)), is to define it as a gift for legal purposes—as the extensive statement of purpose in Section 1 of the Act demonstrates.

Finally, Plaintiffs are wrong that the statute does not apply because conditions on a gift of enrollment would violate "applicable law," *i.e.*, Section 1981. 4AC ¶114c. If tuition-free education is a gift, Section 1981, by its plain text, does not apply.

### B. Plaintiffs' New Reliance On Other Alleged "Contracts" Does Not Save The Case From Mootness

The complaint also seeks to avoid mootness by alleging a rash of other "contracts" that supposedly have not been eliminated. *Id.* ¶¶96, 104-05. Those alleged contracts fall into six buckets:

(i) **Admissions Documents.** Documents signed in connection with the admissions process (¶¶96, 104b).

(ii) **On-campus Purchases.** Purchases from vending machines and stores that one must enter campus to access (¶104e).

(iii) **Handbooks.** School and dormitory rules contained in student handbooks, such as a requirement to pay for damage to school property (¶¶104a, 104i).

(iv) **School Activities Documents.** Documents that enrolled students sign for various purposes related to school activities (*e.g.*, bus transportation, extracurricular activities, healthcare, sports) (¶¶104c, 104f-h, 104j).

(v) **Third-Party Contracts.** Contracts between students and third parties that Kamehameha allegedly facilitates, and contracts between Kamehameha and third parties in which students are allegedly third-party beneficiaries (¶104d).

(vi) **"Information and Belief" Contracts.** Contracts that Plaintiffs surmise on "information and belief" must exist (¶105).

Those allegations do not save this case from mootness.

Most clearly, Plaintiffs are relying on contracts that do not exist. As explained in the sworn declaration Kamehameha submitted, it has eliminated "the use of all documents of a potentially contractual nature," including "waivers"; and Kamehameha does not charge any fees for its "application or enrollment process" or "meals, school materials, [] equipment, boarding, bus transportation, summer programs . . . clubs and extracurricular activities, and dual credit programs." Park Decl. ¶10.

That problem aside, Plaintiffs' arguments suffer from several other legal flaws. *First*, the complaint does not plausibly allege that the contracts are racially discriminatory. As explained above, the complaint acknowledges that non-Native Hawaiians like I.P. and E.S. may enter into admissions contracts and does not allege that any preference is applied at that stage. *See* pp. 7-8, 15-16, *supra*; 4AC ¶¶15, 17, 69, 80, 82. Likewise, the complaint does not allege that only Native Hawaiians may enter the campus to make purchases at vending machines and stores. *See Weaver v. Cary Acad.*, 2021 WL 4428202, at *9 (E.D.N.C. Sept. 27, 2021).

As for the third-party contracts, the complaint does not identify who the third parties are or what services they provide—much less that they do not offer those

services to non-Native Hawaiians or students enrolled in other schools. Although the complaint conclusorily alleges that "Kamehameha bans non-Hawaiians from accessing these contracts with the providers," it provides no support for that claim and no explanation for how Kamehameha could "ban" third parties from entering into contracts with non-Native Hawaiians. And the complaint cites no authority for the proposition that strangers to contracts may seek Section 1981 relief on the ground that they were denied the opportunity to be third-party beneficiaries of the contracts.

With respect to the remaining alleged contracts, Plaintiffs' theory of racial discrimination—that any contracts between Kamehameha and enrolled students are necessarily racially discriminatory—is incorrect. All non-Kamehameha students, Native Hawaiian and non-Native Hawaiian alike, are excluded from any contractual relationship between Kamehameha and its enrolled students. Given that Congress has not elected to prohibit racial classifications in non-contractual arrangements, such as charitable gifts, it would be remarkable to hold that any contractual arrangement incident to such arrangements is forbidden by Section 1981. For example, a charity dedicated to the education of Black youth surely could enter into transportation contracts, liability waivers, and conduct agreements incident to educational programming.

*Second*, for the reasons stated above, school rules of punctuality, behavior, and so forth contained in handbooks and the like are not contracts when connected

to a free education—such as a public-school education. *See* pp. 20-21, *supra*. The Gift Act confirms that understanding by providing that arrangements relating to student activities, when made incident to free enrollment, do not establish contractual relationships between the school and admitted families. The statute describes the educational gift as "*school-conditioned* enrollment" (emphasis added) and proceeds to list the conditions that may be imposed without transforming the relationship into a contractual one, including fees for extracurricular activities, waivers, and the licensing of students' likenesses. Gift Act § 2 (§ 1(a)-(b)). That structure would make no sense if the conditions themselves constituted contracts. And the statute's design is consistent with preexisting common law. *See Welton v. Gallagher*, 2 Haw. App. 242, 248, 630 P.2d 1077, 1083 (1981), *aff'd,* 65 Haw. 528, 654 P.2d 1349 (1982).

*Third*, with respect to the alleged written contracts other than the admissions contracts, the allegations do not provide enough detail to adequately plead either a contractual relationship or racial discrimination. *See Nelson v. Arizona Dep't of Econ. Sec.*, 2022 WL 4354369, at *1 (9th Cir. Sept. 20, 2022). For example, the complaint alleges that "parents of students must complete a 'Medical Treatment Agreement and Release,'" 4AC ¶104f, but it states nothing about the terms of that document, nor whether non-Native Hawaiian teachers and staff must sign the same document. The same is true of other documents alleged in the complaint. ¶104.

*Fourth*, the complaint does not allege that Plaintiffs or SFFA members intend to enter into any of the alleged contracts identified as optional—for example, that they intend to take bus transportation, access third-party services, or make purchases from stores or vending machines. Nor does the complaint allege that their injuries arise from any purported discrimination in those alleged contracts. Plaintiffs therefore lack standing to challenge those alleged contracts. *See* pp. 11-18, *supra*.

*Finally*, an allegation of unnamed contracts that exist on "information and belief" (4AC ¶105) is not sufficient to state a claim because the complaint provides no plausible foundation to believe that any such contracts are racially discriminatory. *See Dante Valve Co. v. Republic Brass Sales, Inc.*, 2019 WL 1406583, at *1-2 (S.D. Cal. Mar. 28, 2019). That the Kamehameha Trustees must enter into contracts with third parties to operate the school says nothing about whether those contracts are racially discriminatory. Here again, Congress has not subjected charitable giving to Section 1981 liability, but organizations offering such programs must pay utility bills and compensate employees.

### C. The Voluntary-Cessation Exception Does Not Apply To Judicially Adopted Permanent Change

The complaint further wrongly asserts that even if the elimination of tuition mooted Plaintiffs' request for prospective relief, the "voluntary cessation" exception to mootness would keep that request alive. 4AC ¶136. That exception allows a plaintiff to seek an injunction against the *resumption* of an unlawful practice. *Gilley*

*v. Stabin,* 2024 WL 1007480, at *1 (9th Cir. Mar. 8, 2024). Plaintiffs here could therefore at most obtain an injunction barring any *resumption* of applying the preference to Families A and B and E.S. *should Kamehameha reinstate tuition* before they graduate from high school. But they don't seek that relief. They appear to seek an injunction barring the preference right now, *even absent tuition or a contract*, *i.e.*, an injunction against lawful conduct. The voluntary-cessation doctrine does not allow them to do so.

Regardless, the voluntary-cessation exception does not apply here because the "challenged conduct cannot reasonably be expected to recur" as Kamehameha's commitment to *permanently* eliminate tuition is enshrined in a binding court order. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 95 (2013). Thus, Plaintiffs' assertion that Kamehameha's elimination of tuition is unilaterally reversible (4AC ¶100) is incorrect. The petition to the probate court (incorporated into the complaint, 4AC ¶98) sought to "permanently" change from a "heavily subsidized tuition model" to a "Complete Gift Approach." Decl. of John F. Bash, Ex. A at 2. The probate court granted that request, allowing the Trustees to "*permanently* adopt a Complete Gift Approach." ECF 149-4 ¶3 (emphasis added). Any future effort to reinstate tuition would require a new petition to modify a binding order. *Already*, 568 U.S. at 95.

Finally, even if the claims for prospective relief are not jurisdictionally moot, the Court should dismiss them under Rule 12(b)(6) because Kamehameha's

elimination of tuition—acknowledged in the complaint, 4AC ¶98—has foreclosed the essential "contract" hook required to state a Section 1981 claim. Thus, even without the court taking judicial notice of the state court proceedings, *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992), the complaint fails on its face to provide any plausible basis to believe that Plaintiffs or any SFFA member will be denied a contractual relationship with Kamehameha in violation of Section 1981.

## III. CONGRESS HAS PERMISSIBLY EXEMPTED KAMEHAMEHA'S PREFERENCE POLICY FROM SECTIONS 1981 AND 1983

Should the Court conclude that it has jurisdiction, the Court should dismiss Plaintiffs' complaint for failure to state a claim under Rule 12(b)(6) because Congress has exercised its constitutional power to exempt Kamehameha's preference policy from Sections 1981 and 1983.

### A. Sections 1981 And 1983 Do Not Prohibit Kamehameha's Preference Policy

Plaintiffs assert that Kamehameha's preference policy violates Section 1981 and Section 1983. 4AC ¶¶107-134. For the reasons explained below, those claims are barred by Section 11705(c)(4) and *Doe I*. *See also infra* Section V (explaining that Kamehameha is not a state actor subject to Section 1983).

#### 1. Section 11705(c)(4) Forecloses Plaintiffs' Statutory Claims

In 2010, Congress expressly exempted Kamehameha's policy from both Section 1981 and, to the extent it might somehow apply, Section 1983. Section

11705(c)(4) provides that "notwithstanding any other provision of Federal or State law, it shall be lawful for [Kamehameha] to continue to offer its educational programs and services to Native Hawaiians . . . first and to others only after the need for such programs and services by Native Hawaiians has been met." 42 U.S.C. § 11705(c)(4). By exempting Kamehameha's admissions policy from "any other provision of Federal or State law," Section 11705(c)(4) establishes that Section 1981 and Section 1983 do not apply to the policy.

Plaintiffs failed to address Section 11705(c)(4) in the first four iterations of their complaint. The Fourth Amended Complaint appears to argue that Kamehameha's preference policy "fail[s] the 'need' standard of 42 U.S.C. § 11705(c)(4)" because "it is not a valid affirmative-action plan." 4AC ¶127. Initially, the premise of that argument is wrong because the en banc Ninth Circuit held that the policy *is* a valid affirmative-action plan. *Doe I*, 470 F.3d at 846.

At any rate, Plaintiffs misread the statute. It says that Kamehameha may "*continue* to offer its educational programs and services to Native Hawaiians . . . first and to others only after the need for such programs and services by Native Hawaiians has been met." 42 U.S.C. § 11705(c)(4) (emphasis added). Plaintiffs acknowledge repeatedly that the same policy is in place today as when Congress passed Section 11705(c)(4). *See, e.g.*, 4AC ¶¶5, 116(c), 123. In context, then, the word "need" refers to offering admission to non-Native Hawaiians only when all

qualified Native Hawaiians have been offered admission—*i.e.*, the policy that was in place at Section 11705(c)(4)'s enactment—not to the criteria for valid affirmative-action plans.

### 2. *Doe I* Forecloses Plaintiffs' Statutory Claims

Even if Section 11705(c)(4) did not exist, Plaintiffs' statutory arguments are foreclosed by the Ninth Circuit's en banc decision in *Doe I*, issued four years before Congress enacted Section 11705(c)(4).

a. *Doe I* held that "a Hawaiian private, non-profit K–12 school that receives no federal funds"—*i.e.*, Kamehameha—does not "violate[] § 1981 by preferring Native Hawaiians in its admissions policy." 470 F.3d at 829. *Doe I* provided two alternative justifications for its legal conclusion. First, it held that Kamehameha's "admissions policy, favoring students of Native Hawaiian descent," is "permissible in the educational context under § 1981" as a remedial measure given the longstanding, systemic disadvantages that Native Hawaiian students face as indigenous youth, including those recognized in congressional findings. *Id.* at 837, 846.

Second, *Doe I* provided an "[a]lternative," stand-alone holding that Congress intended to allow the preference policy when it reenacted Section 1981 in 1991. 470 F.3d at 847-49. In reaching that holding, the court surveyed nearly a century of "steadfast congressional policies favoring remedial measures for Native

Hawaiians—and specifically remedial educational measures, some of them even mentioning Kamehameha Schools and the Bishop Trust approvingly by name." *Id.* at 849. The court noted that since 1920, "Congress has relied on the special relationship that the United States has with Native Hawaiians to provide specifically for their welfare in a number of different contexts," including with respect to "the educational disparities faced by Native Hawaiian students." *Id.* at 848. "It would be incongruous," the Ninth Circuit determined, "to conclude that while Congress was repeatedly enacting remedial measures aimed exclusively at Native Hawaiians, at the same time Congress would reject such Native Hawaiian preferences through § 1981." *Id.* at 849.

A five-judge concurrence by Judge Fletcher reinforced *Doe I*'s alternative holding. *See id.* at 849-57. Judge Fletcher explained that "Native Hawaiians constitute a unique population that has a 'special trust relationship' with the United States" that "Congress has repeatedly 'affirmed,' 'acknowledged,' 'reaffirmed,' and 'recognized.'" *Id.* at 850 (quoting 20 U.S.C. § 7512(8)-(13); 42 U.S.C. § 11701(13)-(16), (19)-(21)). "Based on this 'historical and unique legal relationship,'" he wrote, "Congress has enacted more than 150 laws that 'extend to the Hawaiian people the same rights and privileges accorded to American Indian, Alaska Native, Eskimo, and Aleut communities.'" *Id.* (quoting 42 U.S.C. § 11701(19)).

*Doe I* bars this action. In our legal system "vertical *stare decisis* is absolute," *Ramos v. Louisiana*, 590 U.S. 83, 124 n.5 (2020) (Kavanaugh, J., concurring); *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). In *Doe I*, the Ninth Circuit, sitting en banc, directly held that Section 1981 does not bar Kamehameha's preference policy.

That holding also necessarily extends to Plaintiffs' new Section 1983 claim. As explained, *Doe I*'s second holding rested on an understanding of Congress's intent when it amended Section 1981 in 1991 following decades of enacting statutes benefiting Native Hawaiians and establishing specific remedial measures focused on Kamehameha. Five years later, Congress also amended Section 1983. Pub. L. No. 104-317, tit. III, § 309(c), 110 Stat. 3847, 3853 (Oct. 19, 1996). Nothing changed in the U.S. Code between 1991 and 1996 to suggest the en banc Ninth Circuit's conclusion about congressional intent would apply differently to that enactment.

b. Plaintiffs claim that *Doe I* cannot shield Kamehameha because its reasoning "was abrogated by the Supreme Court in *Harvard*." 4AC ¶121. That is wrong. To implicitly overrule a circuit precedent, a Supreme Court decision must "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Miller*, 335 F.3d at 900. That requirement sets "a high standard." *Lair v. Bullock*, 697 F.3d 1200, 1207 (9th Cir. 2012). It is not met here.

Neither alternative holding of *Doe I* is irreconcilable—much less *clearly* irreconcilable—with *Harvard*. *Harvard* applied strict scrutiny under Title VI and the Equal Protection Clause to hold that campus diversity is not a sufficiently compelling interest to justify race-conscious college admissions policies at a university "that accepts federal funds." 600 U.S. at 195, 197-98, 198 n.2, 214. By contrast, *Doe I*'s first alternative holding concluded that under Section 1981, strict scrutiny does not apply to a remedial preference adopted by "a purely private entity that receives no federal funds," particularly given Congress's conclusion that, "in the unique context of Native Hawaiian history, affirmative measures are needed to address present, severe inequalities in educational achievement." 470 F.3d at 839, 845-46.

Moreover, *Harvard* has no conceivable bearing on *Doe I*'s alternative, stand-alone holding validating Kamehameha's admissions policy on the ground that Congress did not intend the 1991 reenactment of Section 1981 to bar Kamehameha's policy. The complaint here tacitly admits that *Doe I*'s second holding is unaffected by *Harvard* by challenging the second holding only on other grounds. *See* 4AC ¶¶130-134. Indeed, even judges who would have ruled against Kamehameha agreed that "U.S. Supreme Court decisions about affirmative action . . . have nothing to do with this case." *Doe I*, 470 F.3d at 887 (Kleinfeld, J., dissenting).

Plaintiffs also assert that the factual predicates underlying *Doe I*'s approval of Kamehameha's admissions policy have changed so much that *Doe I* is no longer controlling. 4AC ¶123. Here again, however, that contention has no bearing on *Doe I*'s alternative, stand-alone holding that the policy is exempt from Section 1981, because that holding was based on statutory context at the time of enactment in 1991, rather than facts on the ground in 2006. In any event, the developments that Plaintiffs cite are immaterial to *Doe I*'s first holding. And their allegations confirm that significant educational disparities between Native Hawaiians and other students persist. *Id.*

Next, Plaintiffs assert (4AC ¶133) that Section 11705(c)(4) implicitly overrode *Doe I*'s alternative holding. That argument does not hold water. Section 11705(c)(4) makes explicit the construction of Section 1981 that the Ninth Circuit adopted in *Doe I*. By enacting Section 11705(c)(4), Congress strove to ensure that an interpretation adopted by an en banc appellate court would be sustained. Congress's codification of a judicial construction of a statute does not signal that Congress believed the construction incorrect.

### 3. Section 1981 Does Not Bar Contracts Benefiting Native Hawaiians

Although the argument is not available under current precedent, Kamehameha preserves for potential future stages of review the argument that Section 1981 prohibits only contract-related discrimination in favor of "white citizens," 42 U.S.C.

§ 1981(a), not contracting practices that benefit other groups. The Supreme Court previously rejected that argument based on Section 1981's legislative history. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286-96 (1976). But that mode of statutory interpretation has fallen into disfavor. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 437 (2019).

### B. Congress Can Constitutionally Exempt Kamehameha's Preference Policy From Sections 1981 And 1983

Plaintiffs assert that any exemption of Kamehameha's preference policy from liability under Sections 1981 and 1983 would be unconstitutional. 4AC ¶¶130-134. That argument is foreclosed by *Doe I* and lacks merit.

#### 1. *Doe I* Forecloses Plaintiffs' Constitutional Argument

The reasoning in *Doe I* necessarily refutes Plaintiffs' constitutional challenge. In reaching its first alternative holding, the Ninth Circuit considered whether Kamehameha's preference policy "unnecessarily trammels the rights of members of the non-preferred class, that is, students with no Hawaiian ancestry." 470 F.3d at 844. The court concluded that it did not. *Id.* at 844-45. That conclusion is inconsistent with the view that an exemption for the policy violates the constitutional rights of non-Native Hawaiian students. And it is axiomatic that "just as binding as [a] holding is the reasoning underlying it." *Bucklew v. Precythe*, 587 U.S. 119, 136 (2019).

Further, both the five concurring judges *and* the seven dissenting judges in *Doe I* explicitly stated that "[i]f Congress wishes to exempt preferences for Native Hawaiians from § 1981, it may do so." 470 F.3d at 879 (Bybee, J., dissenting); *see id.* at 856-57 (Fletcher, J., concurring).

### 2. The Exemption Is Constitutional

*Doe I* aside, Plaintiffs' constitutional argument lacks merit. Given the United States' longstanding trust obligations to Native Hawaiians in education, the Constitution permits Congress to exempt from Sections 1981 and 1983 a private educational institution that receives no federal funding and serves Native Hawaiian children pursuant to a bequest that predated Hawaii's annexation into the United States.

a. The Equal Protection Clause does not by its terms apply to the federal government, but the Supreme Court has recognized an equal-protection component to the Fifth Amendment's Due Process Clause. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). At the same time, the Court has long held that when the federal government exercises certain plenary powers, it has more flexibility than a state legislature to draw pertinent legislative classifications. For example, federal classifications based on alienage and territorial residence are subject only to rational-basis review in light of Congress's plenary authority over immigration and federal territories. *United States v. Vaello Madero*, 596 U.S. 159, 165-66 (2022); *Mathews*

*v. Diaz*, 426 U.S. 67, 86 & n.26 (1976); *Korab v. Fink*, 797 F.3d 572, 574 (9th Cir. 2014); *see also Mullin v. Doe*, 146 S. Ct. 2121, 2143 (2026) (Thomas, J., concurring) ("Perhaps [because the Fifth Amendment's Due Process Clause is textually distinct from the Fourteenth Amendment's Equal Protection Clause,] this Court has never subjected even express racial classifications in immigration laws to scrutiny under the Due Process Clause.").

That flexibility includes Congress's authority—rooted in the Indian Commerce Clause as well as "principles inherent in the Constitution's structure"—to enact federal laws that benefit indigenous peoples. *Haaland v. Brackeen*, 599 U.S. 255, 274 (2023); *see United States v. Lara*, 541 U.S. 193, 200-02 (2004). When "the United States overcame the Indians and took possession of their lands," the federal government "assumed the duty of furnishing . . . protection" to indigenous peoples "and with it the authority to do all that was required to perform that obligation and to prepare the Indians to take their place as independent, qualified members of the modern body politic." *Bd. of Comm'rs of Creek Cnty. v. Seber*, 318 U.S. 705, 715 (1943). The resulting "'trust relationship between the United States and the Indian people' informs the exercise of [federal] legislative power." *Haaland*, 599 U.S. at 274-75 (citation omitted).

In administering that trust relationship, Congress has often "provid[ed] special treatment, including distribution of funds, based on broad definitions of the terms

'Indian,' 'native,' 'Native American,' and 'tribal organization' that encompass Indians who are not members of federally recognized tribes" with whom the United States has a formal government-to-government relationship. *Doe I*, 470 F.3d at 850-52 (Fletcher, J., concurring) (compiling statutes).

When it enacts such provisions, Congress necessarily enjoys the same flexibility to draw classifications based on Native status as it does in the immigration and territorial contexts. *See Morton v. Mancari*, 417 U.S. 535, 539, 551, 554 (1974). The Supreme Court has consistently upheld statutes and other exercises of federal power that single out indigenous communities, including those with no formal tribal membership, for the receipt of benefits, without suggesting that such classifications are subject to heightened scrutiny. *See United States v. John*, 437 U.S. 634, 650, 653 (1978); *United States v. Antelope*, 430 U.S. 641 (1977); *Del. Tribal Bus. Comm. v. Weeks*, 430 U.S. 73, 97 (1977); *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164 (1973); *Warren Trading Post Co. v. Arizona Tax Comm'n*, 380 U.S. 685, 691 n.18 (1965); *Sunderland v. United States*, 266 U.S. 226, 231-32, 234 (1924). As the Ninth Circuit has held, "[t]raditional equal protection analysis … does not apply to legislation or governmental action favoring Indians." *United States v. Decker*, 600 F.2d 733, 740 (9th Cir. 1979).

Thus, in *Mancari*, the Supreme Court held that a federal agency's hiring preference for Native Americans was not "invidious racial discrimination in

violation of the Due Process Clause of the Fifth Amendment" but rather a permissible feature of the "special relationship" between the United States and Native Americans and thus "political rather than racial in nature." 417 U.S. at 551-52, 553 n.24, 554. Invoking "the solemn commitment of the Government toward the Indians," the Court held that "[a]s long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed." *Id.* at 552-55.

In the fifty years since *Mancari*, the Supreme Court and courts of appeals have continued to uphold federal benefits for indigenous peoples based on the "special treatment [that] can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians." *Del. Tribal*, 430 U.S. at 85 (quoting *Mancari,* 417 U.S. at 555); *see Antelope*, 430 U.S. at 646; *Washington v. Confederated Bands and Tribes of Yakima Indian Nation*, 439 U.S. 463, 500-01 (1979); *see also*, *e.g.*, *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 330 F.3d 513, 522-23 (D.C. Cir. 2003); *EEOC v. Peabody W. Coal Co.*, 773 F.3d 977, 987-88 (9th Cir. 2014).

b. As with other descendants of sovereign, distinctly indigenous communities, the United States has a longstanding trust relationship with Native Hawaiians that reflects a commitment to advance their education and well-being. For over a century, Congress has furthered its commitment to Native Hawaiians through more than 150 statutes providing benefits or special treatment to them. *See*

*Doe I*, 470 F.3d at 850 (Fletcher, J., concurring). Congress has expressly confirmed that these statutes rest on "the trust relationship between the United States and the Hawaiian people." 20 U.S.C. § 7512(10) and (12)(B). The Executive Branch likewise has repeatedly acknowledged the "special political and trust relationship that exists between the United States and the Native Hawaiian community," as recognized by Congress's creation of "Federal programs, services, and benefits . . . specifically for the Native Hawaiian community." 43 C.F.R. § 50.1(b) (2025) (citing statutes); *see* 81 Fed. Reg. 71,278, 71,278-82, 71,285-86 (Oct. 14, 2016). And the Executive Branch has highlighted that "Kamehameha Schools are critical to providing quality education opportunities from early childhood through life, accounting for the mental, physical, religious, and cultural aspects of learners from the Native Hawaiian Community." Assistant Secretary of the Interior for Indian Affairs Bryan Newland, Federal Indian Boarding School Initiative Investigative Report Vol II, at 9, 14-15, 33 (July 2024).

Given that special trust relationship, and consistent with *Mancari*, the Ninth Circuit has applied rational-basis review to uphold federal classifications based on Native Hawaiian status. *See Kahawaiolaa v. Norton*, 386 F.3d 1271, 1279 (9th Cir. 2004); *see also Alaska Chapter, Associated Gen. Contractors of Am., Inc. v. Pierce*, 694 F.2d 1162, 1168 n.8, n.10 (9th Cir. 1982) (same for Alaska Natives before tribal recognition). As Judge Fletcher noted, a contrary approach might require "striking

down the enormous swaths of the United States Code enacted pursuant to the special relationship doctrine." *Doe I*, 470 F.3d at 852 (Fletcher, J., concurring).

Particularly given that courts have "long looked to settled and established practice to interpret the Constitution," *Moore v. Harper*, 600 U.S. 1, 32 (2023), that unbroken congressional practice confirms the constitutionality of federal legislation designed to advance the education, health, and welfare of Native Hawaiians, *see, e.g.*, *N.L.R.B. v. Noel Canning*, 573 U.S. 513, 549 (2014).

Section 11705(c)(4) and the implicit exemption found in *Doe I*'s alternative holding also differ markedly from the state-law provision that the Supreme Court struck down in *Rice v. Cayetano*, 528 U.S. 495 (2000). There, the Supreme Court held that a provision in Hawaii's Constitution limiting the right to vote for the trustees of the Office of Hawaiian Affairs to people with qualifying Hawaiian ancestry violated the Fifteenth Amendment. *Id.* at 522. The Court concluded that the Fifteenth Amendment does not "permit a State, by racial classification, to fence out whole classes of its citizens from decision making in critical state affairs." *Id.* That holding was limited to voting restrictions imposed by state law. *See* Brief for the Federal Parties at 55-59, 65, *Haaland*, 599 U.S. 255; *Davis v. Guam*, 932 F.3d 822, 842 n.18 (9th Cir. 2019). *Rice* has no bearing on whether in the exercise of its special trust relationship, Congress may exempt a private school from federal liability for providing educational services to Native Hawaiians.

Kamehameha's posture likewise differs from that in *Williams v. Babbitt*, 115 F.3d 657 (9th Cir. 1997). *Babbitt* addressed a 1937 federal statute that gave Alaska Natives a quasi-monopoly in the reindeer industry and held that the statute protected an ordinary commercial livestock business that was in "no way relate[d] to native land, tribal or communal status, or culture." *Id.* at 659, 664. Thus, it did not fall within the protection of *Mancari* and its progeny. *Id.* The education of Native Hawaiians, however, is deeply connected to the Native Hawaiian way of life and culture, *i.e.*, self-determination, and thus is nothing like *Babbitt*'s idiosyncratic reindeer statute. *See Ramah Navajo School Board, Inc. v. Bureau of Revenue of New Mexico*, 458 U.S. 832, 842 (1982) (noting the "federal interest in promoting the 'quality and quantity' of educational opportunities for Indians"); *see also Akina v. Hawaii*, 141 F. Supp. 3d 1106, 1132 (D. Haw. 2015).

c. The settled understanding of congressional power in this area defeats Plaintiffs' constitutional argument. In enacting Section 11705(c)(4), Congress expressly invoked its special trust obligation "to provide educational programs designed to improve the health, capability, and well-being of Native Hawaiians" and found that Kamehameha's preference policy helps the United States fulfill that obligation. 42 U.S.C. § 11705(c)(4). That finding demonstrates that Section 11705(c)(4) is rationally related "to the fulfillment of Congress' unique obligation toward" Native Hawaiians, *Del. Tribal*, 430 U.S. at 85, and thus constitutional.

Indeed, in one important respect, the constitutional question here is easier than other cases in which courts have considered laws that aid or advantage Native peoples. In Section 11705(c)(4), Congress has not awarded any direct benefit to Native Hawaiians. Rather, it has allowed a single non-state actor to continue providing educational services to Native Hawaiians without interference from the federal government. *See Bank Markazi v. Peterson*, 578 U.S. 212, 234 (2016) (affirming the principle that "Congress may legislate a legitimate class of one" (quotation omitted)).

The Ninth Circuit approved a similar carve-out in *Atonio v. Wards Cove Packing Co.*, 10 F.3d 1485 (9th Cir. 1993). There, the court applied rational-basis review to uphold Section 402(b) of the Civil Rights Act of 1991, which exempted from that Act's amendments the plaintiffs—nonwhite cannery workers—in a single, long-running disparate-impact case. *Id.* at 1491, 1493-95. The court held that the provision was "targeted at a particular case, and not at a racial class or other category subject to special constitutional protection," and that Congress had not "singled out" any class or "imposed special disabilities on" it. *Id.* at 1493. Section 11705(c)(4) is targeted at Kamehameha in precisely that way—in fact, Kamehameha extends its preference to applicants *of any race or ancestry* who have a single pre-1778 Hawaiian ancestor. *See Doe I*, 470 F.3d at 832 (noting the attendance at Kamehameha of "[m]ore than 60 different racial and ethnic groups").

*Reitman v. Mulkey*, 387 U.S. 369 (1967), does not advance Plaintiffs' position. *See* 4AC ¶¶ 130-134. *Reitman* invalidated a state constitutional amendment construed to have "expressly authorized and constitutionalized the private right to discriminate"—while making clear that a legislature may repeal an antidiscrimination law or "put in statutory form an existing policy of neutrality" without offending the Constitution. 387 U.S. at 376-77. Section 11705(c)(4) is the latter. It simply withdraws a federal cause of action from a private institution's own policy through a statute that, unlike the constitutional amendment in *Reitman*, remains subject to ordinary legislative repeal. Congress routinely limits its antidiscrimination remedies. For instance, Title VII exempts religious organizations and preferences for Indians, 42 U.S.C. §§ 2000e-1(a), 2000e-2(i), and the Fair Housing Act exempts owner-occupied dwellings and religious organizations, *id.* §§ 3603(b), 3607(a).

The carve-out is also consistent with the original understanding of Congress's discretion in creating causes of action for racial discrimination. Section 1981 itself prohibits contract-related discrimination only in favor of "white citizens." That language was present in the original 1866 version of the statute as well as the amended 1870 version enacted after ratification of the Fourteenth Amendment. 14 Stat. 27; 16 Stat. 140, 144. Although the Supreme Court in 1976 expanded the statute's scope based on legislative history, *see McDonald*, 427 U.S. at 286-96, the

plain language of the original statute indicates beyond serious doubt that, even outside the context of indigenous peoples, Congress has ample discretion to limit civil liability for racial discrimination.

## IV. PLAINTIFFS DO NOT ADEQUATELY PLEAD SECTION 1981 OR SECTION 1983 CAUSATION

Section 1981 prohibits racial discrimination in the making and enforcement of contracts. In *Comcast Corp. v. National Association of African American-Owned Media*, 589 U.S. 327 (2020), the Supreme Court held that a Section 1981 "plaintiff bears the burden of showing that race was a but-for cause of its injury," *i.e.*, that the defendant would not "have responded the same way to the plaintiff even if he had been [of the allegedly favored race]." *Id.* at 333. Although the Court reserved the question whether that requires proof that the parties would have entered into the contract but for the plaintiff's race, *id.* at 339, at least two circuits have so held, *see Brown v. J. Kaz, Inc.,* 581 F.3d 175, 182 n.5 (3d Cir. 2009); *Bachman v. St. Monica's Congregation*, 902 F.2d 1259, 1263 (7th Cir. 1990). That follows from the text of Section 1981, which guarantees an equal right to "make" contracts, not a right to equal treatment in the contracting *process* regardless of whether any contract could have resulted. *See CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 451 (2008) (explaining that Congress "defined the scope of § 1981 to include post-contract-formation conduct" but did not mention pre-formation conduct). If the racial

discrimination was not the but-for cause of the plaintiff's failure to "make" a contract, the plaintiff has no right to relief under Section 1981.

Likewise, "[t]o meet [Section 1983's] causation requirement, the plaintiff must establish … causation-in-fact," which exists "only if the injury would not have occurred 'but for' th[e defendant's] conduct." *Chaudhry v. Aragon*, 68 F.4th 1161, 1169 & n.11 (9th Cir. 2023).

Although the complaint describes the accomplishments of the students, it does not allege that I.P., E.S., or any SFFA member would have been admitted (or would be admitted in the future) to Kamehameha—*i.e.*, would have been able to enter into a contract for educational services—but for the challenged admissions policy or provide any plausible basis to believe that is true. *See* pp. 15-18, *supra*. That is fatal to the causation element of Sections 1981 and 1983, separate and apart from the Article III analysis. Although the complaint alleges that I.P. was placed on the waitlist, 4AC ¶14, it contains no allegations about how many applicants are placed on the waitlist or whether such a placement indicates that an applicant is sufficiently competitive that she would have been admitted but for the challenged policy.

## V. PLAINTIFFS DO NOT ADEQUATELY ALLEGE THAT KAMEHAMEHA IS A STATE ACTOR

Section 1983 claims are available only against state actors who act under color of state law. 42 U.S.C. § 1983. Only "in certain 'exceptional cases,'" will a private party "be treated as a state actor for constitutional purposes." *Children's Health Def.*

*v. Meta Platforms, Inc.*, 112 F.4th 742, 754 (9th Cir. 2024) (citation omitted), *cert. denied,* 145 S. Ct. 2846 (2025). In particular, plaintiffs must show that a private defendant "meet[s] two distinct requirements: (1) the 'state policy' requirement and (2) the 'state actor' requirement." *Id*. at 754 (citation omitted).

To satisfy either of those elements, a plaintiff must show that "the nature of the relationship between the private party and the government is such that 'the alleged infringement of federal rights is fairly attributable to the [government].'" *Children's Health Def.*, 112 F.4th at 754 (citation omitted). "In other words, a plaintiff must allege facts supporting an inference that the government 'is *responsible* for the specific conduct of which the plaintiff complains.'" *Id.* (citation omitted). This test "ensures that not all private parties 'face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them.'" *Collins v. Womancare*, 878 F.2d 1145, 1151 (9th Cir. 1989) (citation omitted).

In an attempt to fit within that standard, the fifth iteration of Plaintiffs' complaint advances a new, "alternative[]" argument that Kamehameha is a state actor. 4AC ¶¶136-142; *see* ¶¶107-136. That argument rests on *Pennsylvania v. Brown*, 270 F. Supp. 782, 789 (E.D. Pa. 1967), *aff'd*, 392 F.2d 120 (3d Cir. 1968), a district court decision issued decades before the modern state-action precedents of the Supreme Court and the Ninth Circuit.

*Brown* is irrelevant. There, the trust for a racially discriminatory college had been administered for decades by government officials, and the Supreme Court had already ruled that it was a state actor for that reason. *Pennsylvania v. Board of Directors of City Trusts of City of Philadelphia*, 353 U.S. 230, 231 (1957). After the state trustees were replaced by private trustees, the district court held that the college nevertheless retained the "imprimatur of State approval" given that long history. *Brown* 270 F. Supp. at 789. Right or wrong, that decision has no bearing on this case because Kamehameha has never been administered by state officials. Under the modern, controlling test set out above, Plaintiffs do not adequately allege that Kamehameha meets either the state-action or state-policy requirements.

### A. Plaintiffs Do Not Adequately Allege That Kamehameha Meets The State-Policy Requirement

To meet the state-policy requirement, plaintiffs must adequately allege that the "source of the alleged constitutional harm is a state statute or policy." *Children's Health Def.*, 112 F.4th at 754 (cleaned up). "This requirement is satisfied when a private institution 'enforces a ***state-imposed rule*** instead of the terms of its own rules.'" *Id.* (cleaned up) (emphasis added).

Here, Plaintiffs challenge Kamehameha's preference policy, but they do not allege that the preference policy was created or imposed by the government (and it was not). Thus, "the source of the alleged harm is [Kamehameha's] own policy . . . ,

not any provision of federal [or state] law." *Children's Health Def.*, 112 F.4th at 755 (citation omitted). That alone "is fatal to [their] state action claim." *Id.*

### B. Plaintiffs Do Not Adequately Allege That Kamehameha Meets The State-Actor Requirement

Plaintiffs' allegations are also insufficient to meet the state-actor requirement. As the Ninth Circuit has explained, the Supreme Court has identified four tests for when a private party "may fairly be said to be a state actor": (1) the public-function test, (2) the joint-action test, (3) the state-compulsion test, and (4) the nexus test. *O'Handley v. Weber*, 62 F.4th 1145, 1157 (9th Cir. 2023). None is met here. The state does not in any way influence or control Kamehameha's admission process.

**Public Function.** The public-function test asks whether the challenged activity is an exclusive public function. *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982). "'[V]ery few' functions fall into that category"; "those functions include, for example, running elections." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019) (citations omitted). Education is not an exclusive public function. In *Rendell-Baker*, the Supreme Court held that a private school was not a state actor for purposes of § 1983 even though nearly all the students in the school had been referred to the school by the state and public funds accounted for virtually all of the school's operating budget. 457 U.S. at 842; *see also Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806, 815 (9th Cir. 2010) (public charter schools operated by private nonprofits are not state actors).

Plaintiffs nevertheless argue that by providing a tuition-free education to students, Kamehameha performs a public function. 4AC ¶141d. But they cite no precedent for that proposition beyond *Brown*. If taken seriously, their position would render all schools that provide full scholarships to students state actors.

**Joint Action.** To meet their burden under the joint-action test, Plaintiffs must plead allegations sufficient to show that the private party is "inextricably intertwined" with the Hawai'i state government or federal government, which requires that "the government has so far insinuated itself into a position of interdependence with a private entity that the private entity must be recognized as a joint participant in the challenged activity." *Pasadena Republican Club v. W. Just. Ctr.*, 985 F.3d 1161, 1167 (9th Cir. 2021). No such allegations are in the complaint.

Plaintiffs' principal contention appears to be that because a probate court appoints trustees and approved the elimination of tuition, and because Kamehameha submits reports to the court, the state itself is responsible for the challenged preference policy—again relying heavily on *Brown*. 4AC ¶¶139, 141a-b. That is wrong. *Brown* itself acknowledged that "[m]ere supervision of and, if necessary, appointment of trustees by a probate court does not alone amount to a proscribed State entanglement." 270 F. Supp. at 787.

Hawai'i state courts—including probate courts—are independent forums in which parties may seek relief administered in accordance with state and federal law.

They are not "enlisted" (4AC ¶¶7-9) to meet private actors' demands, and any suggestion otherwise amounts to yet another unfounded attack on the integrity of Hawai'i governmental institutions. As the Supreme Court has explained, "merely resorting to the courts and being on the winning side of a lawsuit does not make a party a co-conspirator or a joint actor with the judge." *Dennis v. Sparks*, 449 U.S. 24, 28 (1980). Something more—such as "bribery of the judge"—is required. *Id*.

Plaintiffs' sweeping theory would transform all trusts overseen by courts nationwide into state actors. For example, federal bankruptcy courts regularly appoint trustees for debtors and oversee the operation of the trusts, including through reporting requirements. That does not render the actions taken by the trustee state action. *Lonneker Farms, Inc. v. Klobucher*, 804 F.2d 1096, 1097 (9th Cir. 1986) (bankruptcy trustee's conduct "under authority given [to] him" by the judge is not state action); *Mortimer v. Grodsky*, 2020 WL 6729118, at *4 (S.D.N.Y. Nov. 13, 2020) (collecting cases).

The complaint's other allegations of joint action are even more dubious. The fact that public school teachers refer applicants to Kamehameha—just as they might for a private university—is irrelevant. 4AC ¶141c. So is Kamehameha's charitable giving in the form of community initiatives and its partnerships with public institutions, all routine activities for private organizations. *Id.* And Plaintiffs acknowledge that tax exemptions do not establish state action. 4AC ¶141e.

**State Compulsion.** Plaintiffs do not allege that any governmental entity has compelled Kamehameha to adopt its admissions policy. *Ohno v. Yuko Yasuma*, 723 F.3d 984, 996 n.13 (9th Cir. 2013) (state compulsion requires a showing that "the state has 'exercised coercive power or has provided such significant encouragement, either overt or covert, that the private actor's choice must in law be deemed to be that of the State.'" (citation omitted)).

**Nexus.** Finally, the nexus test asks whether there exists "a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974). The Supreme Court has stressed that a close nexus cannot be presumed even in cases involving an entity, like a utility company, that is "heavily regulated" and has "something of a governmentally protected legal monopoly." *Id*. at 350-51. Something more is required.

Nothing in the complaint plausibly alleges such a close nexus here. For all the reasons given above with respect to the joint-action test, common circumstances like oversight by a probate court and tax exemptions are insufficient under the close-nexus requirement as well.

## VI. THE COURT SHOULD DISMISS PLAINTIFFS' FIFTH AND FOURTEENTH AMENDMENT CLAIMS

Plaintiffs appear to plead claims directly under the Fifth and Fourteenth Amendments. 4AC at 72, 79. For all the reasons provided above, the Court lacks

jurisdiction over those claims, and they fail on the merits. In addition, the complaint does not identify any legal ground for an implied cause of action directly under the Constitution. *See Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) ("Because implied causes of action are disfavored, the Court has been reluctant to extend *Bivens* liability 'to any new context or new category of defendants.'") (citation omitted).

**CONCLUSION**

For the foregoing reasons, the Court should dismiss with prejudice the Fourth Amended Complaint in its entirety for lack of subject-matter jurisdiction or, in the alternative, for failure to state a claim.

DATED: Honolulu, Hawai‘i, August 31, 2026.

*/s/ Joachim P. Cox*

JOACHIM P. COX
KAMALA S. HAAKE
JOHN F. BASH *(Pro Hac Vice)*
WILLIAM A. BURCK *(Pro Hac Vice)*
ELLYDE R. THOMPSON *(Pro Hac Vice)*

Attorneys for Defendant
TRUSTEES OF THE ESTATE OF
BERNICE PAUAHI BISHOP d/b/a
KAMEHAMEHA SCHOOLS