WATANABE ING LLP
A Limited Liability Law Partnership

SUMMER H. KAIAWE 9599
999 Bishop Street, 19th Floor
Honolulu, Hawaiʻi 96813
Telephone: (808) 544-8300
Facsimile: (808) 544-8399
E-mail: skaiawe@wik.com

Attorney for Amici Curiae
THE HONORABLE BRIAN SCHATZ, UNITED STATES SENATOR
THE HONORABLE MAZIE HIRONO, UNITED STATES SENATOR
THE HONORABLE ED CASE, UNITED STATES REPRESENTATIVE
THE HONORABLE JILL TOKUDA, UNITED STATES REPRESENTATIVE

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAIʻI

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS; I.P., B.P., E.S., by and through her next of friend and mother, K.S.; and K.S.;<br><br>Plaintiffs,<br><br>vs.<br><br>TRUSTEES OF THE ESTATE OF BERNICE PAUAHI BISHOP d/b/a KAMEHAMEHA SCHOOLS.<br><br>Defendant. | CIVIL NO. 1:25-cv-00450-MWJS-RT<br><br>BRIEF OF *AMICI CURIAE* THE HONORABLE BRIAN SCHATZ, UNITED STATES SENATOR, THE HONORABLE MAZIE HIRONO, UNITED STATES SENATOR, THE HONORABLE ED CASE, UNITED STATES REPRESENTATIVE, AND THE HONORABLE JILL TOKUDA, UNITED STATES REPRESENTATIVE IN SUPPORT OF DEFENDANT KAMEHAMEHA SCHOOLS' MOTION TO DISMISS FOURTH AMENDED COMPLAINT [ECF 152] [ECF 155]; CERTIFICATE OF COMPLIANCE<br><br>Judge: Honorable Micah W.J. Smith<br>Trial Date: None |

## TABLE OF CONTENTS

I. INTEREST OF AMICI CURIAE ....................................................1

II. INTRODUCTION ....................................................1

III. ARGUMENT ....................................................2

A. Congress Has Both Plenary Power and a Trust Responsibility to Protect Native Hawaiian Rights, Lands, Assets, and Resources Through Legislation Such as 42 U.S.C. § 11705(c)(4) ....................2

1. Congress Has Plenary Power Over Indian Affairs and an Attendant Trust Responsibility ....................2

2. Congress's Plenary Indian Affairs Power and Trust Responsibility Apply to the Native Hawaiian Community ......10

a. Congress's Plenary Indian Affairs Power and Trust Responsibility Apply to the Native Hawaiian Community as an Aboriginal, Indigenous People of the United States ....................10

b. Congress's Plenary Indian Affairs Power and Trust Responsibility Apply to the Native Hawaiian Community, Regardless of Its Current State of Internal Governmental Organization ....................14

B. For Over a Century, Congress Has Consistently Exercised Its Plenary Indian Affairs Power to Legislate Uniquely in Furtherance of Its Trust Responsibility to the Native Hawaiian Community ....................20

IV. CONCLUSION ....................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adarand Constructors v. Pena*,
515 U.S. 200 (1995)....9

*Arakaki v. Lingle*,
477 F.3d 1048 (9th Cir. 2007)....9

*Cherokee Nation v. Georgia*,
30 U.S. (5 Pet.) 1 (1831)....4

*Davis v. Guam*,
932 F.3d 822 (9th Cir. 2019)....6

*Delaware Tribal Bus. Comm. v. Weeks*,
430 U.S. 73 (1977)....5

*Doe v. Kamehameha Schs./Bernice Pauahi Bishop Estate*,
470 F.3d 827 (9th Cir. 2006)....6

*Haaland v. Brackeen*,
599 U.S. 255 (2023)....3, 18

*Kahawaiolaa v. Norton*,
386 F.3d 1271 (9th Cir. 2004)....9, 19

*Lone Wolf v. Hitchcock*,
187 U.S. 553 (1903)....3

*McKay v. Kalyton*,
204 U.S. 458 (1907)....4

*Minnesota v. Hitchcock*,
185 U.S. 373 (1902)....4

*Minnesota v. United States*,
305 U.S. 382 (1939)....4

*Morton v. Mancari*,
417 U.S. 535 (1974)....4, 9, 16

*Rice v. Cayetano*,
528 U.S. 495 (2000)....................6

*Santa Clara Pueblo v. Martinez*,
436 U.S. 49 (1978)....................5, 6

*Seminole Nation v. United States*,
316 U.S. 286 (1942)....................4

*United States v. Candelaria*,
271 U.S. 432 (1926)....................4

*United States v. Jicarilla Apache Nation*,
564 U.S. 162 (2011)....................3

*United States v. Kagama*,
118 U.S. 375 (1886)....................3, 4

*United States v. Lara*,
541 U.S. 193 (2004)....................3

*United States v. Mason*,
412 U.S. 391 (1973)....................4

*United States v. Mitchell*,
463 U.S. 206 (1983)....................4

*United States v. Sandoval*,
231 U.S. 28 (1913)....................6, 10

*United States v. Shoshone Tribe*,
304 U.S. 111 (1938)....................4

*United States v. Wheeler*,
435 U.S. 313 (1978)....................3

*Washington v. Confederated Bands & Tribes of Yakima Indian Nation*,
439 U.S. 463 (1979)....................3

*Yellen v. Confederated Tribes of the Chehalis Reservation*,
594 U.S. 338 (2021)....................17

**Statutes**


14 U.S.C. § 317 .......... 13

16 U.S.C. § 396a .......... 21

20 U.S.C. § 4401 .......... 23

20 U.S.C. § 7512 .......... 23

20 U.S.C. § 7512(8) .......... 21

25 U.S.C. § 177 .......... 11

25 U.S.C. § 1603(13) .......... 18

25 U.S.C. § 2902 .......... 22

25 U.S.C. § 3005 .......... 22

25 U.S.C. § 3010 .......... 22

25 U.S.C. § 5131 .......... 7

25 C.F.R. Part 83 .......... 7

29 U.S.C. § 3221 .......... 22

38 U.S.C. § 6307(c)(2)(D) .......... 12

42 U.S.C. § 290aa-5a .......... 12

42 U.S.C. § 1981 .......... 1, 26

42 U.S.C. § 11701(17) .......... 11

42 U.S.C. § 11705(c)(4) .......... *passim*

43 C.F.R. Part 50 .......... 7, 15

47 U.S.C. § 1723(i)(2) .......... 12

54 U.S.C. § 306102 .......... 22

Act of June 20, 1938, ch. 530, § 3, 52 Stat. 781, 784–85 .......... 21

Act of Nov. 2, 1994, Pub. L. No. 103-454, tits. II-III, 108 Stat. 4791 1143 (1991) .......... 7

Act of Sept. 21, 1994, Pub. L. No. 103-323, 108 Stat. 2152 (1994) .......... 8

Admission Act, Pub. L. No. 86-3, 73 Stat. 4, 5–6 (1959) .......... 22

Alaska Native Claims Settlement Act, 1971, 43 U.S.C. § 1601 .......... 11

Aroostook Band of Micmacs Settlement Act, Pub. L. No. 102-171, 105 Stat. 1143 (1991) .......... 8

Catawba Indian Tribe of South Carolina Land Claims Settlement Act of 1993, Pub. L. No. 103-116, 107 Stat. 1118 (1993) .......... 8

Coast Guard Authorization Act of 2025, Pub. L. No. 119-60, div. G, 139 Stat. 1658 (2025) .......... 7

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328 (2022) .......... 12

Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, div. H, § 148, 118 Stat. 3 (2004) .......... 12

Coos, Lower Umpqua and Siuslaw Restoration Act, Pub. L. No. 98-481, 98 Stat. 2250 (1984) .......... 8

Coquille Restoration Act, Pub. L. No. 101-42, 103 Stat. 91 (1989) .......... 8

Cow Creek Band of Umpqua Tribe of Indians Recognition Act, Pub. L. No. 97-391, § 3(a)-(b), 96 Stat. 1960 (1982) .......... 8

Elizabeth Dole 21st Century Veterans Healthcare and Benefits Improvement Act, Pub. L. No. 118-210 (2025) .......... 12

Grand Ronde Restoration Act, Pub. L. No. 98-165, § 4(a)-(b), 97 Stat. 1064 (1983) .......... 8

Hawaiian Home Lands Recovery Act, Pub. L. No. 104-42, tit. II, 109 Stat. 357 (1995) .......... 24

Hawaiian Homes Commission Act, 1920, ch. 42, 42 Stat. 108 (1921) .......... *passim*

Indian Trade and Intercourse Acts, Act of July 22, 1790, ch. 33,
1 Stat. 137 ....................................................................................11

Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat.
429 (2021)....................................................................................12

Joint Resolution of Nov. 23, 1993, Pub. L. No. 103-150, 107 Stat.
1510 (1993)....................................................................................23

Klamath Indian Tribe Restoration Act, Pub. L. No. 99-398, 100 Stat.
849 (1986)....................................................................................8

Little Traverse Bay Bands of Odawa Indians and the Little River Band of Ottawa
Indians Act, Pub. L. No. 103-324, 108 Stat. 2156 (1994) ....................................8

Lac Vieux Desert Band of Lake Superior Chippewa Indians Act, Pub.
L. No. 100-420, 102 Stat. 1577 (1989)....................................................8

Lumbee Fairness Act, Pub. L. No. 119-60, § 8803, 139 Stat. 1971(2025)
(2025) ....................................................................................7

Maine Indian Claims Settlement Act of 1980, Pub. L. No. 96-420, 94
Stat. 1785 (1980) ....................................................................................8

Mashantucket Pequot Indian Claims Settlement Act, Pub. L. No. 98-
134, 97 Stat. 851 (1983) ....................................................................................8

National Defense Authorization Act for Fiscal Year 2020, Pub. L. No.
116-92, 133 Stat. 1198 (2019)....................................................................................7

Native Hawaiian Education Act, 20 U.S.C. §§ 7511–7517....................................22

Native Hawaiian Health Care Improvement Act of 1988, 42 U.S.C. §§
11701–11714....................................................................................22

Omnibus Indian Advancement Act, Pub. L. No. 106-568, tits. VII,
XIV, 114 Stat. 2868 (2000) ....................................................................................7

Ponca Restoration Act, Pub. L. No. 101-484, 104 Stat. 1167 (1980) ........................8

Paiute Indian Tribe of Utah Restoration Act, Pub. L. No. 96-227, 94
Stat. 317 (1990)....................................................................................8

Sundry Civil Appropriations Act, ch. 2918, 34 Stat. 1295 (1907)..........................21

Texas Band of Kickapoo Act, Pub. L. No. 97-429, 96 Stat. 2269 (1983) .......... 8

Thomasina E. Jordan Indian Tribes of Virginia Federal Recognition Act of 2017, Pub. L. No. 115-121, 132 Stat. 40 (2018) .......... 7

Ysleta del Sur Pueblo and Alabama and Coushatta Indian Tribes of Texas Restoration Act, Pub. L. No. 100-89, 101 Stat. 666 (1987) .......... 8

VAWA Technical Amendment Act of 2022, Pub. L. No. 117-315, 136 Stat. 4404 (2022) .......... 11

Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, div. W, 136 Stat. 49 (2022) .......... 12

**Other Authorities**

25 C.F.R. pt. 83 .......... 19

43 C.F.R. pt. 50 .......... 15, 19, 25

81 Fed. Reg. 71,278, 71,278 (Oct. 14, 2016) .......... 15, 25

91 Fed. Reg. 4,102, 4,106 (Jan. 30, 2026) .......... 16

Davianna Pōmaikaʻi McGregor & Melody Kapilialoha MacKenzie, Moʻolelo Ea O Nā Hawaiʻi: History of Native Hawaiian Governance in Hawaiʻi (2015) .......... 11

H.R. 309, Native Hawaiian Government Reorganization Act of 2005, 109th Cong. (2005) .......... 25

H.R. 617, Native Hawaiian Government Reorganization Act of 2001, 107th Cong. (2001) .......... 25

H.R. 665, 108th Cong. (2003) .......... 25

H.R. 4904, Native Hawaiian Government Reorganization Act of 2000, 106th Cong. (2000) .......... 24

H.R. Rep. No. 66-839 (1920) .......... 21

S. 2899, Native Hawaiian Government Reorganization Act of 2000, 106th Cong. (2000) .......... 24

S. 746, Native Hawaiian Government Reorganization Act of 2001,
107th Cong. (2001) ........................................................................25

S. 147, Native Hawaiian Government Reorganization Act of 2005,
109th Cong. (2005) ........................................................................25

S. 310, Native Hawaiian Government Reorganization Act of 2007,
110th Cong. (2007) ........................................................................25

S. 1011, Native Hawaiian Government Reorganization Act of 2009,
111th Cong. (2009) ........................................................................25

S. 675, Native Hawaiian Government Reorganization Act of 2011,
112th Cong. (2011) ........................................................................25

## I. INTEREST OF AMICI CURIAE

This amicus brief is filed by the members of the Hawaiʻi Congressional Delegation—United States Senators Brian Schatz and Mazie Hirono and United States Representatives Ed Case and Jill Tokuda—each of whom has taken an active role during their tenure in Congress in legislation advancing the unique trust relationship between the United States and the Native Hawaiian Community. Amici have a shared interest in this case because the issues presented implicate Congress's authority to legislate in furtherance of the federal government's trust obligations to the Native Hawaiian Community. Through this brief, amici provide the Court with important additional context regarding the trust relationship between the federal government and the Native Hawaiian Community, and the manner in which legislation regarding the Native Hawaiian Community—such as 42 U.S.C. § 11705(c)(4), which exempts Kamehameha Schools' preference policy from 42 U.S.C. § 1981—fits within and furthers Congress's obligations as the branch of government constitutionally vested with plenary power over all Indian affairs, including Native Hawaiian affairs.

## II. INTRODUCTION

In 2010, Congress passed legislation expressly reaffirming that it is "lawful for [Kamehameha Schools] to continue to offer its educational programs and services to Native Hawaiians . . . first and to others only after the need for such

programs and services by Native Hawaiians has been met." 42 U.S.C. § 11705(c)(4). That enactment reflects Congress's exercise of its constitutional authority over Indian affairs and its longstanding trust responsibilities towards the Native Hawaiian Community. Legislation protecting the rights of an aboriginal, indigenous Native community to use Native resources on Native lands to advance Native educational objectives, all in furtherance of self-determination, falls squarely within that authority. It is consistent with applicable law and policy defining the plenary power and its attendant trust responsibilities, as well as more than a century of continuous congressional exercise of the power in furtherance of the United States' unique trust obligations to the Native Hawaiian Community. Accordingly, the Court should uphold the constitutionality of 42 U.S.C. § 11705(c)(4) in all respects and dismiss this case.

## III. ARGUMENT

### A. Congress Has Both Plenary Power and a Trust Responsibility to Protect Native Hawaiian Rights, Lands, Assets, and Resources Through Legislation Such as 42 U.S.C. § 11705(c)(4).

#### 1. Congress Has Plenary Power Over Indian Affairs and an Attendant Trust Responsibility.

The United States Supreme Court has repeatedly reaffirmed Congress's plenary and exclusive power over Indian affairs. This authority derives from the Indian Commerce Clause and other constitutional provisions, as well as an extensive body of related treaties and laws that define federal policy toward Native

Nations. *See*, *e.g.*, *Haaland v. Brackeen*, 599 U.S. 255, 272–75 (2023) (explaining that Congress's power over Indian affairs is "well established and broad," and "plenary and exclusive," and that it derives from several constitutional provisions and structural considerations); *United States v. Lara*, 541 U.S. 193, 200 (2004) (reaffirming Congress's "plenary power to legislate in the field of Indian affairs"); *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 470 (1979) (describing Congress's power over Indian affairs as plenary and exclusive); *United States v. Wheeler*, 435 U.S. 313, 319 (1978) (citing Congress's plenary power as an "undisputed fact"); *Lone Wolf v. Hitchcock*, 187 U.S. 553, 565 (1903) (affirming that Congress's plenary power "has always been deemed a political one, not subject to be controlled by the judicial department of the government."); *United States v. Kagama*, 118 U.S. 375, 384 (1886) (explaining that the plenary power "has always been recognized by the executive, and by [C]ongress, and by [the Supreme Court], whenever the question has arisen."). Congress exercises this plenary Indian affairs power against the backdrop of a longstanding federal trust responsibility that the Supreme Court has repeatedly reaffirmed. *See*, *e.g.*, *Haaland*, 599 U.S. at 274 ("the trust relationship between the United States and the Indian people informs the exercise of legislative power") (internal citations omitted); *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 176 (2011) ("We do not question 'the undisputed existence of a general trust

relationship between the United States and the Indian people.' The Government, following 'a humane and self imposed policy … has charged itself with moral obligations of the highest responsibility and trust,' obligations 'to the fulfillment of which the national honor has been committed[.]'") (citations omitted); *United States v. Mitchell*, 463 U.S. 206, 225–26 (1983) ("Our construction of these statutes and regulations is reinforced by the undisputed existence of a general trust relationship between the United States and the Indian people."); *see also United States v. Mason*, 412 U.S. 391, 398 (1973); *Seminole Nation v. United States*, 316 U.S. 286, 296–97 (1942); *Minnesota v. United States*, 305 U.S. 382, 386 (1939); *United States v. Shoshone Tribe*, 304 U.S. 111, 117–18 (1938); *United States v. Candelaria*, 271 U.S. 432, 442 (1926); *McKay v. Kalyton*, 204 U.S. 458, 469 (1907); *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831); *United States v. Kagama*, 118 U.S. 375, 382–84 (1886); *Minnesota v. Hitchcock*, 185 U.S. 373, 396 (1902).

This plenary constitutional authority carries with it a settled and deferential standard of judicial review. Because legislation enacted pursuant to Congress's plenary Indian affairs power rests on the unique political status of Native peoples and Congress's trust obligations to them, the Supreme Court has long held that such legislation is not subject to strict scrutiny. *Morton v. Mancari*, 417 U.S. 535, 553 (1974). Instead, "[a]s long as the special treatment can be tied rationally to the

fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed." *Id.* at 555; *accord Delaware Tribal Bus. Comm. v. Weeks*, 430 U.S. 73, 84–85 (1977). Accordingly, when reviewing the constitutionality of a statute such as 42 U.S.C. § 11705(c)(4), Congress's exercise of its plenary Indian affairs power is measured by the statute's rational relationship to Congress's trust obligations, which are well-established here.

Importantly, neither the use of Native ancestry to determine membership, nor the current lack of a formal federally recognized governing entity remove the Native Hawaiian Community from the scope of Congress's plenary Indian affairs power or alter the applicable deferential standard of review.

First, it is a bedrock principle of federal Indian law that Native peoples have exclusive sovereign authority to determine their own membership criteria without reference to western equal protection principles. *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 n.32 (1978) (affirming that the right to define membership "has long been recognized as central to [a Native people's] existence as an independent political community," and declining to let federal courts review a membership ordinance challenged as sex-discriminatory, given "the often vast gulf between tribal traditions and those with which federal courts are more intimately familiar"). Pursuant to this sovereign authority, and consistent with Supreme Court precedent, nearly every Native community with whom the federal

government transacts uses Native ancestry as a membership criterion, and the federal government routinely does as well. *See*, *e.g.*, *United States v. Sandoval*, 231 U.S. 28, 46 (1913) (describing "Indian lineage" as a proper factor to consider when determining tribal status); *Santa Clara Pueblo*, 436 U.S. at 62 (recognizing that Congress selectively imposes constitutional restrictions to accommodate tribes' "unique political, cultural, and economic needs"); *Doe v. Kamehameha Schs./Bernice Pauahi Bishop Estate*, 470 F.3d 827, 851-52 (9th Cir. 2006) (en banc) (Fletcher, J., concurring) (listing ancestry-based federal Indian laws). Although it is often cited as authority on this point, *Rice v. Cayetano*, 528 U.S. 495 (2000) is inapposite because it pertains specifically to a state government's alleged use of Native ancestry as a "proxy for race" in the voting criteria of a statewide election, and the Court expressly declined to extend its analysis to the use of Native ancestry by a Native polity or by Congress in the exercise of its plenary Indian affairs power. *See id.* at 514, 518–19, 522. As explained in *Davis v. Guam*, 932 F.3d 822 (9th Cir. 2019), "[t]he Supreme Court selected its words carefully when it struck down the voting restrictions at issue in *Rice*. It stated that '[a]ncestry *can* be a proxy for race' . . . not that it always is." *Id.* at 834 (emphasis added) ("Our first inquiry is whether . . . *Rice* held *all* classifications based on ancestry to be impermissible proxies for race. It did not.")

In addition, the Native Hawaiian Community's current lack of a formal federally recognized governing entity does not limit Congress's plenary power or trust obligations. Formal government-to-government recognition of specific Native peoples is a byproduct—not the source—of Congress's plenary Indian affairs power, and as such, formal federal recognition is not required to bring a Native community within the scope of Congress's authority. Treating inclusion on an administratively generated list of federally recognized tribes as the exclusive measure of Congress's authority would conflate administrative recognition with the constitutional and statutory bases for Congress's action.[1] The argument that a

[1] Neither the Department of the Interior's publication of its list (pursuant to Congress's 1994 directive in 25 U.S.C. § 5131), nor its administration of its own formal federal recognition processes through 25 C.F.R. Part 83 and 43 C.F.R. Part 50, limits Congress's original constitutional authority over Indian affairs and its plenary power to establish, recognize, and define the parameters of the federal government's political relationships with Native communities in the United States. Since Interior established its 25 C.F.R. Part 83 process in 1978, Congress has continually exercised its own original authority to recognize, restore, and reaffirm political relationships with 30 Native communities, including the passage of a formal federal recognition act in the current Congress. *See*, *e.g.*, Lumbee Fairness Act, Pub. L. No. 119-60, § 8803, 139 Stat. 1971(2025) (recognizing the Lumbee Tribe of North Carolina); National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, § 2870, 133 Stat. 1198, 1907-09 (2019) (recognizing Little Shell Tribe of Chippewa Indians of Montana); Thomasina E. Jordan Indian Tribes of Virginia Federal Recognition Act of 2017, Pub. L. No. 115-121, 132 Stat. 40 (2018) (recognizing Chickahominy Indian Tribe, Chickahominy Indian Tribe—Eastern Division, Upper Mattaponi Tribe, Rappahannock Tribe, Inc., Monacan Indian Nation, and Nansemond Indian Tribe); Omnibus Indian Advancement Act, Pub. L. No. 106-568, tits. VII, XIV, 114 Stat. 2868, 2914, 2939 (2000) (reaffirming Shawnee Tribe and restoring Federated Indians of Graton Rancheria); Act of Nov. 2, 1994, Pub. L. No. 103-454, tits. II–III, §§ 203, 303(a),108 Stat. 4791, 4792–96

(1994) (reaffirming Central Council of the Tlingit and Haida Indian Tribes of Alaska and restoring Paskenta Band of Nomlaki Indians of California); Little Traverse Bay Bands of Odawa Indians and the Little River Band of Ottawa Indians Act, Pub. L. No. 103-324, § 4(a), 108 Stat. 2156, 2157 (1994) (reaffirming Little Traverse Bay Bands of Odawa Indians and the Little River Band of Ottawa Indians); Act of Sept. 21, 1994, Pub. L. No. 103-323, 108 Stat. 2152 (1994) (reaffirming Pokagon Band of Potawatomi Indians); Catawba Indian Tribe of South Carolina Land Claims Settlement Act of 1993, Pub. L. No. 103-116, § 4(a)(1), 107 Stat. 1118, 1121 (1993) (restoring Catawba Indian Tribe of South Carolina); Aroostook Band of Micmacs Settlement Act, Pub. L. No. 102-171, § 6(a), 105 Stat. 1143, 1148 (1991) (recognizing Aroostook Band of Micmacs); Ponca Restoration Act, Pub. L. No. 101-484, §§ 3-4(a), 104 Stat. 1167 (1990) (restoring Ponca Tribe of Nebraska); Coquille Restoration Act, Pub. L. No. 101-42, § 3(a)-(b), 103 Stat. 91 (1989) (restoring Coquille Indian Tribe); Lac Vieux Desert Band of Lake Superior Chippewa Indians Act, Pub. L. No. 100-420, § 4(a), 102 Stat. 1577-78 (1988) (reaffirming Lac Vieux Desert Band of Lake Superior Chippewa Indians); Ysleta del Sur Pueblo and Alabama and Coushatta Indian Tribes of Texas Restoration Act, Pub. L. No. 100-89, §§ 103, 203(a), 101 Stat. 666, 667, 670 (1987) (restoring Ysleta del Sur Pueblo and Alabama-Coushatta Tribe of Texas); Klamath Indian Tribe Restoration Act, Pub. L. No. 99-398, §2(a)-(b), 100 Stat. 849 (1986) (restoring Klamath Tribes); Coos, Lower Umpqua and Siuslaw Restoration Act, Pub. L. No. 98-481, §3(a)-(b), 98 Stat. 2250 (1984) (restoring Confederated Tribes of Coos, Lower Umpqua and Siuslaw Indians); Grand Ronde Restoration Act, Pub. L. No. 98-165, § 4(a)-(b), 97 Stat. 1064-65 (1983) (restoring Confederated Tribes of the Grand Ronde Community of Oregon); Mashantucket Pequot Indian Claims Settlement Act, Pub. L. No. 98-134, § 9(a), 97 Stat. 851, 855 (1983) (recognizing Mashantucket Pequot Tribe); Texas Band of Kickapoo Act, Pub. L. No. 97-429, § 2(b), 96 Stat. 2269 (1983) (recognizing Texas Band of Kickapoo Indians); Cow Creek Band of Umpqua Tribe of Indians Recognition Act, Pub. L. No. 97-391, § 3(a)-(b), 96 Stat. 1960 (1982) (restoring Cow Creek Band of Umpqua Tribe of Indians); Maine Indian Claims Settlement Act of 1980, Pub. L. No. 96-420, §§ 6(i) and 7(b), 94 Stat. 1785, 1794-95 (1980) (recognizing Houlton Band of Maliseet Indians); Paiute Indian Tribe of Utah Restoration Act, Pub. L. No. 96-227, § 3(a)-(b), 94 Stat. 317-18 (1980) (restoring Paiute Indian Tribe of Utah).

Native people must be formally federally recognized and appear on an administratively generated list to come under Congress's original and plenary constitutional authority over all Indian affairs (which importantly includes the authority to define and alter the parameters of federal recognition in the first place) is oversimplified and illogical.[2] As explained below, the application of Congress's plenary Indian affairs power and trust responsibility is based on the pre-existing inherent sovereign status of the Native community; it does not depend upon the Community maintaining any specific form of internal government or appearing on an administrative list. In the absence of a formal federally recognized governing entity, Congress can and should fulfill its trust responsibilities to a Native community by legislating in support of institutions that perform the work of Native self-governance and self-determination on behalf of that community. Congress did exactly this when it passed Section 11705(c)(4) in support of Kamehameha

---

[2] None of the cases commonly cited for this proposition are on point. *Mancari* explains why Congress's unique treatment of federally recognized tribal members is constitutionally permissible, but it does not go so far as to hold that federal recognition is a necessary prerequisite for Congress's exercise of its Indian affairs authority. *Adarand Constructors v. Pena*, 515 U.S. 200 (1995) merely states a generic proposition about racial classifications in a completely different context that did not factor in or implicate federal Indian law into its analysis at all; *Kahawaiolaa v. Norton*, 386 F.3d 1271 (9th Cir. 2004) actually cuts against the proposition by applying rational basis review to a federal regulation singling out Native Hawaiians for unique treatment; and *Arakaki v. Lingle*, 477 F.3d 1048 (9th Cir. 2007) focuses on the justiciability of questions regarding the Native Hawaiian Community's status, not the scope of Congress's authority to legislate on the matter.

Schools' work to further the Native Hawaiian Community's self-determination through its unique educational mission, which carries on the centuries-old traditional and customary practice of Native Hawaiian chiefs providing for the education and well-being of their people.

### 2. Congress's Plenary Indian Affairs Power and Trust Responsibility Apply to the Native Hawaiian Community.

#### a. Congress's Plenary Indian Affairs Power and Trust Responsibility Apply to the Native Hawaiian Community as an Aboriginal, Indigenous People of the United States.

Congress's plenary Indian affairs power includes the authority to determine whether a specific indigenous community or body of people fits within the scope of the power. *See Sandoval*, 231 U.S. at 46 (recognizing that whether, to what extent, and for how long an Indian community or body of people shall be recognized as requiring the protection of the United States are questions for Congress, not the courts). For over 200 years, Congress has exercised this authority to legislate in furtherance of its trust responsibility to several hundreds of distinct aboriginal, indigenous peoples from widely varied geographic and ethnic backgrounds—both within the original limits of the United States and territory subsequently acquired—including American Indian communities from all regions of the continental United States, Alaska Native communities from the Arctic and

sub-Arctic regions of Alaska, and the Native Hawaiian Community from across the Hawaiian Islands.[3]

As "the aboriginal, indigenous people who settled the Hawaiian archipelago, founded the Hawaiian nation and exercised sovereignty over the islands that subsequently became the Hawaiian Kingdom and Constitutional Monarchy, the Republic of Hawai‘i, the Territory of Hawai‘i and the State of Hawai‘i,"[4] Native Hawaiians clearly fit within the scope of Congress's plenary Indian affairs power and attendant trust responsibility as a matter of historical and anthropological fact. Further, Congress expressly stated that "[t]he authority of the Congress under the United States Constitution to legislate in matters affecting the aboriginal or indigenous peoples of the United States includes the authority to legislate in matters affecting the native peoples of . . . Hawaii," 42 U.S.C. § 11701(17), and Congress has consistently exercised its authority to legislate for Native Hawaiians alongside American Indians and Alaska Natives. Recent examples include: the VAWA Technical Amendment Act of 2022, Pub. L. No. 117-315, 136 Stat. 4404 (2022) (amending the Violence Against Women Act (VAWA) and the Omnibus

---

[3] *See, e.g.*, Indian Trade and Intercourse Acts, Act of July 22, 1790, ch. 33, 1 Stat. 137 (current version at 25 U.S.C. § 177), Alaska Native Claims Settlement Act, 1971, 43 U.S.C. § 1601, and Hawaiian Homes Commission Act, 1920, ch. 42, 42 Stat. 108 (1921).

[4] Davianna Pōmaika‘i McGregor & Melody Kapilialoha MacKenzie, Mo‘olelo Ea O Nā Hawai‘i: History of Native Hawaiian Governance in Hawai‘i, at 26 (2015).

Crime Control and Safe Streets Act to extend VAWA grant and victim-service programs to Native Hawaiian communities and organizations); Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021) (47 U.S.C. § 1723(i)(2) (reserving a share of State Digital Equity Capacity Grant Program funds for Indian Tribes, Alaska Native entities, and Native Hawaiian organizations); *id.* § 1741(a)(11) (defining "Native entity" eligible for middle-mile broadband grants to include an Indian Tribe, an Alaska Native Corporation, and a Native Hawaiian organization)); Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, div. W, 136 Stat. 49 (2022) (34 U.S.C. § 12291(a)(42) (defining "tribal coalition" to include a Native Hawaiian organization alongside Indian and Alaska Native organizations); *id.* § 10441(d) (authorizing tribal-coalition grants to combat domestic and sexual violence against "Indian or Native Hawaiian women")); Consolidated Appropriations Act, 2023, Pub. L. No. 117-328 (2022) (42 U.S.C. § 290aa-5a (funding behavioral-health and substance-use services among American Indians, Alaska Natives, and Native Hawaiians, and making Native Hawaiian health organizations eligible entities)); Senator Elizabeth Dole 21st Century Veterans Healthcare and Benefits Improvement Act, Pub. L. No. 118-210 (2025) (38 U.S.C. § 6307(c)(2)(D) (requiring veterans-outreach grants to address the needs of American Indian veterans, Alaska Native veterans, or Native Hawaiian veterans)); Coast Guard Authorization Act of 2025 (14 U.S.C. § 317

(establishing a Special Advisor to the Commandant for Tribal and Native Hawaiian Affairs to serve Indian Tribes, Tribal organizations, and Native Hawaiian organizations); *id.* § 722 (authorizing grants to eligible entities including Native Hawaiian organizations, Indian Tribes, and Tribal organizations to mitigate impacts of Coast Guard actions on natural and cultural resources).

In addition, Congress's own legislative infrastructure affirms its determination that Native Hawaiians fit within the scope of Congress's Indian affairs power and trust responsibility. For example, the Senate Committee on Indian Affairs asserts jurisdiction over legislation pertaining to American Indians, Alaska Natives, and Native Hawaiians, pursuant to the Committee's mandate to study the unique problems of those communities and propose legislation to alleviate such difficulties, including in the areas of education, economic development, land management, trust responsibilities, health care, and claims against the United States.[5] Similarly, within the House of Representatives, Native

---

[5] About the Committee, S. Comm. on Indian Affairs, https://www.indian.senate.gov/about/ (last visited Sept. 29, 2026). Native Hawaiian interests have historically been well-represented on the Senate Committee, with a Hawaiʻi senator serving on the Committee in every Congress since the Committee's re-establishment in 1977, except for the very first Congress (95th Congress, 1977-1979). Moreover, a Hawaiʻi senator has served as either Chairman or Vice Chairman of the Committee in 13 of the 25 Congresses—Daniel K. Inouye (Chairman 1987-1995 and 2001-2003; Vice Chairman 1995-2001 and 2005-2007), Daniel K. Akaka (Chairman 2011-2013), and Brian E. Schatz (Chairman 2021-2025; Vice Chairman 2025-present)—giving Hawaiʻi the most extensive leadership presence on the Committee by nearly a twofold margin.

Hawaiians are grouped with American Indians and Alaska Natives under the jurisdiction of the House Committee on Natural Resources' Subcommittee on Indian and Insular Affairs, which "oversees most policies regarding Native Americans, including American Indians, Alaska Natives, and Native Hawaiians."[6]

This sustained and long-standing legislative practice supports Congress's treatment of the Native Hawaiian Community as an aboriginal, indigenous people of the United States within the scope of its Indian affairs authority and unique trust relationship.

**b. Congress's Plenary Indian Affairs Power and Trust Responsibility Apply to the Native Hawaiian Community, Regardless of Its Current State of Internal Governmental Organization.**

Just as Congress's plenary Indian affairs power and trust responsibility extend to aboriginal, indigenous peoples of various geographic and ethnic origins, they also extend to aboriginal, indigenous peoples in various stages of internal governmental organization. This includes Native peoples like Native Hawaiians

---

[6] Indian and Insular Affairs, H. Comm. on Nat. Res., https://naturalresources.house.gov/issues/issue/?IssueID=5066 (last visited Sept. 29, 2026) (referencing Rules of the H. Comm. on Nat. Res., 119th Cong., R. 6(a) (2025) (prescribing the jurisdiction of the Subcommittee on Indian and Insular Affairs)). Native Hawaiian interests have also been well-represented on the House Subcommittee in recent years, with Hawai‘i representatives serving in seven of the nine Congresses from the 111th through the 119th, including Representative Colleen Hanabusa, who served in leadership as Ranking Minority Member in the 113th Congress.

who are not currently represented by a formal governing entity, but rather, exercise their inherent Native sovereignty through a strategic framework of Native entities.[7]

As the Department of the Interior clearly explained in its Procedures for Reestablishing a Formal Government-to-Government Relationship With the Native Hawaiian Community, the current lack of a formal Native Hawaiian governing entity is not dispositive of whether Congress's plenary power and trust responsibility apply to the Native Hawaiian Community:

> The Native Hawaiian community's current relationship with the United States has substantively all of the other attributes of a government-to-government relationship, and might be described as a "sovereign to sovereign" or "government to sovereign" relationship. ***It is important to note that a special political and trust relationship may continue to exist even without a formal government-to-government relationship.***

81 Fed. Reg. 71,278, 71,278 (Oct. 14, 2016) (codified at 43 C.F.R. pt. 50). (emphasis added). Here, Congress has recognized and repeatedly reaffirmed a trust relationship with the Native Hawaiian Community as an aboriginal, indigenous people pursuant to Congress's plenary Indian affairs power, and that relationship—standing alone—is sufficient to render Congress's legislative action in support of Native Hawaiians valid and constitutional. The reestablishment of a formal

[7] *See* 43 C.F.R. Part 50 (detailing continuous Native Hawaiian governance from the pre-contact period to the contemporary era through trusts, royal orders, civic clubs, and other Native Hawaiian organizations).

government-to-government relationship, while important to effective implementation and administration of the trust relationship, is not a prerequisite to Congress's authority to legislate in furtherance of it. The Native Hawaiian Community's pre-existing sovereignty, enduring political status, and continued exercise of inherent sovereignty provide the foundation for the unique political and trust relationship Congress has acknowledged. Against that background, the constitutional inquiry is whether the challenged legislation is rationally related to fulfillment of Congress's unique obligations toward the Community. *See Mancari*, 417 U.S. at 555. Section 11705(c)(4) satisfies that standard by advancing the work of a Native Hawaiian educational institution serving the Native Hawaiian Community with the land and resources of Native Hawaiian ruling chiefs per a testamentary directive issued in the sovereign Kingdom of Hawaiʻi prior to United States annexation.

Congress's plenary power and trust responsibility apply to the Native Hawaiian Community despite its absence from the Department of the Interior's list of "Indian Entities Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs" (91 Fed. Reg. 4,102, 4,106 (Jan. 30, 2026)). While the Department of the Interior's list is a helpful administrative tool for identifying federally recognized Indian Tribes, the list does not act as a legal constraint on Congress's plenary constitutional authority to legislate with respect to

other aboriginal, indigenous entities in a bespoke manner that is responsive to the unique experiences of the specific communities.

For example, the Supreme Court's decision in *Yellen v. Confederated Tribes of the Chehalis Reservation*, 594 U.S. 338 (2021) confirms that Congress's Indian affairs power reaches indigenous entities beyond the Department of the Interior's list. *Id.* at 350–52. There, the Court upheld Congress's authority to treat Alaska Native Corporations—unlisted, state-chartered, for-profit entities—as "Indian tribes" for limited statutory purposes under the Coronavirus Aid, Relief, and Economic Security Act and the Indian Self-Determination and Education Assistance Act. *Id*. In doing so, the Court rejected the view that Congress may confer such rights and benefits only on federally recognized tribal governments, reaffirming Congress's authority to include unlisted indigenous entities within Indian affairs legislation when it determines that inclusion is warranted. *See id.* at 351 (noting the need to move beyond the basic "federally recognized tribe" framework and perform a specialized analysis when dealing with *sui generis* entities "tailored to unique circumstances" and "recreated nowhere else").

Similarly, in *Haaland*, the Court upheld Indian Child Welfare Act (ICWA) provisions extending the Act's reach to Indian children and families whose enrollment or formal recognition status may be unresolved or developing. 599 U.S. at 292–94. The Court directly considered the statute's reach to children who are not

enrolled tribal members but are eligible for membership and have a biological parent who is a member, and it confirmed that such provisions fall within Congress's Indian affairs authority. *Id.* at 292–96; *see also* 25 U.S.C. § 1903(4). Further evidence of Congress's authority to legislate beyond Interior's list can also be found in the Indian Health Care Improvement Act, where the term "Indian" is defined for certain purposes to include members of state-recognized and terminated tribes, as well as individuals who are first or second degree descendants of tribal members. *See* 25 U.S.C. § 1603(13). As noted by Kamehameha Schools in its Motion to Dismiss Plaintiffs' Fourth Amended Complaint (Dkt. 155-1), the Supreme Court has consistently upheld statutes and other exercises of the federal Indian affairs power beyond the narrow context of formal tribal membership. *See* Mot. 40.

It is also important to note that Interior's list is exclusive to federally recognized Indian Tribes, and both Congress and the Native Hawaiian Community have historically viewed the Community's relationship with the federal government as a unique one-of-one indigenous trust relationship, coming under the broad Indian affairs power of Congress and running parallel to, but not coextensive with, the distinct relationship between the United States and federally recognized Indian Tribes. *See Kahawaiolaa v. Norton*, 386 F.3d 1271, 1282–83 (9th Cir. 2004) (affirming Congress's authority to "establish[ ] a program of federal benefits and

entitlements for native Hawaiians that is different from that afforded federally recognized Indian tribes in the contiguous United States and Alaska . . . [a]lthough native Hawaiians enjoy many of the ‘same rights and privileges accorded to American Indian, Alaska Native, Eskimo, and Aleut communities’ under certain statutes”). Consistent with this legal framework, every contemporary iteration of the Native Hawaiian Government Reorganization Act introduced in Congress emphasizes that, upon reestablishment of the government-to-government relationship, the Native Hawaiian Community will maintain its own federal benefit structure, separate and apart from the benefit structures established for American Indians and Alaska Natives. *See* Section III.B, *infra*. Likewise, Interior has not brought Native Hawaiians within the scope of its 25 C.F.R. pt. 83 Procedures for Federal Acknowledgement of Indian Tribes, but rather, has applied its expertise to create a parallel process unique to the Native Hawaiian Community through its 43 C.F.R. pt. 50 Procedures for Reestablishing a Formal Government-to-Government Relationship With the Native Hawaiian Community. These legislative and administrative regulatory actions demonstrate that neither the federal government nor the Native Hawaiian Community are trying to shoehorn the Community into the specific mold of an “Indian Tribe.” Rather, they are adopting carefully curated ways to administer their long-standing, firmly established, and constitutionally grounded Native trust relationship, including through potential reestablishment of a

formal government-to-government relationship, should that be the Community's preference.

For these reasons, the Native Hawaiian Community's current lack of a formal federally recognized governing entity to administer its inherent sovereignty is not fatal to the applicability of Congress's plenary Indian affairs power and trust responsibility. The power and responsibility apply as a matter of law and policy based on the Native Hawaiian Community's pre-existing inherent sovereignty and resulting special political and trust relationship, regardless of its current manner of internal governance or appearance on any administrative list.

### B. For Over a Century, Congress Has Consistently Exercised Its Plenary Indian Affairs Power to Legislate Uniquely in Furtherance of Its Trust Responsibility to the Native Hawaiian Community.

Over the past century, Congress has exercised its plenary Indian affairs power to enact over 150 statutes reaffirming, shaping, and implementing its trust relationship with the Native Hawaiian Community.

Shortly after the territorial period began in 1900, Congress began enacting legislation directed specifically at Native Hawaiians, including appropriations for research regarding "the American Indians and the natives of Hawaii." Sundry Civil Appropriations Act, ch. 2918, 34 Stat. 1295, 1310 (Mar. 4, 1907). In 1921, Congress officially codified the United States' trust relationship with the Native Hawaiian Community by enacting the Hawaiian Homes Commission Act to create

a homesteading program for Native Hawaiians. *See* Hawaiian Homes Commission Act ("HHCA"), 1920, ch. 42, 42 Stat. 108 (1921); *see also* 20 U.S.C. § 7512(8) ("Through enactment of the Hawaiian Homes Commission Act, . . . Congress affirmed the special relationship between the United States and the Native Hawaiians[.]"). Notably, the House Report on the Hawaiian Homes Commission Act concluded there was "no constitutional difficulty whatever" with setting aside and developing lands "for native Hawaiians only," explicitly invoking "previous enactments granting Indians" and others special land privileges as precedents. H.R. Rep. No. 66-839, at 6–7 (1920). This Native Hawaiian homesteading framework was later expanded in the Kalapana Extension Act of 1938, which provided for Native Hawaiian fishing, gathering, and homesteading in Volcanoes National Park. Act of June 20, 1938, ch. 530, § 3, 52 Stat. 781, 784–85 (codified at 16 U.S.C. § 396a).

When Hawai‘i became a state in 1959, the Admission Act further acknowledged the United States' trust relationship with the Native Hawaiian Community by delegating certain federal trust obligations to the newly created State of Hawai‘i. In particular, the Admission Act mandated that the State, as an express condition of admission to the union, administer the Hawaiian Homes Commission Act under federal oversight, encompassing approximately 200,000 acres of Hawaiian home lands, and manage approximately 1.2 million acres of

Hawaiian Kingdom Crown and Government lands for the betterment of the conditions of Native Hawaiians, among other public trust purposes. HHCA, 1920, §§ 203-24, 42 Stat. 108, 109–12 (1921); Admission Act, Pub. L. No. 86-3, §§ 4, 5(b), (f), 73 Stat. 4, 5–6 (1959); Haw. Dep't of Hawaiian Home Lands, About, https://dhhl.hawaii.gov/about/ (last visited Oct. 18, 2026) (explaining that approximately 200,000 acres were set aside under the HHCA); H.R. Conf. Comm. Rep. No. 116, in 1997 Haw. H.J. 1084, 1084 (identifying approximately 1.2 million acres of state lands subject to the 5(f) public trust).

Pursuant to the trust relationship first codified in the Hawaiian Homes Commission Act and further reaffirmed in the Hawaiʻi Admissions Act, Congress has consistently legislated the affairs of the Native Hawaiian Community through the present day. In fact, since the termination era of federal Indian policy gave way to the self-determination era in the early 1970s, legislation in furtherance of the Native Hawaiian trust relationship has been passed in an unbroken chain of 27 Congresses, from the 93rd (1973-1974) through the current 119th (2025-2026). Key programmatic examples include the Native Hawaiian Health Care Improvement Act of 1988, 42 U.S.C. §§ 11701–11714; the Native Hawaiian Education Act, 20 U.S.C. §§ 7511–7517; and Native Hawaiian provisions in several Indian law statutes addressing workforce development (*see*, *e.g.*, 29 U.S.C. § 3221), historic and cultural preservation (*see*, *e.g.*, 54 U.S.C. § 306102, 25

U.S.C. § 3005, 3010), Native language education (*see*, *e.g.*, 25 U.S.C. § 2902), religious freedom (*see*, *e.g.*, 20 U.S.C. § 7512), and cultural programs (*see*, *e.g.*, 20 U.S.C. § 4401). Congress expressly states that it "does not extend services to Native Hawaiians because of their race, but because of their unique status as the indigenous people of a once sovereign nation as to whom the United States has established a trust relationship." 20 U.S.C. § 7512(12)(B).

In addition to providing programmatic support, Congress has also directly addressed the contours of the Native Hawaiian-federal trust relationship and options for reestablishing a government-to-government relationship. In 1993, Congress passed watershed legislation memorializing the historical and political foundation of the special political trust relationship and apologizing to the Native Hawaiian Community for the United States' participation in the illegal overthrow of the Hawaiian Kingdom (Pub. L. No. 103-150, 107 Stat. 1510 (1993)). Explicitly confirming that Native Hawaiians are an indigenous people possessing a special relationship with the United States, this "Apology Resolution" acknowledged that the self-declared Republic of Hawaiʻi ceded 1.8 million acres of Crown, Government and Public Lands of the Kingdom of Hawaiʻi to the United States without the consent of or compensation to the Native Hawaiian Community or their sovereign government; that the Native Hawaiian Community never directly relinquished its claims to inherent sovereignty over its national lands to the United

States; and that the overthrow of the Hawaiian Kingdom was illegal. The Apology Resolution further expressed Congress's commitment to acknowledge the ramifications of the overthrow to provide a proper foundation for reconciliation between the United States and the Native Hawaiian Community, and it urged the President of the United States to support reconciliation efforts between the United States and the Native Hawaiian Community.

Consistent with these directives, in 1995, Congress directed the Secretary of the Interior to appoint an individual to administer the responsibilities of the United States under the *Hawaiian Home Lands Recovery Act* (Pub. L. No. 104-42, tit. II, 109 Stat. 357, 363 (1995)) and the *Hawaiian Homes Commission Act* (42 Stat. 108). This created the foundation for what would become Interior's Office of Native Hawaiian Relations, which was established by Congress in 2004 to "effectuate and implement the special legal relationship between the Native Hawaiian people and the United States." Pub. L. No. 108-199, § 148, 118 Stat. 3 (2004).

Concurrently, between 2000 and 2012, Congress repeatedly considered legislation to establish a process for reestablishing a formal government-to-government relationship with Native Hawaiians to better implement the existing special political and trust relationship. S. 2899, Native Hawaiian Government Reorganization Act of 2000, 106th Cong. (2000); H.R. 4904, Native Hawaiian

Government Reorganization Act of 2000, 106th Cong. (2000); S. 746, Native Hawaiian Government Reorganization Act of 2001, 107th Cong. (2001); H.R. 617, Native Hawaiian Government Reorganization Act of 2001, 107th Cong. (2001); H.R. 665, 108th Cong. (2003); S. 147, Native Hawaiian Government Reorganization Act of 2005, 109th Cong. (2005); H.R. 309, Native Hawaiian Government Reorganization Act of 2005, 109th Cong. (2005); S. 310, Native Hawaiian Government Reorganization Act of 2007, 110th Cong. (2007); S. 1011, Native Hawaiian Government Reorganization Act of 2009, 111th Cong. (2009); S. 675, Native Hawaiian Government Reorganization Act of 2011, 112th Cong. (2011). Ultimately, this process was established administratively rather than legislatively, through 43 C.F.R. pt. 50. Concurrent with the development of the Part 50 process, in February 2016, participants in a Native Hawaiian constitutional convention, or ʻAha, adopted a proposed *Constitution of the Native Hawaiian Nation*, capable of being voted upon in a Native Hawaiian referendum. *See* 81 Fed. Reg. 71,278, 71,284 (Oct. 14, 2016). Efforts within the Native Hawaiian Community concerning government reorganization and the potential reestablishment of a formal government-to-government relationship with the United States continue.

## IV. CONCLUSION

Given all of the foregoing, Congress's enactment of 42 U.S.C. § 11705(c)(4) exempting Kamehameha Schools' preference policy from 42 U.S.C. § 1981 is a valid exercise of Congress's original and plenary constitutional authority over Indian affairs, grounded in the longstanding trust relationship between the United States and the Native Hawaiian Community. This authority does not depend on whether the Community exercises its inherent sovereignty through a formal governmental structure, and it does not depend on federal recognition or inclusion in the Department of the Interior's List of Federally Recognized Tribes. The Native Hawaiian Community is a pre-existing and enduring sovereign Native entity within the meaning of federal Indian law, and Congress has plenary power and a trust responsibility to transact with it as such, in a bespoke manner that draws tribal parallels but is uniquely tailored to the history of engagement between the Native Hawaiian Community and the United States. There is simply no credible legal, political, historical, or anthropological argument to the contrary. Accordingly, amici respectfully urge this Court to uphold the constitutionality of 42 U.S.C. § 11705(c)(4) in all respects and dismiss this case.

DATED: Honolulu, Hawaiʻi, October 23, 2026.

*/s/ Summer H. Kaiawe*
SUMMER H. KAIAWE

Attorney for Amici Curiae

THE HONORABLE BRIAN SCHATZ, UNITED STATES SENATOR

THE HONORABLE MAZIE HIRONO, UNITED STATES SENATOR

THE HONORABLE ED CASE, UNITED STATES REPRESENTATIVE

THE HONORABLE JILL TOKUDA, UNITED STATES REPRESENTATIVE