# EXHIBIT "1"

PORTER KIAKONA KOPPER,
A Limited Liability Law Company, LLC

KAPONO F. H. KIAKONA 7691-0
H. MAXWELL KOPPER 9601-0
F. PALAKIKO CHANDLER IV 12042-0
841 Bishop Street, Suite 1500
Honolulu, Hawaii 96813
Telephone No.: (808) 539-1100
Facsimile No.: (808) 539-1189
Email: kkiakona@HawaiiLegal.com
mkopper@HawaiiLegal.com
fchandler@HawaiiLegal.com

Attorneys for Amici Curiae
THE QUEEN LILIʻUOKALANI TRUST
KING LUNALILO TRUST
QUEEN EMMA LAND COMPANY

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAIʻI

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSONS; I.P., B.P., E.S., by and through her next of friend and mother, K.S.; and K.S.;<br><br>Plaintiff,<br><br>vs.<br><br>TRUSTEES OF THE ESTATE OF BERNICE PAUAHI BISHOP d/b/a KAMEHAMEHA SCHOOLS<br><br>Defendants. | CIVIL NO. 1:25-cv-00450-MWJS-RT<br><br>**BRIEF OF *AMICI CURIAE* THE QUEEN LILIʻUOKALANI TRUST, KING LUNALILO TRUST, AND QUEEN EMMA LAND COMPANY IN SUPPORT OF DEFENDANT KAMEHAMEHA SCHOOLS' MOTION TO DISMISS FOURTH AMENDED COMPLAINT [ECF 152] [ECF 155]; DECLARATION OF DAVIANA PŌMAIKAʻI MCGREGOR, PH.D.; EXHIBIT "A";**<br>[*Caption continued on next page*] |

**CERTIFICATE OF COMPLIANCE**

Judge: Honorable Micah W.J. Smith
(No trial date set)

**BRIEF OF *AMICI CURIAE* THE QUEEN LILI'UOKALANI TRUST, KING LUNALILO TRUST, AND QUEEN EMMA LAND COMPANY IN SUPPORT OF DEFENDANT KAMEHAMEHA SCHOOLS' MOTION TO DISMISS FOURTH AMENDED COMPLAINT [ECF 152] [ECF 155]**

# TABLE OF CONTENTS

Page(s)

I. INTEREST OF AMICI CURIAE .......... 1

II. INTRODUCTION .......... 2

III. ARGUMENT .......... 4

A. Native Hawaiian Traditional and Customary Practice is Expressly Recognized, Protected, and Controlling under Hawai‘i Law .......... 4

B. Hawai‘i Courts Have Routinely Extended the Protections of H.R.S. § 1-1 to Different Traditional and Customary Practices .......... 6

C. Kuleana: A Traditional Hawaiian Cultural Relationship And Responsibility That Is Neither Gift Nor Contract .......... 9

IV. CONCLUSION .......... 16

# TABLE OF AUTHORITIES

Page(s)

**CONSTITUTION**

Hawaiʻi State Constitution, Article IX, § 10 (1978)……………………......... 12

Hawaiʻi State Constitution, Article XII, § 7 (1978)..................................6, 9, 16

**CASES**

*Ka Paʻakai o ka ʻĀina v. Land Use Commission*, 94 Haw. 31,
7 P.3d 1068 (2000)……………………………………………………5, 6

*Kalipi v. Hawaiian Trust Co., Ltd.*, 66 Haw. 1,
656 P.2d 745(1982)……………………………………………………5

*Leong v. Takasaki*, 55 Haw. 398, 520 P.2d 758 (Haw. 1974)…………………7

*Mokuhia v. McCandless*, 5 Haw. 370 (1885)…………………………………..7

*O'Brien v. Walker*, 35 Haw. 104 (1939),
*aff'd*, 115 F.2d 956 (9th Cir. 1940)………..........................................................7

*Pele Defense Fund v. Paty*, 73 Haw. 578, 837 P.2d 1247
(1992)………………………………………………………….....5, 7, 9

*Public Access Shoreline Hawaiʻi v. Hawaiʻi County Planning Commission*,
79 Haw. 425, 903 P.2d 1246 (1995)……………………………….............5

*State v. Zimring*, 52 Haw. 472, 474-75, 479 P.2d 202, 204
(1970)……………………………………………………………………..5

**STATUTES**

**Federal**

42 U.S.C. § 1981…………………………………………………......2, 3, 4

**Hawai‘i**

Hawai‘i Revised Statutes § 1-1……………………….........2, 4, 5, 6, 7, 9, 16

Hawai‘i Revised Statutes §§ 6E-43, 6E-43.5, and 6E-43.6………………….. 15

Hawai‘i Revised Statutes § 321-30………………………………………......8

Hawai‘i Revised Statutes § 457J-2……………………………………………..8

Act 12, Session Laws of Hawaii (2006)………………………………………..8

Act 28, Session Laws of Hawaii (2025)………………………………………..8

**TREATISE**

MacKenzie, Melody Kapilialoha et al.,
*Native Hawaiian Law: A Treatise* (2015)...................................................... 17

**OTHER**

Aquino, Kamakana,
*Reflecting on 2024, Reinvigorating for 2025*,
Ka Wai Ola (Jan. 2, 2025)........................................................................ 15

Kalākaua, David,
*The Legends and Myths of Hawai‘i* 219
(Mutual Publishing, 1990)........................................................................11

Kamakau, Samuel M.,
*Nā Mo‘olelo a ka Po‘e Kahiko* 55
(Bishop Museum Press, 1991)................................................................ 11

Kamakau, Samuel M.,
*Ruling Chiefs of Hawai‘i*
(Revised Edition)........................................................................11, 12,13, 14

Kuykendall, Ralph S.,
The Hawaiian Kingdom, 1778-1854, 106-109
(University of Hawai‘i Press, 1965)................................................................13

Office of Hawaiian Affairs,
*Moʻolelo Ea O Nā Hawaiʻi* 874
(Dec. 21, 2015)....................................................................................15

Osorio, Jonathan K.,
*Who Owns the Crown Lands of Hawaiʻi* 18
(University of Hawaiʻi Press, 2008)...........................................................14, 15

Trask, Haunani-Kay,
*Ancient History of the Hawaiian People to the Times of Kamehameha* I 89
(Mutual Publishing, 1996)........................................................................ 11

## I. INTEREST OF AMICI CURIAE

The Queen Liliʻuokalani Trust, Queen Emma Land Company, and the King Lunalilo Trust, (collectively, "Amici" and/or "Aliʻi Organizations") respectfully submit this brief as amici curiae in support of Defendant Kamehameha Schools. Each of these organizations were established by high aliʻi (traditional chief) who understood their kuleana (responsibility) to their people. The King Lunalilo Trust ("KLT") is a perpetual trust established by King William Charles Lunalilo, through his will in 1871 for the poor, destitute, and infirm people of Native Hawaiian descent, with a preference for the elderly. The mission of the trust is to provide kūpuna (elders) and others in need with shelter and care that is grounded in Native Hawaiian culture and values. Queen Emma and King Kamehameha IV established The Queen's Hospital, nka, The Queen's Medical Center in 1859 to address the healthcare needs of Native Hawaiians and all people of Hawaiʻi. The Queen Emma Land Company is a nonprofit corporation established in 1978 to manage and enhance the real estate assets originally left to The Queen's Hospital by Queen Emma in 1885.[1] It principally supports The Queen's Medical Center and its affiliates in providing healthcare in Hawaiʻi. The Queen Liliʻuokalani Trust ("QLT") was established in 1909 through a Deed of Trust by Queen Liliʻuokalani, laying the legal and financial

---

[1] Queen Emma's will established a trust, of which The Queens Hospital was beneficiary. The Trust terminated in 1967.

foundation for a perpetual institution dedicated to benefit orphan and destitute children, with preference given to Native Hawaiians. QLT provides opportunities for Native Hawaiian children to realize their greatest potential: living healthy, joyful, and prosperous lives, while contributing positively to their families, communities, and the world. Amici have a common interest in supporting the legitimate beneficiary structure and trust administered by Kamehameha Schools.

## II. INTRODUCTION

Kamehameha Schools' practice of providing education to Native Hawaiian haumāna (students) fulfills the concept of ali'i (chiefly) kuleana (responsibility, rights, accountability, and authority; an earned role based on fulfillment of expectations) under Hawaiian custom and usage and is therefore a protected activity under *Hawai'i Revised Statutes* ("H.R.S.") § 1-1. This traditional and customary practice removes the relationship between Kamehameha Schools and its beneficiaries from a Western contractual analysis. In other words, Kamehameha Schools' provision of education is protected, or even removed, from being considered a contract for purposes of 42 U.S.C. § 1981 because it is a traditional and customary practice protected by H.R.S. § 1-1.

The Ali'i Organizations' relationships with their respective beneficiaries is not one emanating from (i) group-based prejudice or (ii) systemic exclusion due to race, ethnicity, ancestry, national origin, color, sex, or religion, but is instead an

exercise of the Aliʻi Organizations' responsibility or kuleana to all peoples, including the young and the elderly who share a common bond of Native Hawaiian ancestry in accordance with customs and practices that predated 1892.

As high aliʻi, King Lunalilo, King Kamehameha IV, Queen Emma, and Queen Liliʻuokalani were well-grounded and immersed in Kānaka ʻŌiwi (Native Hawaiian) values and practices. Similarly, Princess Bernice Pauahi Bishop (Ke Aliʻi Pauahi), who created the trust resulting in the establishment of the Kamehameha Schools, understood and acted to fulfill her kuleana as a high aliʻi and guardian of her people.

The Plaintiffs have argued that Kamehameha Schools' admissions policy violates 42 U.S.C. § 1981, which guarantees equal rights in the making and enforcement of contracts. *See*, *e.g.*, Count I in the Plaintiffs' 4th Amended Verified Complaint at 51–65. The relationship between Kamehameha Schools and its students/beneficiaries results from Native Hawaiian traditional and customary practices grounded in kuleana—the responsibility of aliʻi to protect and care for the people and the ʻāina (land). *See* Declaration of Davianna Pōmaikaʻi McGregor (McGregor Declaration), at para. 23. Kuleana is a critical component of the Native Hawaiian culture that has been consistently practiced for over a millennium and is perpetuated by Kamehameha Schools and Amici. Thus, as explained in more depth below, the relationship between Kamehameha Schools and its students is not

contractual. For these reasons, Amici strongly urge the Court to grant Kamehameha Schools' Motion to Dismiss.

## III. ARGUMENT

### A. Native Hawaiian Traditional and Customary Practice is Expressly Recognized, Protected, and Controlling under Hawai‘i Law.

"Hawaiian Usage" or Native Hawaiian Traditional and Customary practices must be considered in determining whether a contractual relationship exists. As discussed extensively in Kamehameha Schools' Memorandum in Support of the Motion to Dismiss, where the applicability of 42 U.S.C. §1981 turns on the existence of a contractual relationship, federal courts will, in the first instance and absent a conflict, look to state law to determine whether such a relationship exists. *See* Memo in Support of Motion to Dismiss, at 14. Consequently, Hawai‘i law determines the threshold question of whether the relationship at issue is contractual in nature.

Under Hawai‘i law, Ke Ali‘i Pauahi's trust and its provision of education to its beneficiaries must be understood in light of Hawaiian usage, as required by H.R.S. § 1-1, which provides:

> **Common law of the State; exceptions.** The common law of England, as ascertained by English and American decisions, is declared to be the common law of the State of Hawaii in all cases, except as otherwise expressly provided by the Constitution or laws of the United States, or by the laws of the State, or fixed by Hawaiian judicial precedent, *or established by Hawaiian usage*; provided that no person shall be subject to criminal proceedings except as provided by the written laws of the United States or of the State.

The Hawaiʻi Supreme Court, in *State v. Zimring*, 52 Haw. 472, 474-75, 479 P.2d 202, 204 (1970), clarified that because the Hawaiian usage exception became law on November 25, 1892, "Hawaiian usage" refers to custom and tradition that predates November 25, 1892. Hawaiʻi courts have repeatedly applied this principle to recognize that Native Hawaiian customary practices inform the interpretation of legal rights.

In *Kalipi v. Hawaiian Trust Co., Ltd.*, 66 Haw. 1, 656 P.2d 745 (1982), the Hawaiʻi Supreme Court, citing H.R.S. § 1-1 and other state law provisions, affirmed that traditional and customary practices are an integral part of Hawaiʻi law. *See, e.g., Kalipi*, 66 Haw. at 10-11, 656 P.2d at 750-751. Subsequent decisions expanded upon and reinforced this tenet. In *Pele Defense Fund v. Paty*, 73 Haw. 578, 837 P.2d 1247 (1992), the Hawaiʻi Supreme Court emphasized that Native Hawaiian traditional and customary rights must be considered within contemporary legal frameworks. *See, Pele Defense Fund*, 73 Haw. at 616-621, 837 P.2d at 1269-1272. In *Public Access Shoreline Hawaiʻi v. Hawaiʻi County Planning Commission*, 79 Haw. 425, 903 P.2d 1246 (1995), and *Ka Paʻakai o ka ʻĀina v. Land Use Commission*, 94 Haw. 31, 7 P.3d 1068 (2000), the Hawaiʻi Supreme Court further determined that Kānaka ʻŌiwi customary practices and usage are integral to the application and interpretation of modern law. *See, Public Access Shoreline Hawaiʻi*, 79 Haw. at 437-442, 903 P.2d at 1258-63, for an

extensive discussion on the impact and understanding of these provisions in Hawaiʻi state law; *see, Ka Paʻakai o ka ʻĀina*, 94 Haw. 45-46, 7 P.3d 1082-83, discussing the legal basis for the obligation to preserve and protect traditional and customary rights and practices.

This legal obligation is also grounded in the Hawaiʻi State Constitution, Article XII, Section 7, adopted in 1978, which requires the State to protect and preserve traditional and customary Native Hawaiian rights:

> The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupuaʻa tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights.

Although H.R.S. §1-1 and art. XII, § 7, of the Hawaiʻi State Constitution, are most often applied in land and resources contexts, Hawaiian customary practices guide and are in infused in all aspects of Hawaiʻi law. Thus, in interpreting and applying Hawaiʻi law, kuleana, a traditional system of cultural relationships and responsibility, should be recognized.

### B. Hawaiʻi Courts Have Routinely Extended the Protections of H.R.S. § 1-1 to Different Traditional and Customary Practices.

In this case, H.R.S. § 1-1 introduces an additional interpretation that must be applied because, as demonstrated more fully below, what may be described as an aliʻi's "gift" of education through a Western perspective should be understood as the fulfillment of kuleana. There are countless examples of Courts applying this

"Hawaiian Usage" analysis to remove the legal analysis from standard Western relationships. Kuleana is no different.

The most common application of traditional and customary rights under H.R.S. § 1-1 is in the context of traditional gathering rights (such as collection of native plants or access to shorelines for subsistence fishing). In *Pele Defense Fund,* the court affirmed the traditional and customary "rights of native Hawaiians to enter undeveloped lands owned by others to practice continuously exercised access and gathering rights necessary for subsistence, cultural or religious purposes[.]" *Pele Def. Fund*, 73 Haw. 619, 837 P.2d 1247, 1271 (1992). This doctrine allows Native Hawaiians access to private property, which would otherwise be considered trespass under codified Hawaiʻi law. *Pele Def. Fund* provides a clear example of how a traditional and customary practice can supersede a codified law.

One of the earliest examples of this is the recognition of the customary practice of hānai, a traditional practice of informal adoption. *See O'Brien v. Walker*, 35 Haw. 104 (1939), *aff'd*, 115 F.2d 956 (9th Cir. 1940) (construing the term "issue" within a deed of trust); *Mokuhia v. McCandless*, 5 Haw. 370 (1885) (determining who may act *in loco parentis*). In a 1974 case, *Leong v. Takasaki*, 55 Haw. 398, 520 P.2d 758 (Haw. 1974), the Hawaiʻi Supreme Court, recognized a grandchild could bring a suit for damages for negligent infliction of emotional distress after witnessing his step-grandmother being killed in a car cash, despite the lack of a formal adoption

done pursuant to statute. In analyzing the issue, the court discussed various forms of Hawaiian customary adoption, noting that the "custom of giving children to grandparents, near relatives, and friends, to raise whether legally or informally remains a strong one. Hence the plaintiff should be permitted to prove the nature of his relationship to the victim and the extent of damages he has suffered because of this relationship." *Id*. at 411, 520 P. 2d at 766.

Another example is a 2006 Hawai‘i law, passed after a dispute arose when the State Department of Health began enforcing a policy that classified the ‘iewe (placenta) of a newborn child as infectious waste. Traditionally, Kanaka ‘Ōiwi "cleaned the ‘iewe of blood to ensure that the child's eyes would not be weak or sore. The ‘iewe was later buried, usually under a tree, to keep the child connected to its home and to prevent the child's spirit from wandering homeless or hungry after death." *See Hawaiian Custom in Hawaii State Law*, 13 Yearbook of New Zealand Jurisprudence 112, 149-50 (2010). Taking these traditional and customary practices into account, Act 12 corrected the law to allow a mother or her designee to take the ‘iewe of the newborn child home, after a negative finding of an infectious disease. Act 12, Haw. Sess. Laws (2006), codified at H.R.S. § 321-30. More recently, after litigation and a settlement, Act 28, Haw. Sess. Laws (2025), codified at H.R.S. § 457J-2, was passed to clarify and affirm that Kānaka ‘Ōiwi traditional and customary

birthing and healing practices do not fall under state licensure mandates, thus allowing for greater use of these practices.

The interpretive framework set out in H.R.S. § 1-1, art. XII, § 7 of the Hawaiʻi Constitution, and prior Hawaiʻi cases, have direct implications in federal court. As discussed previously, where federal claims depend on the existence of a contractual relationship, federal courts look to state law to determine whether such a relationship exists. Thus, Hawaiʻi law governs whether the relationship at issue is contractual.

### C. Kuleana: A Traditional Hawaiian Cultural Relationship And Responsibility That Is Neither Gift Nor Contract.

The "gift vs. contract" framework, standing alone, does not properly describe the relationship between Ke Aliʻi Pauahi and her beneficiaries. Indeed, this relationship is more appropriately characterized as a traditional and customary relationship, removing it from the contract framework altogether. When viewed through the Hawaiian usage lens, the relationship is more accurately understood as one grounded in kuleana, not contract.

The test for whether a practice constitutes "Hawaiian usage" and is thus protected under HRS§1-1 was set forth in *Pele Def. Fund.* "[T]he retention of a Hawaiian tradition should in each case be determined by balancing the respective interests and harm once it is established that the application of the custom has continued in a particular area." *See Pele Def. Fund* 73 Haw. 618, 837 P.2d 1247, 1270 (1992).

As explained in the attached Declaration of Professor Emerita Davianna Pōmaikaʻi McGregor:

> the concept of kuleana . . . [is] integrally related to the concepts of rights and responsibilities. Kuleana are rights that are recognized as necessary to enable a kanaka/Hawaiian person to fufill their responsibilities as a kanaka, i.e., to care for the wellbeing of themself, their ʻohana/immediate and extended family, their community, the lāhui/nation, the ʻāina/land, ocean, environment and the akua/natural elemental life forces. Fulfilling one's kuleana or responsibilities to self, ʻohana, community, lāhui, ʻāina and akua accords one rights to the resources needed for wellbeing.

McGregor Declaration, at para. 9.

Historical sources consistently describe Hawaiian society as structured through reciprocal kuleana between aliʻi and makaʻāinana (people) or similarly between the highest ranking aliʻi and lower ranking aliʻi. These principles were not abstract cultural ideals but were expressed through longstanding practices of aliʻi governance – leading to a state of pono (prosperity, well-being, equity). *See Mana Lāhui Kānaka* 37–39 (Kamanaʻopono Crabbe with Kealoha Fox & Holly Kilinahe Coleman, OHA 2017) for a discussion of the relationship between kuleana and pono.

A review of historical accounts of some of Hawaiʻi's most well-known high aliʻi provides examples of kuleana, which were foundational in leading aliʻi, such as Ke Aliʻi Pauahi and Amici, to follow in the footsteps of their honored ancestors.

The kuleana that all chiefs and makaʻāinana carried was expressed in the wellbeing of their ʻāina and nation, and over the years became focused on education

as well as self-defense. Successfully addressing this concern was Oʻahu chief, Māʻilikūkahi, who ruled in the middle 15th century. Māʻilikūkahi was known as a kind and effective leader, and among his most well-known actions was adopting all the first born aliʻi and makaʻāinana males of Oʻahu. *See* David Kalākaua, *The Legends and Myths of Hawaiʻi* 219 (Mutual Publishing, 1990); Samuel M. Kamakau, *Ruling Chiefs of Hawaiʻi (Revised Edition)* 223 (Kamehameha Schools Press, 1992); Abraham Fornander, *Ancient History of the Hawaiian People to the Times of Kamehameha I* 89 (Mutual Publishing, 1996). He raised these children in Waialua, Oʻahu, where they were educated in various skills, particularly in spear throwing until "each one [was] an expert in the field." *See* Samuel M. Kamakau, *Nā Moʻolelo a ka Poʻe Kahiko* 55 (Bishop Museum, 1991). Significantly, when Oʻahu faced a raid from Hawaiʻi and Maui, Māʻilikūkahi's strategy led to a quick and easy win, with his first born hānai (adopted) sons minimally facing hand-to-hand combat. *Id*. at 55.

Another example is seen in the actions of Kamehameha Paiʻea, Ke Aliʻi Pauahi's great grandfather, for whom she named her schools. He is remembered as a chief who cared for his people, both makaʻāinana and aliʻi. Hawaiian historian Samuel M. Kamakau, describes Kamehameha's deeds after he united most of the islands in 1795, stating he "began to administer the kingdom for the good of chiefs and commoners." *See* Samuel M. Kamakau, *Ruling Chiefs of Hawaiʻi (Revised*

*Edition)* 175 (Kamehameha Schools Press, 1992). He made "laws to protect both chiefs and commoners, prohibiting murder, theft, wanton destruction of property, the taking of property without cause, robbing the weak, praying to death, and laws to observe the tabus of the gods. He thus made it possible for old men and women and children to sleep in safety by the wayside." *Id*. at 175-76. This is undoubtedly a reference to what is known today as "The Law of the Splintered Paddle," enshrined in the Hawai'i State Constitution, which states, in part:

> The law of the splintered paddle, mamala-hoe kanawai, decreed by Kamehameha I--Let every elderly person, woman and child lie by the roadside in safety--shall be a unique and living symbol of the State's concern for public safety.

Haw. State Const., art. IX, § 10 (1978); *see also*, Kamakau, *Ruling Chiefs* at 181; McGregor Declaration at para 16.

Kamakau relates that Kamehameha took "the children of commoners and trained them to be warriors or to learn other arts." *See* Samuel M. Kamakau, *Ruling Chiefs of Hawai'i (Revised Edition)* 178 (Kamehameha Schools Press, 1992). Kamakau also talks about Kamehameha's selection of skilled craftsmen and teachers – those who could make various kinds of canoes, craftsmen to make wooden bowls, those who knew and understood medicinal remedies, those who could teach the many different physical skills, as well as "reading signs and omens (*kilokilo*), pointing out locations (*kuhikuhi pu'uone*), and configurations of the earth (papa hulihonua) . . ." *Id*. at 178.

The deeds of his ancestors undoubtedly gave rise to one of the most important actions by Kauikeaouli (Kamehameha III) when he came to the throne: universal education for his people. In 1825, soon after he became mōʻī, he declared, "He aupuni palapala koʻu[.]" (Mine is a kingdom of literacy and education), significantly expanding the commitment to education; a commitment previously made by Kaʻahumanu and Kalanimoku, his premier and prime minister. *See* Kamakana Aquino, *Reflecting on 2024, Reinvigorating for 2025*, KA WAI OLA (Jan. 2, 2025); *see*, Samuel M. Kamakau, *Ruling Chiefs of Hawaiʻi (Revised Edition)* 373 (Kamehameha Schools Press, 1992). Initially, through the work of the missionaries and supported by the aliʻi, particularly Kaʻahumanu, by the end of 1824, there were "more than 2,000" students in these chiefly and missionary-run schools; four years later, after Kamehameha III took the throne and, again, through the work of the missionaries and support of the aliʻi, there were 37,000 students. By 1831, there were 1,100 such schools and about 52,000 students, or forty percent of the population at the time. *See* Ralph S. Kuykendall, *The Hawaiian Kingdom, 1778-1854*, 106–109 (University of Hawaii Press, 1965). Kamakau notes that on Kamehameha III's passing, he left a strong legacy of education:

> He worked to benefit chiefs and commoners alike. He attained to the ruling power when he was but eleven years of age. . . . (and) he proclaimed "The government of learning" in which chiefs should teach commoners and each one teach another. Teachers were distributed about the islands . . . . Some schools had a hundred, some a thousand

> pupils. From children to bearded men, all were gathered into the school.

Samuel M. Kamakau, *Ruling Chiefs of Hawaiʻi (Revised Edition)* 422-23 (Kamehameha Schools Press, 1992).

These examples of leaders, in the early to mid-1800s, providing universal education to a nation's people, came from a strongly established kuleana that aliʻi held, prompting them to provide for their people in ways that would enable them to successfully support themselves. These systems of aliʻi providing for the education of their people reflect a kind of cultural governance. Within this framework, the act of an aliʻi providing for the makaʻāinana is more accurately understood as the fulfillment of kuleana to those under the care of the aliʻi.

Indeed, as Professor Jon Van Dyke has noted in his discussion of the relationship between the aliʻi, the ʻāina, and the makaʻāinana and the importance of fulfilling kuleana:

> Aliʻi throughout Hawaiʻi, in the time of Kamehameha and before, respected the ʻĀina and acknowledged their Kuleana (rights and responsibilities), as Aliʻi, in caring for it. The ʻĀina could not be owned, or even really possessed, in the way westerners view private property. Instead, the Aliʻi and makaʻāinana cultivated a relationship with the ʻĀina based on different values. Control of the ʻĀina was vital for political and social success, but this power was secured through care and attention as opposed to mere seizure. Although Aliʻi could gain territory by capturing it, they would not be able to retain control unless they succeeded in fulfilling their responsibilities to the ʻĀina and makaʻāinana. Although individual leaders rose and fell from power, the respect for and careful management of the ʻĀina sustained the traditional system of land tenure.

Jon M. Van Dyke, *Who Owns the Crown Lands of Hawai'i* 18 (University of Hawai'i Press, 2008).

Hawai'i's history, as well as its constitutional, statutory, and case law requires construing general legal doctrines in light of Native Hawaiian common law rooted in traditional beliefs, practices, and systems that include Kānaka 'Ōiwi understandings of kuleana. As one example, there is the standing afforded to cultural and lineal descendants of those whose iwi kūpuna (ancestral remains) and burial places are protected under H.R.S. §§ 6E-43, 6E-43.5, and 6E-43.6 (as amended) and the related administrative rules.

As demonstrated above, Hawai'i law adapts and construes laws based on Hawaiian traditional practices and systems, including kuleana, which is often at the heart of those laws. Under Hawaiian tradition and custom, ali'i nui, such as Princess Pauahi, had a kuleana, in their role as protectors of the maka'āinana, to safeguard their people's well-being. Indeed, as one resource notes:

> [I]n the final years of the Hawaiian Kingdom, when the Native Hawaiian people looked to be on a path to extinction, 'āina, as always, was the key. Keep the lands and waters fertile to achieve balance and order. Kamehameha Schools is a manifestation of this ancient compact. Pauahi carried out her kuleana to use the last reserve of Hawaiian lands to restore her and her ancestors' people to a state of wellbeing. By equipping them with education to thrive in a Westernizing political economy, she no doubt believed that a state of pono (perfect equilibrium) might one day be achieved.

*Mo'olelo Ea O Nā Hawai'i* 874 (Office of Hawaiian Affairs, Dec. 21, 2015).

This continued traditional practice of the relationship in the Aliʻi and Kānaka ʻŌiwi has been summarized by Professor McGregor:

> I further conclude, in my professional opinion, that the fulfillment of Kuleana in its richness of meaning and practice traditionally and customarily exercised by Kānaka ʻŌiwi Aliʻi and Mōʻin relationship to those for whom they are responsible, endures as both a responsibility and right of Kānaka ʻŌiwi leaders, educators, practitioners, and learners. Furthermore, this is a mutual collective responsibility, rather than an individualized responsibility, and involves mutual long-term dedication and commitment, rather than immediate exchange.

McGregor Declaration, at para. 23.

## IV. CONCLUSION

Under Hawaiʻi law, the relationship between Ke Aliʻi Pauahi's trust and its beneficiaries must be understood not merely through Western common law categories, but in light of Hawaiian usage, as required by H.R.S. § 1-1 and art. XII, § 7 of the Hawaiʻi State Constitution, and Hawaiʻi caselaw. Within that Kānaka ʻŌiwi framework of traditional and customary practices, what may be described as a "gift" is more accurately understood as the fulfillment of kuleana, an enduring system of responsibility, authority, and relational accountability that is certainly not contractual, but also cannot be conceptually reduced to mere voluntary gifting in the Western sense. Ke Aliʻi Pauahi's provision of education is an affirmatively protected Native Hawaiian traditional and customary practice rooted in the traditional kuleana system that Kamehameha Schools has a legal right to perpetuate.

As one source states in describing the Ali‘i Organizations:

> These trusts reflect the reciprocal duties of the ali‘i and the maka‘āinana (common people). Traditionally, the maka‘āinana had the duty to care for the land, and wise management of the people and land enhanced the right of the ali‘i to rule. Productive use of the land and mutual cooperation ensured the right of the maka‘āinana to live off the land and use its resources. Although the traditional social structure was dramatically altered through the creation of private property rights in the mid-nineteenth century and the transition from a subsistence to a market economy, the creation of these trusts suggests that the ali‘i continued to understand and attempted to fulfill their obligation to provide for the needs of their people.

*Chap. 19, Ali‘i Trust: Native Hawaiian Charitable Trusts* in *Native Hawaiian Law: A Treatise* 1168, 1171 (Kamehameha Pub. 2015).

In light of the foregoing, Amici respectfully urge this Court to grant Kamehameha Schools' Motion to Dismiss.

Dated: Honolulu, Hawaii, October 28, 2026

/s/ *Kapono F. H. Kiakona*
KAPONO F.H. KIAKONA
H. MAXWELL KOPPER
F. PALAKIKO CHANDLER IV
Attorneys for the Amicus Curiae of
The Queen Lili‘uokalani Trust
King Lunalilo Trust
Queen Emma Land Company

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

DECLARATION OF DAVIANNA PŌMAIKAʻI MCGREGOR, PH.D.

I, DAVIANNA PŌMAIKAʻI MCGREGOR, under penalty of perjury, hereby declare as follows:

1. I am a Professor Emerita at the University of Hawaiʻi, Mānoa in Ethnic Studies and Oral History. I was on the founding faculty of the Department of Ethnic Studies at the University of Hawaiʻi at Mānoa. I am a historian of Hawaiʻi and the Pacific. I received my M.A. in Pacific Islands Studies from the University of Hawaiʻi, Mānoa in 1979; and I received my Ph.D. in 1989 from the University of Hawaiʻi in Hawaiian/Pacific History.

2. My research has focused on the persistence of traditional Hawaiian cultural customs, beliefs, and practices in rural Hawaiian communities, including the island of Molokaʻi; the districts of Puna and Kaʻu on Hawaiʻi; Keʻanae-Wailuanui on Maui; and Waiahole-Waikane on Oʻahu. This research is featured in my 2007 UH Press book, *Nā Kuaʻāina: Living Hawaiian Culture* (UH Press, 2007) which won the Balridge Prize for best book in any field of history written by a resident of Hawaiʻi from 2005-2007.

3. My research has also documented the inherent right of sovereignty of Lāhui ʻŌiwi/the Native Hawaiian nation and the ongoing exercise of self-governance by

Kānaka ʻŌiwi. This is documented in *Moʻolelo Ea o Nā Hawaiʻi, History of Native Hawaiian Governance in Hawaiʻi*, a special report prepared for the Office of Hawaiian Affairs and co-authored with Melody Kapilialoha MacKenzie in 2015.

4. In 2024, I was recognized by the Honpa Hongwangi Mission of Hawaiʻi as a "Living Treasure of Hawaiʻi."

5. Attached to this Declaration as Exhibit "A" is my curriculum vitae. It provides more details about my background and professional endeavors.

6. I have served as a pro bono expert witness regarding traditional Hawaiian subsistence, cultural, and religious customs and practices in a number of Civil Cases, including *Office of Hawaiian Affairs, et al vs. Housing and Community Development Corporation of Hawaii, et al, Civil No. 94-4207-11 SSM, 1994 - 2001* and *Pele Defense Fund v. Campbell Estate, Civ. No. 8-089 (*Haw 3rd Cir.*).* I have also testified as a cultural expert in criminal trespass cases, including *State of Hawaiʻi v. Lloyd Pratt* (Haw. 5th Cir). I have also appeared as an expert in administrative proceedings including before the State of Hawaiʻi Water Commission in the *Nā Moku Aupuni O Ko'olau Hui Contested Case Docket DLNR Fil No. 01-05-MA 2005* and before the State of Hawai'i Water Commission in the *Kamiloloa Aquifer Case, In re Waiola O Molokai, Docket no. CCH-MO096-11997.*

7. Ke Aliʻi/Princess Bernice Pauahi Bishop (1831 - 1884) descended from King Kamehameha I through her mother Konia whose father, Kaʻoleiokū was the

son of Kamehameha I and his wife, Kānekapolei Nui. Signifying his high ranking status and the alignment of his heirs with the deep cultural and spiritual traditions of the divine chiefs, Kaʻoleiokū, upon his death in 1818 was the last high ranking chief to be sanctified, consecrated and deified as an akua/god at the Hale o Keawe at the Puʻuhonua o Hōnaunau. (Russ Apple, City of Refuge National Park, Honaunau, Hawaiʻi, *Pre-Restoration Study of the Hale-O-Keawe Platform,* 1966 at p. 8)

8. In the Mary Kawena Pukui and Samuel Elbert *Hawaiian Dictionary* (UH Press, 1971), kuleana has several meanings: right, title, property, portion, responsibility, jurisdiction, authority, interest, claim, ownership; reason, cause, function, justification; small piece of property, as within an ahupuaʻa, blood relative through whom a relationship to less close relatives is traced, as to in-laws. Hoʻokuleana means to entitle, give right to possess; to give a responsibility. *Hawaiian Dictionary,* at 165.

9. The Hawaiian Dictionary definitions and meanings convey the concept of kuleana as integrally related to the concepts of rights and responsibilities. Kuleana are rights that are recognized as necessary to enable a kanaka/Hawaiian person to fufill their responsibilities as a kanaka, i.e., to care for the well-being of themself, their ʻohana/immediate and extended family, their community, the lāhui/nation, the ʻāina/land, ocean, environment and the akua/natural elemental life forces. Fulfilling

one's kuleana or responsibilities to self, ʻohana, community, lāhui, ʻāina and akua accords one rights to the resources needed for well-being.

10. E.S. Craighill Handy, Elizabeth Green Handy and Mary Kawena Pukui described the meaning and function of kuleana in relation to land in the book *Native Planters in Old Hawaiʻi, Their Life Lore and Environment* (Bishop Museum Press 1972). They wrote:

> Now we come to the consideration of a land term which, in its modern usage, dates from the mid-19th century of the Monarchy. The term is kuleana, which now means a plot of land acquired "in fee simple" by its former tenant . . . Kuleana in old usage meant a portion or share of a thing or enterprise. It was chosen as the legal term applicable to the claims filed by tenants who sought permanent title to parcels of land then being allotted under the law of 1848. The word in old Hawaiian also meant a man's rights, affairs, interests, being derived from the adjective kūleʻa meaning competent, successful. It was to the competent planters, formerly, merely tenants, that title in fee simple was given during the Mahele to the lands they were then cultivating for their own use; thus the titles and land involved were termed kuleana - the planter's property or competence. *Native Planters* at 53.

11. With regard to the great Ali'i/chiefs, the ʻŌiwi/Hawaiian proverb, "I aliʻi no ke aliʻi i ke kānaka," means "A chief is a chief because of the people." Mary Kawena Pukui, *ʻŌlelo Noʻeau: Hawaiian Proverbs & Poetical Sayings*, #1150 at 125 (Bishop Museum Press, 1983). This reflects the fundamental ʻŌiwi tenet that the greatness, competence and success of an Aliʻi was determined by the conditions and well-being of the people for whom they had responsibility. Another related saying is, "I ʻike ʻia no ke aliʻi, i ka nui o na makaʻāinana. A chief is known by his

many followers." *ʻŌlelo Noʻeau*, #1172 at 128. Again, Aliʻi are considered to be great, competent and successful according to the number and well-being of the commoners for whom they are responsible. Both proverbs acknowledged that it was the kuleana or responsibility of the Aliʻi to look after and care for the well-being of the people for whom they were accountable.

12. An additional saying conveys the interrelated responsibilities of the Aliʻi to care for the commoners and to hold the land in trust for the commoners, as part of a relationship of mutual trust and responsibilities wherein the Aliʻi and the people care for and respect the land. "He aliʻi ka ʻāina; he kauwā ke kanaka. The land is a chief; man is its servant. Land has no need for man, but man needs the land and works it for a livelihood." *ʻŌlelo Noʻeau,,* #531, at 62. This conveys the respect and humility of the Kānaka ʻŌiwi/Hawaiian people for the land and its resources and the mutual and collective kuleana of the Aliʻi and people to jointly protect and take care of the land.

13. This respect and collective kuleana for the land was also reflected in a land tenure system where there was no "ownership" of land as property. According to Handy, Handy and Pukui, "The supreme chief, moʻi, of an island 'held' the land; but even for him the concept was not one of 'owning' it, but of being trustee under Kane and Lono, the nature gods who caused the land to be fruitful." Handy, Handy,

and Pukui, *Native Planters in Old Hawai'i, Their Life, Lore and Environment,* at 41.

14. In his book, *Hawaiian Antiquities*, nineteenth century Hawaiian historian, Davida Malo (1795 - 1853), described the type of training given to young chiefs who were given the kuleana to rule as follows:

> It was the policy of the government to place the chiefs who were destined to rule, while they were still young, with wise persons, that they might be instructed by skilled teachers in the principles of government, be taught the art of war, and be made to acquire personal skill and bravery. The young man had first to be subject to another chief, that he might be disciplined and have experience of poverty, hunger, want and hardship, and by reflecting on these things learn to care for the common people, and at the same time pay due respect to the ceremonies of religion and the worship of gods to live temperately, not violating virgins . . . conducting the government kindly to all. Davida Malo, *Hawaiian Antiquities* at 53-54 (Emerson, 1898, Honolulu: Museum)

The young chiefs were educated into fulfilling their kuleana to govern the people justly and with empathy and compassion.

15. A 2020 translation of *The Mo'olelo Hawai'i of Davida Malo,* Volume 2 (Honolulu: UH Press and Bishop Museum Press, 2020), translated by Charles Langlas and Jeffrey Lyon, provides the following insights on the kuleana of the Ali'i:

> 3. The ruling *ali'i* was set up to help those who appealed to him concerning their burdens, to relieve the one in the right and to punish the one in the wrong. The ali'i ruled overall; everything was under his control, so long as he acted properly. *The Mo'olelo Hawai'i of Davida Malo*, Vol. 2, at 127.

Malo also wrote, "Furthermore, those destined to rule lived during their

childhood with wise men and listened to the words of clever people and were told of those things important to maintaining the government properly." *Davida Malo*, Vol. 2, at 128. Malo described a society led by ruling Ali'i who were raised in the art of governance, the skills of warfare and a sense of kuleana or accountability to those they governed.

16. In his book, *Kamehameha and His Warrior Kekūhaupi'o*, Rev Stephen Desha describes the diligent and careful training of the young ali'i, Kamehameha, in the kuleana that he would assume as a ruling Mō'ī, by the warrior Kekūhaupi'o. (Kamehameha Schools Press, 2000). Early in his training, Kekūhaupi'o instructed the young Kamehameha, "E Kalani ē, cease your activity, my lord. This is not the activity which will gain you the island. Return to your war maneuvers, care for the little man and the big man, for this that you are now doing has no future, my lord." *Kamehameha and His Warrior*, at 65.

Later, as one of the ruling chiefs of Hawai'i Island, Mō'ī Kamehameha demonstrated the compassionate leadership and kuleana he had been trained to live up to by declaring the Kānāwai Māmalahoe, The Law of the Splintered Paddle. This law states, "Let the old men go and lie by the roadside, let the old women go and lie be the roadside, let the children go and lie by the roadside and no one shall harm them." *Kamehameha and His Warrior*, at 216.

17. The phrase, "koe wale no ke **kuleana** o na kanaka e noho ana ma ua mau aina la" which the government translated as "subject or reserved only to the **rights** of the tenants" is the concluding statement on the 1850 declaration by the Board of Commissioners to Quiet Land Titles establishing the Crown and Government lands. *Indices of Awards Made by the Board of Commissioners to Quiet Land Ttitles in the Hawaiian Islands, Honolulu:Star-Bulleting Press, 1929, Crown, Government and Fort Lands*, Enumerated, L.1848, at 22; C.C., at 374. This phrase reserves the rights customarily and traditionally held by Native Hawaiian ahupuaʻa tenants in the Crown and Government lands.

18. The Privy Council Records of 1850 explained that:

> [T]he king was concerned that a ʻlittle bit of land even with allodial title, if they [the people] be cut off from all other privileges would be of very little value. *Privy Council Minutes*, July 13, 1850, at 713.
>
> [The] proposition of the King, which he inserted as the seventh clause of the law, as a rule for the claims of common people to go to the mountains, and the seas attached to their own particular lands exclusively, is agreed. *Privy Council Minut*es, August 27, 1850, at 763.

These statements reveal that King Kamehameha III, cognizant of his traditional and customary kuleana to care for the well-being of his people, implemented a deliberate and extraordinary measure to provide for his people and future generations of Kānaka ʻŌiwi by including the right to enter private and public lands to gather what was needed by his people to fulfill their responsibility to care for themself, their ʻohana, their community, the ʻāina and the akua. This measure

was Section 7 of the Kuleana Act of 1850, which is currently section 7-1 of the Hawaiʻi Revised Statutes, and reads:

> Where the landlords have obtained, or may hereafter obtain, allodial titles to their lands, the people on each of their lands shall not be deprived of the right to take firewood, house-timber, aho cord, thatch, or ki leaf, from the land on which they live, for their own private use, but they shall not have a right to take such articles to sell for profit. The people shall also have a right to drinking water, and running water, and the right of way. The springs of water, running water, and roads shall be free to all, on all lands granted in fee simple; provided that this shall not be applicable to wells and watercourses, which individuals have made for their own use.

This law of King Kamehameha III provides access to the resources that the Kānaka ʻŌiwi/Native Hawaiian people customarily and traditionally relied upon for subsistence, cultural and religious purposes. It is reinforced by Article XII Section 7 of the Hawaiʻi State Constitution. This law articulates the kuleana of land owners to share the resources of their lands with the kānaka who have customarily and traditionally relied upon those resources for their own well-being as well as that of themselves and their ʻohana, community, lāhui, ʻāina and akua.

19. In 1898, Queen Lili'uokalani published her moʻolelo or history, *Hawaiʻi's Story by Hawaiʻi's Queen* (Mutual Publishing, 1898, 1990). In reference to the disposition of the Leialiʻi or Crown Lands of the Hawaiian monarchy, the Queen wrote, "For four years and more, now, these people [Provisional Government and Republic of Hawai'i] have confiscated and collected the revenues reserved from all time in order that the chief highest in rank, that is, the reigning sovereign might care

for his poorer people." *Hawai'i's Story* at 260. This statement provides insight again into the kuleana of the Aliʻi to use the resources of their landed wealth to care for the people of their Lāhui (Nation), a practice that the Provisional Government and Republic of Hawaiʻi had breached.

20. In 1920, Prince Kūhiō Kalanianaʻole introduced a bill in the U.S. Congress to set aside the Crown Lands of the Hawaiian monarchy, which the Republic of Hawaiʻi had ceded to the U.S. government, for homesteading, exclusively by Kanaka ʻŌiwi. Prince Kūhiō explained the kuleana or collective and mutual responsibility that the Hawaiian monarchy held for these lands to benefit the native Hawaiian commoners in an article he wrote for *The Mid-Pacific Magazine* in February 1921:

> The act creating the executive department contained a statute establishing a board of royal commissioners to quiet land titles. . . This board decided that there were but three classes of vested or original rights in land, which were in the King or Government, the chiefs, and the common people, and these three classes of interest were about equal in extent. . . . The common people, being left out in the division after being recognized as owners of a third interest in the kingdom, believing that new methods had to be adopted to place them in possession, assumed that these lands were being held in trust by the crown for their benefit. *Mid-Pacific Magazine*, Vol. 21, No. 2, Feb 1921, at 126.

21. A contemporary examination of kuleana is provided by Mehana Blaich Vaughan, UH-Mānoa Natural Resources and Environmental Management professor in her book, *Kaiāulu: Gathering of Tides* (OSU Press, 2018). The book investigates authority, obligations, and interdependence within the fishing communities of

Halele‘a and Ko‘olau on Kaua‘i and the responsibilities that come with being of a place. *Kaiaulu*, at 6. The book reaffirms the ongoing relevance and significance of the practice of collective kuleana among Kanaka ‘Ōiwi. As Vaughan explains:

> *Kuleana* is more than a general ethic of care for the Earth, minimizing your impact wherever you go. It encompasses distinct responsibilities to the specific places that nourish our lives and families and the right to mālama, or care for, these places. Kuleana grows from reciprocity: regulate return, cultivation of relationship, and active work to nurture abundance. Caretaking renders certain places "ours," while making us more conscious of our behavior when we are in places cared for by others. *Kaiaulu*, at 48

Vaughan noted that the communities she worked with persisted in maintaining their relationship and kuleana to sustaining the resources of their ancestral lands and nearshore ocean despite challenges. "A key motivator was working for future generations such as their own grandchildren, to have a connection and sense of *kuleana* to place." *Kaiaulu*, at 161.

22. In conclusion, in my professional opinion, I believe that the fulfillment of kuleana in its richness of meaning and practice traditionally and customarily exercised by Kānaka ‘Ōiwi Ali‘i and Mō‘ī in mutual relationship with the ‘āina, i.e., Hawai‘i's lands, ocean and natural resources, endures as an ongoing responsibility and right of Kānaka ‘Ōiwi leaders, educators, practitioners and stewards. Furthermore, this is a mutual collective responsibility, rather than an individualized responsibility, and involves mutual long-term dedication and commitment, rather than immediate exchange.

23. I further conclude, in my professional opinion that the fulfillment of Kuleana in its richness of meaning and practice traditionally and customarily exercised by Kānaka ʻŌiwi Aliʻi and Mōʻin relationship to those for whom they are responsible, endures as both a responsibility and right of Kānaka ʻŌiwi leaders, educators, practitioners and learners. Furthermore, this is a mutual collective responsibility, rather than an individualized responsibility, and involves mutual long-term dedication and commitment, rather than immediate exchange.

DATED: Honolulu, Hawaiʻi, September 15, 2026

Davianna P. McGregor

____________________________________

DAVIANNA PŌMAIKAʻI MCGREGOR

# EXHIBIT "A"

**Exhibit "A" - Curriculum Vitae**

**Davianna Pōmaikaʻi McGregor**
**1942 Naio St. / Honolulu, Hawaiʻi 96817**
**email: davianna@hawaii.edu**

**Education:** Ph.D., University of Hawaiʻi-Mānoa, Hawaiian/Pacific History, 1989

"Kupa'a I Ka 'Aina: Persistence On The Land," University of Hawai'i-Mānoa, 1989

M.A., University of Hawai'i-Mānoa, Pacific Islands Studies, 1979

"Hawaiian Resistance: 1887 - 1889," University of Hawaiʻi - Mānoa, 1979.

**Awards:** Honorary Doctorate, Social Sciences, Université Laval, Quebec, Canada June 2020**;** Na Kuaʻāina: Living Hawaiian Culture - Kenneth W. Balridge Prize for best book in any field of history written by a resident of Hawaiʻi from 2005-2007.

**Teaching Experience**: Professor Emerita, Ethnic Studies and Oral History, University of Hawaiʻi, Mānoa, 2023 to present; Ethnic Studies Program/Department, University of Hawaiʻi - Mānoa, Professor, 2005 to 2023

**Courses Taught:** ES 101 Introduction to Ethnic Studies; ES 221 Hawaiians; ES 301 Ethnic Identity; ES 310 Community, Ethnicity and Identity; ES 340 Land Tenure and Use in Hawaiʻi; ES 350 Economic Change and Hawaiʻi's People; ES 392 Change in the Pacific; ES 493 Oral History: Theory and Practice. ES 495/History 495 Hawaiian Labor History.

**Administrative Experience:** Director, University of Hawaiʻi Mānoa Center for Oral History, January 2018 to 2023.

**Published Books:** Na Kua'āina: Living Hawaiian Culture, Honolulu: UH Press, 2007, xi, 372p.

**Edited Textbook:** Our History, Our Way: An Ethnic Studies Anthology, co-edited with Gregory Y. Mark and Linda A. Revilla, Iowa: Kendall/Hunt, 1996, ix, 469p.

**Articles in Refereed Journals**: "Rethinking Asian Settler Colonialism: A Historical Perspective of Hawaiʻi Asians on Indigenous Lands," Laurel Mei-Singh, Davianna Pōmaikaʻi McGregor, American Quarterly, Volume 76, Number 3, September 2024. "The Trust of an Aliʻi: Queen Emma Kaleleonālani and Queen's Hospital," *Social Process in Hawaii*, Volume 46, December 2020.

"Statehood: Catalyst of the Twentieth Century Kānaka ʻŌiwi Cultural Renaissance and Sovereignty Movement," *Journal of Asian American Studies*, October 2010.

"Research in Action: Ethnohistory of Puna," *Social Process in Hawaii*, Volume 39, 1999.

"A Holistic Assessment Method of Health and Well-Being for Native Hawaiian Communities," with Jon Matsuoka and Luciano Minerbi, *Pacific Health Dialog*, Volume 5, 1998.

"An Introduction to the Hoa'āina and Their Rights," The Hawaiian Journal of History, Volume 30,1996.

**Articles in a Scholarly Journal:**

"Honoring and Preserving Hawaiian Cultural Landscapes," Forum Journal: Heritage in the Landscape Preservation Leadership Forum, National Trust for Historic Preservation, 31:3 (2019): 22 – 29.

**Book Chapters:**

"Chapter 23. The Preservation of Indigenous Cultures in Hawai'i" *Routledge Handbook of Race and Ethnicity in Asia*, edited by Michael Weiner, Routledge, (2022).

"Lessons from Aloha ʻĀina Activism" jointly with Noa Emmett Aluli & Rosie Alegado, The *Value of Hawaiʻi Volume 3: Hulihia, the Turning,* edited by Noelani Goodyear-Kaʻōpua, Craig Howes, Jonathan Kay Kamakawiwoʻole Osorio, and Aiko Yamashiro, Honolulu: University of Hawaiʻi Press, 2021.

"Kanaloa Kahoʻolawe: He Wahi Akua," Detours: A Decolonial Guide to Hawaii," edited by Hōkūlani K. Aikau and Vernadette Vicuna Gonzalez, Durham: Duke University Press, 2019.

"Imagine Kanaloa Kahoʻolawe," in *Indigenous Perspectives on Sacred Natural Sites: Culture, Governance and Conservation*, edited by Jonahtan Liljeblad and Bas Verschuuren, Routledge, 2018.

"Recognizing Native Hawaiians: Reality Bites," in *Sovereign Acts: Contesting Colonialism Across Indigenous Nations and Latinx America,* edited by Frances Negrón-Muntaner, University of Arizona Press, 2017.

**Grants and Contracts:**

Title: ACLS Sustaining Public Engagement Grant "Connecting Through Life Histories of Perserverance and Resilience," Co-Priniciple Investigator. Funded: American Council of Learned Societies, $61,893.00**.**

Title: 1960s to Present Hawaiʻi Labor Oral History, Co-Priniciple Investigator: May 2021 – September 30, 2022, Funded: Jack Hall Hawaiʻi Housing Corporation $25,094.00; Title: Cooperative Agreement The United States Department of Interior National Park Service and University of Hawaiʻi, Co-Principle Investigator, 2020 – 2026. Funded: National Park Service, $363,086.93

**Expert Witness:**

Qualified as an expert witness for specialized knowledge, skill, experience, training and education on traditional and customary Native Hawaiian customs and practices, especially on the perpetuation of these practices in rural Hawaiian communities

**Civil Cases:**

Arakaki v Lingle. Civil No. 02-00139 SOM-KSC; Barrett v. Cayetano. Civil No. 00-00645 SOM/UEK; Office of Hawaiian Affairs, et al vs. Housing and Community Development Corporation of Hawaii, et al, Civil No. 94-4207-11 SSM, 1994 - 2001;

Mālama Mākua v. Donald H. Rumsfeld, Civil No. 00-00813 (SOM) (LEK), 2001; Hanakeawe v. Nansay Hawaii. Inc., Civ. No. 90-316 (Haw. 3rd Cir.); Pele Defense Fund v. Campbell Estate, Civ. No. 8-089 (Haw 3rd Cir.).

**Criminal Trespass Cases:**

State of Hawaiʻi v. Kona Wong, 2021**;** State of Hawaiʻi v. Lloyd Pratt, Haw. 2012.

**Administrative Hearings:**

Nā Moku Aupuni O Ko'olau Hui Contested Case Docket DLNR Fil No. 01-05-MA 2005**;** Before the State of Hawai'i Water Commission in the Kamiloloa Aquifer Case, In re Waiola O Molokai, Docket no. CCH-MO096-11997.

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAI‘I

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSONS; I.P., B.P., E.S., by and through her next of friend and mother, K.S.; and K.S.;<br><br>Plaintiffs,<br><br>vs.<br><br>TRUSTEES OF THE ESTATE OF BERNICE PAUAHI BISHOP d/b/a KAMEHAMEHA SCHOOLS<br><br>Defendants. | CIVIL NO. 1:25-cv-00450-MWJS-RT<br><br>**CERTIFICATE OF COMPLIANCE**<br><br>Judge: Honorable Micah W.J. Smith<br>(No trial date set) |

**CERTIFICATE OF COMPLIANCE**

The undersigned hereby submits this *Certificate of Compliance* pursuant to L.R. 7.4(e) affirming this Memorandum complies with the applicable word/page limit set forth in LR 7.4(b), and the computation methods set forth in LR 7.4(d). The number of words/pages contained in the “BRIEF OF AMICI CURIAE THE QUEEN LILI‘UOKALANI TRUST, KING LUNALILO TRUST, AND QUEEN EMMA LAND COMPANY IN SUPPORT OF DEFENDANT KAMEHAMEHA SCHOOLS’ MOTION TO DISMISS FOURTH AMENDED COMPLAINT [ECF

152] [ECF 155]" is: 4,288 words, 19 pages (including the caption and the signature block for counsel of record).

Dated: Honolulu, Hawaii, October 28, 2026

/s/ *Kapono F. H. Kiakona*
KAPONO F.H. KIAKONA
H. MAXWELL KOPPER
F. PALAKIKO CHANDLER IV
Attorneys for the Amicus Curiae of
The Queen Lili‘uokalani Trust
King Lunalilo Trust
Queen Emma Land Company